## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES CONCANNON,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>LEGO Systems, Inc. and<br>LEGO A/S,<br><br>　　　　　Defendants. | Civil Action No. 3:21-CV-1678 (JBA)<br><br><br><br><br><br><br>APRIL 22, 2022 |

**DEFENDANT LEGO SYSTEMS, INC.'S *REDACTED* MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Elizabeth A. Alquist (ct15643)
Andraya Pulaski Brunau (ct29715)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103-1212
Phone: (860) 275-0100
Fax: (860) 275-0343
eaalquist@daypitney.com
abrunau@daypitney.com

*Attorneys for Defendant LEGO Systems, Inc.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND .......................................................................................... 2

STARDARD OF REVIEW ............................................................................................. 7

ARGUMENT .................................................................................................................... 8

I.   THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM
     FOR COPYRIGHT INFRINGEMENT (COUNT I) ........................................... 8

     A.   The LEGO Group of Companies Has A Valid License To Mr. Porowski's
          Likeness That Includes The Porowski Jacket ............................................. 9

     B.   The Court Should Dismiss Count I For The Separate And Independent
          Reason That The Subject Torso Element Of The Antoni Minifigure Figurine
          Is A Transformative Fair Use .................................................................... 15

          1.   The Third Fair Use Factor—The Amount And Substantiality Of The Portion
               Used—Weighs In Favor Of LSI ........................................................ 16

          2.   The First Fair Use Factor—The Purpose And Character Of The Use—
               Weighs In Favor Of LSI Because The Use Is Transformative.................. 20

          3.   The Second Fair Use Factor—The Nature Of The Copyrighted Work—Is
               Afforded Little Weight In Light of the Transformative Nature of the Antoni
               Minifigure Figurine ........................................................................ 22

          4.   The Fourth Fair Use Factor—The Effect Of The Use On The Market Or
               Value Of The Copyrighted Work—Weighs In Favor Of LSI.................. 23

II.  THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM
     FOR TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION
     (COUNT IV) ...................................................................................................... 25

     A.   Mr. Concannon Has Failed To Allege Protectable Trade Dress Due To His
          Failure To Distinctly Define His Alleged Trade Dress ............................. 27

     B.   Mr. Concannon Has Failed To Plead That His Alleged Trade Dress Has
          Acquired Secondary Meaning .................................................................. 31

     C.   Mr. Concannon Has Failed To Plead Likelihood Of Confusion .............. 35

III. THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR
     VIOLATION OF CUTPA (COUNT V) BECAUSE IT FAILS TO STATE A CLAIM
     FOR VIOLATION OF THE LANHAM ACT…………………………………..38

CONCLUSION................................................................................................................ 39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Allen v. Men's World Outlet, Inc.*,
  679 F. Supp. 360 (S.D.N.Y. 1988) ......................................................................33

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021),
  *cert. granted*, No. 21-869, 2022 WL 892102 (U.S. Mar. 28, 2022) ......................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................7, 38

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014).....................................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................7, 8, 11

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)........................................................................16, 17, 23

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)....................................................................................23

*Boisson v. Banian, Ltd*,
  273 F.3d 262 (2d Cir. 2001)...............................................................................13, 17

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*,
  87 F. Supp. 3d 499 (S.D.N.Y. 2015).......................................................................15

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...................................................................................20, 22, 24

*Cardinal Motors, Inc. v. H&H Sports Prot. USA, Inc.*,
  No. 1:20-CV-07899, 2021 WL 1758881 (S.D.N.Y. May 4, 2021) ......................26, 27, 28, 31

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)......................................................................16, 17, 19

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*,
  11 F. Supp. 3d 317 (E.D.N.Y. 2014) ......................................................33, 36, 38

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)..................................................................................4, 13

*Doctor's Assocs., Inc. v. QIP Holder LLC*,
  No. 3:06-CV-1710, 2010 WL 669870 (D. Conn. Feb. 19, 2010)............................................38

*Easter Unlimited, Inc. v. Rozier*,
  No. 18-CV-06637, 2021 WL 4409729 (E.D.N.Y. Sept. 27, 2021) ............................35, 36, 37

*Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)............................................................................................................8

*Finn v. Barney*,
  471 F. App'x 30 (2d Cir. 2012) ..........................................................................1, 3, 4, 12

*Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*,
  30 F. Supp. 3d 117 (D. Conn. 2014)..................................................................................39

*Gasery v. Kalakuta Sunrise, LLC*,
  422 F. Supp. 3d 807 (S.D.N.Y. 2019)......................................................................9, 10, 11

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
  352 F. Supp. 3d 265 (S.D.N.Y. 2018)................................................................................27

*Graham v. Prince*,
  265 F. Supp. 3d 366 (S.D.N.Y. 2017)..........................................................................17, 19

*Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*,
  No. 11-CV-01794 LTS, 2011 WL 6600267 (S.D.N.Y. Dec. 22, 2011),
  *aff'd*, 507 F. App'x 74 (2d Cir. 2013)......................................................................33, 34, 37

*Int'l Audiotext Network, Inc. v. AT & T*,
  62 F.3d 69 (2d Cir. 1995)....................................................................................................8

*Int'l Leisure Prod., Inc. v. FUNBOY LLC*,
  747 F. App'x 23 (2d Cir. 2018) .........................................................................................32

*Jorgensen v. Epic/Sony Recs.*,
  351 F.3d 46 (2d Cir. 2003)..................................................................................................8

*Kelly–Brown v. Winfrey*,
  717 F.3d 295 (2d Cir.2013).................................................................................................16

*L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*,
  79 F.3d 258 (2d Cir. 1996)...........................................................................................26, 32

*Larsen Chelsey Realty Co. v. Larsen*,
  232 Conn. 480 (1995) .........................................................................................................38

*LMNOPI v. XYZ Films, LLC*,
  449 F. Supp. 3d 86 (E.D.N.Y. 2020) ......................................................................16, 23, 25

*Lopez v. Gap, Inc.*,
    883 F. Supp. 2d 400 (S.D.N.Y. 2012)......................................................................34

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016)......................................................................34

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010)......................................................................32

*Nat'l Lighting Co. v. Bridge Metal Indus., LLC*,
    601 F. Supp. 2d 556 (S.D.N.Y. 2009)......................................................................27

*Playboy Enterps. Int'l Inc. v. Mediatakeout.com LLC*,
    No. 15-CV-7053, 2016 WL 1023321 (S.D.N.Y. Mar. 8, 2016)..............................9

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961).....................................................................................35

*Powlus v. Chelsey Direct, LLC*,
    No. 09-CV-10461, 2011 WL 135822 (S.D.N.Y. Jan. 10, 2011) ..............................8

*Sherwood 48 Assocs. v. Sony Corp. of Am.*,
    76 F. App'x 389 (2d Cir. 2003) ........................................................................26, 27

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020)....................................10, 11, 12, 17, 19, 20, 21, 22, 25

*Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*,
    25 F. Supp. 2d 154 (S.D.N.Y. 1998)........................................................................34

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014).......................................................................................15

*TCA Television Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016).....................................................................................16

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
    338 F.3d 127 (2d Cir. 2003).....................................................................................19

*Vedder Software Grp. Ltd. v. Ins. Servs. Offs., Inc.*,
    No. 1:11-CV-00369, 2013 WL 12121098 (N.D.N.Y. Mar. 22, 2013),
    *aff'd*, 545 F. App'x 30 (2d Cir. 2013)...................................................................27

*Walt Disney Co. v. Goodtimes Home Video Corp.*,
    830 F. Supp. 762 (S.D.N.Y. 1993) ..........................................................................28

*Weinstein Co. v. Smokewood Ent. Grp., LLC*,
    664 F. Supp. 2d 332 (S.D.N.Y. 2009)..................................................................9, 11

*World Trade Ctrs. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.,*
    No. 15-CV-7411, 2016 WL 8292208 (S.D.N.Y. Dec. 15, 2016) ...........................................36

**Statutes**

15 U.S.C. § 1125...................................................................................................................26

17 U.S.C. § 107.....................................................................................................................15

Conn. Gen. Stat. § 42-110a..................................................................................................38

Defendant LEGO Systems, Inc. ("LSI") respectfully submits this memorandum of law in support of its Motion to Dismiss the Second Amended Complaint filed by Plaintiff James Concannon on March 29, 2022 (ECF No. 30) (the "Second Amended Complaint").

## INTRODUCTION

On December 17, 2021, Mr. Concannon filed a Complaint (ECF No. 1) in the United States District Court for the District of Connecticut against LSI and LEGO A/S for copyright infringement, 17 U.S.C. § 101 *et seq.*, based on LSI's sale and marketing of the *Queer Eye – The Fab 5 Loft* LEGO® construction toy set (the "Queer Eye Set"). The Queer Eye Set, based on the Netflix® show Queer Eye[1], contains LEGO® Minifigure figurines in the likenesses of the show's five artists, including chef, model, and actor Antoni Porowski.

The operative complaint is the Second Amended Complaint which asserts three claims against LSI for copyright infringement, 17 U.S.C. § 101 (Count I), trade dress infringement and unfair competition, 15 U.S.C. § 1125(a) (Count IV), and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA") (Count V), based on allegations that the "jacket" worn by the Antoni Porowski LEGO® Minifigure figurine (the "Antoni Minifigure Figurine") in the Queer Eye Set infringes rights held by Mr. Concannon in certain designs that he painted, *gratis*, on a black Mackage® brand leather jacket owned by Mr. Porowski.

---

[1] More than a decade after Queer Eye for the Straight Guy—the Emmy award-winning Bravo TV reality show—went off the air, Netflix rebooted the popular Queer Eye franchise. Queer Eye, which premiered on Netflix on February 7, 2018, is now in its sixth season. *See Queer Eye (TV Series 2018 – ) IMDb*, https://www.imdb.com/title/tt7259746/ (last visited Apr. 18, 2022); *Queer Eye for the Straight Guy (TV Series 2003 – 2007) IMDb*, https://www.imdb.com/title/tt0358332/ (last visited Apr. 22, 2022); *About IMDb*, https://www.imdb.com/pressroom/about/?pf_rd_m=A2FGELUUNOQJNL&pf_rd_p=bd531ab2-71d8-49b7-8996-9c69b72c77c9&pf_rd_r=RQK6X0WK3S4M7HD9PV2W&pf_rd_s=right-1&pf_rd_t=60601&pf_rd_i=pressroom&ref_=fea_pr_pr_lk2 (last visited Apr. 22, 2022); *Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (finding that the court may take judicial notice of publicly available websites).

The Antoni Minifigure Figurine is not substantially similar to the Porowski Jacket and, should this matter proceed past the motion to dismiss stage, LSI will prevail in demonstrating that Mr. Concannon cannot prove a prima facie case for copyright infringement or trade dress infringement.  Nevertheless, the Second Amended Complaint should be dismissed as to LSI, at this stage of the litigation, pursuant to Fed. R. Civ. P. 12(b)(6) because, based on the facts alleged and documents incorporated therein by reference, it fails to state a claim upon which relief may be granted.  First, the Second Amended Complaint fails to state a claim for copyright infringement (Count I) because the LEGO Group of Companies has a valid license to Mr. Porowski's license which includes the Porowski Jacket (*see infra* at 9–14) and, separate and independent of the license, even assuming *arguendo* that Mr. Concannon could show substantial similarity, LSI's alleged use of the copyrighted work constitutes fair use (*see infra* at 15–24). Second, the Amended Complaint fails to state a claim for trade dress infringement and unfair competition (Count IV) because Mr. Concannon has failed to plead the *prima facie* elements of trade dress infringement and unfair competition.  *See infra* at 25–38.   Third, because Mr. Concannon's CUTPA claim (Count V) is based on alleged violations of the Lanham Act it must also be dismissed because the Second Amended Complaint fails to state a claim for trade dress infringement.  *See infra* at 38–39.  For these reasons, and those discussed *infra*, the Second Amended Complaint should be dismissed.

## FACTUAL BACKGROUND

The following facts—set forth in the Second Amended Complaint and documents and materials incorporated therein by reference—are assumed to be true solely for purposes of deciding LSI's Motion to Dismiss the Second Amended Complaint:

On February 7, 2018, Queer Eye launched on Netflix.  ECF No. 30 at ¶ 37; *see also supra* n.1.  A reboot of the Emmy award-winning Bravo TV reality show Queer Eye for the

Straight Guy, Queer Eye featured a brand new cast—food and wine specialist Antoni Porowski, interior designer Bobby Berk, grooming consultant Jonathan Van Ness, fashion designer Tan France, and culture expert Karamo Brown—and a new location in Atlanta, Georgia.  ECF No. 30 at ¶ 37; *see also supra* n.1.  Queer Eye quickly gained popularity.[2]

In 2018, Mr. Concannon created a "custom leather jacket" at the request of Mr. Porowski, and "gifted it to Porowski."  ECF No. 30 at ¶ 3, 41.  Mr. Porowski provided a black Mackage brand leather jacket[3] to Mr. Concannon who decorated the jacket with paint and then returned the jacket back to Mr. Porowski to have and to wear (hereinafter the "Porowski Jacket").  ECF No. 30 at ¶ 3.

After receiving the Porowski Jacket, Mr. Porowski appeared in promotional media for Queer Eye wearing the Porowski Jacket,[4] and later appeared on Queer Eye – Season 4 wearing the Porowski Jacket.  *Id*. at ¶¶ 41–43.  Mr. Concannon was happy to see his artwork in the '952 Copyright embodied in the Porowski Jacket featured on Queer Eye and was not concerned that it was featured on the show without Netflix first seeking a written license agreement specific to his

---

[2] In less than a month, Queer Eye boasted a number of celebrity fans and earned a 100% rating on Rotten Tomatoes, a website that scores television shows and movies based on the opinions of hundreds of film and television critics. *See* Steven McIntosh, *Why is Netflix's Queer Eye Connecting So Much With Viewers*, BBC News (Mar. 9, 2018), https://www.bbc.com/news/entertainment-arts-43328996 (last visited Apr. 22, 2022); *see also About Rotten Tomatoes*®, Rotten Tomatoes, https://www.rottentomatoes.com/about#whatisthetomatometer (last visited Apr. 22, 2022); *see Finn*, 471 F. App'x 30 at 32.

[3] LSI refers to the jacket as a Mackage brand leather jacket because the photographs of the subject jacket included in the Complaint, First Amended Complaint, and Second Amended Complaint include a label that says "Mackage." ECF No. 1 at ¶ 19; ECF No. 15 at ¶¶ 30, 36; ECF No. 30 at ¶¶ 41, 48.

[4] *See* YouTube, *Queer Eye: Season 3 | Official Trailer [HD] | Netflix* (Mar. 9, 2019) https://www.youtube.com/watch?v=8SZbVV6eVFk&ab_channel=Netflix (last visited Apr. 22, 2022) (the Porowski Jacket appears at timestamp 1:12 of the 2 minute promotional video for Queer Eye – Season 3); *see also* YouTube, *Queer Eye: Season 4 | Official Trailer | Netflix* (July 8, 2019) https://www.youtube.com/watch?v=eoNO6yeKGis&ab_channel=Netflix (last visited Apr. 22, 2022) (the Porowski Jacket appears at timestamp 0:08 to 0:10 of the 1 minute 49 second promotional video for Queer Eye – Season 4); *see Finn*, 471 F. App'x 30 at 32.

artwork on the Porowski Jacket.  *Id*. at ¶ 43.  Mr. Porowski wore the Porowski Jacket so much so that it became part of his iconic James Dean-like aesthetic.[5]  *See id*. at ¶ 54.

On September 24, 2020, the LEGO Group of Companies was granted a license to Mr. Porowski's likeness.  *Id.* ¶ 63.  A true and accurate copy of the license agreement between the production company for Queer Eye, Scout Productions Inc., by and through its representative, IMG Worldwide, LLC, and LEGO Systems, A/S (the "License Agreement") is attached as <u>Exhibit 1</u>.[6]  The License Agreement grants █████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████

In September 2021, LSI began marketing the Queer Eye Set in the United States.  ECF No. 30 at ¶¶ 47, 56 (images of the Queer Eye Set box); *see also* <u>Exhibit 2</u> (tangible copy of the

---

[5] *See* E. Alex Jung, *Queer Eye's Antoni Porowski Goes Deep on A Little Life*, Vulture (Feb. 23, 2018), https://www.vulture.com/2018/02/queer-eye-antoni-porowski-a-little-life.html (last visited Apr. 22, 2022) ("[Antoni's] wearing his signature Queer Eye look: a band T-shirt (Arcade Fire this time), a black leather jacket, and a smile that curls at the edges."); Alisha K. Staggers, *Why Antoni Porowski is Our Style Icon*, Grey Journal (circa 2019), https://greyjournal.net/play/style/icons/why-antoni-porowski-is-our-style-icon/ (last visited Apr. 22, 2022) (describing Antoni's "James Dean" appearance); Rachel Douglass, *Queer Eye's Antoni Drops Personal Collection in Collaboration with Wardrobe*, Fashion United (Nov. 25, 2021), https://fashionunited.com/news/fashion/queer-eye-s-antoni-drops-personal-collection-in-collaboration-with-wardrobe/2021112544013 (last visited Apr. 22, 2022) (referring to the Porowski Jacket, available to rent via joinwardrobe.com, *see infra* at n.10:  "This jacket. The brilliant James Concannon handpainted this moto jacket - it's been on Queer Eye, it's been to Congress, and it's even on a Lego. I am forever in awe of James's art and you can also find some of his painted tees in my closet."); *see Finn*, 471 F. App'x 30 at 32.

[6] The License Agreement is properly incorporated into the Second Amended Complaint by reference because Mr. Concannon relies on it as the basis of his willful infringement claim, he had notice of the existence of the License Agreement prior to filing the Complaint (ECF No. 1), and the existence of the License Agreement was integral to and relied on in framing the Second Amended Complaint.  ECF No. 30 at ¶¶ 60–66; *see Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991).

Queer Eye Set filed manually with the Court).[7]  The Queer Eye Set, available to purchase in the United States starting on October 1, 2021, includes LEGO® Minifigure figurines representing the five (5) Queer Eye artists—Jonathan Van Ness, Karamo Brown, Tan France, Bobby Berk and Mr. Porowski—as well as show participant Kathi Dooley, and dog Bruley.  ECF No. 30 at ¶¶ 4, 47, 56; *see also* Ex. 2.  Consistent with Mr. Porowski's James Dean-like aesthetic, the Antoni Porowski LEGO® Minifigure figurine (the "Antoni Minifigure Figurine") has two "outfits" (depicted below) consisting of a lower body element wearing light blue "jeans" and white "sneakers" and:  (1) a torso element wearing a white "tee shirt" and a red bandana; and (2) a torso element wearing a white "tee shirt" and a black decorated "leather" jacket  (the "Subject Torso Element").  *Id*. at ¶¶ 41, 48, 56.



---

[7] The Court may consider the Queer Eye Set at the motion to dismiss stage because the Second Amended Complaint incorporates by reference, refers to, and relies on the Queer Eye Set. ECF No. 30 at ¶ 56 (photos thereafter).

*See also* Ex. 2 (front of the Queer Eye Set box depicts the Antoni Minifigure Figurine wearing both "outfits"); *see also* Ex. 2, Building Instructions, at 1, 5, 15 (depicting the Antoni Minifigure Figurine wearing the jeans, white tee shirt, and tennis shoe "outfit"); Ex. 2, Building Instructions at 19 (depicting the Subject Torso Element on the clothing rack in the Fab 5 Loft).

One month before the Queer Eye Set went on sale, Mr. Concannon contacted the LEGO Group of Companies' customer service line seeking a free Queer Eye Set.  ECF No. 30 at ¶ 60. Almost two months later, when Mr. Concannon did not receive a free Queer Eye Set, he applied for and was granted Copyright No. VA 2-276-952 (the " '952 Copyright").  ECF No. 30-1.  The '952 Copyright protects "the artwork embodied in the [Porowski] Jacket," namely the graffiti-style paint on the black Mackage brand leather jacket.  ECF No. 30 at ¶ 41; ECF No. 30-1.

Just over two weeks later, Mr. Concannon filed the Complaint alleging the Subject Torso Element infringed the '952 Copyright.  ECF No. 1.

On February 15, 2022, Mr. Concannon amended the Complaint to add claims for trade dress infringement and unfair competition, 15 U.S.C. § 1125(a) (Count II) and violation of CUTPA (Count III), in addition to the claim for copyright infringement (Count I).  ECF No. 15.

On February 24, 2022, LSI filed a Motion for Pre-Filing Conference regarding its anticipated motion to dismiss, consistent with this Court's chambers practices.  ECF No. 16.  The Court held a pre-filing conference on March 15, 2022.  ECF No. 27.  During the conference, counsel for LSI articulated the basis for dismissal of the action as to LSI, namely, the Amended Complaint's failure to state a claim against LSI for (1) copyright infringement based on the License Agreement and because the Subject Torso Element constitutes fair use; (2) trade dress infringement and unfair competition based on the failure to define protectable trade dress and

establish a prima facie claim for trade dress infringement; and (3) violation of CUPTA because Mr. Concannon's CUTPA claim was derivative of his Lanham Act claim.  ECF No. 16.

The Court entered a scheduling order requiring Mr. Concannon to file a Second Amended Complaint—the allegations of which are 'final' as to LSI—by March 29, 2022, and LSI to file a motion to dismiss by April 22, 2022.  ECF No. 26.

On March 29, 2022, Mr. Concannon filed a Second Amended Complaint, which is the operative complaint in this Action.  ECF No. 30.  The Second Amended Complaint[8] asserts claims against LSI for copyright infringement (Count I), trade dress infringement and unfair competition (Count IV), and violation of CUTPA (Count V).  *Id.*  The Second Amended Complaint added a number of factual allegations in an attempt to define protectable trade dress, however, none of the 'new' allegations changes the outcome.  The Court should dismiss the Second Amended Complaint for failure to state a claim upon which relief may be granted.

## STANDARD OF REVIEW

"To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 677–78 (citing *Twombly*, 550 U.S. at 555–557). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and cross the line from "possibility and plausibility of 'entitle[ment] to relief.'"  *Twombly*, 550 U.S. at 555, 557 (quotation marks and alteration marks omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

---

[8] The Second Amended Complaint also added claims for contributory copyright infringement (Count II) and vicarious copyright infringement (Count III) against Defendant LEGO A/S.  ECF No. 30.

possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the complaint must be dismissed." *Twombly*, 550 U.S. at 558, 570.

Generally, when considering a motion to dismiss, "the Court is limited to facts as stated in the complaint[;]" however "it may consider exhibits or documents incorporated by reference without converting the motion into one for summary judgment." *Powlus v. Chelsey Direct, LLC*, No. 09-CIV-10461, 2011 WL 135822, at *2 (S.D.N.Y. Jan. 10, 2011) (citing *Int'l Audiotext Network, Inc. v. AT & T*, 62 F.3d 69, 72 (2d Cir. 1995)).  "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext*, 62 F.3d at 72 (quoting *Cortec Indus.*, 949 F.2d at 47).

## ARGUMENT

### I.   THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR COPYRIGHT INFRINGEMENT (COUNT I).

To establish copyright infringement, Mr. Concannon must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enterps.*, 471 U.S. 539, 548 (1985)).  "To satisfy the second element of an infringement claim—the 'unauthorized copying' element—a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Ent., Inc. v. Carol Publ'g. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).

Here, even assuming *arguendo* that Mr. Concannon could show substantial similarity between the protectable elements of the Porowski Jacket covered by the '952 Copyright and the

Subject Torso Element of the Antoni Minifigure Figurine, the allegations of the Second Amended Complaint, and documents and materials incorporated therein by reference, make clear that Mr. Concannon cannot prove the second element of copyright infringement—unauthorized copying—for two separate and independent reasons.  First, the LEGO Group of Companies has a valid license to Mr. Porowski's likeness which includes the Porowski Jacket.  Second, the Subject Torso Element of the Antoni Minifigure Figurine constitutes fair use.

        **A.**     **The LEGO Group Of Companies Has A Valid License To Mr. Porowski's Likeness That Includes The Porowski Jacket.**

The Court should dismiss Count I because the allegations in the Second Amended Complaint, and documents and materials incorporated therein by reference, demonstrate that Mr. Concannon granted a non-exclusive license to Mr. Porowski to use the Porowski Jacket as part of his likeness which rights flow to the LEGO Group of Companies via the License Agreement and Mr. Porowski's repeated wearing of the Porowski Jacket in promotional media for Queer Eye and while filming Queer Eye, and Mr. Porowski's collaboration and endorsement of the Queer Eye Set.

The Court may dismiss a claim for copyright infringement based on the existence of a license where, as here, the allegations "clearly and unambiguously demonstrates the existence of the defendant's license to exploit the plaintiff's copyrights and where plaintiff has not shown any limitation on that license."  *Playboy Enterps. Int'l Inc. v. Mediatakeout.com LLC*, No. 15-CV-7053, 2016 WL 1023321, at *2 (S.D.N.Y. Mar. 8, 2016) (quoting *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015)); *Gasery v. Kalakuta Sunrise, LLC*, 422 F. Supp. 3d 807, 817 (S.D.N.Y. 2019) (finding the complaint established an implied license); *Weinstein Co. v. Smokewood Ent. Grp.*, *LLC*, 664 F. Supp. 2d 332, 342 (S.D.N.Y. 2009) (noting the existence of a license is "a legal question that can be resolved upon a motion to dismiss").

The Second Circuit "has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," however, "courts in this Circuit have found an implied non-exclusive license where [1] one party created a work at the other's request and [2] handed it over, intending that the other copy and distribute it."  *Gasery*, 422 F. Supp. 3d at 816 (quoting *Weinstein Co.*, 664 F. Supp. 2d at 344).  The copyright owner's intent to have the recipient copy and distribute the copyrighted work is inferred where the recipient is "likely to appear 'in public, on television, in commercials, or in other forms of media'" with the artwork, as celebrities, like Mr. Porowski, often do.  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020) (quotation marks omitted).

In *Solid Oak Sketches*, the District Court for the Southern District of New York held that National Basketball Association (NBA) players Eric Bledsoe, LeBron James, and Kenyon Martin had implied non-exclusive licenses to tattoos created by tattoo artists such that the NBA players could sublicense the tattoos to whomever they wished, including the defendant companies who developed, published, and marketed an NBA basketball video game featuring the NBA players' likenesses which included reproductions of the tattoos.  The plaintiff claimed that it owned copyrights to the five tattoos depicted on NBA players Eric Bledsoe, LeBron James, and Kenyon Martin, by virtue of the tattoo artists licensing their rights to the plaintiff, and that the defendants infringed those copyrights by publicly displaying depictions of NBA players and their tattoos in their video game.  *Id.* at 339.  The court rejected this argument and agreed with the defendants that, *inter alia*, "they had an implied license to feature the [t]attoos as part of the [NBA] [p]layers' likenesses."  *Id.* at 346.  The court's reasoning is instructive:[9]

_____

[9] Although *Solid Oaks Sketches* was a summary judgment case, the decision is equally applicable here because the allegations of the Second Amended Complaint, and documents incorporated therein by reference, establish the same core facts that the *Solid Oaks Sketches* court relied on, as discussed *infra* at 12–14.

Here, the undisputed factual record clearly supports the reasonable inference that the tattooists necessarily granted the [NBA] [p]layers nonexclusive licenses to use the [t]attoos as part of their likenesses, and did so prior to any grant of rights in the [t]attoos to [p]laintiff. . . . (i) the [NBA] [p]layers each requested the creation of the [t]attoos, (ii) the tattooists created the [t]attoos and delivered them to the [NBA] [p]layers by inking the designs onto their skin, and (iii) the tattooists intended the [NBA] [p]layers to copy and distribute the [t]attoos as elements of their likenesses, each knowing that the [NBA] [p]layers were likely to appear in public, on television, in commercials, or in other forms of media.  Thus, the [NBA] [p]layers, ***who were neither requested nor agreed to limit the display or depiction of the images tattooed onto their bodies*, *had implied licenses to use the [t]attoos as elements of their likenesse***s.  Defendants' right to use the [t]attoos in depicting the [NBA] [p]layers derives from these implied licenses, which predate the licenses that Plaintiff obtained from the tattooists.

*Id.* (emphasis added) (quotation marks and citation omitted).

Here, the Second Amended Complaint and documents incorporated therein by reference establish every element of an implied license, allowing the Court to resolve this legal issue at the motion to dismiss stage.  *Twombly*, 550 U.S. at 558 (explaining that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the complaint fails to state a claim); *Weinstein Co.,* 664 F. Supp. 2d at 342 (noting that the existence of a license "is a legal question that can be resolved upon a motion to dismiss"); *Gasery*, 422 F. Supp. 3d at 817 (dismissing claim for copyright infringement based on the existence of an implied non-exclusive, which the court concluded was inferred from the parties' conduct as alleged in the complaint).

First, Mr. Porowski owned the Mackage leather jacket (*i.e.,* the undecorated Porowski Jacket) and "sent" it to Mr. Concannon to decorate.  ECF No. 30 at ¶ 41 (the Porowski Jacket "was created using a plain black leather jacket that Porowski sent to Concannon").

Second, Mr. Concannon added the graffiti-style paint to the Mackage leather jacket at the request of Mr. Porowski, and at no charge.  *Id.*; *see also id.* at ¶ 3 (Mr. Concannon created a "***custom*** leather jacket" as a "gift" for Mr. Porowski) (emphasis added).

-11-

Third, Mr. Concannon returned the decorated Porowski Jacket to Mr. Porowski in September 2018, intending that Mr. Porowski copy and distribute it. *Id.* at ¶¶ 42–43. Like *Solid Oak Sketches*, Mr. Concannon knew that Mr. Porowski was a celebrity (*id.* at ¶¶ 3, 27–30, 37, 38, 40–42), that he had previously worn clothing items decorated by Mr. Concannon in public and on television (*id.* at ¶¶ 29, 37–38) and, thus, was "likely to appear 'in public, on television, in commercials, or in other forms of media'" with the Porowski Jacket. *Solid Oak Sketches*, 449 F. Supp. 3d at 346 (quotation marks omitted). That Mr. Concannon expected the Porowski Jacket to appear in public and on television is further evidenced from the text on the back of the Porowski Jacket—"THYME IS ON MY SIDE"—which highlights Mr. Porowski's role as the food and wine expert on Queer Eye. ECF No. 30 at ¶ 32 (Mr. "Concannon used the phrase 'THYME IS ON MY SIDE' as a play on Mr. Porowski's interest in food and cooking.").

Fourth, when Mr. Porowski did appear in promotional media for Queer Eye – Season 3 (released March 4, 2019) and Queer Eye – Season 4 (released July 8, 2019) wearing the Porowski Jacket, and on television wearing the Porowski Jacket in Queer Eye – Season Four, Episode One (released on Netflix in July 2019) [10], Mr. Concannon was "happy to see his work featured on [the] show" (*id.* at ¶ 43), and was not disturbed that neither his friend Mr. Porowski, nor Netflix, sought a written release to display his "original artwork" included on the Porowski Jacket[11] before the Queer Eye trailers or episode were released. *Id.* at ¶¶ 38–40, 43. At no time

---

[10] Not only has Mr. Porowski worn the Porowski Jacket in promotional media for Queer Eye, and while filming Queer Eye, Mr. Porowski also currently rents items from his personal "closet"—including the Porowski Jacket—online via joinwardrobe.com where the Porowski Jacket is identified as a "Mackage Black Graffitied Leather Jacket," without mention of or reference to Mr. Concannon. *Black Graffitied Leather Jacket*, Wardrobe, https://www.joinwardrobe.com/items/outerwear/black-graffitied-leather-jacket (last visited April 22, 2022); *Finn*, 471 F. App'x at 32 (finding that the court may take judicial notice of publicly available websites).

[11] The '952 Copyright only protects the "2-D artwork" on the Porowski Jacket. ECF No. 30-1; ECF No. 30 at ¶ 41 ("The artwork embodied in the Concannon Jacket, pictured below, is registered with the United States Copyright Office, as reflected by Reg. No. VA0002276952"). Specifically, it protects the "[p]ictorial and graphic features identified separately from and being capable of existing independently of the utilitarian aspects of a useful article." *Id.* Additionally, the '952 Copyright does not extend to any elements original to the Mackage leather jacket as they

did Mr. Concannon notify anyone at Netflix, Scout Productions (the company that produces Queer Eye), or ITV America (Scout Productions' representative that Mr. Concannon had corresponded with in the past), or his friend Mr. Porowski, that they did not have Mr. Concannon's permission to display the Porowski Jacket in promotional material and on the show. *See generally* ECF No. 30 (containing no such allegations).

Fifth, like *Solid Oak Sketches*, Mr. Concannon does not allege that he asked Mr. Porowski, nor that Mr. Porowski agreed, to limit the display or depiction of Mr. Concannon's works on the Porowski Jacket. *See generally* ECF No. 30 (containing no such allegations).[12]

Mr. Concannon's conduct demonstrates that he conveyed a non-exclusive license to the artwork disclosed in the '952 Copyright embodied in the Porowski Jacket to Mr. Porowski to use as he wished, including as a part of his likeness, and that there was no limitation on Mr. Porowski's right to sublicense the work.[13]

Mr. Porowski's grant of an implied non-exclusive license in his likeness to Scout Productions, the production company for Netflix, which includes items from his personal wardrobe such as the "iconic" Porowski Jacket, is evidenced by Antoni's repeated wearing of the Porowski Jacket on the show and in promotional media. This use includes wearing the Porowski

---

are not original or Mr. Concannon's work, such the jacket's black color, lapels, buttons, zippers, and its general cut, shape, and design. *See Boisson v. Banian, Ltd*, 273 F.3d 262, 268 (2d Cir. 2001).

[12] LSI notes that in paragraphs 63 through 65 of the Second Amended Complaint Mr. Concannon includes improper and inaccurate summaries of settlement discussions between the parties in violation of Rule 408 of the Federal Rules of Evidence in which undersigned counsel disclosed to Mr. Concannon the LEGO Group of Companies' possession of a valid license agreement with Scout Productions.

[13] Indeed, in Mr. Concannon's November 12, 2021 letter to the LEGO Group of Companies, he repeatedly refers to the Porowski Jacket as Mr. Porowski's "iconic" leather jacket thereby conceding that the Porowski Jacket is synonymous with Mr. Porowski's image. A true and correct copy of Mr. Concannon's November 12, 2021 letter, attached hereto as Exhibit 3, and may be considered by the Court at motion to dismiss stage. The letter is incorporated into the Second Amended Complaint by reference because Mr. Concannon relies on the letter as the basis of his willful infringement claims, he had actual notice of the document and it was integral to and relied on in framing the Second Amended Complaint. ECF No. 30. at ¶¶ 61, 63, 65, 70; *Cortec Indus.*, 949 F.2d at 44.

Jacket in promotional videos for Queer Eye – Season 3 and Queer Eye – Season 4 (*see supra* at n.4) and while filming Queer Eye – Season 4 (ECF No. 30 at ¶ 43).  It is also evidenced by Mr. Porowski's participation in and endorsement of the Queer Eye Set—developed as part of the "special partnership" between LEGO System A/S, Scout Productions, and the Queer Eye artists—which includes the Antoni Minifigure Figurine with the Subject Torso Element.[14]  ECF No. 30 at ¶ 56; Ex. 2, Building Instructions, at 93 (Antoni Porowski:  "Growing up LEGO® was my very favorite toy. I would build cities, pirate ships, destroy them, then start all over again. It's pretty incredible to think that young kids will not have LGTBQ+ options to play and build with. *I'm honored to be part of this special partnership*. Ten-year old Antoni is internally screaming." (emphasis added)).

Further emphasizing the LEGO Group of Companies' right to use Mr. Porowski's likeness, which includes the Porowski Jacket, is the License Agreement.  *See* Ex. 1.  The License Agreement grants ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████

The facts alleged in the Second Amended Complaint and documents incorporated therein by reference clearly demonstrate the LEGO Group of Companies has a license to the artwork

---

[14] The Building Instructions for the Queer Eye Set are properly incorporated by reference into the Second Amended Complaint because paragraph 56 includes a link to the listing for the Queer Eye Set on the LEGO website which website includes, *inter alia*, photographs of the set and the building instructions for the set.  *See* ECF No. 30 at ¶ 56 (citing https://www.lego.com/en-us/product/queer-eye-the-fab-5-loft-10291?p=10291&cmp=socialn4r7lm-SHOP).

disclosed in the '952 Copyright and embodied in the Porowski Jacket and, therefore, Count I fails to state a claim of copyright infringement against LSI and must be dismissed.

**B.**     **The Court Should Dismiss Count I For The Separate And Independent Reason That The Subject Torso Element Of The Antoni Minifigure Figurine Is A Transformative Fair Use.**

The Court should also dismiss Count I for the separate and independent reason that the Subject Torso Element of the Antoni Minifigure Figurine is a transformative fair use of Mr. Concannon's artwork in the '952 Copyright embodied in the Porowski Jacket.

"[T]he fair use of a copyrighted work . . . is not an infringement of copyright."  17 U.S.C. § 107.   In determining whether the use of a copyrighted work constitutes "fair use" courts consider four factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id*.  "Though mandatory, these four factors are non-exclusive." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014).   "Moreover, '[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor.'"  *Id*. (alteration in original) (quoting *NXIVM Corp. v. Ross Inst*., 364 F.3d 471, 476–77 (2d Cir. 2004)).   "Rather, '[a]ll [factors] are to be explored, and the results weighed together, in light of the purposes of copyright.'"   *Id*. (alteration in original) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)).

Fair use is an affirmative defense that is properly considered at the motion to dismiss stage where, as here, the allegations of the complaint demonstrate fair use.  *BWP Media USA,*

*Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015) (citing cases); *see also Kelly–Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir.2013) (recognizing that affirmative defenses, such as fair use, may be decided at the motion to dismiss stage where the facts needed to establish fair use are evident from the complaint).  While seven years ago, there were few cases dismissing a copyright infringement claim for fair use, dismissal is appropriate where, as here, fair use is "so clearly established by a complaint as to support dismissal of a copyright infringement claim."  *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016); *see also LMNOPI v. XYZ Films, LLC*, 449 F. Supp. 3d 86, 93 (E.D.N.Y. 2020) (dismissing the complaint where it plead facts sufficient to establish the defendant's use was transformative).

Here, consideration of each of the fair use factors demonstrates that dismissal is appropriate.  LSI beogins with the third fair use factor—the amount and substantiality of the portion of the copyrighted work used—because visual comparison of the photographs of the material registered in the '952 Copyright and the Subject Torso Element of the Antoni Minifigure Figurine included in the Second Amended Complaint show little, if any, overlap. Indeed, the Subject Torso Element includes designs *not* included in the '952 Copyright.

### 1.      The Third Fair Use Factor—The Amount And Substantiality Of The Portion Used—Weighs In Favor Of LSI.

"The third fair use factor asks the court to examine 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole.'"  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (quoting 17 U.S.C. § 107(3)).  "The court must examine the quantitative and qualitative aspects of the portion of the copyrighted material taken."  *Id.* (quoting *Campbell*, 510 U.S. at 586).  In so doing, the court "consider[s] not only the quantity of the materials taken but also their quality and importance to the original work." *Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013).  "[T]he law does not require that the

secondary artist may take no more than is necessary." *Id.* "The secondary use must be permitted to conjure up at least enough of the original to fulfill its transformative purpose." *Id.* (quotation marks and alteration marks omitted). "[C]ourts have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham Archives*, 448 F.3d at 613.

In *Solid Oak Sketches*, the court found that the defendants copied two tattoos "in their entirety" but because, *inter alia*, "[d]efendants did so in order to effectuate the transformative purpose of creating a realistic [video] game experience," and "reduced in size" the tattoos, this factor weighed in favor of transformative use. *Solid Oak Sketches*, 449 F. Supp. 3d at 349; *see also Graham v. Prince*, 265 F. Supp. 3d 366, 383 (S.D.N.Y. 2017) ("[W]here a defendant used plaintiff's 'images in their entirety,' but displayed them in 'the *minimal* image size and quality necessary to' effectuate defendant's transformative purpose." (quotation marks omitted)).

Here, visual comparison demonstrates that the "jacket" on the Subject Torso Element of the Antoni Minifigure Figurine did not copy the works registered in the '962 Copyright "in their entirety," and any similarity was necessary to effectuate the transformative purposes of creating a realistic Minifigure figurine version of Mr. Porowski and his James Dean-like appearance.

*First*, the front of the "jacket" on the Subject Torso Element includes two designs— (1) an artistic rendering of a LEGO Minifigure figurine head; and (2) a globe—that are <u>not</u> in the '952 Copyright.

*Second*, the yang symbol and safety pins—both of which are in the public domain—on the front of the Subject Torso Element are not "blatant cop[ies]" of the '952 Copyright.[15]   The

---

[15] Both the yin-yang symbol and safety pins are within the public domain and cannot enjoy copyright protection. *See Boisson*, 273 F.3d at 268–69 ("Some material is unprotectible because it is in the public domain, which means that it 'is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work'" (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992)).

'952 Copyright includes a three-dimensional ying-yang pin (within the black yin symbol there is a white smile face; within the white yang symbol there is a black frown face) on the left lapel of the Porowski Jacket and eight safety-pins below the right lapel.  *See* ECF No. 30 at ¶ 48 (side-by-side photographs of the front of the Porowski Jacket and the Subject Torso Element).   In contrast, the "jacket" on the Subject Torso Element contains only a one-dimensional yang symbol (with a straight face) and four safety pins of a different design.

*Third*, the peace sign—which is also in the public domain—on the front of the "jacket" of the Subject Torso Element also is not a "blatant copy" of the '952 Copyright.  The peace sign symbol on the Subject Torso Element uses different colors (gray and white; not black and white), is in a different location than on the Porowski Jacket and, significantly, does not include the text "1967 IS DEAD" above the peace sign, the shaded white border around the peace sign, or the text "FAILED" in the upper sections of the peace sign.  *See* ECF No. 30 at ¶ 48.

*Fourth*, the text on the back of the "jacket" on the Subject Torso Element is a phrase—"REBUILD THE WORLD"—which is proprietary to the LEGO Group of Companies, which owns a common law trademark in the slogan which it has used in commerce since at least September 16, 2019.[16]  Unlike the back of the Porowski Jacket, which features the white text "THYME IS ON MY SIDE" surrounded by a black and white painted design utilizing the word "THYME," the Subject Torso Element has light gray text with a solid dark grey border.  *Lastly*, the designs on the sleeves of the Porowski Jacket, as well as the hands and chain on the lower

---

[16] The LEGO Group of Companies launched the Rebuild the World global brand campaign in 2019 to "celebrat[e] the natural creativity of children" and "to encourage kids around the world to develop and retain these skills as they grow older. With this campaign, we want to inspire people of all ages to play and unleash their creativity to create a world of infinite possibilities."  *The LEGO Group with Mark Ronson Inspire Kids to Rebuild the World*, LEGO (Sept. 16, 2019)  https://www.lego.com/en-us/aboutus/news/2019/september/rebuild-the-world/ (last visited Apr. 22, 2022).

right of the front of the Porowski jacket, included in the '952 Copyright are in no way represented on the Subject Torso Element.

*Finally*, even if the Court were to find some similarity between the yang symbol, safety pins and peace sign[17] on the "jacket" of the Subject Torso Element and the '952 Copyright, the designs on the Subject Torso Element (which torso is less than one inch tall) are significantly smaller than the designs on the Porowski Jacket, such that the yang symbol, peace sign are hardly discernable. *Solid Oak Sketches*, 449 F. Supp. 3d at 349; *Graham*, 265 F. Supp. 3d at 383. Moreover, inclusion of these elements embodying world peace (yang symbol and peace sign) and building (safety pins) are central to the LEGO Group of Companies' Rebuild the World Campaign (discussed *supra* at n.16) and the goal of creating a LEGO set that inspires all children, including LGTBQ+ children, to have a role in shaping the world, similar to the way that the artists on Queer Eye, like Mr. Porowski, help people overcome obstacles and rebuild their image.

Clearly, the Antoni Porowski Minifigure Figurine "conjure[d] up at least enough of the original to fulfill its transformative purpose" of accurately depicting Mr. Porowski's likeness in the Queer Eye Set. *Cariou*, 714 F.3d at 710. This factor weighs in favor of transformative use.

---

[17] In *Tufenkian*, the Second Circuit held that while "all creative works draw on the common wellspring that is the public domain[,]" a court must factor out elements in the public domain, "[f]or copying is not unlawful if what was copied from the allegedly infringed work was not protected, for example, if the copied material had itself been taken from the public domain." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc*., 338 F.3d 127, 132, 135 (2d Cir. 2003). The court must therefore "take[] care to identify precisely the particular aesthetic decisions—original to the plaintiff and copied by the defendant—that might be thought to make the designs similar in the aggregate." *Id*. at 134. While in *Tufenkian* the aesthetic decisions were copied, the court acknowledged that its finding may be different in "a case in which the defendant's new elements 'blot out' or otherwise so thoroughly obscure copied original expression as to render the copying insignificant and the defendant's product noninfringing." *Id*. at 137 n. 14. The present action is such a case because, as noted, the Subject Torso Element only used elements in the public domain that lacked the aesthetic decisions of Mr. Concannon, and designs/phrases that were proprietary to the LEGO Group of Companies such as the Minifigure figurine head and the Rebuild the World slogan.

## 2. The First Fair Use Factor—The Purpose And Character Of The Use—Weighs In Favor Of LSI Because The Use Is Transformative.

"The first factor in a fair use enquiry is 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" *Campbell*, 510 U.S. at 578 (quoting 17 U.S.C. § 107).  The purpose of this investigation is to examine  "whether the new work merely supersedes the objects of the original creation" or whether the new work "instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Id*. at 579 (quotation marks and alteration marks omitted).  "Although such transformative use is not absolutely necessary for a finding of fair use . . . the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id*.  Notably, where **the work was** "**not included for their expressive value**, **but rather to most accurately recreate** [**a**] **certain** [**individual's**] **likeness**[,]" **the use is** "*entirely different*[.]"  *Solid Oak Sketches*, 449 F. Supp. 3d at 347–48 (emphasis added).

*Solid Oak Sketches* is determinative on this factor.  There, the defendants used exact copies of the tattoo artists' designs that were tattooed on the NBA players featured in the defendants' video game.   *Id*. at 347.   The court concluded that the defendants' use was transformative because "[t]he [t]attoos were originally created as a means for the [NBA] [p]layers to express themselves through body art" whereas the "[d]efendants reproduced the [t]attoos in the video game in order to most accurately depict the [NBA] [p]layers." *Id*. (noting "[t]he uncontroverted evidence thus shows that the [t]attoos were included in NBA 2K for a purpose—general recognizability of game figures as depictions of the [p]layers—different than that for which they were originally created").

-20-

Here, like *Solid Oak Sketches*, the artwork that Mr. Porowski asked Mr. Concannon to add to the Mackage leather jacket was done as a means of Mr. Porowski's self-expression, in the same way that a person may commission a tattoo or particular hair design as a means of self-expression.  Mr. Concannon added "his original artwork" to the Mackage leather jacket in a way that "incorporate[ed] elements personal to Mr. Porowski[,]" such as his "interest in food and cooking."  ECF No. at ¶¶ 32, 41.  Further, Mr. Concannon claims that his designs were meant to "criticize mainstream pop culture through satirical phrases and puns handwritten in graffiti lettering."  *Id*. at ¶ 31.  In contrast, the purpose of the Subject Toro Element of the Antoni Minifigure figurine is "to most accurately depict" Mr. Porowski's likeness.  *Solid Oak Sketches*, 449 F. Supp. 3d at 347–48; ECF No. 30 at ¶¶ 4, 48, 56.

Further, like *Solid Oak Sketches*, the "jacket" on the Subject Torso Element of the Antoni Minifigure Figurine arguably represents "an inconsequential portion of" the Queer Eye Set. *Solid Oak Sketches*, 449 F. Supp. 3d at 348.  The Subject Torso Element is one of two torso elements included for the Antoni Minifigure Figure shown on the packaging and included in the Queer Eye Set.  Ex. 2; *see also* ECF No. 30 at ¶ 56.  The Antoni Minifigure Figurine is one of six LEGO Minifigure Figurines included in the set, and the Subject Torso Element is one of hundreds of LEGO construction elements in the Queer Eye Set.  Ex. 2.

 Finally, while the Subject Torso Element has been featured in the marketing of the Queer Eye Set, Mr. Concannon's alleged designs are not on the Subject Torso Element and the "images are merely 'incidental to the commercial . . . value of the [set]' because 'consumers do not buy [LEGO construction sets] for the" drawings on Mr. Porowski's jacket.  *Solid Oak Sketches*, 449 F. Supp. 3d at 348 (quotation marks and ellipsis omitted).  Unlike *Solid Oak Sketches*, as discussed *supra*, the Subject Torso Element does not copy the '952 Copyright,

which extends only to the artwork embodied in the Porowski Jacket.  Rather, as discussed *supra*, the Subject Torso Element includes designs featuring various elements *not* featured in the '952 Copyright or the Porowski Jacket.  ECF No. 30 at ¶¶ 4, 48, 56.

Because the Subject Torso Element of the Antoni Minifigure Figurine was created without the artwork protected by the '952 Copyright for the transformative purpose of accurately recreating Mr. Porowski's likeness, it is immaterial that the Antoni Minifigure Figurine with the Subject Torso Element is featured on the box of the Queer Eye Set and the LEGO Group of Companies' social media.

The first fair use factor weighs in favor of LSI because the purpose and character of use was transformative as the purpose of the Antoni Minifigure Figurine is to accurately recreate Mr. Porowski's likeness.  ECF No. 30 at ¶ 54 (Mr. Porowski "has a really iconic leather jacket that we redid in LEGO version").

> **3.      The Second Fair Use Factor—The Nature Of The Copyrighted Work—Is Afforded Little Weight In Light Of The Transformative Nature Of The Antoni Porowski Minifigure Figurine.**

The second fair use factor—the nature of the copyrighted work—"draws on . . . the value of the materials used." *Campbell*, 510 U.S. at 586 (quotation marks omitted).  "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Id.*  In evaluating the second factor, the Court must consider:  (1) whether the Copyrighted work "is 'expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational; and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.'" *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26,

45 (2d Cir. 2021) (alteration in original) (quoting *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006)), *cert. granted*, No. 21-869, 2022 WL 892102 (U.S. Mar. 28, 2022). "[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives*, 448 F.3d at 612 (citing *Campbell*, 510 U.S. at 586).

In *Bill Graham*, while the defendant's use was a creative work, it was also transformative because it was used "for the transformative purpose of enhancing the biographical information provided in *Illustrated Trip*." *Bill Graham Archives*, 448 F.3d at 612. Therefore, "even though [the plaintiff's] images are creative works, which are a core concern of copyright protection, the second factor has limited weight in our analysis because the purpose of [the defendant's] use was to emphasize the images' historical rather than creative value." *Id.* at 612–13.

The works in the '952 Copyright are expressive, however, the Porowski Jacket was published on September 14, 2018, years before Mr. Concannon applied to register the '952 Copyright, limiting the weight this factor should carry. ECF No. 30-1; *see also Bill Graham Archives*, 448 F.3d at 612. The weight accorded to this factor is further limited because the purpose of the Antoni Minifigure Figurine is factual, transformative, and not "to exploit its creative virtues" but to accurately recreate Mr. Porowski's likeness. *Blanch*, 467 F.3d at 257; *Bill Graham Archives*, 448 F.3d at 612–13; *LMNOPI*, 449 F. Supp. 3d at 94 n.6 ("Courts in the Second Circuit have rarely ascribed significance to the nature of the work, especially when a use has already been deemed transformative") (citations omitted).

### 4.    The Fourth Fair Use Factor—The Effect Of The Use On The Market Or Value Of The Copyrighted Work—Weighs In Favor Of LSI.

"The fourth fair use factor is 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). It requires consideration of "not only the extent of market harm caused by the particular actions of the

alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Id*. (quotation marks and ellipsis omitted).

"[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: **the harm that results because the secondary use serves as a substitute for the original work**." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) (emphasis added) (quoting *Campbell*, 510 U.S. at 591). "[U]nder Factor Four, any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." *Id*. (citing *Bill Graham*, 448 F.3d at 614). Therefore, where the use is transformative, any evidence of lost licensing revenues is irrelevant. *See id*. at 99–100.

There are no allegations that the Subject Torso Element of the Antoni Minifigure Figurine serves as a substitute for the original work, nor could there be as the former is a children's construction toy figurine and the latter is a men's leather jacket, with the two works having drastically different audiences, namely the in the "global toy market" on the one hand (ECF No. at ¶ 53), and underground men's fashion on the other hand. Further, there are no allegations in the Second Amended Complaint to support a conclusion that Mr. Concannon would or could enter the global toy market, such that there would be overlap in the markets for the two works.[18] *See, e.g., LMNOPI*, 449 F. Supp. 3d at 94 (dismissing the plaintiff's complaint where the defendant's use of the plaintiff's work was transformative and the secondary use would not usurp the market because of drastically different target audiences); *Solid Oak*

---

[18] Mr. Concannon claims he "is a multi-disciplinary artist who specializes in the infiltration and subversion of pop culture." ECF No. 30 at ¶ 18. Mr. Concannon sells his clothing, jackets, and accessories through his website. *Id*. at ¶ 19. His products are worn by those who wish to "comment satirically on punk rock and pop culture" and his consumers include "celebrities and non-celebrities alike, [requesting] custom Concannon Products." *Id*. at ¶ 24. Noting in the Second Amended Complaint suggests Mr. Concannon intends to enter the "global toy market".

*Sketches, LLC*, 449 F. Supp. 3d at 350 (the hypothetical market was the tattoos on the NBA players in video games, not the tattoos by the artist generally).

Considering all of the factors, the allegations of the Second Amended Complaint, documents incorporated therein by reference, and public sources demonstrate the purpose of the Subject Torso Element of the Antoni Minifigure Figurine is transformative fair use, and that the Court should dismiss Mr. Concannon's copyright infringement claim (Count I).

## II.   THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION (COUNT IV).

The Court should dismiss Count IV because the allegations of the Second Amended Complaint fail to establish the elements of protectable trade dress and fail to state a claim against LSI for trade dress infringement and unfair competition under the Lanham Act.

The Lanham Act provides that

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  "The protection against unregistered trademark infringement extends to 'trade dress,' . . . , which encompasses the design and appearance of a product along with all the elements that serve to identify the product to consumers."  *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (citation omitted).

Trade dress "is 'essentially [the] total image and overall appearance' of a product." *L. & J.G. Stickley*, *Inc. v. Canal Dover Furniture Co.*, 79 F.3d 258, 262 (2d Cir. 1996) (quotation marks and alteration marks omitted). "It is a broad concept that encompasses a product's look— its overall design, and all the elements that make up its total appearance—which makes the product identifiable to consumers." *Cardinal Motors, Inc. v. H&H Sports Prot. USA*, *Inc.*, No. 1:20-CV-07899, 2021 WL 1758881, at *2 (S.D.N.Y. May 4, 2021) (quoting *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 274–75 (S.D.N.Y. 2018)). "A product's trade dress includes 'features such as size, shape, color or color combinations, texture, or graphics.'" *Id.* (quoting *Eliya*, *Inc. v. Kohl's Dep't Stores*, No. 06-CV-195, 2006 WL 2645196, at *2 (S.D.N.Y. Sept. 13, 2006)).

"'Trade dress generally falls into one of two categories: product packaging or product design.'" *Id.* at *3 (quoting *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 537 (S.D.N.Y. 2011)). "Product packaging is the dressing, or packaging, of a product, . . . . and includes elements such as a label, package, and display card." *Id.* (citations, quotation marks and alteration marks omitted). "Product design, by contrast, refers to the design or configuration of the product itself." *Id.* (quotation marks omitted).

"To plead a claim of trade dress infringement involving the appearance of a product, Property Owners must allege that (1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning;[19] and (3) there is a likelihood of confusion between the plaintiff's good and the defendant's." *Sherwood 48 Assocs.*, 76 F. App'x at 391 (citing *Yurman Design*, *Inc. v. PAJ*, *Inc.*, 262 F.3d 101, 115–16 (2d Cir. 2001)). "A plaintiff must also offer 'a

---

[19] "Secondary meaning is synonymous with acquired distinctiveness and occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Cardinal Motors*, 2021 WL 1758881, at *3 n.3 (alteration in original) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000)) (internal quotation marks omitted).

precise expression of the character and scope of the claimed trade dress.'" *Id*. (quoting *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 381 (2d Cir. 1997)). "[T]he 'focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress.'" *Id*. (quoting *Landscape Forms*, 113 F.3d at 381).

### A.   Mr. Concannon Has Failed To Allege Protectable Trade Dress Due To His Failure To Distinctly Define His Alleged Trade Dress.

"Failing to identify the specific elements that make up a purported trade dress may signal to the court that a plaintiff's claim is pitched at an improper level of generality, *i.e*., the claimant seeks protection for an unprotectible style, theme or idea." *GeigTech*, 352 F. Supp. 3d at 274–75 (quoting *Yurman Design, Inc.*, 262 F.3d at 117). "Therefore, describing a trade dress in general terms or broad categories is not sufficient to state a claim for trade dress infringement." *Id*. "A trade dress infringement claimant must enumerate which features of its purported dress are distinctive and indicate *how* they are distinctive." *Id*. (emphasis added); *accord Nat'l Lighting Co. v. Bridge Metal Indus*., *LLC*, 601 F. Supp. 2d 556, 562 (S.D.N.Y. 2009); *Vedder Software Grp. Ltd. v. Ins. Servs. Offs*., *Inc*., No. 111CV00369GTSCFH, 2013 WL 12121098, at *10 (N.D.N.Y. Mar. 22, 2013), *aff'd* 545 F. App'x 30 (2d Cir. 2013).

Vague, generic, and imprecise allegations are insufficient to state a claim for trade dress infringement. *Cardinal Motors*, 2021 WL 1758881, at *4. Definitions of trade dress elements that include "and/or" modifiers, refer to categories of features, or include terms that are "'subjective descriptors like a 'pleasing appearance' or an 'aesthetic proportion,' and avoid defining its trade dress in terms of alternative or 'optional' features" will not "withstand a Rule 12(b)(6) motion." *Id*. at *3–4 (quotation marks omitted).

Additionally, where the plaintiff seeks protection for a line of products, "the plaintiff must also show that the look of each product in the line is consistent; and courts are more wary of granting trade dress protection to a line of products, for fear of inhibiting competition." *Id.* at *4.

The United States District Court for the Southern District of New York's decision in *Walt Disney Co. v. Goodtimes Home Video Corp.*, is instructive and demonstrates the high bar of consistency amongst products that is required. 830 F. Supp. 762, 767 (S.D.N.Y. 1993). The court examined each element of the alleged trade dress and noted the lack of consistency among several elements. *Id.* While dominant components may have been similar, the court noted differences in the titles of the products, such as differences in size, style, placement and color, and that the use of the word "classic" was not consistent. *Id.* at 767–68. While each cassette tape had a scene from the film, the placement and size of the characters depicted varied. *Id.* While the color blue was used in the background of each cassette tape, the shade of blue was not consistent. *Id.*

Although *Walt Disney Co.* concerned product packaging, rather than product design, courts in the Second Circuit apply a stricter analysis to trade dress claims for a line of product design. *E.g.*, *Cardinal Motors*, 2021 WL 1758881, at *4 n. 5 ("Courts also have a heightened concern for respecting market competition where, as here, the plaintiff claims protection for a product design rather than for product packaging. This is because product designs are 'almost invariably' intended not to identify the source of the product, but to make it 'more useful or more appealing,' so granting trade dress protection to a product design threatens to impermissibly inhibit competition" (citation and quotation marks omitted)).

-28-

Here, Mr. Concannon has failed to distinctly define his alleged trade dress because: (1) he does not articulate a single definition; (2) the terms he attempts to use are generic and not sufficiently specific; and (3) he has not established consistency amongst Concannon Products.

*First*, Mr. Concannon's definition of his alleged trade dress changes no less than six (6) times throughout the Second Amended Complaint.  Namely:

1.  "Concannon has achieved notoriety as the creator of a popular line of t-shirts, jackets, and accessories ('Concannon Products'), which are instantly recognizable as Concannon Products because they feature ***short, provocative statements*** in hand-painted, graffiti-style lettering." ECF No. 30 at ¶ 19.

2.  "The ***unique combination of provocative, tongue-in-cheek phrases relating to pop culture***, with hand-painted, graffiti-style lettering on the Concannon Products (Concannon's 'Trade Dress') is not only a hallmark of Concannon's aesthetic . . ." *Id.* at ¶ 20.

3.  Concannon Products "***comment satirically on punk rock*** and pop culture[.]" *Id.* at ¶ 24.

4.  "Concannon's Products all uniformly ***criticize mainstream pop culture*** through satirical phrases ***and puns*** handwritten in graffiti lettering. Concannon customizes pieces by choosing ***words or phrases that are tailored to a customer's interest***." *Id.* at ¶ 31.

5.  "[A] genuine Concannon Product would . . . customiz[e] the phrase to evoke the 'customer's' interests." *Id.* at ¶ 51.

6.  "[T]he phrase 'REBUILD THE WORLD' on the Lego version of the jacket, is exactly the type of ***pop culture pun*** that would be included on a genuine Concannon Product bearing the Trade Dress[.]" *Id.*

7.  And finally, under Count IV, the "unique combination of provocative, tongue-in-cheek phrases related to pop culture, with hand-painted, graffiti-style lettering. . . is distinctive of Concannon Products[.]" *Id.* at ¶ 105.

When referencing the Porowski Jacket, which states "THYME IS ON MY SIDE", Mr. Concannon refers to his trade dress as "uniformly criticiz[ing] mainstream pop culture through satirical phrases and puns handwritten in graffiti lettering." *Id.* at ¶¶ 30, 31.   Perhaps realizing that THYME IS ON MY SIDE does not "criticize main stream pop culture" or

"comment satirically on punk rock", Mr. Concannon then changes his claimed trade dress, again, broadening it to include "phrases that are tailored to a customer's interest." *Id*. at ¶ 31. Indeed, "Concannon used the phrase 'THYME IS ON MY SIDE' as a play on Mr. Porowski's interest in food and cooking." *Id*. at ¶ 32.

Even if the Court were to credit the many (and inconsistent) definitions of the asserted trade dress, the Second Amended Complaint does not set forth a claim for trade dress infringement upon which relief may be granted. In asserting that the Subject Torso Element's use of the phrase "Rebuild the World" falls within the scope of Mr. Concannon's alleged trade dress, the Second Amended Complaint alleges that this "is exactly the type of ***pop culture pun*** that would be included on a genuine Concannon Product bearing the Trade Dress[.]" *Id*. at ¶ 51. Not only is this conclusory allegation at odds with the claimed trade dress asserted in Count IV, such claim fails because the claimed dress is limited to clothing and the Subject Torso Element of the Antoni Minifigure Figurine is used in an entirely different class of goods, namely construction toys. *Id*. at ¶ 21 ("Concannon's use of provocative, tongue-in-cheek phrases relating to pop culture, in hand-painted, graffiti-style lettering on ***t-shirts and jackets*** is entitled to common law trademark and trade dress protection. ***Clothing*** that embodies these elements are immediately recognizable to the public as Concannon Products") (emphasis added).

*Second*, Count IV should be dismissed because the (many) definitions of the asserted trade dress alleged in the Second Amended Complaint are impermissibly vague and fail to distinctly define Mr. Concannon's alleged trade dress. Importantly, the attempts to define the asserted trade dress merely list several categories that *could* cover the works, such as, "tongue-in-cheek phrases" or "pop culture pun" fail to provide sufficient detail such that someone could discern whether a work falls within this definition. Even "graffiti" is defined categorically as an

-30-

"usually unauthorized writing or drawing on a public surface," which arguably does not apply to the "Concannon Products."   Finally, "provocative" and "tongue-in-check" are entirely subjective, which cannot withstand a Rule 12(b)(6) motion. *Cardinal Motors, Inc.*, 2021 WL 1758881, at *4.

*Third*, Mr. Concannon has failed to establish the requisite consistency required for a line of products.   ECF No. 30 at ¶¶ 19–23.   As in *Walt Disney Co.*, the works Mr. Concannon identifies to support his claim of trade dress protection are vastly different.   *Id*. at ¶¶ 19, 26–27, 41.   The text color, length, and style all differ amongst the pictures.   *Compare* "DRINK IGGY POP" *Id*. at ¶ 19.   *with* "CRY ME A RIVER PHEONIX" *and* "PURPLE RAIN" *Id*. at ¶ 26. Finally, the subject matter of the text varies greatly and lacks consistency, ranging from the single phrase "CONTROL" to composite phrases "JAMES DEAN SPEED QUEEN" and "THYME IS ON MY SIDE." *Id*. at ¶¶ 19, 41.

Mr. Concannon has therefore failed to distinctly define his asserted trade dress and Count IV of the Second Amended Complaint must be dismissed

### B.   Mr. Concannon Has Failed To Plead That His Alleged Trade Dress Has Acquired Secondary Meaning.

Count IV should be dismissed for the separate and independent reason that the Second Amended Complaint fails to set forth sufficient allegations to show that the asserted trade dress has acquired secondary meaning.

"In order to prevail on a trade dress claim under § 43(a) of the Lanham Act, a party must first show that the trade dress is inherently distinctive or has become distinctive because it has acquired secondary meaning." *L. & J.G. Stickley*, 79 F.3d at 262.   "[T]he threshold inquiry is distinctiveness: whether the trade dress identifies the producer." *Id*.   "A trade dress may identify the producer in one of two ways: a product either may be inherently distinctive or it may acquire

-31-

distinctiveness by gaining in the mind of consumers a secondary meaning associating the trade dress with the product's source." *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)).  "An inherently distinctive trade dress is one that is likely to serve primarily as a designator of origin of the product, . . . taking into account the nature of the designation and the context in which it is used."  *Id.* (citations and quotation marks omitted).  "[A]n unregistered design-based trade dress cannot be inherently distinctive, . . . a plaintiff seeking to protect such a trademark must establish distinctiveness based on an acquired secondary meaning."  *Int'l Leisure Prod., Inc. v. FUNBOY LLC*, 747 F. App'x 23, 26 (2d Cir. 2018) (citation omitted).[20]

The Second Circuit has set forth six factors that courts may consider in determining whether a mark has acquired secondary meaning: "(1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to a source."  *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 314–15 (S.D.N.Y. 2010) (citing *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)). While "'[n]o single factor among the six is determinative, and every element need not be proved[,]'" *id.* at 315 (quotation marks omitted), it is insufficient for a plaintiff to claim "secondary meaning, without offering evidence for this proposition[.]" *Allen v. Men's World Outlet, Inc.*, 679 F. Supp. 360, 366 (S.D.N.Y. 1988).

Simply claiming that a product "line has been purchased by celebrities, featured in various magazines, and commissioned for use in the decoration of public and private spaces" is insufficient to plead secondary meaning.  *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, No. 11-CV-01794, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011), *aff'd*, 507 F. App'x 74 (2d

---

[20] Mr. Concannon also does not claim that his trade dress is inherently distinctive.  *See generally* ECF No. 30.

Cir. 2013).   Blanket assertions of high sales similarly are insufficient to plead secondary meaning.  *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 344 (E.D.N.Y. 2014).   Rather, the plaintiff must provide details of consumer identification.   *Id.*   Similarly, simply claiming that consumers associate the product with the brand is nothing more than a mere legal conclusion and insufficient to allege secondary meaning.  *Id.*

In an attempt to establish secondary meaning, the Second Amended Complaint alleges that Mr. Concannon has received unsolicited media coverage because celebrities purchase his products and then are photographed wearing them.   ECF No. 30 at ¶¶ 25, 26.   Mr. Concannon also cites to social media posts where celebrities have posted pictures of themselves while wearing Mr. Concannon's products.   *Id.* at ¶ 27.   Additionally, Mr. Concannon cites his "frequent" orders and four counterfeit items (*id.* at ¶ 31) and claims that his works have been featured in television, movies, magazines, and art publications (*id.* at ¶ 17).   These allegations, however, are insufficient.

In *Heptagon Creations*, the plaintiff was an owner of a furniture line who brought claims against the defendants for, *inter alia*, trade dress infringement based on the defendants use of the plaintiff's furniture line to virtually furnish an apartment the defendants had listed for sale. *Heptagon Creations*, 2011 WL 6600267, at *1–2.   In an attempt to establish secondary meaning, the complaint alleged that the "furniture line has been purchased by celebrities, featured in various magazines, and commissioned for use in the decoration of public and private spaces." *Id.* at *8.   In granting the defendants' motion to dismiss, the court noted that "[t]he [c]omplaint does not, however, contain any allegations as to Heptagon's advertising expenditures, or consumer surveys linking the ANDRE JOYAU furniture line to a particular source."  *Id.*

Like *Heptagon Creations*, the Second Amended Complaint does not contain any allegations regarding Mr. Concannon's advertising expenditures, or consumer surveys, or other evidence from which a reasonable fact finder could conclude his asserted trade dress and product line has acquired secondary meaning. *See generally* ECF No. 30. Additionally, it fails to explain how celebrities wearing Mr. Concannon's clothing equates to consumers identifying Mr. Concannon as the source of those products. *See id.* For example, there are no allegations that Mr. Concannon had an increase in sales, or experienced increased traffic to his social media page or website, after the alleged paparazzi photos were taken. He does not even cite where or when these photos were published.[21] Indeed, there are no allegations that Mr. Concannon was identified as the source of the products, or that consumers would recognize the asserted trade dress and claimed product line as a result of this publicity. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 658–59 (S.D.N.Y. 2016).

Moreover, of merely three social media posts cited where the individuals have "tagged" Mr. Concannon's Instagram account, only one arguably identifies him as the designer of the clothing—and it has 351 "likes" and is posted from an unverified account. [22] *Id.* at ¶ 27.

---

[21] *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 426–27 (S.D.N.Y. 2012) ("Lopez offers modest evidence, through testimony and documents, of 'unsolicited media coverage.' . . . Specifically, he offers (1) testimony that an artist was featured in the magazine Hip Hop Weekly wearing his apparel, . . . (2) screenshots of his apparel in a music video that was distributed through Yahoo! Music, . . . and (3) pictures of music artists wearing his apparel, . . . . including a screenshot of an artist wearing a t-shirt with the Lower East Side Mark in the online publication. . . . This evidence does demonstrate that local figures have worn clothing with the Lower East Side Mark and the LES NYC Mark. It is not, however, clear that the media coverage, such as it is, on each of these occasions was unsolicited. Lopez's evidence as to these three incidents is insufficient to show enough unsolicited media coverage to support a finding of secondary meaning); *Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (holding that media coverage outside of the relevant period are irrelevant in a secondary meaning analysis).

[22] "A verified badge is a check that appears next to an Instagram account's name in search and on the profile. It means Instagram has confirmed that an account is the authentic presence of the public figure, celebrity or brand it represents." *Verified Badges*, Instagram Help Center, https://help.instagram.com/854227311295302 (last visited April 22, 2022). To be verified, "[y]our account must represent a well-known, highly searched-for person, brand or entity." Cory Lancaster, *Understanding Verification on Instagram*, Instagram (Sept. 2, 2021), https://about.instagram.com/blog/announcements/understanding-verification-on-instagram (last visited April 22, 2022).

If anything, the counterfeit items were made in an attempt to capitalize on the celebrity's brand, not Mr. Concannon's.  *See* ECF Nos. 30-2, 30-3, 30-4, 30-5.  Indeed, in one of the attached counterfeit examples, the category was "Celebrity Shirts[.]"  ECF No. 30-3.  *E.g.*, *Easter Unlimited, Inc. v. Rozier*, No. 18-CV-06637, 2021 WL 4409729, at *21 (E.D.N.Y. Sept. 27, 2021) (noting that conclusory statements of the strength of the plaintiff's mark were insufficient to prove secondary meaning and "that [p]laintiff appears to conflate the wide recognition of the Scream franchise and [p]laintiff's Ghost Face Mask as featured in Scream with the strength of its own mark").

The facts as plead do not relate to Mr. Concannon's product line and are therefore insufficient to establish secondary meaning.  Accordingly, Count IV of the Second Amended Complaint must be dismissed..

### C.   Mr. Concannon Has Failed To Plead Likelihood Of Confusion.

Count IV should be dismissed for the additional reason that the Second Amended Complaint fails to plead facts sufficient to show likelihood of confusion.

The Second Circuit has identified eight factors (the "*Polaroid* factors") to be considered when examining the likelihood of confusion, namely:

> [1] the strength of [the plaintiff's] mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap, [5] actual confusion, and [6] the reciprocal of defendant's good faith in adopting its own mark, [7] the quality of defendant's product, and [8] the sophistication of the buyers.

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  "It is well settled that, when applying the *Polaroid* factors to determine likelihood of confusion at a motion to dismiss stage, courts have not required all factors to be addressed in order to find adequate pleading of a likelihood of confusion."  *World Trade Ctrs. Ass'n, Inc. v. Port Auth. of N.Y. &*

*N.J.*, No. 15 CV 7411, 2016 WL 8292208, at *2 (S.D.N.Y. Dec. 15, 2016).  "Rather, courts have consistently held that likelihood of consumer confusion was adequately pleaded based on facts relating to some, but fewer than all, of the *Polaroid* factors."  *Id.* (citation omitted).  However, conclusory statements consistent with a claim for likelihood of confusion that track the language of 15 U.S.C. § 1125 are insufficient to survive a motion to dismiss.  *Carson Optical*, 11 F. Supp. 3d at 346.

The Second Amended Complaint does not allege the strength of his alleged trade dress; that the Subject Torso Element and the Porowski Jacket are in close proximity; that there is actual confusion; or any facts related to the quality of the Subject Torso Element or the sophistication of the buyer.  *See generally* ECF No. 30.  The Second Amended Complaint merely contains conclusory allegations that the Subject Torso Element is a "near exact copy[]" of the Porowski Jacket, that it "is likely to cause confusion as to whether Concannon is affiliated with or sponsored by LEGO," and that the creation of the Torso Element was in bad faith.  *Id.* at ¶¶ 50, 52.  These boilerplate allegations are insufficient.  The mere allegation that the Antoni Minifigure Figurine invoked the Porowski Jacket is insufficient to establish bad faith.  *Easter Unlimited*, 2021 WL 4409729, at *24 ("Defendant has explicitly conceded that he wished to invoke the Scream mask from the movie Scream.  But Defendant's concession does not necessarily compel a conclusion that Defendant's use was undertaken in bad faith to confuse or deceive purchasers").  Mr. Concannon fails to allege that LSI was attempting to deceive the purchaser—because he cannot make a credible allegation to this effect.  Rather, the Second Amended Complaint, and documents incorporated therein by reference, demonstrate that the Antoni Minifigure Figurine sought to invoke the Porowski Jacket to accurately recreate Mr. Porowski's likeness.  ECF No. 30 at ¶¶ 2–5, 55; *see supra* at 20–22.

-36-

Importantly, Mr. Concannon is not, in any way, in competition with LSI. "A plaintiff fails to plead likelihood of confusion where they fail "'to allege that Defendants compete in [the same market as the product line] or that any member of the public would plausibly think that the allegedly infringed [works] were designed or offered by Defendants.'" *Heptagon Creations*, 2011 WL 6600267, at *8.

Similarly, in *Easter Unlimited*, the court rejected the plaintiff's attempt to define the market in which the defendant participated in to t-shirts generally when the defendant only sold his t-shirts on his website and at basketball games. 2021 WL 4409729, at *23. Rather, the defendant's market was limited to the areas in which he sold his products and the consumers who purchased from those platforms. *Id*. The court found that there was no overlap where the plaintiff did not sell in these markets.

Mr. Concannon sells his clothing, jackets, and accessories through his website. ECF No. 30 at ¶ 19. His products are worn by those who wish to "comment satirically on punk rock and pop culture" and his consumers include, "celebrities and non-celebrities alike, [requesting] custom Concannon Products." *Id*. at ¶ 24. There is nothing in the Second Amended Complaint that suggests that Mr. Concannon competes in the "global toy market[.]" Nor is there anything alleged that Mr. Concannon intends to bridge the gap and go into the toy industry. Mr. Concannon does not even allege a mutual consumer basis. *See generally id*. Therefore, "any risk of confusion between [the Subject Torso Element of the Antoni Minifigure Figurine and Mr. Concannon] in that [the global toy market] is beside the point." *Heptagon Creations*, 2011 WL 6600267, at *8.

Rather, Mr. Concannon baldly claims that "the Infringing Product, are likely to cause confusion with Concannon Trade Dress by creating a false sense of sponsorship or affiliation

between LEGO and Concannon." *Id.* at ¶ 26.  However, again, Mr. Concannon does not support this assertion.  He is not entitled to state facts merely consistent with liability to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *Carson Optical*, 11 F. Supp. 3d at 346   (rejecting a mere "formulaic recitation of the *Polaroid* factors").   As Mr. Concannon has failed to allege secondary meaning, he has failed to plead a *prima facie* trade dress infringement claim and Count IV of the Second Amended Complaint must be dismissed.

## III.    THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF CUTPA (COUNT V) BECAUSE IT FAILS TO STATE A CLAIM FOR VIOLATION OF THE LANHAM ACT.

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995).  "The operative provision of the act, § 42-110b(a), states merely that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Id.* (alteration in original) (quoting Conn. Gen. Stat. § 42-110b(a)). "Trade or commerce, in turn, is broadly defined[.]" *Id.* (citing Conn. Gen. Stat.  § 42-110(a)).  "'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat.  § 42-110a(4).

The same evidence that establishes a violation of Section 43(a) of the Lanham Act also establishes a violation of CUTPA." *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 3:06-CV-1710, 2010 WL 669870, at *25 (D. Conn. Feb. 19, 2010).  "Conversely, where a CUTPA claim relies upon allegations tied to a Lanham Act claim, a plaintiff's failure to establish a Lanham Act violation is fatal to its CUTPA claim." *Id.*; *accord Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop*, *LLC*, 30 F. Supp. 3d 117, 140 n. 20 (D. Conn. 2014).

-38-

Mr. Concannon fails to assert any facts to support his CUTPA claim independent from his Lanham Act claim.  *See* ECF No. 30 at ¶¶ 113–19.  The CUTPA claim must similarly be dismissed.  *Garden Catering-Hamilton Ave*, 30 F. Supp. 3d at 140 n.20.

## **CONCLUSION**

For all the foregoing reasons, this Court should grant LSI's Motion to Dismiss the Second Amended Complaint.[23]

Respectfully submitted,

By:   */s/ Elizabeth A. Alquist*
        Elizabeth A. Alquist (ct15643)
        Andraya Pulaski Brunau (ct29715)
        Day Pitney LLP
        242 Trumbull Street
        Hartford, CT 06103-1212
        Telephone:  (860) 275-0137
        Facsimile:   (860) 881-2456
        *eaalquist@daypitney.com*
        *abrunau@daypitney.com*

        *Attorneys for Defendant LEGO Systems, Inc.*

---

[23] LEGO A/S had not been served prior to the March 15, 2022 pre-filling conference and, therefore, was unable to join in this motion to dismiss.  However, at the March 15, 2022 pre-filing conference, the Court noted that Mr. Concannon could not again amend the Second Amended Complaint to overcome the grounds for dismissal LSI raised at the pre-filing conference.  The Court should dismiss Counts I, IV, and V against LEGO A/S for failure to state a claim upon which relief can be granted for the same reasons that it should dismiss these claims against LSI.

## <u>CERTIFICATION</u>

I hereby certify that on April 22, 2022, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


   _/s/ Andraya P. Brunau_____
            Andraya P. Brunau