**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| |
JAMES CONCANNON, | |
| |
      Plaintiff, | |
| |
    v. |     Civil Action No. 3:21-CV-1678 (JBA)
| |
LEGO Systems, Inc., and | |
LEGO A/S, | |
| |
      Defendants. | |
| |

**PLAINTIFF JAME CONCANNON'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT LEGO SYSTEMS, INC'S MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ...........................................................................................................1

**FACTUAL BACKGROUND** ......................................................................................2

**STANDARD OF REVIEW** ........................................................................................7

**ARGUMENT** ...............................................................................................................7

   **I.**   **James Concannon Has Sufficiently Alleged Claims For Copyright Infringement (Count I) In The Second Amended Complaint** ........................................................7

     a.  LSI's Affirmative Argument that it Possesses an Implied License to Exploit the Concannon Jacket is Improper and Unsupported ..............................................6

     b.  Concannon Has Sufficiently alleged that LSI's Use of the Concannon Jacket is Infringing and Fails to be Transformative ......................................................15

         i.   *Defendants' Failed to Add Any Transformative Elements in its Recreation of the Concannon Jacket* ..................................................................17

         ii.  *Defendants Substantially used the Entirety of the Concannon Jacket* ..............19

         iii.  *Defendants' Use of the Concannon Jacket is Purely Commercial*....................22

         iv.  *Defendants Have Negatively Impacted the Market for Concannon Works*........23

   **II.**  **James Concannon Has Sufficiently Alleged Claims For Trade Dress Infringement And Unfair Competition (Count IV) In The Second Amended Complaint**.............24

     a.  Concannon has Adequately Pled the Elements of his Trade Dress .................................25

     b.  The Trade Dress has Acquired Secondary Meaning ......................................................27

     c.  The Infringing Work Creates a Likelihood of Confusion ...............................................30

   **III.**  **James Concannon Has Sufficiently Stated A Claim For Violation Of CUPTA (Count V) In The Second Amended Complaint** ...........................................................32

**CONCLUSION** .................................................................................................................33

# TABLE OF AUTHORITIES

*Agence France Presse v. Morel*
    769 F. Supp. 2d 295 (S.D.N.Y. 2011) .............................................................. 10

*AJB Enterprises, LLC v. BackJoy Orthotics, LLC*
    3:16-CV-00758 (VAB), 2017 WL 4400746, at *3 (D. Conn. Sept. 29, 2017) .............. 25

*Arrow Prods., LTD. v. Weinstein Co.,*
    44 F.Supp.3d 359, 2014 WL 4211350, at *8 (S.D.N.Y.2014) ................................... 15,22

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) .................................................................................. 7

*Associated Press v. Meltwater U.S. Holdings, Inc.,*
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ........................................................... 11

*Authors Guild, Inc. v. HathiTrust*
    755 F.3d 87 (2d Cir. 2014) ........................................................................ 22

*Baker v. Weber*
    19 CIV. 1093 (JPC), 2021 WL 4480998, at *6 (S.D.N.Y. Sept. 30, 2021) ...................... 4

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ............................................................................ 10,11

*Bill Graham Archives v. Dorling Kindersley Ltd.*
    448 F.3d 605 (2d Cir. 2006) ..................................................................... 23

*BWP Media USA,. Inc. v. Gossip Cop Media, LLC,*
    87 F. Supp. 3d 499 (S.D.N.Y. 2015) ............................................................. 16

*Campbell v. Acuff–Rose Music, Inc.,*
    510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) ..............................15,17,18,19,23

*Capitol Records, LLC v. ReDigi Inc.,*
    934 F. Supp. 2d 640 (S.D.N.Y. 2013), *aff'd* 910 F.3d 649 (2d Cir. 2018) ..................... 14

*Cariou v. Prince,*
    714 F.3d 694 (2d Cir. 2013) ..................................................................... 15,24

*Carson Optical, Inc. v. Prym Consumer USA, Inc.,*
    11 F. Supp. 3d 317 (E.D.N.Y. 2014) ............................................................. 25

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,*
    150 F.3d 132 (2d Cir. 1998) ..................................................................... 19

*Design Options, Inc. v. BellePointe, Inc.,*
    940 F. Supp. 86 (S.D.N.Y. 1996) ................................................................. 8

*Easter Unlimited, Inc. v. Rozier*
    18-CV-06637 (KAM), 2021 WL 4409729, at *24 (E.D.N.Y. Sept. 27, 2021) ............... 30

*Effie Film, LLC v. Pomerance*
909 F.Supp.2d 273 (S.D.N.Y. 2012) ............................................................8

*Erickson v. Pardus*
551 U.S. 89 (2007) ..................................................................................7

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*
499 U.S. 340 (1991) ................................................................................8

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*
80 F. Supp. 3d 535 (S.D.N.Y. 2015) ..........................................................11

*Fruit-Ices Corp. v. Coolbrands Int'l, Inc.*
335 F. Supp. 2d 412 (S.D.N.Y. 2004) .......................................................31

*Graham v. Prince*
265 F. Supp. 3d 366 (S.D.N.Y. 2017) ...................................................15,16

*GTFM, Inc. v. Solid Clothing, Inc.,*
215 F. Supp. 2d 273 (S.D.N.Y. 2002) .......................................................29

*Hamil Am. Inc. v. GFI*
193 F.3d 92 (2d Cir. 1999) ......................................................................8

*Harlequin Enterprises Ltd. v. Gulf & Western Corp.*
503 F.Supp. 647 (S.D.N.Y.1980), *aff'd* 644 F.2d 946 (2d Cir.1981) ............26

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) .................................15

*Heptagon Creations, Ltd. v. Core Group Mktg. LLC*
11 CIV. 01794 LTS, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011), *aff'd,* 507 Fed.
Appx. 74 (2d Cir. 2013) .........................................................................29

*Horizon Comics Productions, Inc. v. Marvel Entm't, LLC*
246 F. Supp. 3d 937 (S.D.N.Y. 2017) ........................................................8

*ID7D Co., Ltd. v. Sears Holding Corp.*
311CV1054 VLB, 2012 WL 1247329, at *8 (D. Conn. Apr. 13, 2012) ...........28,30

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.*
596 F. Supp. 2d 497 (D. Conn. 2009) .......................................................32

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC,*
399 F. Supp. 3d 120 (S.D.N.Y. 2019) .....................................................12,14

*Kelly-Brown v. Winfrey*
717 F.3d 295 (2d Cir. 2013) ...................................................................16

*Knitwaves, Inc. v. Lollytogs Ltd. Inc.*
71 F.3d 996 (2d Cir. 1995) ......................................................................8

*Landscape Forms, Inc. v. Columbia Cascade Co.*
113 F.3d 373 (2d Cir. 1997) ...................................................................25

*Life Indus. Corp. v. Star Brite Distrib., Inc.*
    31 F.3d 42 (2d Cir. 1994) ...................................................................... 30

*LMNOPI v. XYZ Films, LLC,*
    449 F. Supp. 3d 86 (E.D.N.Y. 2020) ..................................................... 17

*May v. Sony Music Entm't*
    399 F. Supp. 3d 169 (S.D.N.Y. 2019) ................................................... 15

*McCray v. Lee*
    963 F.3d 110 (2d Cir. 2020) .................................................................... 7

*Murphy v. Provident Mutual Life Insurance Co.*
    923 F.2d 923 (2d Cir.1991) .................................................................... 32

*Otto v. Hearst Commc'ns, Inc.*
    345 F. Supp. 3d 412 (S.D.N.Y. 2018) ................................................... 11

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*
    602 F.3d 57 (2d Cir. 2010) ...................................................................... 8

*Psihoyos v. Pearson Educ., Inc.*
    855 F. Supp. 2d 103 (S.D.N.Y. 2012) ................................................... 11

*Sherwood 48 Assocs. v. Sony Corp. of Am.,*
    76 F.Appx. 389 (2d Cir. 2003) .............................................................. 25

*SHL Imaging, Inc. v. Artisan House, Inc.*
    117 F.Supp.2d 301 (S.D.N.Y.2000) ...................................................... 12

*Solid Oak Sketches, LLC v. 2K Games, Inc.*
    449 F. Supp. 3d 333 (S.D.N.Y. 2020) ..................................... 13,14,15,18,20,21

*Tasini v. New York Times Co.*
    206 F.3d 161 (2d Cir. 2000), *aff'd* 533 U.S. 483 (2001) ................................ 10

*TCA Television Corp. v. McCollum,*
    839 F.3d 168 (2d Cir. 2016) .................................................................. 16

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*
    338 F.3d 127 (2d Cir. 2003) .................................................................... 8

*Walt Disney Co. v. Goodtimes Home Video Corp.*
    830 F. Supp. 762 (S.D.N.Y. 1993) ........................................................ 27

*Wright v. Warner Books, Inc.*
    953 F.2d 731 (2d Cir. 1991) .................................................................. 16

*Yurman Design, Inc. v. PAJ, Inc.*
    262 F.3d 101 (2d Cir.2001) ................................................................... 24

*Zulick v. Patrons Mutual Ins. Co.*
    287 Conn. 367, 378 n. 11, 949 A.2d 1084 (Conn.2008) ............................... 32

Plaintiff James Concannon ("Concannon") respectfully submits this memorandum of law in support of its opposition to Defendant LEGO Systems, Inc's ("LSI") Motion to Dismiss the Second Amended Complaint ("Motion," ECF No. 35).

## **INTRODUCTION**

Lego Systems, Inc. and Lego A/S (collectively, "Defendants") are one of the largest toy companies in the world, generating billions of dollars in revenue a year. LSI alleges that Defendants want to inspire "people of all ages to play and unleash their creativity to create a world of infinite possibilities."  Motion, FN 16. Unfortunately, in this case, Defendants have attempted to inspire creativity in others by misappropriating the work of a respected contemporary artist without any accreditation or compensation. Similar infringement has become commonplace with large corporations, who know they have the resources and means to silence small artists by making any attempts to assert their intellectual property rights an "uphill battle." *See* Plaintiff's Second Amended Complaint ("Complaint," ECF No. 30), ¶ 63.

James Concannon is a multi-disciplinary artist that has exhibited his work at galleries and venues in Brooklyn, Manhattan, Miami (during Art Basel Miami Beach), Tokyo, and many other cities around the United States and the world. Concannon designs and sells distinctive products that feature his signature hand-painted graffiti lettering and phrases that reference punk rock as a means of commenting on pop culture today. After receiving a degree in photography from Loyola-Marymount in Los Angeles, Concannon has worked tirelessly to gain a cult-like following in punk rock and contemporary art circles across the globe. His work has sold to countless celebrities and collectors, including Antoni Porowski, one of the stars of Netflix's Queer Eye. While Porowski has worn and credited many of Concannon's pieces, the item in dispute in this case is a custom leather jacket Concannon created for Porowski in 2018. As admitted by Defendants, this leather

jacket is iconic and was a memorable statement piece that stood out from other clothing items worn by Concannon. Complaint at ¶ 18-19. Concannon sells these articles of clothing as 1 of 1 artworks, much like a painter sells a painting or a sculptor sells a sculpture.

Lego used the work by Concannon in creating a Lego set based on the Queer Eye show.

Not surprisingly, Concannon filed suit alleging: (1) copyright infringement; (2) contributory copyright infringement (against Lego A/S); (3) vicarious copyright infringement (against Lego A/S); (4) federal trade dress infringement and unfair competition; and, (5) a violation of the Connecticut Unfair Trade Practices Act. In response, LSI filed its Motion, which improperly attempts to couch affirmative matters and extrinsic evidence as arguments brought under Fed. R. Civ. P. 12(b)(6). LSI cannot plead around its own statements regarding the intentional copying of Concannon's work and the substantial similarity apparent in comparing the two works. As such, Concannon has sufficiently pled Count I, IV, and V against LSI and its Motion should be denied.[1]

## FACTUAL BACKGROUND

James Concannon is a multi-disciplinary artist and designer who has garnered critical acclaim for his artwork, which consists largely of t-shirts, jackets, and accessories (the "Concannon Works"). Complaint at ¶ 18-19. Concannon's work is known for its satirical commentary on punk rock and pop culture through tongue in cheek statements uniquely incorporated onto the Concannon Works. *Id.* at ¶ 23. The Concannon Works all prominently feature short, provocative statements in hand-painted, graffiti-style lettering (the "Trade Dress"). *Id.* This style and overall aesthetic is unique and a distinctive source identifier for the Concannon Works.  *Id.,*¶ 20. Consumers have come to associate this unique and distinctive combination of

---

[1] Counts II and III of the Complaint are alleged against Defendant Lego A/S, which has not yet filed a responsive pleading.

elements with Concannon Works, and Concannon specifically uses these elements to identify, promote, and solidify his unique and recognizable brand and body of artwork in the eyes of the public. *Id.*

Concannon has garnered acclaim for his use of pop culture and propaganda as a form of commentary. *Id.* at ¶ 18. The distinctive style and design of the Concannon Works have resulted in widespread popularity and demand. *Id.* at ¶ 18. The Concannon Works have been featured on television, film, magazines, and art publications. *Id.* at ¶ 18. Moreover, the Concannon Works have become a very part of the pop culture on which they comment. *Id.* at ¶ 24. Numerous celebrities including Lady Gaga, Lil Wayne, Suki Waterhouse, Jaime King, and punk rock icons like Jimmy Webb and the band Death have been photographed wearing Concannon Works. *Id.* at ¶ 26. Moreover, celebrities and well-known fashion influencers prominently identify Concannon as the designer behind the Concannon Works. *Id.* In turn, more celebrities and consumers reach out to Concannon for custom products that encompass Concannon's signature hand-painted graffiti style and commentary on pop culture. *Id.* at ¶ 30. For his custom pieces, Concannon will incorporate his Trade Dress and signature style with elements unique to the individual requesting the clothing. *Id.* at ¶ 31. These custom pieces are highly sought after and can sell for hundreds or thousands of dollars. *Id.* at ¶ 33.

Amongst many other celebrities, Antoni Porowski was a fan of Concannon and the Concannon Works. *Id.* at ¶ 39. Mr. Porowski is the food and wine expert on the Queer Eye Netflix Series ("Queer Eye"). In June 2017, Concannon received an email from a clearance coordinator at ITV America, the producer of Queer Eye, which was set to launch in early 2018. *Id.* at ¶ 37.  In her email, ITV's clearance coordinator told Concannon that Mr. Porowski, "would love to be able to" wear three Concannon Works—"Acid And Nancy Reagan," "The Crank Generation," and

"Cry Me A River Phoenix"—at different times throughout the show's first season. *Id.* at ¶ 38. The email attached a release form, which Concannon signed, granting ITV America (on behalf of Netflix) the limited right to feature Concannon Works on the show and in connection with the show's advertising. *Id.*

Through this interaction, Concannon learned that Mr. Porowski was a fan of his work and the two eventually became friends. *Id.* at ¶ 39.  As a result, Concannon provided several custom Concannon Works to Porowski and many were featured on Queer Eye from 2017 to 2021. *Id.* at ¶ 40. Mr. Porowski would routinely credit the Concannon Works by prominently tagging Concannon in social media posts and discussing Concannon in interviews. *Id.* Each time a Concannon Work was going to be featured on the show, Queer Eye's producers sought Concannon's permission and obtained a signed release specifying the Product that would appear on the show and the nature of the rights being granted. *Id.*

The only time Queer Eye did not seek Concannon's permission to feature one of Concannon's creations on the show was in 2018, in connection with the work that is the subject of this lawsuit. *Id.* at ¶ 40. In 2018, Concannon created a custom leather jacket for Porowski using a plain black leather jacket that Porowski provided to Concannon (the "Concannon Jacket"). *Id.* at ¶ 41. As expected by Porowski, Concannon added the distinct elements of the Trade Dress in his overall design and composition of the Concannon Jacket. *Id.* The artwork embodied in the Concannon Jacket, pictured below, is registered with the United States Copyright Office, as reflected by Reg. No. VA0002276952. *Id.*

Defendants are self-proclaimed fans of Queer Eye and were excited to pursue a collaboration with the show. *Id.* at ¶ 54. Defendants began creating a new LEGO set, called "Queer

Eye – The Fab 5 Loft," based on the Queer Eye Netflix series (the "LEGO Set").[2] *Id.* at ¶ 47. In designing the LEGO Set, Defendants specifically recalled and wanted to recreate Porowski's "iconic leather jacket." *Id.* at ¶ 54. Upon information and belief, Defendants jointly conspired to create a LEGO Set that directly copied the Concannon Jacket (the "Infringing Work"). *Id.* at ¶ 46. As is clear in comparing the works, Defendants copied both the individual creative elements of the Concannon Jacket, and the unique placement, coordination, and arrangement of those individual artistic elements as well. *Id.* at ¶ 52. Specifically, the Infringing Work uses the Trade Dress by displaying graffiti-style lettering on the back of the jacket. *Id.* at ¶ 51. To the extent LEGO altered the original text on the back of the jacket, it did so in a way that is still intended to evoke Concannon's signature style and brand so that the Infringing Product would look like a Concannon Work and benefit from the association with Concannon's trademark. *Id.* Indeed, LEGO altered the text in the same way that a genuine Concannon Work would, by customizing the phrase to evoke the "consumer's" interests. Here, because LEGO creates blocks that are used to build things, the phrase "REBUILD THE WORLD" on the Lego version of the jacket, is exactly the type of pop culture pun that would be included on a genuine Concannon Work bearing the Trade Dress. *Id.* LEGO did not seek Concannon's permission—let alone offer to compensate or credit

---

[2] LSI improperly attempts to incorporate extrinsic evidence by attaching the license agreement between the production company for Queer Eye, Scout Productions Inc., by and through its representative, IMG Worldwide, LLC, and LEGO Systems, A/S (the "License Agreement"). LSI argues that the Complaint incorporates the License Agreement by reference and was integral to the framing of the Complaint. LSI's argument is a misleading attempt to incorporate evidence outside the four corners of the Complaint. Concannon does not reference the License Agreement, nor has he ever previously seen the License Agreement between the producers of Queer Eye and Defendants. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (holding that the court could consider extrinsic documents that had been prepared by or executed by the plaintiffs since the plaintiff had knowledge of these documents and explicitly relied upon them in framing the complaint) Rather, Concannon pleads that it owned the exclusive copyrights to the Concannon Jacket and that Queer Eye did not have a license to display it, let alone grant the right to replicate it to the Defendants. Further, Concannon pleads that Defendants did not have a license to replicate the Concannon Jacket.  Thus, the License Agreement is immaterial, outside the Complaint, and should not be considered by the Court in deciding LSI's Motion.

Concannon—before exploiting Concannon's original artwork or Trade Dress in the global toy market. *Id.* at ¶ 53. Without any deference to Concannon's intellectual property rights, Defendants began manufacturing, distributing, advertising, and selling the Lego Set both online and at its brick-and-mortar locations. *Id.* at ¶ 57-58. The Infringing Work was prominently displayed on both the front of the packaging and in commercials for the Lego Set. *Id.* at ¶ 56 – 59.

As a result of this aggressive advertising, Concannon learned of the Infringing Work and contacted Defendants to inquire about the use of the Concannon Jacket. *Id.* at ¶ 60. Although Concannon was surprised to see the Infringing Work without any prior notice or accreditation, Concannon simply asked Defendants for a Lego Set for his son. *Id.* at ¶ 60. When Defendants later reneged on their offer to send Concannon a Lego Set, Concannon took to social media to express his dissatisfaction. *Id.* Specifically, Concannon expressed his frustration of being a small artist with limited means faced with the prospect of a multimillion-dollar company misappropriating his work and subverting his livelihood. *Id.* Indeed, this is just one product launched by Defendants, but to Concannon, his designs are his source of income for supporting his family and managing his ongoing medical conditions. *Id.* at ¶ 62. Upon hearing Concannon's plight, his supporters encouraged him to find legal representation rather than allow the Defendants to continue to misappropriate Concannon's work. *Id.* at ¶ 61. Through undersigned counsel, Concannon asserted his intellectual property rights against Defendants in a cease-and-desist to Defendants. *Id.* Concannon hoped that Defendants would acknowledge and compensate Concannon for the use of his intellectual property. Instead, Concannon's work on the Concannon Jacket was minimized and he was mocked for his earlier request for a Lego Set for his son. *Id.* at ¶ 64. More importantly, Concannon was told that he'd face an "uphill battle" against Defendants. *Id.* at ¶ 63. Dissatisfied with Defendant's treatment of small artists and empowered by support from others that have had

their ideas misappropriated by large corporations with no recourse, Concannon was forced to file suit in defense of his intellectual property.

## STANDARD OF REVIEW

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To survive the motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555). "[C]onsideration of a motion under Rule 12(b)(6) is limited to the contents of the operative complaint and documents attached to it or incorporated into it by reference." *McCray v. Lee*, 963 F.3d 110, 119 (2d Cir. 2020).

## ARGUMENT

**I.    JAMES CONCANNON HAS SUFFICIENTLY ALLEGED CLAIMS FOR COPYRIGHT INFRINGEMENT (COUNT I) IN THE SECOND AMENDED COMPLAINT.**

In order to establish a claim of copyright infringement, 'a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the

protectable elements of plaintiff's.'" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602

F.3d 57, 63 (2d Cir. 2010) (*quoting Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999).

In evaluating substantial similarity, the Court "must attempt to extract the [unprotectable]

elements from [its] consideration and ask whether the [protectable] *elements, standing alone*, are

substantially similar." *Horizon Comics Productions, Inc. v. Marvel Entm't, LLC*, 246 F. Supp. 3d

937, 941 (S.D.N.Y. 2017) (citing *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d

Cir. 1995)) (emphasis in original). But, in comparing two works, the Court need not separate

components of each work and compare only those elements. *Effie Film, LLC v. Pomerance*, 909

F.Supp.2d 273, 290 (S.D.N.Y. 2012) (citing *Peter F. Gaito Architecture, LLC v. Simone Dev.

Corp.*, 602 F.3d 57, 63 (2d Cir. 2010)). Rather, the inquiry is more holistic, as the Court

"compar[es] the contested [work's] total concept and overall feel with that of the allegedly

infringed work, as instructed by our good eyes and common sense." *Id.* (internal quotation marks

omitted). The "inquiry necessarily focuses on whether the alleged infringer has misappropriated

the original way in which the author has selected, coordinated, and arranged the elements of his or

her work." *Id.; see also Knitwaves Inc.*, 71 F.3d at 1004 (quoting *Feist Publ'ns, Inc. v. Rural Tel.

Serv. Co.*, 499 U.S. 340, 358 (1991)). Such an approach allows for a finding of copyright

infringement where a defendant has "parrot[ed] properties that are apparent only when numerous

aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one

another." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir.

2003).

Concannon has sufficiently pled a claim for copyright infringement. First, Concannon has

properly pled and LSI does not dispute that Concannon owns and has registered the copyrights to

the Concannon Jacket. Complaint at ¶ 41; *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp.

86, 89 (S.D.N.Y. 1996) (holding that under the Copyright Act, a certificate of registration from the constitutes prima facie evidence of the valid ownership of a copyright). Second, Concannon has sufficiently pled substantial similarity between the Concannon Jacket and the Infringing Work. The similarities between the works are undeniable in light of Defendants' admission that they were affirmatively attempting to recreate the Concannon Jacket. Complaint at ¶ 54. In this effort, Defendants copied the unique design and placements of the protectable elements of the Concannon Jacket, including the: (1) ying-yang symbol with an expression drawn inside of it on the left collar; (2) peace sign on the right collar; (3) safety pin detailing on the middle right; (4) circular chain link pattern on the bottom right; (5) graffiti-style lettering on the back of the jacket; and, (5) the face of a LEGO Figure inspired by the skull on the middle left of the Concannon Jacket. Complaint at ¶ 48. Moreover, it is apparent that Defendants attempted to copy the aesthetic decisions and overall feel embodied in the Concannon Jacket by emulating Concannon's signature satire by altering the text of the back of the Infringing Work in the same way that a genuine Concannon Work would be customized to evoke the "customer's" interests. Complaint at ¶ 30-33. Here, because LEGO creates blocks that are used to build things, the phrase "REBUILD THE WORLD" on the Lego version of the jacket, is exactly the type of pop culture pun that would be included on a genuine Concannon Work bearing the Trade Dress.[3] Not only has Concannon sufficiently pled his copyright claims, but it is also apparent in viewing both works that Defendants have infringed upon Concannon's copyrights to the Concannon Jacket.

LSI brings its Motion pursuant to Fed. R. Civ. P 12(b)(6) and argues that Concannon failed to state a claim for copyright infringement. Yet, LSI improperly asserts affirmative defenses rather

---

[3] LSI argues that the phrase "THYME IS ON YOUR SIDE" lacks Concannon's signature commentary on pop culture. This argument shows LSI's lack of creativity and failure to understand the purpose of Concannon's work despite their desire to copy it.

than challenging Concannon's well-pled allegations of infringement. LSI's Motion asks this Court to consider factual issues that exist outside the four corners of the Complaint, and thus LSI's arguments are inappropriate for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). As such, LSI's Motion should be denied.

> **a. LSI's Affirmative Argument that it Possesses an Implied License to Exploit the Concannon Jacket is Improper and Unsupported.**

LSI asserts that the mere fact that Concannon has allowed Mr. Porowski to wear his work on Queer Eye, somehow grants Queer eye the unfettered right to grant a license to Defendants to duplicate and distribute the Concannon Jacket so that LSI can generate millions in revenue for itself on the back of Concannon's intellectual property. This argument is unsupported by the fundamentals of copyright law. Additionally, it is an affirmative defense improperly couched as a Rule 12(b)(6) motion. *Baker v. Weber*, 19 CIV. 1093 (JPC), 2021 WL 4480998, at *6 (S.D.N.Y. Sept. 30, 2021) (holding that an argument for an implied license acts as an affirmative defense); *Agence France Presse v. Morel, 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011)*(holding that the defendant holds the burden of coming forward with evidence of a license*); Tasini v. New York Times Co.*, 206 F.3d 161, 171 (2d Cir. 2000), aff'd, 533 U.S. 483 (2001) (holding that the existence of a license may be raised as an affirmative defense to copyright infringement, and where the dispute turns on whether there is a license at all, the burden is on the alleged infringer to prove the existence of the license). Importantly, LSI's assertion of an implied license is blatantly contradicted by Concannon's well-pled allegations that he did not grant a license to Queer Eye to utilize the Concannon Jacket in connection with the show, nor did he grant a license for Defendants to exploit his work in the Lego Set. Complaint, ¶¶ 38-40. LSI's argument is nothing more than a post-hoc justification for its blatant misappropriation of Concannon's work without compensating or crediting him for the creation of the Concannon Jacket, and should be rejected by the Court.

Pursuant to the Copyright Act, all grants of exclusive rights in a copyright must be made in writing. 17 U.S.C. § 204(a). Thus, only a nonexclusive license can be granted orally or implied from conduct. *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561–62 (S.D.N.Y. 2013). "The Second Circuit has not yet developed a test for determining whether a copyright owner has conveyed an implied license." *Baker v. Weber*, 19 CIV. 1093 (JPC), 2021 WL 4480998, at *8 (S.D.N.Y. Sept. 30, 2021) (citing *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 434 (S.D.N.Y. 2018). Further, "[t]he law in the area of implied licenses shows a measure of conflict." *Id.* (citing *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 119 (S.D.N.Y. 2012)). Generally, a defendant asserting the existence of an implied license must show that the plaintiff "created a work at [another's] request and handed it over, ***intending that [the other] copy and distribute it***. *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 2d 535, 539 (S.D.N.Y. 2015) (internal citations omitted) (emphasis added).   The circumstances in which an implied license may be found are exceedingly narrow and require evidence of "a meeting of the minds between the licensor and licensee such that it is fair to infer that the licensor intended to grant a nonexclusive license." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013).

Here, Concannon has sufficiently pled that he had no meeting of the minds regarding Defendants' exploitation of the Concannon Jacket. Mr. Porowski is a fan of Concannon and wore several Concannon Works on Queer Eye. ECF No. 30. at ¶ 39. In addition to wearing ready-to-wear Concannon Works, Concannon provided and Porowski wore several custom Concannon Works to Porowski from 2017 to 2021. *Id.* at ¶ 40. Every time a Concannon Work was featured on Queer Eye, ITV America would notify Concannon and provide a narrow release granting ITV America (on behalf of Netflix) the limited right to feature Concannon Works on the show and in

connection with the show's advertising. *Id.* at ¶ 38 - 40. Further, Mr. Porowski would credit the Concannon Works prominently tagging Concannon in social media posts and discussing him in interviews. *Id.* Thus, through their previous business interactions, Concannon expected that Queer Eye would contact him when Mr. Porowski wore a Concannon Work on the show. *Id.*   In turn, Concannon would typically agree to allow Queer Eye to display the Concannon Work both on the show and in connection with advertising for the show. *Id.* Queer Eye never asked and Concannon never agreed to replicate his work in connection with third-party collaborations. *Id.*

Importantly, Queer Eye did not seek Concannon's permission to feature the Concannon Jacket on the show. *Id.* at ¶ 40. Due to Concannon and Queer Eye's extensive history, Concannon believed that this was an oversight by ITV and was happy that Mr. Porowski continued to credit him as the designer of the Concannon Jacket. *Id.* at ¶ 43. However, Concannon was unaware of Queer Eye's collaboration with Defendants and thus could not have agreed to let Defendants replicate the Concannon Jacket in the LEGO Set.[4] *Id.* at ¶ 44. Concannon had no intention of licensing the Concannon Jacket to be replicated in the LEGO Set and reached no meeting of the minds with ITV on exploiting his work outside of the usual scope of their licenses. *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 142 (S.D.N.Y. 2019) (holding that the inquiry focuses on the licensor's objective intent at the time of creation and delivery of the copyrighted work as manifested by the parties' conduct); *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 317 (S.D.N.Y.2000) (holding that "[a]n implied [non-exclusive] license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose.").

---

[4] Concannon does not allege that he owns any intellectual property with respect to the design of the leather jacket. Rather, Concannon pleads and has a registration for the design elements, layout, and overall aesthetic elements he designed and added to the existing jacket.

In its Motion, LSI heavily relies on *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020). In *Solid Oak Sketches* the plaintiff, which held the copyright to five tattoo designs inked on NBA players, alleged that defendant video game companies infringed on its copyrights when the video games at issue depicted the NBA players (including their visible tattoos). *Id*.

First, *Solid Oak Sketches* concerns tattoos which, in stark contrast to a jacket, are an unremovable element of a person's likeness. *Id.* Quite obviously, the basketball players in *Solid Oak Sketches* could not interchangeably swap out their tattoos and, as a result, it was a reasonable expectation that the tattoos would be seen as a part of their likeness. *Id.* However, the Concannon Jacket is a removable clothing article that is separate from Mr. Porowski's likeness. Indeed, Defendants acknowledge the difference between a tattoo, which forms part of someone's likeness and an item of clothing, which does not, because they provided different clothing pieces for the Antoni figurine to wear in the LEGO Set. Complaint at ¶ 56 (showing the Antoni figurine in an alternative outfit consisting of a plain white t-shirt).

While Mr. Porowski has the right to wear the Concannon Jacket, Concannon retained all intellectual property with respect to the design. *Id*. at ¶ 41. Mr. Porowski acknowledges that by crediting Concannon as the designer behind the piece. *Id*. While Concannon expected that Mr. Porowski would be seen wearing the Concannon Jacket, he never expected that the Defendants would exploit his designs for their own profit in the LEGO Set. *Id.* LSI's argument leads to the absurd conclusion that merely owning a protected piece of clothing gives the owner the unfettered right to replicate and distribute the work. If LSI's argument is credited, any celebrity gifted with a designer clothing item would have the unrestricted right to recreate and distribute copies of the

clothing item, since it would be considered part of their likeness.[5] This is in direct contravention of the purpose of the Copyright Act.

Second, the court found that there was an implied license in *Solid Oak Sketches* in part because the NBA players had never "requested nor agreed to limit the display or depiction of the images tattooed onto their bodies." *Solid Oak Sketches*, *LLC*, 449 F. Supp. 3d at 346. Here, Concannon and ITV had an extensive licensing history which specifically limited the display of Concannon Works. Every time a Concannon Work was featured on Queer Eye, ITV America would notify Concannon and provide a narrow release granting ITV America (on behalf of Netflix) the limited right to feature Concannon Works on the show and in connection with the show's advertising. *Id.* at ¶ 38-40. In other words, Concannon and ITV were in agreement on the limited depiction of certain Concannon Works and ITV had no right to grant Defendants the right to replicate the Concannon Jacket. *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 143 (S.D.N.Y. 2019) (holding that written agreements are compelling evidence of a party's expectations with respect to licensing and finding that the defendant's argument for an implied license was inconsistent with its limited scope for licensing in the past). LSI improperly asks the Court to look outside the Complaint and expand the scope of ITV's right to display the Concannon Jacket on Queer Eye and in connection with advertisements for the show.

---

[5] LSI demonstrates a misunderstanding of the first sale doctrine. Under the first sale defense, once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution. 17 U.S.C.A. §§ 106(3), 109. As such, Concannon acknowledges that by selling the Concannon Jacket to Mr. Porowski, he does not have an exclusive right to distribute the Concannon Jacket and Mr. Porowski is entitled to sell the Concannon Jacket to a third party. However, the first sale doctrine does not entitle the owner the rights to redistribute copies of purchased copyrighted works. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013), aff'd, 910 F.3d 649 (2d Cir. 2018). For instance, purchasing a piece of art entitles the owner to possess and sell that work. However, it does not extend to recreating and distributing that piece of art on apparel.

Third, and importantly, *Solid Oak Sketches* was resolved on summary judgment based on extensive discovery and a factual record regarding the intent and scope of the parties' relationship and licensing. LSI's conclusory statement that the procedural posture of *Solid Oak Sketches* is irrelevant (Motion, 10) because the allegations in the Complaint establish the same core facts shows a misunderstanding of Fed. R. Civ. P. 12(b)(6). Concannon has sufficiently pled that he never expected nor did he agree to the exploitation of the Concannon Jacket in the LEGO Set. LSI's argument that Concannon granted Defendants an implied licenses to the Concannon Jacket should be rejected.

> **b. Concannon Has Sufficiently alleged that LSI's Use of the Concannon Jacket is Infringing and Fails to be Transformative.**

Fair use is an affirmative defense to copyright infringement, and thus the party asserting fair use bears the burden of proof. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). The determination of fair use is a "mixed question of fact and law," which necessitates "an open-ended and context-sensitive inquiry," *Cariou v. Prince*, 714 F.3d 694, 704–05 (2d Cir. 2013). As such, as pointed out by LSI, fair use is not typically an issue decided on a motion to dismiss. A court cannot engage in the fair use inquiry until it has been presented with facts relevant to evaluating the fair use factors. *Graham v. Prince,* 265 F. Supp. 3d 366, 377 (S.D.N.Y. 2017) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). Courts should only grant motions to dismiss infringement claims based on a defendant's fair use defense when "discovery would not provide any additional relevant information" and "[a]ll that is necessary for the court to make a determination as to fair use are the two [works] at issue." *May v. Sony Music Entm't*, 399 F. Supp. 3d 169, 188 (S.D.N.Y. 2019)(quoting *Arrow Productions, Ltd. v. Weinstein Co.*, 44 F. Supp.3d 359, 368 (S.D.N.Y. 2014)). Due to the fact-sensitive nature of the inquiry,

courts generally do not address the fair use defense until the summary judgment phase. *Id.* (citing *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016)). In fact, the Second Circuit has even stated that "the fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area." *Graham v. Prince*, 265 F. Supp. 3d 366, 377 (S.D.N.Y. 2017) (citing *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991).

In light of the foregoing, it is unsurprising that LSI fails to cite to a single analogous case in which this Court grants a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the basis of fair use. Rather, LSI relies on cases resolved on summary judgment. *See, e.g., BWP Media USA,. Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015) (granting summary judgment when the defendants unauthorized use of copyrighted photographs in its for-profit website was not fair use). LSI further cites to cases in which the district court's dismissal of copyright claims on the basis of fair use was overturned by the Appellate Court because dismissal based on Fed. R. Civ. P. 12(b)(6) was improper. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 187 (2d Cir. 2016) (holding that the statutory factors of fair use weighed in favor of the plaintiffs on a 12(b)(6) record and the dismissal of the complaint based on fair use was in error);[6] *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013) (vacating the judgment of the district court and holding that the defendants had not adequately demonstrated that they were entitled to dismissal of plaintiff's claims under the fair use defense).[7]

---

[6] The court in *TCA Telivision Corp.* affirmed the dismissal of the Complaint on the basis that the plaintiff failed to plead a valid copyright. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 187 (2d Cir. 2016).

[7] The court in *Kelly-Brown* was considering fair use in the context of the Lanham Act as opposed to the Copyright Act. *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013).

LSI solely relies on *LMNOPI v. XYZ Films, LLC*, 449 F. Supp. 3d 86, 91 (E.D.N.Y. 2020), which is distinguishable from the facts as alleged by Concannon in the Complaint. In dismissing the plaintiff's complaint in *LMNOPI,* the court found that the defendant's use of a copyrighted mural was de minimis when it was briefly shown in the background of a film, partially obscured by the actress and irrelevant to the plot point. *Id.* On its face, LSI's fact-intensive and conclusory analysis, which attempts to incorporate extrinsic evidence demonstrates that its Motion is inappropriate to resolve pursuant to Fed. R. Civ. P. 12(b)(6), in contrast to *LMNOPI.* Concannon has sufficiently pled that Defendants' infringement was more than de minimus. Indeed, the Infringing Work is a complete recreation of the Concannon Jacket and is prominently displayed in the LEGO Set and its accompanying advertisements. Complaint at ¶ 51-53. As such, a finding of fair use is inappropriate at this stage.

However, even when weighing the statutory factors of fair use, it is clear that Concannon has sufficiently pled that Defendants' use of the Concannon Jacket was not transformative. In determining whether a fair use defense applies, courts are required to consider four non-exclusive factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Graham v. Prince*, 265 F. Supp. 3d 366, 376–77 (S.D.N.Y. 2017) (quoting 17 U.S.C. § 107)

### i. Defendants' Failed to Add Any Transformative Elements in its Recreation of the Concannon Jacket.

The first factor, which addresses the manner in which the copied work is used, is the "heart of the fair use inquiry." *Campbell,* 510 U.S. at 579. As the Supreme Court instructed in *Campbell*, the central purpose of the inquiry is to determine whether the new work merely supersedes the

objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. *Id.* "A use is transformative if it does something more than repackage or republish the original copyrighted work." *N. Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 614 (S.D.N.Y. 2015) (internal citations omitted). The allegedly offending use of the original work is "transformative if it "alter[s] the first [work] with new expression, meaning, or message" and is the "very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Campbell*, 510 U.S. at 579.

In asserting fair use, LSI improperly again relies on *Solid Oak Sketches* which is easily distinguishable. *See supra.* at 13-15. In *Solid Oak Sketches*, the tattoos were included for the purpose of recreating the likeness of the NBA players, which could not be separated from the tattoo itself. *Solid Oak Sketches*, *LLC*, 449 F. Supp. 3d at 346. Here, however, Defendants recreated and highlighted the design of the Concannon Jacket in the infringing work for Defendants' own benefit. Defendants argue that the Concannon Jacket was designed as a means of Mr. Porowski's self-expression and was akin to commissioning a tattoo or particular hair design. Motion at 21. However, this assertion is directly contradicted by the Complaint. Specifically, Concannon pleads that Mr. Porowski asked Concannon to design a custom piece with elements distinctive to the Trade Dress. Complaint at ¶ 40. Concannon does not plead, nor is it true, that Mr. Porowski dictated the elements of the Concannon Jacket. Rather, Concannon designed the Concannon Jacket to incorporate the distinctive style of Concannon Works while creatively incorporating Concannon's take on Mr. Porowski. *Id.*

LSI further argues that the Infringing Work represents an "inconsequential portion of" the Queer Eye Set. *See* Motion at 21. This argument is both insulting and disingenuous. While the Defendants' use of the Concannon Jacket may be inconsequential to them, Concannon's designs

are his livelihood and sole means of supporting his family and health conditions. Further, LSI's assertion is directly contradicted by its own designers. As pled by Concannon, the designers of the Lego Set specifically stated that they wanted to recreate the Concannon Jacket. *Id.* at ¶ 54. The mere fact that the Infringing Work was created as part of the LEGO Set does make the purpose transformative, absent a meaning that supersedes the Defendant's blatant and intentional infringement. As pled by Concannon, Defendants have copied the Concannon Jacket for the pure purpose of recreating it. Defendants do not provide any further commentary or transformative elements.

> **ii.    Defendants Substantially used the Entirety of the Concannon Jacket.**

In considering the substantiality of the infringement, the Court must focus upon whether "[t]he extent of ... copying" is consistent with or more than necessary to further "the purpose and character of the use." *Campbell,* 510 U.S. at 586–87, 114 S.Ct. 1164. "In general, the more of a copyrighted work that is taken, the less likely the use is to be fair." *Swatch*, 756 F.3d at 89 (internal citations omitted). "[B]y focusing on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 144 (2d Cir. 1998) (quoting *Texaco*, 60 F.3d at 926). In *Campbell*, for example, the Supreme Court determined that a "parody must be able to 'conjure up' at least enough of [the] original [work] to make the object of its critical wit recognizable" and then determined whether the amount used of the original work was "no more than necessary" to satisfy the purpose of parody. *Id.* (quoting *Campbell,* 510 U.S. at 588–89). In contrast, in *Castle Rock Entm't, Inc.,* the Second Circuit held that the defendant's excessive use of

the copyrighted material was for entertainment purposes, rather than commentary, and would not serve a critical or otherwise transformative purpose. *Id.*

LSI's argument boils down to the argument that because LSI's use is transformative, it is justified in copying any elements of the Concannon Jacket that it desired. However, the fact that Defendants desired to create Mr. Porowski's likeness does not make their use of the Concannon Jacket transformative. Indeed, this purpose fails to add any transformative meaning. Further, Defendants could have portrayed Mr. Porowski's likeness without copying the Concannon Jacket. Quite obviously, Mr. Porowski wears other clothing and accessories beyond the Concannon Jacket. Mr. Porowoski dresses in additional clothing on Queer Eye and is recognizable in other sartorial choices. Mr. Porowski's appearance and likeness is separate from the Concannon Jacket, and Defendants admit as such by including other accessories that depict Mr. Porowski's clothing style. Complaint at ¶ 56. In recreating Mr. Porowski's likeness, Defendants did not need to borrow at all from the Concannon Jacket. Yet, they chose to use the entire design of the Concannon Jacket in the Infringing Work. Moreover, Defendants made no attempt to obscure the borrowed elements of the Concannon Jacket. *Solid Oak Sketches, LLC v. 2K Games, Inc*., 449 F. Supp. 3d at 345 (holding that the use of the tattoos was insubstantial when the "undisputed factual record shows that average gameplay is unlikely to include the players with the Tattoos and that, even when such players are included, the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures in groups of player figures."). Further the Solid Oak Sketches court found significant that "the Tattoos are not featured on any of the game's marketing material". *Id.*[8] As pled by Concannon, the Infringing Work was highlighted in the LEGO Set and in all advertising campaigns related to the LEGO Set. Complaint at ¶ 54 – 59.

---

[8] In *Solid Oak Sketches,* the court specifically notes that it had denied the defendant's argument at the pleading stage since it was "unable to conclude without the aid of extrinsic evidence that 'no reasonable

LSI further attempts to draw distinctions between the Concannon Jacket and Infringing Work that do not exist. Specifically, it attempts to compare each element of the Concannon jacket separately. Motion, at 16- 19. As pled by Concannon, his copyrights extend to the overall aesthetic of the work and cover the placement and overall composition of the Concannon Jacket. Complaint at ¶ 41.  Further, the absence of certain elements of the Concannon Jacket does not address Concannon's allegations of substantial similarity between other protectable elements of the '952 Copyright.

First, LSI unconvincingly argues that the LEGO Minifigure head and globe as pictured on the Infringing Work are not on the Concannon Jacket. Motion, at 17-19. However, these designs are derivative of the skull and circular chain link pattern found on the Concannon Jacket. Complaint at ¶ 41.  And, the placement and overall aesthetic of the design copies directly from the Concannon Jacket. *Id.* at ¶ 48.

Second, LSI argues that the yang symbol and safety pins are part of the public domain. otion, at 17-19. However, the overall composition, placement, and unique features such as the placement of an expression inside the yang symbol are all protected elements copied from the Concannon Jacket. Complaint at ¶ 48.

Third, the placement of the peace sign on the right collar is virtually identical between the works. *Id.*

Fourth, LSI improperly brings in extrinsic evidence regarding its alleged "REBUILD THE WORLD" campaign and makes conclusions that are improper at this stage of litigation. Motion, at 17-19. As pled by Concannon,  Defendants attempted to copy the placement and hand-painted graffiti style of Concannon on the Infringing Work. Complaint at ¶ 51. To the extent LEGO altered

---

jury, properly instructed, could find that the two works are substantially similar.'" *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d at 345 (internal quotes omitted).

the original text on the back of the jacket, it did so in a way that is still intended to evoke Concannon's signature style and brand so that the Infringing Product would look like a Concannon Work and benefit from the association with Concannon's trademark. *Id.* Indeed, LEGO altered the text in the same way that a genuine Concannon Work would, by customizing the phrase to evoke the "customer's" interests. Here, because LEGO creates blocks that are used to build things, the phrase "REBUILD THE WORLD" on the Lego version of the jacket, is exactly the type of pop culture pun that would be included on a genuine Concannon Work bearing the Trade Dress. *Id.*

Fifth, LSI argues that the reduced size obscures certain design elements found on the Infringing Work. Motion, at 18-19. As seen in an image of the Infringing Work, this contention is false. Complaint at ¶ 48.  As sufficiently pled by Concannon, the Infringing Work prominently and discernably shows the copied elements of the Concannon Jacket.

### iii.   Defendants' Use of the Concannon Jacket is Purely Commercial.

In its Motion, Defendants attempt to sidestep this factor, which weighs whether Defendants' use was for a commercial purpose. This consideration arises when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work. *Arrow Prods., LTD. v. Weinstein Co.*, 44 F.Supp.3d 359, 369–70, 2014 WL 4211350, at *8 (S.D.N.Y.2014). The "importance of this factor is determined on a sliding scale: the more transformative the work, the less important the commercial purpose." *N. Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 618 (S.D.N.Y. 2015). The purpose of this factor is to consider whether the copyrighted work is "of the creative or instructive type that the copyright laws value and seek to foster." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

Defendants rely heavily on *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006). However, the comparison falls flat. *Bill Graham Archives* considers the use of

posters in a biographical book about a famous music group. In *Bill Graham Archives,* the court specifically noted that the defendant did not exploit the original work for commercial gain and did not use any of the images in commercial advertising. *Id.* Rather, it used pictures to describe the life of the Grateful Dead, and thus the use was incidental to the commercial biographical value of the book. *Id.* In stark contrast, the LEGO Set is not a biographical work aimed at educating and informing the public. Rather, it is a toy centered around aesthetics and is meant to capitalize on the popularity of Queer Eye. As pled by Concannon, Defendants are indisputably a commercial business motivated by profits. Complaint at ¶ 2.  Defendants used the popularity of cultural pieces like Queer Eye and the Concannon Jacket to sell their products. Complaint at ¶ 47.  Concannon has sufficiently pled that the Infringing Work lacks any transformative elements. *See supra* at 17-19.  Defendants recreated the Concannon Jacket for the sole purpose of appealing to Queer Eye fans that would recognize Concannon's distinctive work and sell more Lego sets. This factor weighs heavily against LSI's assertion that its use constitutes fair use.

### iv.   Defendants Have Negatively Impacted the Market for Concannon Works.

Under this factor, the Court should "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164. The fourth factor must also "take account . . . of harm to the market for derivative works," defined as those markets "that creators of original works would in general develop or license others to develop," *Id.* at 592. In considering this factor, the Court should be  "mindful that [t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original, even though the fair use, being transformative, might well harm, or even destroy, the market for the

original." *Cariou*, 714 F.3d at 709 (internal quotes omitted). Furthermore, "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *N. Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 622 (S.D.N.Y. 2015)(quoting *Am. Geophysical Union,* 60 F.3d at 929).

LSI argues that the Concannon Jacket and the Infringing Work have separate markets because one is a toy. Motion at 24. LSI further argues that the Complaint is devoid of allegations that Concannon intends on entering the global toy market. *Id.* LSI considers the fourth factor in too literal of a manner. Concannon need not allege that it intended to use the design of the Concannon Jacket to enter the toy market. Concannon is a multidisciplinary artist who creates art in forms outside of clothing. Complaint at ¶ 18. Concannon has sufficiently alleged that by copying the design of the Concannon Jacket, Defendants have harmed the distinctiveness and market for any derivative works that Concannon could make. Concannon relies on the exclusivity and distinctiveness of his designs in order to sell Concannon Works. *Id.* at 66-67. It further sets a dangerous precedent that any company can borrow copyrighted works without paying licensing fees, if they simply do so in a different market than the original. As such, this factor weighs against the finding of fair use.

## II.   JAMES CONCANNON HAS SUFFICIENTLY ALLEGED HIS CLAIMS FOR TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION (COUNT IV) IN THE SECOND AMENDED COMPLAINT.

Trade dress "originally included only the packaging or dressing of a product, but it has been expanded to encompass . . . the design or configuration of the product itself." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir.2001). In order to state a claim for federal trade dress infringement and unfair competition under the Lanham Act, "a plaintiff must

allege that '(1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion' between the products". *AJB Enterprises, LLC v. BackJoy Orthotics, LLC*, 3:16-CV-00758 (VAB), 2017 WL 4400746, at *3 (D. Conn. Sept. 29, 2017)(quoting *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F.Appx. 389, 391 (2d Cir. 2003)). Additionally, a plaintiff must "offer a 'precise expression of the character and scope of the claimed trade dress.'" *Id.* ( quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)). The Second Circuit has urged that "courts must not lose sight of the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." *Landscape Forms, Inc.*, 113 F.3d at 375.

Here, Concannon has sufficiently pled factual allegations in support of its claim for trade dress infringement and unfair competition.

### a.  Concannon has Adequately Pled the Elements of his Trade Dress.

In defining a trade dress, a plaintiff should describe both the trade dress elements and an explanation of how they are distinctive. *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 347 (E.D.N.Y. 2014). Although "there is no question that trade dress may protect the 'overall look' of a product" since "each element of a trade dress individually might not be inherently distinctive . . . the combination of elements may be indicative of source." *Landscape Forms*, 113 F.3d at 381 (internal quotation marks and citation omitted). Illustrating the distinctive elements of a trade dress can sufficiently establish a trade tress at the pleading stage. *AJB Enterprises, LLC v. BackJoy Orthotics*, LLC, 3:16-CV-00758 (VAB), 2017 WL 4400746, at *4 (D. Conn. Sept. 29, 2017).

Here, Concannon has sufficiently pled the distinctive elements of the Trade Dress to include: (1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop

25

culture; (3) hand-painted graffiti-style lettering. Complaint at ¶ 20. These elements are non-functional and Concannon uses this Trade Dress across all of its Concannon Works. *Id.* As such, Concannon has sufficiently alleged a distinctive Trade Dress with specificity. *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 503 F.Supp. 647 (S.D.N.Y.1980), *aff'd* 644 F.2d 946 (2d Cir.1981) (finding a protectable trade dress when a volume of books had consistent glossy white covers of similar size and displaying the Harlequin trademark at the top of the cover).

LSI acknowledges the six allegations that consistently describe the Concannon Trade Dress. Motion, at 29. But, LSI confusingly argues that Concannon's description is inconsistent. This is unsurprising given LSI's fundamental misunderstanding of the underlying elements of the Concannon Works beyond an interest in copying its creative aspects.  As Concannon has consistently pled, all Concannon Works are designed with hand-painted graffiti letters. Complaint at 20. Each of the Concannon Works uses satirical phrases to comment on punk rock and pop culture. *Id.* The style is easily recognizable by the relevant consumers and distinct to Concannon. *Id.* at 19. Concannon also offers custom pieces outside of his ready-made pieces. *Id.* at 30. Customers expect and Concannon exclusively designs custom pieces that display the Trade Dress. *Id.* at 31. Contrary to LSI's assertion, Concannon pleads that his custom pieces can combine his trademark aesthetic with elements personal to the customer. *Id.*

LSI then proceeds to argue that the saying on the Concannon Jacket, "THYME IS ON MY SIDE" does not criticize "mainstream pop culture" or "comment satirically on punk rock." *See* Motion at 29 -30. Apparently, LSI is not a fan of the Rolling Stones, a pioneering band and cultural icon in the world of rock. Indeed, this phrase was inspired by "Time is on My Side" which is performed by the Rolling Stones. The original song generally comments about losing a love interest even though it's just a matter of time until they return. Concannon uses the title to comment

on the resurgence of punk rock while incorporating Mr. Porowski's interest in cooking by changing "Time" to "Thyme." This is a pun signature to Concannon's trade dress and is seen on all the Concannon Work. While LSI may fail to grasp the pop culture reference and commentary in each of the Concannon Works, true creatives and consumers of Concannon Works readily identify it as a source identifier of Concannon's work.

LSI improperly relies on *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 767 (S.D.N.Y. 1993). In this case, after a three-day trial on the merits, the Court found Disney was unable to prove the existence of its alleged trade dress, because Disney's videocassette packages each inconsistently displayed the purported elements of its trade dress. *Id.* Here, LSI seems to argue that Concannon's use of the Trade Dress is inconsistent solely because it does not understand the pop-cultural references being used. Indeed, each of the phrases on the Concannon Works refers to significant music and pop culture icons in a way that comments on society. Moreover, LSI misunderstands Concannon's Trade Dress in saying that the Concannon Works have differing text color, lengths, and style. However, Concannon does not claim any of these elements in its Trade Dress. Rather, it claims the hand-painted graffiti style of writing. Complaint at ¶ 20. The variations in text color, length, and style are meant to highlight and distinguish the hand-painted style of Concannon in contrast to mass-produced print apparel.

Concannon has sufficiently pled the Trade Dress and LSI's Motion with respect to Count IV of the Complaint should be denied.

### b.  The Trade Dress has Acquired Secondary Meaning

In alleging secondary meaning, a plaintiff must sufficiently distinguish its trade dress from those of others. *ID7D Co., Ltd. v. Sears Holding Corp.,* 311CV1054 VLB, 2012 WL 1247329, at *8 (D. Conn. Apr. 13, 2012). The secondary meaning analysis considers whether "the purchasing public associates [the] dress with a single producer of source rather than just with the product itself." *Id.* (internal quotations omitted). The Court can consider elements such as: (1) plaintiff's advertising expenditures, (2) consumer surveys, (3) sales success, (4) unsolicited media coverage, (5) attempts to plagiarize the trade dress, and (6) the length and exclusivity of plaintiff's use of the dress." *Id.* (citations omitted). However, "[N]o single factor is determinative, and every element need not be proved." *Id.*

In its Motion, LSI improperly expects Concannon to prove every factor in establishing secondary meaning for its Trade Dress. LSI shows unrealistic expectations for a small artist like Concannon. Concannon pleads that he is a singular artist working on his own and selling Concannon Works to help support his livelihood.  Complaint at ¶ 62. Concannon is not a multi-million-dollar company like Defendants that can readily conduct consumer surveys and regularly budget for mass advertising. Rather, over the past decade, Concannon has built his business through the creativity and distinctive style of his work. *Id.* at ¶ 19. Concannon has advertised and sold Concannon Works online and through social media. *Id.* Concannon's signature style and commentary on pop culture resulted in certain popularity within celebrity circles. *Id.* at ¶ 26. Further, Concannon has pled and attached samples of infringing works that attempt to copy Concannon's Trade Dress. *Id.* at 35.[9]

---

[9] LSI attempts to minimize Concannon's work by stating that counterfeit items were meant to capitalize on the celebrity's brands, rather than the Trade Dress. But, these two concepts are one in the same. As Concannon has pled, consumers have seen celebrities wear Concannon Works. As a result, the Trade Dress has gained popularity and distinctiveness. Consumers seek Concannon Works, and in turn, counterfeiters seek to copy the Trade Dress.

Again, LSI relies on a case easily distinguishable from the facts at bar. Motion, at 32, citing *Heptagon Creations, Ltd. v. Core Group Mktg. LLC*, 11 CIV. 01794 LTS, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011), *aff'd*, 507 Fed. Appx. 74 (2d Cir. 2013). In *Heptagon Creations,* the court ruled that the plaintiff failed to provide allegations sufficient to establish that its individual pieces whose trade dress was at issue acquired secondary meaning when the plaintiff's own exhibits failed to show references to Heptagon. *Id.* Here, Concannon pleads and shows that celebrities, including Porowski will tag and credit Concannon as the designer of the Concannon Works that they wear and promote on social media and in interviews.[10] *Id.*  at 27. Indeed, LSI cites to an extrinsic article in which Porowski identifies Concannon as the designer of the Concannon Jacket. *See* Motion at FN 5. Further, celebrities have worn and Concannon has been credited for Concannon Works on film and television shows like *Native Son* and *Queer Eye. Id.* at 28. Concannon pleads that this has resulted in more celebrity and non-celebrity consumers seeking out Concannon Works, and thus sufficiently pleads secondary meaning. *See*, *e.g*., *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (holding that while the plaintiff admits that its advertising expenditures were relatively low, the brand's mark achieved widespread public exposure through its affiliation with prominent celebrities and the plaintiff's strategy of using celebrities to wear its articles of clothing). Further, this has contributed to consumers associating the distinctive Trade Dress with Concannon and specifically seeking out Concannon Works. *Id.* at 30. Concannon has sufficiently pled that its Trade Dress has acquired secondary meaning.

### c.   The Infringing Work Creates a Likelihood of Confusion.

---

[10] Again, LSI shows its disdain for small artists by stating that the Instagram post by "deathworldwide" which credited Concannon should hold little weight because the account is unverified and only received three hundred and fifty likes. *See* Motion at 35. While LSI snubs Death Worldwide due to its unverified account, the band is considered a pioneer punk rock band from the 70s with a cult like following that includes the Stokes and Ramones. *See, e.g., https://www.nytimes.com/2009/03/15/arts/music/15rubi.html.* Given Concannon's signature take on punk rock culture, promotion by bands such as Death Worldwide has significantly boosted his sales and presence with his customer base.

Finally, Concannon has sufficiently pled a likelihood of confusion between the Trade Dress and the Infringing Work pursuant to the *Polaroid* factors. However, LSI errs again in stating that Court should weigh all the *Polaroid* factors in the strictest sense.[11] "The *Polaroid* factors are not an exhaustive list of relevant considerations, and must not be applied mechanically. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *ID7D Co., Ltd. v. Sears Holding Corp.*, 311CV1054 VLB, 2012 WL 1247329, at *10 (D. Conn. Apr. 13, 2012) (internal quotation marks and citation omitted).

First, Concannon has pled that its Trade Dress is strong. A mark is considered strong if it is distinctive, arbitrary, and fanciful. *Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d 42, 46 (2d Cir. 1994). Even if elements of a trade dress are plain and descriptive, "their manner of combination" can make the mark unique. *Id.* Here, Concannon has sufficiently pled and shown its distinctive and fanciful trade dress which combines: (1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; (2) hand-painted graffiti-style lettering. Complaint at ¶ 20. In combination, these elements establish a unique source identifier for Concannon.

Second, Concannon has sufficiently pled a substantial similarity between the Trade Dress and the Infringing Work. Indeed, the Infringing Work is meant to copy the Concannon Jacket and its associated Trade Dress. Concannon has pled that the Infringing Work borrows the Trade Dress's hand-painted graffiti style lettering and attempts to invoke Concannon's signature tongue-in-cheek pop culture reference by using the phrase "REBUILD THE WORLD" as a circular reference to Legos. Complaint at ¶ 51.

---

[11] LSI continues to improperly cite cases which were resolved on a summary judgment basis. *See Easter Unlimited, Inc. v. Rozier*, 18-CV-06637 (KAM), 2021 WL 4409729, at *24 (E.D.N.Y. Sept. 27, 2021). LSI asks this Court to make inferences and reach conclusions that the court in *Easter Unlimited* only reached after extensive discovery.

Third, Concannon has pled both the proximity between the works and a likelihood of confusion.[12] Defendants' own designers have stated that the Concannon Jacket is "iconic." Complaint at ¶ 54. Concannon has pled that Porowski has continuously credited Concannon as the designer of the Concannon Jacket. *Id*. at ¶ 43. As a result, consumers readily associate Concannon as the source of the Concannon Jacket. *Id.* at ¶ 66. Since Defendants have openly admitted to recreating the Concannon Jacket for the LEGO Set, Concannon has sufficiently pled that consumers are likely to falsely affiliate Concannon with the Infringing Work.[13] *Id*. at ¶ 109. This establishes that there is a strong likelihood of confusion as to the source of the Infringing Work.

Fourth, Concannon does not merely rely on the conclusory statement that Defendants have acted in bad faith. Rather, Concannon incorporates by reference an interview with the designers of the Lego Set admitting that Defendants had knowledge of the Concannon Jacket and that they wanted to recreate this "iconic leather jacket" in LEGO version. *Id*. at ¶ 54. Defendants explicitly refer to the Concannon Jacket on a standalone basis and not as a part of Porowski's likeness. *Id.* LSI's contention that it simply attempted to accurately recreate Porowski's likeness is disingenuous in light of the fact that it could have easily done so without copying the Concannon Jacket. As Concannon pleads and LSI does not dispute, Defendants took no steps to credit or compensate Concannon for his original work. *Id.* at ¶ 53.

As such, Concannon has sufficiently pled the elements of trade dress infringement and unfair competition. Thus, LSI's Motion should be denied.

---

[12] A plaintiff need not show actual confusion to state a claim under the Lanham Act. *Fruit-Ices Corp. v. Coolbrands Int'l*, Inc., 335 F. Supp. 2d 412, 426 (S.D.N.Y. 2004).

[13] Concannon is known as a multi-disciplinary artist that works in multiple mediums. Further, Concannon is prominently known as designer that frequently provides clothing for Porowski and *Queer Eye*. As such, there is a natural bridge between the Concannon Jacket and the Infringing Work. Consumers are likely to falsely associate Concannon with the design of the Infringing Work in the LEGO Set.

### III.   JAMES CONCANNON HAS SUFFICIENTLY STATED A CLAIM FOR VIOLATION OF CUTPA (COUNT V) IN THE SECOND AMENDED COMPLAINT.

In establishing a cause of action under CUTPA, a plaintiff must establish: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons." (Internal citations and quotations omitted). *Zulick v. Patrons Mutual Ins. Co.,* 287 Conn. 367, 378 n. 11, 949 A.2d 1084 (Conn.2008). All three criteria do not need to be satisfied to support a finding of unfairness since a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 506–07 (D. Conn. 2009). Thus, a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. *Id.* Although a Lanham Act violation is a per se violation of CUTPA, "a party need not successfully assert a statutory claim to maintain a CUTPA claim." *Indiaweekly.com, LLC.*, 596 F. Supp. 2d at 506 (citing *Murphy v. Provident Mutual Life Insurance Co.*, 923 F.2d 923, 929 (2d Cir.1991) (considering CUTPA claim after dismissing trademark claim based on the same conduct)).

Here, Concannon has sufficiently pled a violation of the Lanham Act. *See supra.* at. 24 – 31. However, even if the Court dismisses count IV, Concannon has established an independent action under CUPTA. Concannon has sufficiently pled: (1) Defendants have violated public policy in misappropriating Concannon's intellectual property; (2) Defendants' actions are exploitive and oppressive to small artists that supply the creative lifeblood for industries like the one that

Defendants dominate; and, (3) Defendants have severely damaged Concannon and threatened his livelihood through its shameful theft of Concannon's intellectual property which constitutes Concannon's livelihood. *See generally* Complaint.

As such, Concannon has sufficiently pled a cause of action pursuant to CUPTA and LSI's Motion should be denied with respect to Count V of the Complaint.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should deny LSI's Motion to Dismiss the Second Amended Complaint and all other relief that it deems just and equitable.

Dated: May 13, 2022                                  Respectfully submitted,

                                                     JAYARAM LAW, INC.

                                            By:      <u>/s/ Vivek Jayaram</u>
                                                     Vivek Jayaram (admitted p.h.v.)
                                                     Elizabeth Austermuehle (admitted p.h.v.)
                                                     Jayaram Law, Inc.
                                                     142 West 57th Street
                                                     11th Floor
                                                     New York, NY 10019
                                                     Telephone: (212) 287-5638
                                                     vivek@jayaramlaw.com
                                                     liz@jayaramlaw.com

                                                     Steven Coyle (ct21039)
                                                     Nicholas Geiger (ct28060)
                                                     Katherine Tassmer (ct31098)
                                                     Cantor Colburn LLP
                                                     20 Church Street, 22nd Floor
                                                     Hartford, CT 06103
                                                     Telephone:  (860) 286-2929
                                                     scoyle@cantorcolburn.com
                                                     ngeiger@cantorcolburn.com
                                                     ktassmer@cantorcolburn.com

                                                     *Attorneys for Plaintiff James Concannon*

## <u>CERTIFICATE OF SERVICE</u>

I, Vivek Jayaram, hereby certify that on May 13, 2022, a true and correct copy of the

foregoing document was filed electronically. A notice of this filing was emailed to all parties via

the Court's CM/ECF System.

<u>/s/ Vivek Jayaram</u>

34