UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES CONCANNON, <br><br> *Plaintiff,* <br><br> *v.* <br><br> LEGO SYSTEMS, INC., and LEGO SYSTEM A/S <br><br> *Defendants.* | Civil No. 3:21-cv-01678 (JBA) <br><br> March 15, 2023 |

**RULING ON MOTION TO DISMISS AND MOTION TO SEAL**

**Table of Contents**

I.   Background..................................................................................................4

II.   Legal Standard ..........................................................................................8

III.   Discussion ...............................................................................................8

   A.   Consideration of Documents Outside the TAC................................8

   B.   LEGO's Motion to Seal Exhibit 1................................................ 10

   C.   Copyright Infringement Under 17 U.S.C. § 101 (Count 1) ................. 12

     1.   Implied Non-Exclusive License................................................ 13

     2.   Fair Use .......................................................................... 18

  D. Contributory Copyright Infringement (Count II) and Vicarious Copyright Infringement (Count III)...................................................... 28

  E. Trade Dress Infringement and Unfair Competition Under 15 U.S.C. § 1125(a) (Count IV)................................................................................... 28

     1.   Description of the Trade Dress .............................................. 29

     2.   Nonfunctionality and Secondary Meaning................................ 32

     3.   Likelihood of Confusion...................................................... 36

4.    Overall Assessment on Prima Facie Trade Dress Infringement .................. 42

F.    Violation of CUTPA Under Conn. Gen. Stat. § 42- 110a, et seq (Count V) ...... 42

IV.   Conclusion ............................................................................................... 43

**SUMMARY**

Plaintiff James Concannon brought suit against Defendant LEGO Systems, Inc. ("LSI") and Defendant LEGO System A/S ("LSAS") alleging that Defendant LSI produced a LEGO piece (the "LEGO Jacket") in its "Queer Eye – the Fab 5 Loft" Lego play set (the "Fab Five Set") copying a design that Plaintiff painted on a black leather jacket owned by celebrity Antoni Porowski ("the Concannon Jacket"). (Third Am. Compl. ("TAC") [Doc. # 48].) Plaintiff alleges copyright infringement by LSI (Count 1), contributory copyright infringement by LSAS (Count 2), vicarious copyright infringement by LSAS (Count 3), trade dress infringement by LSI, (Count 4) and unfair competition in violation of CUTPA by LSI (Count 5). (*Id.*)

Defendant LSI moves to dismiss Count 1 on the grounds that it has a valid license that permits use of the jacket, or in the alternative, that its actions constitute fair use. It also moves to dismiss Count 4 and 5 for failure to plead a *prima facie* trade dress infringement claim, which serves as the basis of Plaintiff's Lanham Act (Count 4) and CUTPA (Count 5) claims. (Mot. to Dismiss [Doc. # 35] at 2.) Defendant LSAS joins Defendant LSI's motion to dismiss Counts 1, 4, and 5, and argues as to Counts 2 and 3 that because Plaintiff has failed to plead a claim for direct copyright infringement, the contributory and vicarious copyright claims should be dismissed as well. (Supp. Mem. in Support of Mot. to Dismiss [Doc. # 57] at 2.)

For the reasons that follow, the Court DENIES Defendants' motions to dismiss. Defendant LSI's motion is denied as to Count 1 because it does not show the parties "meeting of the minds" necessary to establish the affirmative defense of an implied nonexclusive license to use Plaintiff's design. Defendant LSI's motion is also denied based on its fair use defense because factual issues remain as to the purpose, character, and nature of the Concannon and Lego Jackets, and the remaining fair use factors do not weigh in Defendant's favor. Defendant LSI's motion is denied as to Counts 4 and 5 because Plaintiff has set forth a

sufficient trade dress definition, and has adequately pled secondary meaning and likelihood of confusion to show a plausible claim on which his Lanham Act claim and the CUTPA claim are based. Defendant LSAS' motion to dismiss Counts 2 and 3 for contributory and vicarious copyright infringement are also denied because the underlying direct copyright infringement claim survives. The Court also DENIES Defendant LSAS' motion to seal for failure to narrowly tailor its sealing request.

## I.  Background

Plaintiff James Concannon is a "multi-disciplinary artist and designer" who alleges that he has "achieved notoriety" as a creator of t-shirts, jackets, and accessories that are recognizable because they feature "short, provocative statements in hand-painted, graffiti-style lettering." (TAC ¶¶ 2, 19.) He describes this "unique combination of provocative, tongue-in-cheek phrases relating to pop culture, with hand-painted, graffiti-style lettering" as a "hallmark" of his aesthetic. (*Id.* ¶ 20.) The "look, feel, and aesthetic" of Plaintiff's products is "consistent," "recognizable and distinctive[;]" "no other artist or designer has released a line of clothing containing this unique combination of specific elements." (*Id.* ¶¶ 22, 23.) Additionally, Plaintiff alleges that because the products "comment satirically on punk rock and pop culture" while being "worn and publicized by celebrities," they also form "part of the culture." (*Id.*) Plaintiff also receives orders for custom products "featuring Concannon's distinctive Trade Dress" and customized by "choosing words or phrases that are tailored to a customer's interest." (*Id.* ¶¶ 30-31.)

Plaintiff identifies numerous celebrities who have been photographed wearing or featuring his work, including "Lady Gaga, Lil Wayne, Suki Waterhouse, Jaime King, and punk rock icons like Jimmy Webb and the band Death." (*Id.* ¶ 26.) At least one of these celebrities made a social media post describing Concannon as "creating a new underground fashion scene with his signature hand-painted" pieces. (*Id.* ¶ 27.) Plaintiff maintains that while he

4

"sells or gifts his custom pieces," he "retains the copyrights to his designs and the Trade Dress in order to conduct business and maintain his distinct designs." (*Id.* ¶ 34.) One celebrity who has worn Plaintiff's works is Antoni Porowski, one of the stars of the Netflix series *Queer Eye,* produced by ITV America. (*Id.* ¶ 29.) Netflix requested Plaintiff's permission for Porowski to wear four Concannon products in the show's first season; Plaintiff signed a release granting ITV the right to feature the products on the show and in connection with the show's advertising. (*Id.* ¶¶ 37, 38.) Through this process, Plaintiff learned that Porowski "was a fan" of his work, and the two became friends. (*Id.* ¶ 39.) Over the next few years, Plaintiff provided Porowski with several additional Concannon products; when these products were featured on the show, "*Queer Eye's* producers sought Concannon's permission and obtained a signed release specifying the Product that would appear on the show and the nature of the rights being granted." (*Id.*)

In 2018, at Porowski's request, Plaintiff created a custom black leather jacket with the words "THYME IS ON MY SIDE" painted on the jacket, a "play on Mr. Porowski's interest in food and cooking." (*Id.* ¶¶ 32, 41.) The artwork embodied on the jacket "is registered with the United States Copyright Office." (*Id.* ¶¶ 41.) The jacket appeared on the first episode of *Queer Eye's* fourth season, but Netflix and the show's producers did not seek a release to display it. (*Id.* ¶ 43.) Although Plaintiff said he was "not disturbed" by the Concannon Jacket's appearance because he "figured this was simply an oversight on Netflix's part" and was "happy to see his work featured on a show" that had previously asked his permission and credited him, he also maintains that he "never granted Netflix a license to display the jacket on the show." (*Id.* ¶¶ 44.)

In September 2021, LEGO began marketing its Fab Five Sets, which it began selling on October 1, 2021 for $99.99. (*Id.* ¶ 48.) Plaintiff alleges that the set contained a piece—the LEGO Jacket—that copied "the individual creative elements of the Concannon Jacket" as well

as the "unique placement, coordination, and arrangement of those individual artistic elements," and his "distinctive Trade Dress—specifically, a tongue-in-cheek phrase prominently displayed in graffiti-style lettering on the back of the jacket." (*Id.* ¶¶ 49, 50.) The TAC provides an image of the two side by side:

 

 

(*Id.* at ¶ 48.) The TAC alleges "[u]pon information and belief" that LEGO System A/S and LEGO Systems "jointly conspired to create, advertise, and sell a LEGO set that directly copied the Concannon jacket," as evidenced by a statement from LEGO's Senior Graphic Designer in a promotional video that Antoni Porowski "has a really iconic leather jacket that we redid in the LEGO version." (*Id.* ¶¶ 46, 54.) According to Plaintiff, neither LSI nor LSAS sought Plaintiff's permission to use the artwork or Trade Dress or credited him as the creator. (*Id.* ¶ 53.) The LEGO "Fab Five" set has been created, distributed, and sold "throughout the world," with marketing materials including photos and animated videos of the LEGO Jacket used to promote the set. (*Id.* ¶ 57-59.)

Plaintiff alleges that when he learned of the production of the set, he contacted LEGO customer service, where he was told that LEGO "loves creators" and was offered a free Fab 5 Loft set; when he called back, however, he was told that LEGO does not give out free sets. (*Id.* ¶ 60.) On November 12, 2021, Plaintiff sent LEGO a cease-and-desist letter in which he asserted his "intellectual property rights" in the hope that LEGO "would offer to compensate" him "or pay him a reasonable royalty". (*Id.* ¶¶ 61-62; Def.'s Mem. Exh. 3 [Doc. # 35-4].) Plaintiff registered the "artwork embodied in the Concannon Jacket" with the United States Copyright Office on November 26, 2021. (TAC Exh. A, Certificate of Registration [Doc. # 48-1].) Following the release of the set containing the LEGO Jacket, Plaintiff contends that his "business and livelihood have been threatened" because he "relies on the exclusivity and distinctiveness of his designs" to sell his products. (TAC ¶ 67.)

Plaintiff filed his initial complaint on December 17, 2021, against LEGO A/S and LEGO Systems Inc. [Doc. # 1.] An amended complaint was filed on February 15, 2022. [Doc. # 15]; a Second Amended Complaint was filed March 29, 2022 [Doc. # 30] following a prefiling conference. After Defendant's Motion to Dismiss was filed on April 22, 2022, Plaintiff filed a stipulation seeking permission to substitute LEGO System A/S for LEGO A/S without altering

the substantive allegations, (*see* Stipulation for James Concannon to File a Third Amended Complaint [Doc. # 1]), which the Court granted, resulting in the filing of the TAC on June 13, 2022 [Doc. # 48].

## II.   Legal Standard

"To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sarmiento v. United States*, 678 F.3d 147, 152 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).) The "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In other words, a valid claim for relief must cross "the line between possibility and plausibility." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The Court must "accept as true all factual allegations and draw from them all reasonable inferences." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). Although it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations," *id.,* motions to dismiss "assess the legal feasibility of a complaint" and are not the place to "assay the weight of the evidence which might be offered in support" of the merits. *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.,* 432 F. Supp. 3d 131, 151 (D. Conn. 2019) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)).

## III.   Discussion

### A.   Consideration of Documents Outside the TAC

Plaintiff objects to Defendants' attempt to introduce Exhibit 1, which is the licensing agreement between Scout Productions Inc. (which produces *Queer Eye* for Netflix) and Defendant LSAS. (Ex. 1 [Doc. # 35-2].) "[A] district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants or relies on factual allegations contained in legal briefs

or memoranda in ruling on a 12(b)(6) motion to dismiss." *See Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) (alteration in original) (quoting *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991). However, courts can consider "extrinsic material that the complaint incorporates by reference, that is integral to the complaint, or of which courts can take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021). A document is integral to the complaint if it was "possessed by or known to the plaintiff," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), and the "complaint relies heavily upon its terms and effect," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks omitted).

Defendant argues that "[t]he License Agreement is properly incorporated into the Second Amended Complaint[1] by reference because Mr. Concannon relies on it as the basis of his willful infringement claim, . . . and the existence of the License Agreement was integral to and relied on in framing the Second Amended Complaint." (Defs.' Mem. at 4 n.6.) Plaintiff counters that the TAC does not reference the agreement nor do its claims implicitly rely upon it. (Pl.'s Opp'n at 5 n.2.) Plaintiff is correct; the TAC references Defendants' attorneys' representations about the existence of a sublicensing agreement between Netflix and Defendants, but not the agreement itself. (Comp. ¶ 63.) Neither the terms or effects of the agreement are relied on by the TAC, which concerns the existence of licenses (or lack thereof) between Plaintiff and *Queer Eye*'s production company or Plaintiff and LEGO, not between the *Queer Eye* production company and LEGO. Nor could the TAC rely on the terms of the agreement, because Plaintiff has never seen a copy of the agreement. (Pl.'s Opp'n at 5

———————————

[1] Defendant's Motion to Dismiss was filed when the Second Amended Complaint was the operative complaint and makes reference to it as such; the Third Amended Complaint is now the operative complaint. The only difference is the substitution of one of the Defendants; the substantive allegations are identical.

n.2.) Because the TAC neither references nor relies on the specific contents of Exhibit 1, the Court declines to consider it in deciding the motion to dismiss.

Defendant also seeks to submit the LEGO set (Ex. 2 [Doc. # 35-3]), the set's building instructions (*Id.*), and the cease and desist letter sent by Plaintiff's counsel to the LEGO group (Ex. 3 [Doc. # 35-4]) as exhibits to its motions to dismiss and for the Court to consider them as materials referenced by and thus incorporated by the complaint. Plaintiff does not object to consideration of any of these exhibits. The LEGO set itself and the cease and desist letter are both referenced in the TAC (*see, e.g.*, Compl. ¶¶ 4-7, 61), and so will be considered by the Court. However, the building instructions in Exhibit 2, which apparently confirm that Mr. Porowski partnered with LEGO and granted them a non-exclusive implied license in his likeness, are not referred to in the TAC. Defendant argues that the TAC links to a website that contains the building instructions; the building instructions are also contained in the physical set itself. (Defs.' Mem. at 14 n.14; TAC ¶ 56.) However, the TAC does not specifically reference the material in the instructions, and the link in the TAC Defendant references does not link directly to the building instructions, but rather requires the viewer to click two additional links to find it. Based on these facts, the instructions are not referenced in the "four corners" of the TAC, nor does the TAC rely "heavily" on the contents of the building instructions such that they are "integral" to Plaintiff's arguments. The building instructions will not be considered in the evaluation of Defendant's motion.

### B.  LEGO's Motion to Seal Exhibit 1

Defendant LSI has moved to seal the entirety of Exhibit 1 of its motion to dismiss, and the portions of its motion that quote the agreement. (Defs.' Mot. to Seal. [Doc. # 36] at 1.) This District's Local Rules state that to grant a motion to seal, the Court must make "particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." L. R. Civ. P. (5)(e)(3). This high

standard is consistent with the fact that "the normal burden upon the proponent of a protective order to establish good cause for protection is significantly enhanced with respect to judicial documents, as to which a common law presumption of access attaches." *Standard Inv. Chartered, Inc. V. Fin. Indus. Regul. Auth., Ind.*, 347 Fed. Appx. 615, 616 (2d Cir. 2009) (internal citations and quotation marks omitted). As such, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *Video Software Dealers Assoc. v. Orion Pictures, Corp*., 21 F.3d 24, 27 (2d Cir. 1994). "[B]lanket sealing of entire documents . . . is generally disfavored." *Travelers Indem. Co. v. Excalibur Reinsurance Corp*., No. 3:11-CV-1209, 2012 WL 13029590, at *3 (D. Conn. Apr. 13, 2012).

Defendant LSI argues that "[t]he License Agreement contains confidential information of third parties relating to the licensing of intellectual property rights, including the terms of said license, financial and bank account information, and information pertaining to insurance policies, that, if disclosed to the public, and competitors, would result in a competitive disadvantage." (Mot. to Seal at 2.) "Documents falling into categories commonly sealed are those containing trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like." *Cumberland Packing Corp. v. Montsanto Co*., 184 F.R.D. 504, 506 (E.D.N.Y. 1999). However, "non-trade secret but confidential business information" is "not entitled to the same level of protection from disclosure as trade secret information," and "[b]usiness documents that are secret or that might cause adverse publicity if disclosed do not automatically warrant a protective order, and broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the standard for nondisclosure." *Grayson v. Gen. Elec. Co*., No. 3:13CV1799 (WWE), 2017 WL 923907, at *1 (D. Conn. Mar. 7, 2017).

Defendant LSI fails to show by clear and convincing evidence that the Court should disregard the presumption against blanket sealing. There are certain portions that fall within presumptively sealable categories, such as personal identifying information, and the terms of "confidential trademark licensing agreements" are also subject to sealing to protect companies from being disadvantaged "in negotiating future licensing agreements." *Rubik's Brand Ltd. v. Flambeau, Inc.*, No. 17CV6559PGGKHP, 2021 WL 1085338, at *1 (S.D.N.Y. Mar. 22, 2021). However, Defendant has not "narrowly tailored" its sealing request to such categories, instead seeking a blanket sealing of the entire document. *See id.* (initially denying the motion to seal because the parties "had vastly over-designated documents for redaction and sealing," and granting the motion only after revised motions were filed).

Defendant also has not presented a compelling reason to seal the portions of the licensing agreement quoted in their motion to dismiss; the quoted portions of the agreement simply state the subject of the agreement or terms that do not facially contain "trade secrets" or competitive information. Defendant fails to explain how the disclosure of these specific terms, some of which are highly specific to the Lego set at issue and seem unlikely to come up in "future licensing agreements," would cause competitive disadvantage were it to be disclosed to the public.

The Court denies the motion to seal [Doc. # 36] based on the above. Defendant LSI may file a motion with a properly redacted Exhibit 1 and supporting memorandum if it does not wish for the entire contents to be part of the public record. Any such motion to seal shall be filed within 14 days of this ruling.

### C. Copyright Infringement Under 17 U.S.C. § 101 (Count 1)

In order to establish a claim of copyright infringement, the plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991).

Defendant LSI[2] assumes for purposes of this motion that Plaintiff can establish actual copying and substantial similarity but argues that the copying was not illegal based on two affirmative defenses: (1) Defendant had an implied non-exclusive license to use the Concannon jacket and its likeness, and (2) because the LEGO Jacket constitutes fair use. (Def.'s Mem. at 9.)

### 1.  Implied Non-Exclusive License

"While a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint, the complaint itself must establish the facts necessary to sustain defendant's defense." *Capitol Records, Inc. v. MP3tunes, LLC,* No. 07 Civ. 9931(WHP), 2009 WL 3364036, at *3 (S.D.N.Y. Oct. 16, 2009). Defendant is not precluded from raising an affirmative defense at this stage but must make its case based on the facts of the TAC, without reliance on extrinsic evidence. As discussed below, it fails to do so.

"Where the dispute turns on whether there is a license at all, the burden is on the alleged infringer to prove the existence of the license." *Tasini v. New York Times, Co*., 206 F.3d 161, 171 (2d Cir. 2000). "[U]nder federal law, nonexclusive licenses may . . . be granted orally, or may even be implied from conduct." *Graham v. James,* 144 F.3d 229, 235 (2d Cir.1998). However, as reflected by the parties' positions at oral argument, "[t]he law in the area of implied licenses shows a measure of conflict." *Psihoyos v. Pearson Educ.,* Inc., 855 F. Supp. 2d 103, 119 (S.D.N.Y. 2012). Defendant's counsel maintained that so long as Plaintiff delivered the jacket to Mr. Porowski, a celebrity, with the understanding that he was going to wear it in public and did not impose restrictions, the Court can find an implied license; Plaintiff, on

---

[2] Defendant LSAS joins all Defendant LSI's arguments as to Counts I, IV, and V in full and makes no additional arguments for dismissal as to these counts. (*See* Def. LSAS' Supp. Mem.) As such, any reference to "Defendant" singular is to Defendant LSI unless otherwise specified.

the other hand, contends that a Court can only find an implied license if the artist has the knowledge and intent that the work will be used for some other specific purpose.

The Second Circuit's most recent case on implied licenses, *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022), recognized two potential tests to determine whether an implied license existed: "a narrow test, finding an implied license only where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it,'" and "a more permissive test by which consent may be inferred based on silence where the copyright holder knows of the use and encourages it."[3] These two potential tests track the positions taken by Plaintiff's and Defendant's counsel at oral argument, respectively. Unfortunately, there is no definitive resolution since the Second Circuit declined to adopt a particular test, holding only that either test for an implied license requires "a meeting of the minds between the parties to permit the particular usage at issue." *Id.*

Defendant's argument as to the existence of an implied license requires several inferential leaps. First, Defendant argues that because Plaintiff added the copyrighted design elements to Mr. Porowski's black leather jacket for free before returning it to him, and because he did so "intending that Mr. Porowski copy and distribute it," an implied license existed. (Def.'s Mem. at 5-6.) Specifically, Defendant asserts that the facts demonstrate Plaintiff conveyed a non-exclusive license to Mr. Porowski to use the Concannon Jacket to "use as he wished, including as a part of his likeness" because Plaintiff knew that Mr. Porowski was a celebrity and thus "likely to appear" in public with the jacket, never protested Mr. Porowski's appearance on *Queer Eye* Season 3 and 4 wearing the jacket despite the absence of any written authorization, and never asked Mr. Porowski to limit the "display

---

[3] Unless otherwise indicated, internal citations, quotation marks, and other alterations are omitted throughout in text quoted from court decisions.

or depiction" of the Concannon Jacket either before or after its appearance on *Queer Eye*. (*Id.* at 12-13.) This constitutes the "meeting of the minds" in Defendant's view, and once the implied license was granted to Mr. Porowski, he was free to sublicense it as he wished. Second, Defendant contends that Mr. Porowski in turn granted an implied non-exclusive license in his likeness, including the Concannon Jacket, to Scout Productions, the company that produces *Queer Eye* for Netflix, because Mr. Porowski appeared in *Queer Eye* and in promotional media wearing the Concannon jacket. (Def.'s Mem. 7-8.)[4]

Plaintiff responds that there was no "meeting of the minds" because "through their previous business interactions," Plaintiff expected that Netflix "would contact him" when a Concannon product was featured on the show and in connection with advertising. (Pl.'s Mem. at 11-12.) Although he did not object to the display of the Concannon Jacket on the *Queer Eye* show without his permission, Plaintiff argues that he was unaware of "collaboration with Defendants" and "had no intention of licensing the Concannon Jacket to be replicated in the LEGO Set." (*Id.* at 11-12.) To find an implied license here, Plaintiff asserts, would mean that "any celebrity gifted with a designer clothing item would have the unrestricted right to recreate and distribute copies of the clothing item, since it would be considered part of their likeness." (*Id.*)

The Court does not currently have sufficient factual information on the face of the complaint to determine whether the license existed as required for an affirmative defense, regardless of which test for finding implied license the Court applies. While Plaintiff did see

---

[4] In addition, Defendant argues that Mr. Porowski's grant of a non-exclusive license for his likeness extended to the LEGO group of companies as well based on a quote in the building instructions from Mr. Porowski referring to the Fab Five LEGO set as a "special partnership", and because in Exhibit 1, the "License Agreement", Scout Productions grants LEGO permission to use Antoni Porowski's likeness. Both documents, as explained above, will not be considered in evaluating Defendant's motion. (*Id.*)

the appearance of the jacket on *Queer Eye* and subsequently choose not to take further action. that alone is not enough to infer that he *intended* for it to be copied and distributed, or that he and Mr. Porowski had any common understanding of how the jacket would be used. Plaintiff alleges that he did not, and that in particular, he had no reason to believe based on his prior dealings with Mr. Porowski and Netflix that the Concannon Jacket would be used by LEGO to create a new product. Taking Plaintiff's factual allegations about his own understanding and knowledge as true, the Court cannot conclude that there was a "meeting of the minds" on how the Concannon Jacket would be used, and dismissal on this basis is unwarranted.

Defendant attempts to evade this conclusion, relying on *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020). The plaintiffs in *Solid Oak Sketches* were the tattoo artists that had designed and inked the tattoos of several NBA players; the NBA players in turn granted licenses to their likenesses to defendant, a video game company, so that the company could portray the NBA players in a game. *Id.* Because the depiction of the NBA players included digital depictions of the tattoos, plaintiffs asserted that the game infringed on their copyrights to the tattoo designs. *Id.* at 339. The court applied a version of the stricter test for implied license, finding that (1) the NBA players requested the tattoos to be created, (2) the tattoo artists created and delivered the tattoos, (3) the tattooists "intended" that the players would "copy and distribute" the tattoos as "elements of their likenesses" based on their knowledge that the NBA players "were likely to appear in public, on television, in commercials, or in other forms of media," and (4) the artists never requested that the NBA players limit "the display or depiction" of the images. *Id.* at 346. Based on these facts, which were part of the "the undisputed factual record" at summary judgment, the court held that NBA players had been granted an implied nonexclusive license to feature their

16

tattoos as part of their likeness by plaintiffs, which included the right to then sub-license the tattoos as part of their likeness. *Id.*

The facts of this case, however, are distinguishable from *Solid Oak Sketches.* There, the tattoo artists' own declarations plainly stated that they "intended the Players to copy and distribute the Tattoos as elements of their likenesses." *Id.* at 346. Here, Plaintiff has made no such admission, nor can his consent be implied from his silence alone.[5] Further, as Plaintiff observes, a tattoo cannot be removed from one's body, and thus the artists in *Solid Oak Sketches* were necessarily recognizing that imprinting a tattoo's design onto a public figure meant that the tattoo would appear wherever that public figure did. (Pl.'s Mem. at 13.) On the other hand, Mr. Porowski was featured wearing multiple items of clothing from Plaintiff alone throughout the course of the show *Queer Eye*, and Defendant's Lego set also provides an alternative outfit piece for Mr. Porowski—a plain white t-shirt—the interchangeability of which necessarily demonstrates that the Concannon jacket is not an irremovable part of Mr. Porowski's likeness. (*Id.*) Further, even if the facts in the TAC supported Defendant's claim of an implied license between Mr. Porowski and Plaintiff, without the building instructions and license agreement, the Court also cannot determine whether LEGO was ever granted a license to the Concannon Jacket by anyone with an alleged implied license of their own.

Finally, regardless of whether there was an implied license at the time the set was manufactured and distributed, it has been revoked by the filing of this lawsuit. *See Ortiz v.*

---

[5] At oral argument, Plaintiff's counsel cited in further support *Alexander v. Take-Two Interactive Software, Inc.*, 489 F. Supp. 3d 812, 820 (S.D. Ill. 2020), a case in which the court denied a motion to dismiss where the record did not make clear whether Plaintiff, a tattoo artist, discussed the scope of any implied license, such as permission to copy, distribute, and sublicense, with the recipient of the tattoo. While the Court notes that counsel did not cite this case in her briefing, it nevertheless provides a persuasive illustration of why implied licenses are ill-suited for resolution on a motion to dismiss absent a clear license contained in the complaint.

*Guitian Music Bros.*, No. 07 CIV. 3897, 2009 WL 2252107, at *4 (S.D.N.Y. July 28, 2009). In

*Ortiz*, the court found that "Plaintiff revoked any license that may have existed between him

and Defendants" by instituting a lawsuit because implied licenses are revocable by definition.

*Id.* The court rejected the affirmative defense of implied licensing on that basis because the

defendants "continued distribution and sale" of the product after the action was filed. *Id.* The

same is true here—Plaintiff alleges in the TAC that he has not been compensated for use of

his design, and by filing this action, Plaintiff has revoked any implied license that may have

existed prior to the lawsuit. As such, Defendant cannot show that there is *now* an implied

license, and as Plaintiff has alleged that distribution of the LEGO set continues, he has

plausibly alleged a copyright infringement claim.

The motion to dismiss Count 1 based on the existence of an implied license is denied.

### 2. Fair Use

The fair use doctrine "permits and requires courts to avoid rigid application of the

copyright statute when, on occasion, it would stifle the very creativity that the law is

designed to foster." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 127

L.Ed.2d 500 (1994). "In determining whether the use made of a work in any particular case

is fair use, courts consider the following four factors enumerated in the Copyright Act:

> (1) the purpose and character of the use, including whether such use is
>     of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the proportion used in relation to
>     the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the
>     copyrighted work."

*Arrow Prods., LTD. v. Weinstein Co. LLC*, 44 F. Supp. 3d 359, 367 (S.D.N.Y. 2014). "The

ultimate test of fair use is whether the copyright law's goal of promoting the Progress of

Science and useful Arts would be better served by allowing the use than by preventing it." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) "The determination of fair use is a mixed question of law and fact," *id,* and so "[c]ourts most frequently address a proffered fair use defense at summary judgment." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). Reserving the question for summary judgment is particularly appropriate when the "record is insufficient to make such a fact-intensive ruling as a matter of law." *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011). Courts should only grant motions to dismiss based on a fair use defense when "discovery would not provide any additional relevant information." *May v. Sony Music Entm't*, 399 F. Supp. 3d 169, 188 (S.D.N.Y. 2019) (quoting *Arrow Productions, Ltd. v. Weinstein Co.*, 44 F. Supp.3d 359, 368 (S.D.N.Y. 2014)). However, while the Second Circuit has cautioned that the "fact-driven nature of the fair use determination suggests that a district court should be cautious" when considering dismissing a claim based on fair use in advance of trial, *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d Cir. 1991), the Court is not precluded from doing so.

### a. Purpose and Character

The first factor asks whether the "new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . ., in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. While not an absolute prerequisite for fair use, whether the work is transformative is an inquiry that lies "at the heart of the fair use doctrine's guarantee of breathing space." *Id.* Several factors the court can consider in evaluating whether the work is transformative are "(i) whether the two works have different purposes, (ii) the size of the reproductions, (iii) whether the expressive value of the reproduced material is minimized, and (iv) the proportion of copied material." *Solid Oak Sketches,* 449 F. Supp. 3d at 347 (citing *Bill Graham*

*Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006)). The inquiry for determining the work's purpose is an objective one that considers how the Defendant's use "may reasonably be perceived without concern for the [Defendant's] subjective intent." *O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112, 129 (S.D.N.Y. 2021).

Defendant argues that the LEGO Jacket is analogous to the depiction of basketball players' tattoos in a video game, which was found transformative in *Solid Oak Sketches.* As the court explained, the use of "exact copies of the Tattoo designs" was for the purpose of "accurately depict[ing] the Players," while the original creation of the tattoos was for the purpose of the players "express[ing] themselves through body art." *Solid Oak Sketches,* 449 F. Supp. 3d at 347. Defendant argues that here, Plaintiff created the jacket as "a means of Mr. Porowski's self-expression," whereas Defendant's purpose for the LEGO Jacket was "to most accurately depict" the likeness of Antoni Porowski. (Def.'s Mem. at 21.) Plaintiff argues, however, that *Solid Oak Sketches* is inapposite because Defendants "could have portrayed Mr. Porowski's likeness without copying the Concannon Jacket" if their purpose was only to accurately recreate him, and that Defendant's purpose was thus not to accurately portray Mr. Porowski's likeness, but to recreate the Concannon Jacket to "benefit from the association with Concannon's trademark." (Pl.'s Mem. at 18, 20-22.)

*Solid Oaks Sketches'* conclusion that accurately depicting a subject can be transformative where the purpose of the original work was expressive should be interpreted narrowly in light of the Second Circuit's note that courts have often "declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work." *Blanch v. Koons,* 467 F.3d 244, 252 (2d Cir. 2006) (citing cases). Plaintiff argues that Defendant has done exactly that by simply exploiting the creative values of the jacket by recreating it in a different form. Choosing a new medium and changing a few elements also do not constitute transformation; "taking 'the heart of' a

copyrighted work, even if the taking is quantitatively insubstantial, militates against fair use." *Campbell v. Koons*, No. 91 CIV. 6055 (RO), 1993 WL 97381, at *3 (S.D.N.Y. Apr. 1, 1993) (holding that modifying a few elements from the original product, a picture, was not enough to render the infringing product, a sculpture, transformative when the "central subject matter" was the same.)

Here, without materials such as affidavits or depositions to draw on, it would be premature for the Court to decide whether Defendant's purpose was accurate portrayal of Mr. Porowski, exploitation of the original work's values, or something else. The open nature of the question becomes especially clear because unlike the tattoos at issue in *Solid Oak Sketches,* the LEGO Jacket "includes designs featuring various elements *not* featured" on the Concannon Jacket, which Defendant asserts was done for the purpose of supporting its own marketing campaign rather than to "accurately depict" Mr. Porowski. (*Compare* Def.'s Mem. at 16 (explaining that the LEGO Jacket "includes designs featuring various elements" not featured on the Concannon Jacket) *with* Def.'s Mem. at 21 (explaining that it was trying to "most accurately depict" Antoni Porowski through inclusion of the Concannon Jacket.)) Defendant's counsel maintained at oral argument that there is no inconsistency between customizing the Lego Jacket and accurately depicting Mr. Porowski; however, whether those two purposes are consistent and whether one, both, or neither should be credited is better decided with the benefit of a fully developed record.

Defendant also argues that the LEGO Jacket is an "inconsequential portion" of the Fab Five set since there are two torso elements for Mr. Porowski's minifigure and six Minifigures in total, and the size of the LEGO Jacket is a fraction of the size of the Concannon Jacket. (Def.'s Mem. at 21; Def.'s Reply at 6.) In addition to somewhat blurring the lines of analysis between the "purpose and character" factor and the "amount and substantiality" factor, Defendant's argument misses the mark. While as in *Solid Oak Sketches,* the size of the jacket reproduction

21

is significantly reduced from the original, it was the *impact* of the size reduction that mattered in *Solid Oak Sketches*, rather than the mere fact of it. As the court explained, the reduction in size made the tattoos "difficult to observe" because they were "too small and distorted for game users to even recognize," thus reducing the likelihood that the purpose had been an expressive one. *Solid Oak Sketches,* 449 F. Supp. 3d at 348. The reduction in size of the LEGO Jacket, on the other hand, does not make the individual design elements difficult to observe; to the contrary, a simple visual inspection of the LEGO Jacket allows for easy identification of each design element. Rather than being "infrequently and only imprecisely observed," the jacket is placed on the torso of one of the "Fab Five" that the set features, and the marketing materials for LEGO specifically stated that it was being used for its association with Antoni Porowski and its "iconic" status, unlike in *Solid Oak Sketches* where the tattooed players were only three of 400 players and comprised ".000286% to 000431%" of the total game data, the "particulars of the Tattoos" were not observable and were displayed only in concert with "myriad other auditory and visual elements" meant to simulate an actual NBA game, and the tattoos were not featured in advertising. *Id.* at 348.

Finally, in determining the nature of an alleged infringing work, courts also consider whether the work is commercial in nature. If the use is not transformative, the "question whether the new use is commercial [] acquires an importance it does not have" otherwise. *On Davis v. The Gap, Inc.,* 246 F.3d 152, 175 (2d Cir. 2001), *as amended* (May 15, 2001). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Rather than arguing that the LEGO Jacket is not commercial in nature, Defendant instead contends that the commercial nature aspect of the first prong should be given limited weight because the LEGO Jacket is merely "incidental" to the commercial value.

(Def.'s Mem. at 21.) Plaintiff argues to the contrary that Defendants are a "commercial business motivated by profits," and used "the popularity of cultural pieces like Queer Eye and the Concannon Jacket to sell their products." (Pl.'s Mem. at 23.)

Defendant relies on *Solid Oak Sketches'* explanation that the commercial nature was incidental because "consumers do not buy NBA 2K video games for the tattoos on LeBron James, Eric Bledsoe, or Kenyon Martin." *Solid Oak Sketches* at 348. Here, however, Plaintiff has alleged that Defendants "initially attracted and secured consumers through their act of infringement," including through advertisements that prominently feature the LEGO Jacket. (TAC at ¶ 58, 59.) Whether Defendant intended to use the LEGO Jacket specifically to attract customers, what profits it has earned based on the inclusion of the LEGO Jacket in the set that it would not otherwise have made, and whether there are customers who bought the set specifically because it had a product resembling or copying the Concannon Jacket, are questions that cannot be resolved only on an analysis of the TAC.

Defendant has failed to establish that the purpose and character factor weighs in its favor. This alone would be enough to deny its motion to dismiss. *See O'Neil*, 563 F. Supp. 3d at 131 (denying summary judgment where reasonable jurors could disagree as to whether a work was transformative.) However, open questions also remain as to the following three factors that weigh against granting a motion to dismiss, as discussed below.

### b.  Nature of Copyrighted Work

The second factor—the nature of the copyrighted work—"calls for recognition that some works are closer to the core of intended copyright protections than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586. "[C]reative expression for public dissemination falls within the core of the copyright's protective purposes." *Id.* However, this factor "is rarely found to be determinative." *On Davis,* 246 F.3d at 175.

Plaintiff's copyrighted work—handpainted design elements on a leather jacket—has the "nature of an artistic creation" that falls within the core protected purposes at the heart of copyright. Defendant acknowledges that the Concannon Jacket's design is expressive but asserts that "the purpose of the Antoni Minifigure Figurine is factual, transformative, and . . . to accurately recreate Mr. Porowski's likeness." (Def.'s Mem. at 22.) As discussed above, whether the purpose and character of the work are transformative cannot be resolved at this stage and neither can this factor be properly weighed without a more fulsome record of the purpose behind Defendant's creation and distribution of the LEGO Jacket.

### c.  Amount and Substantiality

Defendant argues that it did not copy the Concannon Jacket in its "entirety" for five reasons: (1) the LEGO Jacket includes an a "LEGO Minifigure figurine head" and a globe that are not part of Plaintiff's copyright; (2) the LEGO Jacket has a one dimensional "yang" symbol as opposed to the Concannon jacket's three-dimensional ying-yang pin, and four safety pins rather than eight; (3) the peace sign on the LEGO Jacket uses different placement, colors, and elements than the peace sign on the Concannon Jacket; (4) the text "REBUILD THE WORLD" on the back of the LEGO Jacket differs from the phrase "THYME IS ON MY SIDE"; and (5) the designs on the sleeves of the Concannon Jacket, and the hands and chain design on the lower right, are not on the LEGO Jacket. (Def.'s Mem. at 17-18.) It further asserts that "any similarity was necessary to effectuate the transformative purpose of creating a realistic Minifigure figurine version of Mr. Porowski." (*Id.* at 17.)

Plaintiff maintains that Defendants "could have portrayed Mr. Porowski's likeness without copying the Concannon Jacket" through use of other clothing and accessories worn by Mr. Porowski that would be recognizable. (Pl.'s Mem. at 20.) Instead, Plaintiff contends that Defendants "chose to use the entire design of the Concannon Jacket," making "no attempt to obscure the borrowed elements" and featured the jacket "in all advertising campaigns

24

related to the LEGO Set." (*Id.*) Plaintiff also maintains that Defendant's attempt to compare elements separately is unavailing because his copyright extends to "the overall aesthetic of the work and cover[s] the placement and overall composition of the Concannon Jacket." (*Id.*)

In Defendant's fourth argument in defense of its use of the phrase "REBUILD THE WORLD" on the back of the LEGO Jacket, it references LEGO press release about the purpose of its "Rebuild the World" campaign (*see* Def.'s Mem. at 18) that is neither mentioned nor referenced in the TAC. The same goes for Defendant's argument about its purpose for "inclusion of [] elements embodying world peace" and "building" such as the yang symbol, peace sign, and safety pins; whether those elements are indeed "central to the LEGO Group of Companies' Rebuild the World Campaign" cannot be established except through reliance on materials outside the TAC.

Defendant's remaining arguments as to how individual elements of the two jackets differ are not supported by *Solid Oak Sketches*. The amount and substantiality of the Concannon Jacket elements used by the LEGO Jacket is facially distinguishable from the display of player's tattoos where "average gameplay" was "unlikely to include the players with Tattoos," the display was "small and indistinct," the images appeared "as rapidly moving visual features of moving figures in groups of figure players," and their size was reduced such that they were "not recognizable" and had limited "visual impact." *Solid Oak Sketches,* 449 F. Supp. 3d at 349.

Defendant has not established based on the TAC that the amount and substantiality of use factor weighs in its favor.

### d.  Effect on Potential Market

The fourth factor requires examination of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In evaluating this factor, the Court looks at "not only the market harm caused by the particular infringement, but also to

whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives,* 448 F.3d at 613. However, the driving concern is "not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 481-82 (2d Cir. 2004). *Campbell* explains that the market effect must be evaluated in light of whether the secondary use is transformative; "when a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects,' of the original and serves as a market replacement for it . . . [b]ut when . . . the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred." Campbell, 510 U.S. at 591.

Defendant argues that there are "no allegations" in the TAC that the LEGO Jacket "serves as a substitute for the original work" and that there could be no such finding because one is a "children's construction toy figurine" sold in the "global toy market" and the other is a "men's leather jacket" part of the "underground men's fashion" scene. (Def.'s Mem. at 24.) Because there is no allegation that Plaintiff "would or could enter the global toy market," Defendant asserts the fourth factor weighs strongly in its favor. (*Id.*) Plaintiff responds that "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *North Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 622 (S.D.N.Y. 2015). Plaintiff argues that he need not allege that he intends to enter the toy market or use the design in that market because Defendants' actions "have harmed the distinctiveness and market for any derivative works," including by undermining their "exclusivity," and by setting a "dangerous precedent

that any company can borrow copyrighted works without paying licensing fees" if they "do so in a different market than the original." (Pl.'s Mem. at 24.)

*North Jersey Media Group* considered the impact of the alleged infringing use on the licensing market, and found in plaintiff's favor because it "maintain[ed] an active licensing program for the photograph." 74 F. Supp. 3d at 622. There is no such allegation of harm here, however, because Plaintiff did not charge Porowski for the jacket, nor did he publish or license it for compensation. The Second Circuit found similar circumstances suggestive that there had been no "deleterious effect" on the market for the copyrighted work. *Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006). However, unlike in *Blanch,* Plaintiff does not concede that the alleged infringing work "did not cause any harm" to his career or "upset any plans" he had for either the Concannon Jacket or any other Concannon Product; to the contrary, he specifically alleges that Defendant's use undermines the exclusivity of his brand. *Id.* Further, the court in *North Jersey Media Group* did not *only* consider the impact on the licensing program for the photograph; it also considered the "very real danger that other such media organizations will forego paying licensing fees for the Work," an impact that went beyond "simply the loss of licensing revenues from this one-time use." 74 F. Supp. 3d at 623.

At this stage, Plaintiff has alleged a harm to the market for his products in the form of the loss of royalties for this specific LEGO Jacket, the harm to the exclusivity and consumer view of his products, and the future harm because of the risk that other companies will follow Defendant's lead and use his products in different markets without paying licensing fees. Plaintiff is not required to have predictively pled his complaint to meet Defendant's affirmative defense, and will be given the chance to develop the record to enable the Court to weigh this factor on a motion for summary judgment.

### e.  Overall Assessment Weighing the Fair Use Factors

Weighing the factors in their totality, the Court denies the motion to dismiss based on a finding of fair use but will consider this defense on a summary judgment record.

### D. Contributory Copyright Infringement (Count II) and Vicarious Copyright Infringement (Count III)

Defendant LSAS argues that Plaintiff fails to state a claim for contributory and vicarious copyright infringement "for the reasons set forth in LSI's Memorandum and Reply." (Def. LSAS' Supp. Mem. at 4.) Because Defendant LSI's arguments as to Count I have been rejected, Defendant LSAS' motion to dismiss the derivative Counts II and IIII is also denied.

### E. Trade Dress Infringement and Unfair Competition Under 15 U.S.C. § 1125(a) (Count IV)

Trade dress infringement claims are brought under 15 U.S.C. § 1125(a), the Lanham Act 43(a), which provides a cause of action for use by "any person" who "uses in commerce any word, term, name, symbol, or device" which "is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." In addition to protecting registered marks, the Lanham Act also protects "trade dress", which "includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers, . . . including size, shape, color, texture, and graphics." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 454 F. Supp. 3d 229, 248-49 (S.D.N.Y. 2020). When, as here, the trade dress infringement claim is based on the product's design, the plaintiff must show "(1) non-functionality, (2) secondary meaning, and (3) a likelihood of confusion." *Capri Sun GmbH v. Am. Beverage Corp.*, No. 19CIV1422PAEDCF, 2022 WL 976270, at *66 (S.D.N.Y. Mar. 31, 2022), *motion to certify appeal denied*, No. 19CIV1422PAEVF, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022). "A plaintiff must also offer a precise expression of the character and scope of the claimed trade dress," and describe the elements of "design with specificity to be

afforded trade dress protection." *Sherwood 48 Assocs. v. Sony Corp. of Am.,* 76 Fed. Appx. 389, 391 (2d Cir. 2003).

### 1.   Description of the Trade Dress

To survive a motion to dismiss, a plaintiff seeking protection for his trade dress must specify both "*which* features are distinctive" and "*how* they are distinctive." *Heller Inc. v. Design Within Reach, Inc.*, No. 09–CIV–1909, 2009 WL 2486054, at *6 (S.D.N.Y. Aug. 14, 2009). While "trade dress may protect the 'overall look' of a product" as distinctive, it still must articulate "the specific elements which comprise its distinct dress." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997). Elements of a trade dress definition may include "features such as size, shape, color or color combinations, texture [or] graphics." *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577 (2d Cir.1993), as well as "the appearance of the product itself." *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993). When seeking "trade dress protection for an entire product line," a plaintiff must also establish that the "'overall look' in each separate product is 'consistent.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001) (quoting *Walt Disney Co.*, 830 F. Supp. at 766). If "a trade dress is composed exclusively of commonly used or functional elements," it "might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 76 (2d Cir. 1985).

Plaintiff argues that his trade dress includes three distinct elements that appear in both his ready-made and his custom pieces: "(1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; (3) hand-painted graffiti-style lettering." (Pl.'s Mem. at 25.) Defendant argues that differences in the phrasing of Plaintiff's trade dress definition in the TAC, such as using "short, provocative statements" in one section, and "unique combination of provocative, tongue-in-cheek phrases relating to pop

culture" or "pop culture pun" in others, demonstrates a "failure to articulate a single definition." (Def.'s Mem. at 29.) Defendant further asserts that the definition is "generic and not sufficiently specific" because it merely lists categories that do not allow an observer to determine "whether a work falls within this definition." (*Id.*)[6]

At this stage, the Court accepts Plaintiff's definition for two reasons. First, the definition is sufficiently specific because the level of detail distinguishes this case from ones like *Sherwood 48 Associates,* where the court found that describing the trade dress as "the unique configuration and ornamentation of One Times Square, Two Times Square and 1600 Broadway and the advertising and signage display on One Times Square, Two Times Square and 1600 Broadway" was inadequate because it failed to identify "the specific elements that comprise each building's identifiable trade dress." 76 Fed. Appx. at 391. Plaintiff's definition allows the Court to determine by visual inspection whether each item of clothing falls within the proposed definition. Some variation in the phrasing used to describe the trade dress is not fatal to the definition, because the "product's trade dress is not, in a legal sense, the combination of words which a party uses to describe or represent [its] 'total image.' Rather, the trade dress *is* that image itself, however it may be represented in or by the written word." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* No. 01 Civ. 11295, 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003). Further, at least one court has found that even "pictures in the complaint" were sufficient to convey the "overall image" of a trade dress. Here, Plaintiff's photographs in the TAC sufficiently pled that his product line makes use of

---

[6] Defendant also argues that the trade dress infringement claim does not state a claim upon which relief can be granted because the trade dress is limited to clothing, whereas the LEGO Jacket is part of the "construction toys" class of goods. However, the difference between the market for Plaintiff's trade dress and the allegedly infringing product goes not to whether the trade dress is defined with adequate specificity, but instead to the proximity of the products in the market for purposes of consumer likelihood of confusion, and is addressed below in Section III(D)(3)(c).

the elements he claims as part of his trade dress. *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co*., 292 F. Supp. 2d 535, 545 (S.D.N.Y. 2003). Second, Plaintiff also alleges in the TAC that the defined elements are distinctive "because no other artist or designer has released a line of clothing containing this unique combination of specific elements." (TAC ¶ 23); *cf. Caraway Home, Inc. v. Pattern Brands, Inc.,* No. 20 CIV. 10469, 2021 WL 1226156, at *8 (S.D.N.Y. Apr. 1, 2021) (granting a motion to dismiss for insufficient trade dress definition because although the definition was sufficiently specific, it did not explain how the product (a set of pans) "differed from other cookware.")

Defendant also argues that the variation in "text color, length, style" of the design elements on Concannon Products and "subject matter of the text" painted on them demonstrates fatal inconsistency between the products and the trade dress. (Def.'s Mem. at 31.) Defendant's argument relies on the trial decision in *Walt Disney* finding inconsistencies in trade dress displays demonstrated lack of trade dress protection. Plaintiff points out that he does not claim consistent text color, length, and style as part of his trade dress; rather, those variations serve to highlight the "hand-painted style" and "pop-culture references" that *are* part of his trade dress. (Pl.'s Mem. at 27.) Plaintiff also argues that even the custom-made pieces include the trade dress elements while also incorporating a customer's specific interest or preferences.[7]

There are admittedly some similarities between Plaintiff's trade dress arguments and those made in *Walt Disney*. However, the court in *Walt Disney* made its determination that

---

[7] Plaintiff offers an example to demonstrate the application of his definition: Plaintiff explains that the phrase "THYME IS ON MY SIDE" on the Concannon Jacket is a reference to the Rolling Stones song "Time is on My Side," commenting in a short, satirical phrase on "the resurgence of punk rock" while also nodding to Mr. Porowski's interest in cooking. (*Id.*) The TAC also confirms that the text of the phrase is hand-painted, and a visual observation demonstrates the "graffiti-style lettering." (TAC ¶ 19-20.)

the differences in packaging outweighed any consistent elements of the proposed trade dress after "observing the demeanor of the witnesses on direct and cross-examination, and weighing the evidence, particularly after viewing" the packages during the bench trial. 830 F. Supp. at 768. Here, on the other hand, the Court is evaluating only the handful of Concannon works that are included in the TAC, all of which demonstrate a consistent "overall look" and fall within the parameters Plaintiff has defined. (*See* TAC ¶ 19-20.) At this stage, the Court accepts the assertion that the variations in the non-trade dress elements of his product line "highlight" the distinctive elements rather than overshadow them as in *Disney* and leave an evaluation of whether consumers would feel the same for expert opinion and factual resolution at a later stage.

The Court determines that Plaintiff has proposed an adequately specific trade dress definition.

### 2.  Nonfunctionality and Secondary Meaning

Trade dress acquires secondary meaning[8] when "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11 (1982). "Secondary meaning exists where 'the public is moved in any degree to buy an article because of its source.'" *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (quoting *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n. 4 (2d Cir.

---

[8] Because Defendant does not allege that the trade dress is functional, nor is there any indication that the trade dress as defined by Plaintiff would put competitors at a non-reputation-related disadvantage were the Court to protect it, the Court assumes that the trade dress is nonfunctional and focuses its analysis on whether the trade dress has acquired "secondary meaning." *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 543 (S.D.N.Y. 2003)("Where the asserted trade dress extends to the 'overall look' of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features *taken together*, not in isolation.")

1997)). The Second Circuit has articulated six non-exclusive factors for courts to consider when weighing secondary meaning: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012). Because "proof of secondary meaning entails vigorous evidentiary requirements," *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985), courts should be cautious in finding lack of secondary meaning at the motion to dismiss stage.

According to Defendant, Plaintiff fails to satisfy several of these factors. First, it maintains that Plaintiff does not make any allegations as to the advertising expenditures or consumer studies linking the trade dress to a source. (Def.'s Mem. at 34.) Second, Defendant views the fact that celebrities have worn Plaintiff's clothing as insufficient to establish secondary meaning because there are no allegations that Plaintiff had an increase in sales or in social media attention after the photos were taken of his clothes being worn, and no proof "that consumers would recognize the asserted trade dress and claimed product line as a result of this publicity." (*Id.* at 34.) Plaintiff responds that as a "single artist working on his own," it is improper to expect him to establish every one of the nonexclusive factors, and that rather than relying on "consumer surveys" and "mass advertising," Plaintiff relies on his online presence and social media, as well as his products' "certain popularity within celebrity circles" to sell his products. (Pl.'s Mem. at 28.) Plaintiff also points out that the TAC attached samples of infringing works that sought to copy his trade dress, and that he has pled that the appearance and crediting of his works on film and television shows has "contributed to consumers associating" his trade dress with Plaintiff. (Pl.'s Mem. at 29.)

At this stage, Defendant's argument is inappropriate because "[n]one of these elements is determinative and not every one of them must be proved to make a showing of

secondary meaning." *Landscape Forms*, 117 F. Supp. 2d at 366; *see also GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 282 (S.D.N.Y. 2018) (denying a motion to dismiss based on lack of secondary meaning because "none of [the six factors] is generally amenable to determination on a motion to dismiss," and "Defendant's arguments regarding the qualitative nature of Plaintiff's advertising, its lack of consumer surveys, and questions regarding prior attempts to plagiarize are all evidentiary in nature and properly reviewed on [a] motion for summary judgment.")

Further, as Plaintiff observes, the TAC *does* plead facts that satisfy several of the factors when viewed in the context of Plaintiff's specific circumstances. For example, while Plaintiff does not allege that he spends money advertising his products, the TAC alleges that his work has "been exhibited in galleries and featured on film and television and in magazines and art publications," and that he has "gained notoriety" for his "popular" line of clothing, (TAC ¶ 18-19), using his trade dress to "identify, promote, and solidify his brand" in the eyes of the public. (TAC ¶ 20.) According to Plaintiff, he has been making Concannon products "[o]ver the past decade," and "no other artist or designer has released a line of clothing containing this unique combination of specific elements," weighing in favor of the brand's exclusivity, and he has received unsolicited media attention via photographs of celebrities "wearing and promoting" Concannon products, often "specifically identify[ing] [Plaintiff] as the source of those Products, on social media and in interviews." (TAC ¶ 23-30.)[9] As for sales, Plaintiff alleges that his line of products on his website is "popular," (TAC ¶ 19), and that his custom pieces are "highly sought after," "very valuable," and often sell "for

---

[9] Plaintiff provides specific examples of this—for example, the TAC includes a screenshot of Antoni Porowski wearing a Concannon t-shirt and crediting Plaintiff by tagging his Instagram handle while also promoting *Queer Eye*; the post received 66,563 likes. (TAC ¶ 29.)

hundreds or thousands of dollars." (TAC ¶ 33.) Plaintiff further attached exhibits showing that "numerous infringers have sought to capitalize" on his trade dress "by selling counterfeit versions" of his products. (TAC ¶ 35; Exhibits B-F.)

Plaintiff's allegations distinguish this case from *Heptagon Creations, Ltd. V. Core Group Mktg., LLC,* on which Defendant relies. No. 11 CIV. 01794 LTS, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011), *aff'd*, 507 F. App'x 74 (2d Cir. 2013). In *Heptagon Creations,* the court found that it was not enough for the plaintiff to show its furniture line "has been purchased by celebrities, featured in various magazines, and commissioned for use in the decoration of public and private spaces" because it did not make any allegations concerning "advertising expenditures, or consumer surveys linking the ANDRE JOYAU furniture line to a particular source." *Id.* The plaintiff there also lacked details or support on factors like sales, exclusivity, unsolicited media attention, or attempted counterfeiting; Concannon's allegations, on the other hand, allege facts addressing each of those factors. Further, the absence of consumer surveys or advertising expenditure claims is more notable for a company producing a furniture line than for a single artist who trades on exclusivity and the "underground" perception of his work.

Plaintiff rightly compares this case instead to *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002). There, the court found after a bench trial that due to the sales volume, plaintiff's consistent use of the design element as a "designation of source," and the efforts of other companies to copy the mark, plaintiff's proof was sufficient to find that the mark acquired secondary meaning; the fact that it "failed to present consumer survey evidence" was not dispositive because "every element need not be proved." *Id. GTFM* also highlights that the key inquiry the six factors are meant to get at is whether the public is moved to buy the product because of its source; Plaintiff has pled that "customers reach out" for his custom orders "with the expectation that any product they buy from Concannon will

feature the Trade Dress," and that his trade dress "serves as a source identifier" that consumers have "come to associate" with his products. At this stage, that is all the pleading standard requires. *See GeigTech E. Bay LLC*, 352 F. Supp. 3d at 284 ("[c]ourts have assumed secondary meaning at the motion to dismiss stage on very minimal pleadings, recognizing that determination of many factors going to secondary meaning will require discovery.")

The Court finds that Plaintiff has sufficiently pled the existence of secondary meaning.

### 3. Likelihood of Confusion

To evaluate the likelihood of confusion between the Plaintiff's trade dress mark and Defendant's allegedly infringing product, the Court must examine whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark." *Naked Cowboy v. CBS,* 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012). The plaintiff must show that there is "a probability of confusion, not a mere possibility." *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). The Second Circuit uses the eight *Polaroid* factors to evaluate the likelihood of confusion:

> (1) strength of the plaintiff's trade dress; (2) similarity of the trade dresses; (3) proximity of the products in the marketplace; (4) likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group.

*Nat. Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005). Evaluation of these factors "is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020).

Courts have granted motions to dismiss "where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work." *Roberts v. Bliss*, 229 F. Supp. 3d 240, 251 (S.D.N.Y. 2017). However, the "general rule" is that determining likelihood of confusion is "usually reserved for a jury, as it requires a fact intensive examination of 'the probable reactions of prospective purchasers of the parties' goods.'" *A.V.E.L.A. Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 309 (S.D.N.Y. 2019) (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d at 579, 584 (2d Cir. 1990)); *see also Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d. 402, 412 (S.D.N.Y. 2006) ("the likelihood of confusion is a fact-intensive analysis that ordinarily does not lend itself to a motion to dismiss.")

Defendant argues that the TAC fails to allege "the strength of [Plaintiff's] alleged trade dress," the proximity of the copyrighted work and the alleged infringing work, actual confusion, the quality of the alleged infringing product, the sophistication of the buyer, or that Defendant was "attempting to deceive the purchaser." (Def.'s Mem. at 36.) Defendant further asserts that Plaintiff is not in competition with LEGO because of the difference between the markets for Concannon Products and LEGO products. (Def.'s Mem. at 37-38.) Plaintiff contends that his trade dress is strong, that there is a substantial similarity between the Concannon Jacket and the LEGO Jacket, that there is a proximity between the works that creates a likelihood of confusion, and that he has pled specific facts that allow for an inference of bad faith. (Pl.'s Mem. at 30.)

Plaintiff's TAC does not make any allegations related to three of the factors—bridging the gap between markets, the quality of defendant's product, and consumer sophistication—and so at this time, none of the three weighs in his favor. An analysis of the five remaining factors follows.

### a. Strength of the Mark

Courts evaluating a trade dress' strength look to "the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013). Defendant argues that Plaintiff "does not allege the strength of his alleged trade dress," (Def.'s Mem. at 36.)[10] Plaintiff asserts that the same elements that give the trade dress secondary meaning also "establish a unique source identifier" for Plaintiff, making it unique. As discussed above in the section on secondary meaning, Plaintiff has pled facts regarding both the distinctive elements of the trade dress and the associations consumers now make with his trade dress based on the media attention and social media presence of his products.

Taking Plaintiff's allegations as true and drawing inferences in his favor, as required at this stage, this factor weighs in favor of Plaintiff.

### b. Degree of Similarity

The degree of similarity between the trade dress and the allegedly infringing product turns on "whether confusion is probable among numerous customers who are ordinarily prudent." *Estee Lauder Inc. v. The Gap*, 108 F.3d 1503, 1510 (2d Cir. 1997). According to Defendant, a "conclusory allegation" that the LEGO Jacket is a "near exact" copy of the Concannon Jacket is insufficient to survive its motion to dismiss. (Def.'s Mem. at 36.) Plaintiff points to allegations that the LEGO Jacket "borrows the Trade Dress's hand-painted graffiti style lettering" and attempts to invoke Plaintiff's "signature tongue-in-cheek pop culture

---

[10] "The strength of the trade dress factor considers the same factors as whether the trade dress has secondary meaning." *River Light V, L.P. v. Olem Shoe Corp.*, No. 20 CIV. 7088 (LGS), 2022 WL 4484575, at *6 (S.D.N.Y. Sept. 27, 2022), *on reconsideration in part*, No. 20 CIV. 7088 (LGS), 2022 WL 16722210 (S.D.N.Y. Nov. 4, 2022).

reference by using the phrase 'REBUILD THE WORLD' as a circular reference to LEGOS." (Pl.'s Mem. at 30.) A visual comparison of the two products reveals similarity in the placement and general design; the safety pins, the peace sign, and the yang symbol are all placed in similar places on both jackets, and the remaining elements that LEGO modified often still bear visual resemblance to the original, such as the visual blur around the words on the back of the jacket, the use of a short all-caps phrase on the back of the jacket, and a LEGO skull placed on the LEGO Jacket in the spot where a human skull shape is placed on the Concannon Jacket.

While the "general 'purpose' of selling products for profit" is too vague for a finding of similarity, *Activision Blizzard, Inc.*, 450 F. Supp. 3d at 481*,* Plaintiff has alleged that Defendants "painstakingly copied" the Concannon Jacket in order to "benefit from the association" with Plaintiff's trade dress, and with the intent of creating a perception of "affiliation" between Defendants and Plaintiff. (TAC ¶ 51-52.) This factor is a close call. Defendant has a colorable argument that the purpose of the uses is facially different based on the facts in the TAC. However, the TAC plausibly alleges that the purpose of the use was to create a perception of affiliation, and the two products are similar based on a visual comparison. While Defendants may ultimately prove otherwise after the benefits of discovery by demonstrating that their purpose in creating the Lego Jacket was accurate portrayal, a marketing campaign, or something else, this factor weighs in Plaintiff's favor at this stage.[11]

_____

[11] However, the role of the different purposes of the jackets will presumably assume an important role in the developed record. *See DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 47 (E.D.N.Y. 1994) (holding that if "the marks are used for different purposes and are presented to the public differently, even though they say the same thing, they are dissimilar); *AM Gen. LLC v. Activision Blizzard, Inc.,* 450 F. Supp. 3d 467, 481 (S.D.N.Y. 2020) (applying *DeClemente* to find that the second *Polaroid* factor weighed in Defendant's favor where Plaintiff, manufacturer of the Humvee vehicle, had the purpose of "using [the Humvee] mark is to sell vehicles to militaries," whereas Defendant was a video game company

### c. Proximity of the Products

The proximity factor "focuses on whether the two products compete with each other," and whether the goods "serve the same purpose, fall within the same general class, or are used together." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991). Defendant correctly argues that there is no proximity because Plaintiff does not claim that he is competing in the global toy market, or that there is a mutual consumer basis. Based on the lack of factual allegations to the contrary, this factor weighs in favor of Defendant.

### d. Actual Confusion

Determining whether there was actual confusion requires the Court to "consider the evidence that consumers are actually confused as to the origin of a particular product or service or as to whether the junior user of a mark is sponsored by or affiliated with the senior user." *Disney Enters. v. Sarelli*, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018). Plaintiff has pled that "Porowski has continuously credited Concannon as the designer of the Concannon Jacket," which has led to consumers readily associating Plaintiff as the source of the Concannon Jacket. (Pl.'s Mem. at 31, TAC at 43, 66.) Because Plaintiff is also "prominently known as a designer that frequently provides clothing for Porowski and Queer Eye," Plaintiff asserts that consumers are "likely to falsely associate Concannon with the design" of the LEGO Jacket. *Id.*

At this stage, this factor does not weigh in Plaintiff's favor; alleging that customers "likely" associate Plaintiff with the Lego Jacket does not satisfy a showing of *actual* confusion. However, this factor is not well suited for resolution on a motion to dismiss, as actual confusion is difficult to demonstrate without the benefit of further factual development on actual consumer reactions, and so will be given limited weight.

### e. Bad Faith

---

portraying the Humvee vehicle in the games "to create realistically simulating modern warfare video games for purchase by consumers".)

The bad faith factor "assesses whether the junior user intentionally copied and intended to benefit off the goodwill of the senior user's entire trade dress." *Capri Sun GmbH.*, 595 F. Supp. 3d at 191. While "deliberate copying may indicate that the defendant acted in bad faith," *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 118 (2d Cir. 2009), the crux of the inquiry is "whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion" between the two products. *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 591 (S.D.N.Y. 2018).

The TAC alleges "[u]pon information and belief" that Defendant LSAS and Defendant LSI "jointly conspired to create, advertise, and sell a LEGO set that directly copied the Concannon Jacket." (TAC ¶ 46.) Plaintiff asserts that the allegation is supported by the fact that the designers of the Fab Five set "admit[ed]" that they "wanted to recreate" the "iconic leather jacket" Mr. Porowski was known for wearing in the LEGO version. (Pl.'s Mem. at 31.) Because Defendant made a "near exact copy" of the Concannon Jacket without taking steps to "credit or compensate" Plaintiff for his original work, Plaintiff maintains that the Court can infer bad faith. (*Id.*; TAC ¶ 46, 52.) Defendant responds that merely "invok[ing]" the Concannon Jacket in the design of the LEGO Jacket is not evidence of bad faith, and that none of Plaintiff's allegations allow for an inference that Defendant was trying to "deceive the purchaser."

The allegation that Plaintiff "conspired" to "directly cop[y]" the Concannon Jacket, when supported by the other facts discussed above, allows for a plausible inference of bad faith. This factor weighs slightly in Plaintiff's favor when taking the facts of the complaint as true and drawing inferences in his favor.

### f.   Overall Assessment of the *Polaroid* Factors

Three of the eight factors weigh in Plaintiff's favor at this stage, and several require further factual development before the Court can fully evaluate them. However, "the Polaroid test is nonexclusive and no one factor is dispositive." *GeigTech E. Bay LLC*, 352 F. Supp. 3d at 285. When examined as a whole, Plaintiff's allegations as to the strength of the trade dress, the similarity between the products, and bad faith by Defendants in copying the Concannon Jacket create a plausible inference that consumers are likely to be confused into thinking that Plaintiff endorsed or was affiliated with the LEGO Jacket and the Fab Five set. *See id.* (denying a motion to dismiss where plaintiff alleged that the use of the trade dress was likely to cause "confusion, mistake, or deception as to the affiliation, connection, and/or association of Defendant with [plaintiff] and "as to the origin, sponsorship, and/or approval of the infringing products," bad faith was evidenced by "the similarity of the infringing products" and "continuing disregard" for plaintiff's rights, and there was a "striking similarity" based on "side-by-side photographic comparisons"); *see also The Cousteau Soc'y, Inc. v. Cousteau,* 498 F. Supp. 3d 287, 310 (D. Conn. 2020) (denying a motion to dismiss where the allegedly infringing uses included the use of numerous materials, products, and advertisements with the protected mark, and the creation of a perception that would confuse the consumer as to the plaintiff's "endorsement or involvement" of defendant's activities).

At this early stage, Plaintiff has sufficiently pled a likelihood of consumer confusion.

### 4.  Overall Assessment on Prima Facie Trade Dress Infringement

Because Plaintiff has adequately defined his trade dress, alleged that it is nonfunctional, has secondary meaning, and that there is a likelihood of confusion between the trade dress and the infringing product, the motion to dismiss Count IV is denied.

### F.  Violation of CUTPA Under Conn. Gen. Stat. § 42- 110a, et seq (Count V)

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.

Stat. § 42-110b(a). CUTPA claims can be based on either an "actual deceptive practice" or an unfair practice—that is, a "practice amounting to a violation of public policy." *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013). An act or practice is actually deceptive under CUTPA when there is: (1) "a representation, omission, or other practice likely to mislead consumers"; (2) the consumer "interpret[s] the message reasonably under the circumstances"; and (3) "the misleading representation, omission, or practice [is] material—that is, likely to affect consumer decisions or conduct." *Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14, 28 (2004) (internal quotation marks omitted). To determine whether an act or practice is unfair under CUTPA, Connecticut courts look to the following factors:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Ulbrich*, 310 Conn. at 409, 78.

As addressed above, Plaintiff's Lanham Act allegations survive the motion to dismiss, and thus serve as a sufficient basis for his CUTPA claim as well. The motion to dismiss Count V is denied.

## IV.   Conclusion

Defendant LSI and LSAS' motion to dismiss [Doc. # 35] is DENIED. The parties are directed to file an amended 26(f) Report in 14 days.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 15th day of March, 2023