# **Exhibit 1**

## (Redacted License Agreement)

## LICENSE AGREEMENT

### PART I – COMMERCIAL TERMS

Subject to Part II attached hereto, which sets out the terms and conditions of this Agreement and which is incorporated into this Agreement in its entirety, the following is hereby agreed by the parties set out in Part I, paragraph 1 below:

**1.    Parties**

(1)    Scout Productions Inc., located at 175 E Olive Avenue, Suite 200, Burbank CA 91502 (the "**Licensor**"); and

(2)    LEGO System A/S, a Denmark corporation and having an office at Aastvej 1, DK-7190 Billund, Denmark (the "**Licensee**").

**2.    Licensor's Representative**

IMG Worldwide, LLC, 304 Park Ave. South, 10th Floor, New York, New York 10010

**3.    Property**

The names, logos, and trademarks set out in Annex A.

**4.    License Type**

Exclusive for Brick-Based Toys (as defined below), non-transferable, non-assignable, non-sublicensable, revocable right and license.

The license granted to Licensee shall be exclusive only with respect to "Brick-Based Toys" utilizing the Property. "Brick-Based Toys" are defined as toys consisting of interlocking plastic pieces with primary (knobs) and secondary (tubes) coupling means such as bricks, base plates, and a variety of other customized pieces, elements and parts, all packaged with and designed to interlock with and/or be used together to allow the user to construct toy models of vehicles, environments, buildings and other objects. Except as set forth herein, Licensor always retains the right to use the Property in the Territory and elsewhere.  For the avoidance of doubt, it is understood that Licensor shall not grant any third party a license to utilize the Property granted to Licensee hereunder in connection with Brick-Based Toys in the Territory during the Term.

**5.    Licensed Product(s)**

A LEGO® loft to include five (5) characters under Licensee's LEGO® Creator Expert brand

Each of the Licensed Products shall be co-branded with the Property and Licensee's LEGO® brand.

**6.    Distribution Channels**

- Toy stores;
- E-commerce;
- Hyper/supermarkets;
- Department stores;
- Licensee's LEGO® stores; and
- Licensee's website, www.LEGO.com

E

LD/VK/JP/2020/507774                                    1

7.    **Territory**

Worldwide, excluding the following countries: ███████████████████
████████████████████████████████████████████████████████████████

Any country or area that is now included in the Territory, but later appears on Licensor's list of "restricted territories," or becomes subject to trade sanctions imposed by the United States or the United Nations, shall be immediately and specifically excluded from the Territory. The Parties agree that the exclusion shall be effective immediately, and this Agreement shall be read so as to include the revised definition of Territory without additional written amendment.

8.    ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

9.    **Renewal**

██████████████████████████████████████████████████████████████████████

10.   **Specified Currency**

USD ($)

11.   **Minimum Guarantees**

██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

12.   **Payment Schedule of Minimum Guarantee**

██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

13.   **Minimum Sales**

████████████████████████████

Sensitivity: Confidential

14.  **Royalty Rate**

███████████████████

15.  **Licensee Marketing Spend**

████████

16.  **Marketing Fund Payment**

██████

17.  **Reporting Period**

Quarterly ending on the last days of March, June, September, and December

18.  **Trade Introduction Date**

May 1, 2021

19.  **Market In-Store Date**

June 1, 2021

20.  **Specified Number of Samples of each Licensed Product**

████████████████████████████████████████████████

21.  **Sell-Off Period**

████████

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date below written.

DocuSigned by:

*Eric Kosh*

For and on behalf of Scout Productions

Date: 9/24/2020

*POUL SCHOU*

For and on behalf of LEGO System A/S

Date: 24/9/20

## PART II – TERMS AND CONDITIONS

**1.    DEFINITIONS**

1.1.    In this Agreement the following words shall have the following meanings:

(a)    **"Advertising"** shall mean advertising and promotions using third party above-the-line consumer media (television, print, third party websites, and/or outdoor) and/or consumer point-of-sale displays and materials, but excluding any business-to-business or trade promotions of any kind.

(b)    **"Agreement"** shall mean this document, including Part I and Part II, and all Schedules and Annexes hereto.

(c)    **"Ancillary Mark"** shall mean any name or logo (other than the Property), including any of the Licensee's trademarks or logos, which is used in connection with Licensed Product(s) or Related Materials.

(d)    **"Applicable Laws"** shall mean any and all applicable laws, statutes, regulations (including national, regional, local or municipal laws, regulations or by-laws of any kind whatsoever and requirements, regulations or industry practices), codes of practice, government policies, enactments or instruments which may be in force from time to time in any country in which any of the rights granted to the Licensee under this Agreement may be exercised.

(e)    **"Certified Statement"** shall mean a detailed Royalty statement of the total Net Sales Value and Royalties earned and payable by the Licensee to Licensor during the Term in a format approved by the Licensor, signed and certified to be true and complete by a duly authorized officer of the Licensee.

(f)    **"Commencement Date"** shall mean the date on which this Agreement is executed by both parties..

(g)    **"Contract Year"** shall have the meaning set forth in Part I, paragraph 8.

(h)    **"Distribution Channels"** shall mean the licensed channels of distribution (which in respect of sales in the European Union, shall be non-exhaustive), as set out in Part I, paragraph 6 in which Licensee is permitted to sell the Licensed Product(s).

(i)    **"E-Commerce Website"** shall mean promoting, offering, providing, or selling the Licensed Products using or via web pages located at a common uniform resource locator in an Internet protocol based network.

(j)    **"European Union"** shall mean the twenty eight (28) jurisdictions that are EU Member States at the date of execution of this Agreement (Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden and the UK) plus the EEA Member States at the date of execution of this Agreement (Iceland, Liechtenstein and Norway), plus any jurisdiction that becomes a member of the European Union or the European Economic Area during the Term. For the avoidance of doubt, should any jurisdiction cease to be member of the European Union or the European Economic Area during the Term, all obligations set out herein will continue to apply mutatis mutandis as if the jurisdiction in question had continued to be a member of the European Union or the European Economic Area for the entire Term.

(k)    **"Internet Sales"** shall mean the advertisement, promotion, and sale of articles of merchandise anywhere in the Territory throughout the Term to individual consumers who respond to an advertisement or promotion viewed over the Internet and who submit orders for such articles of merchandise directly through the Internet.

Sensitivity: Confidential

(l)     "**IPR**" shall mean all intellectual property rights, including without limitation patents, patentable rights, copyright, design rights, utility models, trademarks, service marks, logos, trade names, other indicia of source or origin, rights of publicity, rights in inventions (whether or not any of the above are registered), rights in data, database rights, rights in know-how and confidential information and all other intellectual and industrial property and similar or analogous rights existing under the laws of any country and all pending applications for and rights to apply for or register the same (present, future, and contingent, and including all renewals, extensions, revivals, and all accrued rights of action).

(m)    "**Letter of Credit**" means a letter of credit from an internationally known bank reasonably acceptable to Licensor in the form of Annex C or such other equivalent form as is reasonably acceptable to Licensor.

(n)    "**Licensed Product(s)**" shall mean all products listed in Part I, paragraph 5 that are approved by the Licensor in accordance with the terms hereof, and that are manufactured, advertised, promoted, and sold by or for the Licensee under the Property. Licensee acknowledges that due to the nature of the marketplace, the definition of Licensed Products may change or may not be amenable to precise delineation. Licensee agrees that if there is a dispute over the definition of Licensed Products, Licensor shall render a reasonable written determination which shall be conclusive and binding on Licensee without legal recourse.

(o)    "**Licensee Marketing Spend**" shall mean those amounts (if any) set out in Part I, paragraph 15.

(p)    "**Licensor's Representative**" shall mean the Licensor's duly authorized representative as set out in Part I, paragraph 2.

(q)    "**Licensee Website**" shall mean an E-Commerce Website, whereby Licensee makes Licensed Products available for sale directly to consumers and is fully owned and operated by Licensee.

(r)    "**Market In-Store Date**" shall mean the date that the first Licensed Product(s) are available to consumers at retail, as set out in Part I, paragraph 19.

(s)    "**Marketing Fund Payment**" shall mean the Licensee's payment (if any) towards the Licensor's global cross-marketing initiative to which all its licensees contribute, as set out in Part I, paragraph 16 which, for the avoidance of doubt, shall not be counted towards any amounts due to the Licensor from the Licensee, pursuant to Part II, paragraph 8 or otherwise.

(t)    "**Marketing Spend Shortfall**" shall have the meaning set out in Part II, paragraph 4.2.

(u)    "**Minimum Guarantees**" shall mean each of the irrevocable and non-refundable guaranteed minimum annual royalty payments set out in Part I, paragraph 11.

(v)    "**Minimum Sales**" shall mean the minimum Net Sales Value (if any) that Licensee commits to achieving in each Contract Year, as set out in Part I, paragraph 13.

(w)    "**Net Sales Value**" shall mean the total aggregate invoiced, or paid amount, whichever is greater, for all Licensed Product(s) sold in accordance with the following:

(a) with respect to the Business-to-Business (**"B2B"**) environment, Net Sales Value will be calculated as the result of the following: the number of units sold by Licensee of each Licensed Product in the B2B environment multiplied by the Licensee's invoiced price less actual returns (but not reserve for returns) to the extent supported and evidenced by or on the relevant sales invoices or credit memoranda, provided such returns on B2B sales are capped at ██████████████ or

███████████

(b) with respect to Licensee's Direct-to-Consumer (**"D2C"**) environments (e.g., LEGO Brand Retail Stores and LEGO Shop@home, and any other such D2C sales which may occur by Licensee), the Net Sales Value shall be calculated as the result of the following: the number of units

Sensitivity: Confidential

sold by Licensee of each Licensed Product in the D2C environment multiplied by the average price from Licensee's B2B environment, less any bona fide credits for returns of the Licensed Product(s) actually incurred which are supported and evidenced by the relevant credit memoranda, provided such returns on D2C sales are capped ██████████████

No other deduction whatsoever may be made to the Net Sales Value, including, by way of example: cash discounts; early payment discounts; year-end rebates; costs incurred in manufacturing, selling, distributing, or handling Licensed Products; advertising (including cooperative and promotional allowances, fixturing, merchandising guides, displays and/or the like); uncollectible accounts; commissions; foreign exchange gains or losses; rush-transportation costs on otherwise late deliveries; make-good costs for defective product, design errors or lost or damaged product; government fines or penalties; and licensing fees. Licensee shall be responsible for charging, collecting or paying all VAT, sales, use, or import taxes, customs, duties, or similar taxes that may be assessed by any jurisdiction, A Licensed Product shall be deemed "sold" as of the date on which such Licensed Product is shipped, invoiced, billed or paid for, whichever first occurs. Licensee understands, agrees and acknowledges that in the event that any sale or other disposition or transfer of Licensed Product(s) is made to any person, organization, middleman, distributor or other entity of any kind related or connected in any manner to the Licensee, or its officers, directors or major shareholders (individually and/or collectively **"a related third party"**), the amount used for calculating the Net Sales Value of such a sale or transfer shall always be the amount used (i.e. invoiced, billed, booked or paid) with the first unrelated third party in the commercial chain for the sale or transfer of the Licensed Product(s) leading from the Licensee to the final consumer.

(x)     **"Payment Schedule"** shall mean the payment schedule for the Minimum Guarantees, as set out in Part I, paragraph 12.

(y)     **"Premium"** shall mean any item of merchandise given away free of charge or sold at a substantial discount by a party as a part of any plan intended to promote the products, services, or business of such party.

(z)     **"Prohibited Names"** shall mean the Property, the name of the Licensor, any other trademark, service mark, logo, designation, name, phrase, design, symbol, image, or other indicia of source or origin of the Licensor, and/or any other indicia of source or origin which is part of or confusingly similar to the foregoing.

(aa)    **"Property"** shall mean the licensed property set out in Part I, paragraph 3.

(bb)    **"Quarter"** shall mean each successive period of three (3) months commencing on the first day of January, April, July, or October during the Term, with the exception of the first Quarter, which shall commence on the Commencement Date and continue until the last day of March, June, September, or December, as applicable, and the final Quarter, which shall commence on the first day of January, April, July, or October, as applicable, and continue until the date of expiration or termination of this Agreement, and **"Quarterly"** shall be construed accordingly.

(cc)    **"Related Materials"** shall mean all materials whatsoever accompanying or in any way associated with Licensed Product(s), including without limitation all labels, tags, cartons, or containers (including without limitation packing and wrapping material), all stationery, and all advertising, promotional, point-of-sale, and display materials.

(dd)    **"Renewal"** shall mean the renewal as set out in Part I, paragraph 9.

(ee)    **"Reporting Period"** shall mean the period in respect of which the Licensee provides its royalty statements and Royalties to the Licensor, as set out in Part I, paragraph 17.

(ff)    **"Royalties"** shall mean the earned royalties, calculated at the Royalty Rate, on the total Net Sales Value of Licensed Product(s) distributed and/or sold (the date of which for these purposes shall

Sensitivity: Confidential

always mean the earlier of the date on which the relevant Licensed Product(s) is billed, invoiced, shipped, or paid for by or to the Licensee) during the Term.

(gg)     "**Royalty Rate**" shall mean the rate set out in Part I, paragraph 14.

(hh)     "**Sell-Off Period**" shall mean that period specified in Part I, paragraph 21.

(ii)      "**Specified Currency**" shall mean the currency specified in Part I, paragraph 10.

(jj)      "**Specified Number of Samples**" shall mean the number of samples of each Licensed Product specified in Part I, paragraph 20 to be supplied free-of-charge (including any shipping charge or customs duties) to the Licensor's Representative for the Licensor and additional samples as reasonably requested by Licensor or Licensor's Representative.

(kk)     "**Territory**" shall mean those territories specified in Part I, paragraph 7.

(ll)      "**Term**" shall mean that period of time set out in Part I, paragraph 8, including any Renewal and which refers to the period of time that Licensee may manufacture and sell the Licensed Product(s) in the Territory within the Distribution Channels. For the avoidance of doubt, other than under the specific provisions of the Sell-Off Period as specified herein, Licensee may not sell Licensed Products to trade customers or any other third party for sale at retail or otherwise, or otherwise make any use of the Property, after the Term. For example, if the Term expires on December 31, Licensee may not sell Licensed Products which are intended for sale at retail anytime in the subsequent year, notwithstanding the actual sale by the Licensee to the trade customer or any other third party occurs during the Term.

(mm)    "**Trade Introduction Date**" shall mean the date that the first Licensed Product(s) are introduced to trade customers, as set out in Part I, paragraph 18.

1.2.      Headings in this Agreement are for convenience only and shall not affect its interpretation.

## 2.      GRANT OF RIGHTS

2.1.      The Licensor grants to the Licensee, subject to and on the terms of this Agreement, a license as described in Part I, paragraph 4, to use the Property solely on and in connection with the manufacture, promotion, and sale of Licensed Product(s) in the Territory in the Distribution Channels for the duration of the Term.

2.2.      Unless as otherwise set forth in Part I, paragraph 4, nothing in this Agreement shall be construed so as to prevent the Licensor from granting to any third party any rights to use the Property (including without limitation granting licenses for the type of products constituting Licensed Product(s)) or from itself using the Property in any manner whatsoever, including soliciting, negotiating, and granting any license (including without limitation granting licenses for the type of products constituting Licensed Product(s)), to a third party during the Term and nothing in this Agreement shall prevent such third party licensee from designing, developing, manufacturing, and presenting to the trade, or promoting or selling, the Licensed Product(s). Notwithstanding anything to the foregoing, Licensor reserves all rights to enter into co-branded collaborations for the Property, including, without limitation for the same Licensed Product(s).

2.3.      It is expressly understood that the Licensee may use the Property only in connection with Licensed Product(s) and only in accordance with the terms hereof. No rights other than those expressly licensed above are granted and all other rights are reserved to the Licensor. For clarity, Licensee may not have any third party use or exploit any of its rights under this Agreement except as expressly stated.

Sensitivity: Confidential

## 3.    APPROVAL AND QUALITY CONTROL; COMPLIANCE WITH LAWS AND STANDARDS

3.1    The Licensee agrees that the Licensed Product(s) shall be of a high standard of style, quality, and appearance, compliant with any Licensor guidelines provided to Licensee prescribing the permitted form and manner in which the Property may be used, and compliant in all respects with this Agreement. In order to assure the Licensor that it is complying with such standards, the Licensee shall, before marketing, advertising, selling, or distributing any Licensed Product(s), deliver to the Licensor, free of all costs or charges in connection with delivery (including without limitation shipping charges, air freight, and customs charges), the Specified Number of Samples of each such Licensed Product(s), including all sizes, colors, and variations, together with all proposed Related Materials and any additional samples as may be required for the Licensor's use. All Licensed Product(s) and their Related Materials must be approved in writing by the Licensor (which approval the Licensor shall have the right to withhold in its discretion) before the Licensee may advertise, market, sell, distribute, or use the same.

3.2    The Licensee shall submit samples of Licensed Product(s) and Related Materials to the Licensor for its approval in accordance with Part II, paragraph 3.1 at the various stages of development, from initial concept to finished product, in accordance with the Licensor's protocol and procedures set out by the Licensor separately from time to time, but which include the right of the Licensor to review and approve the creative design of each Licensed Product(s) at all principal stages of development. Licensee shall provide Licensor with a written detailed request for approval of each such Licensed Product(s) (a **"Products Approval Request"**). If Licensor disapproves a Products Approval Request, Licensor shall accompany such disapproval with a written description in reasonable detail of the deficiency in such Licensed Product(s) or other reason for such disapproval and Licensee shall have the right to address Licensor's reasons for disapproval and resubmit a revised Products Approval Request to Licensor for approval. If Licensor does not respond in writing to a Products Approval Request within ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ of Licensor's receipt of such Products Approval Request, any Licensed Product(s) included within the Products Approval Request shall be deemed disapproved. Licensee shall not exploit any Licensed Product(s) in connection with the Property without Licensor's prior written approval in each instance.

3.3    The Licensee shall not depart from the style, quality, and appearance of the approved Licensed Product(s) and Related Materials in any material respect without the prior written consent of the Licensor, and the Licensee shall: (i) periodically send the Specified Number of Samples to the Licensor upon request of the Licensor; and (ii) grant access to its, and cause any sub-contractor to grant access to its, relevant business premises for inspection to any authorized representatives of the Licensor during normal business hours and upon reasonable notice by the Licensor, to confirm compliance with the foregoing standards and the terms of this Agreement. The Licensee agrees that the obligations in this Part II, paragraph 3 are of the essence of this Agreement and material terms hereof and if the Licensee fails to comply with them in any one or more respects, the Licensor shall be entitled to terminate this Agreement under Part II, paragraph 17.

3.4    Any use of any Ancillary Mark on the Licensed Product(s) and/or any Related Materials shall be subject to the Licensor's prior written consent in each instance. The Licensee warrants that it is the owner of or has the rights to use any such Ancillary Mark and that the use of any Ancillary Mark on any Licensed Product(s) and/or Related Materials will not infringe the IPR of any third party nor result in any loss or damage to the goodwill or reputation of the Licensor.

3.5    As a material condition of this Agreement, the Licensee undertakes not to use and not to permit the use by any related third party (which shall include without limitation any party connected with the subject matter of this Agreement) of child labor or any other labor which offends against decency or morality in relation to the manufacture, distribution, or sale of Licensed Product(s). In particular, the Licensee shall, and shall ensure that any party connected with the subject matter of this Agreement shall, comply with either the code of conduct set out in Annex B (the

LD/VK/JP/2020/507774                              8

"**Code**") or Licensee's "The LEGO Group Responsible Business Principles" guidelines and with the highest standard of business ethics prevailing in the industry throughout the Term.

3.6    If applicable, at all times that Licensee Processes Personal Data and/or Company Data, as defined in the attached Data Protection Schedule, which is incorporated into this Agreement, the Licensee shall comply with all terms of the Data Protection Schedule. If there is any conflict between the Data Protection Schedule and the main body of the Agreement then the Data Protection Schedule shall prevail.

3.7    Except to the extent inconsistent with U.S. law, Licensee shall comply with all applicable laws, including but not limited to, all data privacy and data protection laws. If Licensee shall collect credit card data in connection with the sale of the Licensed Products, Licensee shall comply with the Payment Card Industry Data Security Standards (PCI DSS). Licensee shall implement and maintain adequate administrative, technical and physical safeguards to protect any consumer data that Licensee collects through its direct to consumer E-Commerce Website.

3.8    Licensee agrees to comply with applicable U.S. export controls and sanctions laws and regulations in the export, reexport, transfer, use, and disposition of the Licensed Products. Licensee agrees to cause its customers to comply with applicable U.S. export controls and sanctions laws and regulations. Among other things, the Licensed Products may not be exported, reexported, or transferred without prior U.S. Government permission to (i) anyone on the U.S. Government's Consolidated Screening List, (ii) any entity owned, directly or indirectly, 50% or more in the aggregate by parties on the U.S. Government's Consolidated Screening List, or (iii) any country or area subject to a U.S. embargo. The U.S. Government's Consolidated Screening List is available at: https://www.export.gov/csl-search. Currently, the countries/areas subject to U.S. embargoes are Crimea region of Ukraine, Cuba, Gaza Strip, Iran, North Korea, Sudan (North Sudan), and Syria.

3.9    Licensee understands that Licensor has the right to stop performance and withdraw from this Agreement without penalty under this Agreement if Licensee or a Licensee Officer, Director, or Employee becomes a U.S. sanctioned party, if Licensor determines in good faith that Licensee is violating U.S. export control and sanctions laws, or if Licensee or Licensor is not able to obtain any license or authorization required under U.S. export control and sanctions laws.

3.10    Licensee understands that the obligations in Part II, paragraphs 3.7 and 3.8 are U.S. legal requirements and agrees that they shall survive any term or termination of this Agreement.

3.11    Licensee agrees to indemnify and hold harmless Licensor against any claim, demand, action, proceeding, judgment, penalty, fine, loss, liability, cost or expense suffered or incurred by Licensor (including, without limitation, attorney's fees), and arising out of or relating to ███████ ████████████████████████████████████████████ The Licensed Products shall be manufactured, distributed and sold in accordance with all Applicable Laws including, without limiting the generality of the foregoing, the Federal Food, Drug and Cosmetic Act, the Federal Hazardous Substance Act (FHSA), the Flammable Fabrics Act, the Consumers Products Safety Act, and the ASTM Standard Consumer Safety Specifications on Toy Safety (Toy Manufacturers of America Voluntary Toy Safety Standard) or other acts and standards. Without limiting the generality of the foregoing, Licensee shall comply with applicable United States legal requirements, whether or not located in the United States.

3.12    Licensee shall promptly provide Licensor with copies of all communications relating to the Property or Licensed Product(s) with any governmental, regulatory, or industry authority.

**4    MARKETING AND REPORTING**

4.1    The Licensee shall, ████████████████████████████████████ prepare and deliver to Licensor an annual marketing plan for the Licensed Product(s) containing



4.2     Intentionally omitted.

4.3     Intentionally omitted.

4.4     The Licensee shall from time to time, on written request by the Licensor, duly provide Licensor
        a timely and detailed management update of Licensee's commercial activities and results with
        respect to the Licensed Products in a format acceptable to the Licensor (which will typically
        require

## 5     DISTRIBUTION

5.1 The Licensee acknowledges, in consideration of Licensor's willingness to enter in the Agreement
    with Licensee in connection with the sale and distribution of the Licensed Products in the Territory,
    (a) the importance for Licensor to maintain control over the style, quality and appearance of the
    Licensed Products being introduced to the marketplace as appropriate for the Territory and of the
    preservation of the integrity of the Property and (b) that for purposes of maintaining and enhancing
    the reputation of the Licensor and the Property, the Licensed Product(s) should only be sold
    through retail sales locations and other channels of distribution in the Territory, as specified in
    Part I, Paragraph 7, which are consistent with the reputation and public image of the Licensor and
    the Property. Accordingly, the parties agree that the Distribution Channels achieve this. Licensee
    agrees that it shall agree to represent as to the good standing and compliance of such customer and
    will be directly liable for any failure of such third party distributor or retailer to comply with the
    Letter of Instruction. For the avoidance of doubt, the Licensee expressly agrees that it shall not
    distribute Licensed Product(s) nor sell Licensed Product(s) to any distributor for sale through any
    discount or off-price retailer without the Licensor's prior written approval (which approval the
    Licensor may withhold at its sole discretion) unless such discount channel is explicitly allowed by
    its inclusion in the Distribution Channels. Notwithstanding the foregoing, the parties agree that, in
    respect of sales within the European Union, the list of Distribution Channels agreed herein shall
    be non-exhaustive.

5.2 The Licensee shall have the non-exclusive right to sell Licensed Product(s) to its retail customers
    for sale on such retail customer's E-Commerce Websites and Licensee shall use best efforts to
    ensure that its retail customers and distributors are not permitted to make sales to any third party
    reseller.

## 6     DILIGENT MARKETING AND DISTRIBUTION

6.1     The Licensee agrees that approved samples for each Licensed Product(s) category shall be
        introduced to trade customers by no later than the Trade Introduction Date and final approved
        production Licensed Products offered for sale to end consumers by no later than the Market In-
        Store Date. If any such product category is not offered for sale by the Market In-Store Date, the

Sensitivity: Confidential

Licensor shall have the right to sever from the definition of Licensed Product(s) such product category (with no reduction in the Minimum Guarantees) and shall have the right to terminate this Agreement.

6.2   Intentionally omitted.

6.3   During the Term, the Licensee shall actively market, develop, and promote (collectively "**diligently commercialize**") all the Licensed Product(s) throughout the Territory in each of the Distribution Channels. The Licensor may revoke this license for any category of Licensed Product(s), in any part of the Territory and/or any Distribution Channel which is not so diligently commercialized by the Licensee (with no reduction in the Minimum Guarantees). For the purposes of this Part II, paragraph 6.3, the Licensor may, for example, determine that the Licensee has failed to diligently commercialize: (i) Licensed Product(s) which have not been developed and manufactured in volume; or (ii) a part of the Territory for which no significant sales or Licensed Product(s) distribution has been obtained or (iii) any Distribution Channel for which no significant sales or customer accounts have been obtained (with respect to the foregoing, subject in all respects to the applicable laws of the European Union and the EEA).

6.4   In addition to the Licensor's rights and remedies at law or in equity or pursuant to this Agreement (including the right to immediately terminate this Agreement pursuant to Part II, paragraph 17.1), the Licensee agrees ███████

6.5   Licensee agrees that it will use its best efforts to plan its production and inventory such that there will be minimal unsold inventory at the end of the Term unless Licensee has in the meantime been granted a renewal or extension of this Agreement by Licensor. For the avoidance of doubt, Licensee will not produce and stock inventory in quantities such that the intent of the end of Term is effectively and in bad faith extended through an over-supply of Licensed Product(s) sold or otherwise disposed in the Territory.

## 7   INTENTIONALLY OMITTED.

## 8   PAYMENTS AND STATEMENTS

8.1   In consideration for the grant of rights set out herein, the Licensee shall pay to the Licensor in the Minimum Guarantees in accordance with the Payment Schedule. The paid Minimum Guarantees shall be credited against the earned Royalties due under Part II, paragraph 8.2 during the Term, as further described in Part II, paragraph 8.2.

8.2   As additional consideration, the Licensee shall pay to the Licensor the Royalties in accordance with Part II, paragraph 8.4, provided however that the full amount of the Minimum Guarantee actually paid to Licensor that is applicable to the Contract Year concerned shall first be credited against the payment of any Royalty with respect to sales of Licensed Products made during the Term. If the total amount of Royalties payable in respect of any Contract Year is: (i) less than the Minimum Guarantees, no part of the Minimum Guarantees shall be refundable by the Licensor to the Licensee; or (ii) greater than the Minimum Guarantees, no excess Royalties may be carried forward to any subsequent Contract Year. Furthermore all sales made to third party distributors will be duly noted as such in all sales royalty reports.

8.3   Further, if set forth in Part I, paragraph 11 (or as otherwise required by Licensor pursuant to Part II, paragraph 8.8 of this Agreement), the Licensee shall procure within 30 days of the Commencement Date (or of Licensor's request pursuant to Part II, paragraph 8.8) the provision of a valid Letter of Credit covering the amount detailed in Part I, Paragraph 11. It is agreed

LD/VK/JP/2020/507774                11

between the parties that such Letter of Credit shall be renewed at Licensor's request at the end of each Contract Year and reduced by the amount of any Minimum Guarantees paid during such Contract Year.

8.4    The Licensee shall, ████████████████████████████████ furnish to the Licensor complete and accurate statements in the format of Licensee's Standard Royalty Template,, signed and certified to be true and complete by a duly authorized officer of the Licensee.

At the same time as delivering such statement, the Licensee shall pay the Licensor an amount equal to:

   (i)     the Royalties receivable during such Reporting Period; plus

   (ii)    the sum of all Royalties receivable during previous Reporting Periods of such Contract Year; less

   (iii)   the sum of all Minimum Guarantees due and paid to the Licensor for such Contract Year as of the end of such Reporting Period; less

   (iv)    the sum of all Royalties paid to the Licensor in previous Reporting Periods of such Contract Year;

provided that if such amount is less than zero (0), then no amount of Royalties shall be paid for such Reporting Period.

For the avoidance of doubt, the Licensee shall submit statements in accordance with the foregoing even if no sales have been made by the Licensee during such Reporting Period. As per the definition of Net Sales Value, Licensed Product(s) are considered sold when invoiced, shipped, delivered, or paid for, whichever occurs first, and Licensee shall not wait until a customer invoice is paid before reporting sales and paying any royalty amount that is due.

8.5    Except as otherwise provided in this paragraph 8.5, all payments hereunder shall be made in the Specified Currency together with such sales tax, use tax, or value added tax (or other similar tax) as may be chargeable thereon and, except as otherwise provided in this Part II, paragraph 8.5, without deduction whatsoever, including without limitation deduction of any expenses or withholding or other taxes (amounts specified to be net of taxes). ████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Bank:  HSBC Bank USA
Branch: ███████████
ABA: ███████████
SWIFT Code: ███████
Account Name: ████████
Account Numbe███████

Sensitivity: Confidential

All payments shall be made in US currency. The royalties due upon sales made in Non-US currency will be converted to US currency using HSBC commercially available exchange rates offered by HSBC Bank at the end of the calendar quarter in which the royalty is due.

8.6     Any cost of conversion built into a bank's exchange rate must be accounted for with a corresponding increase in the amount being converted so that all costs of conversion, as well as wire transfer and other bank fees, shall be the sole expense of the Licensee, and the Licensor shall receive the full amount of payments without reduction.

8.7     Overdue payments shall bear interest at the rate of: ███████████████
███████████████████████ whichever is less, from the due date of payment until actual payment.

8.8     The parties acknowledge that failure to pay the Minimum Guarantees or the Royalties or the Marketing Spend Shortfalls or any Marketing Fund Payments in a timely manner shall be construed as a material breach of this Agreement and shall enable the Licensor to either: (i) require the provision of a valid Letter of Credit in form and substance acceptable to Licensor; or (ii) terminate this Agreement pursuant to Part II, paragraph 17.1.2. For the avoidance of doubt, the Licensor may require that any such Letter of Credit requested: (i) covers any or all of the amounts due during the Term and any Sell-Off Period; and (ii) will provide Licensor's Representative with the irrevocable right to draw down on first demand any amount that is due but not paid by the Licensee hereunder. If Licensor terminates this Agreement in such circumstances, the Licensor may, in its sole discretion, accelerate the due date of all future payments owing under this Agreement for the remainder of the Term and these payments shall become immediately payable on termination of this Agreement.

8.9     Intentionally omitted.

## 9     BOOKS & RECORDS

9.1     Licensee shall make all payments in connection with this Agreement in a manner that creates an accurate record of such payments and shall accurately record such payments in its books and records. Wherever possible, Licensee shall make such payments by wire transfer or any similar method that creates an external record of the transaction and shall avoid making such payments in cash.

9.2     The Licensee shall keep and maintain, during the Term, and ███████████████ hereafter (the "Audit Period"), complete and accurate books and records in connection with sales of Licensed Product(s) and the computation of Royalties in respect thereof, including without limitation invoices, correspondence, banking, commercial, financial and/or accounting and other records pertaining to the subject matter of this Agreement.

9.3     Such books and records shall be available for inspection and audit (an "Audit") at any time or times during the Audit Period, during reasonable business hours and upon reasonable notice by the Licensor or an authorized representative, such as Licensor's Agent, a third party auditor or accounting firm. In particular, the Licensee undertakes to provide the Licensor or its authorized representatives with all reasonable assistance in the conducting of an Audit, as set forth below. Failure to cooperate with Licensor or Licensor's authorized representative in connection with the Audit shall be deemed a material breach of this Agreement. Within ███████████ written request by the Licensor or its authorized representatives Licensee shall be required to provide a minimum of four (4) dates for Licensor or its authorized representatives to conduct the Audit on site where Licensee maintains such books and records related to the Agreement (such dates to fall within ████████ of such written request). Additionally, upon written request by Licensor or its authorized representative, with ███████████ from such written request, Licensee shall provide all information pertaining to the subject matter of this Agreement, including, without limitation, all invoices, correspondence, banking, commercial, financial and/or accounting and other records (including safety and performance records).

Sensitivity: Confidential

DocuSign Envelope ID: 5E50C538-C1C3-436A-A5A9-A8565A2937A3

Licensor is allowed to audit once per year, covering calendar years and the last audit should start within ███████ after termination of this Agreement.

9.4    Should Licensee fail to maintain auditable books and records, Licensee shall pay to Licensor a penalty equal to the greater of: ███████ of the Minimum Guarantee or ███████ of all Royalties paid (or owed) to Licensor from the later of (i) the commencement of the Term or (ii) the last date as covered in the most recent settled audit, through the period subject to audit. Payment of such penalty shall not waive, limit, or restrict any rights or remedies which Licensor may have in law or equity.

9.5    If any Audit discloses a deficiency between the amount found to be due to the Licensor and the amount actually paid to the Licensor, then such deficiency shall be due immediately and the Licensee shall pay such deficiency, together with interest at the rate set out in Section 8.6, to the Licensor within ███████ of receipt of an invoice from the Licensor or its authorized representatives for such amount. Additionally, if such deficiency above is greater than ███████ percent ███ then the Licensee shall promptly reimburse the Licensor and/or its representatives for all out of pocket costs and expenses incurred in conducting such Audit, including but not limited to, auditor and outside counsel fees, travel, accommodations and local meal expenses.

9.6    If such deficiencies identified in an Audit are disputed by the Licensee (an "Audit Dispute"), then the Licensee shall raise such Audit Dispute (in respect of such disputed amounts only) with the Licensor within ███████ of receipt of the Audit findings and/or Audit report, and the parties thereafter undertake to enter into good faith discussions to resolve the Audit Dispute. For the avoidance of doubt, all undisputed amounts shall be paid in accordance with Section 9.5 above. In the event the Audit Dispute is not resolved within ███████ of the Audit Dispute being raised, the Licensee shall promptly place such disputed sums into escrow. Licensor shall appoint a second independent auditor to audit Licensee's books and records as it pertains to the disputed sums only. All out of pocket costs associated with the appointment of the second auditor shall be borne by Licensee. The parties agree to accept fully, and be bound by, the findings of such second Audit without dispute, and upon conclusion of the second Audit, such sums in escrow shall be promptly paid to the Licensor, or returned to the Licensee, in accordance with findings of the second Audit. All sums due to Licensor under this Section 9.4 shall be payable by Licensee within ███████ of receipt of an invoice from the Licensor or its authorized representatives for such amount.

## 10    NO SUB-LICENSE

The Licensee shall have no right to grant any sub-licenses hereunder but shall have the right (subject to Licensor's approval in so far as any manufacturing arrangements are concerned, which shall require, without limitation, that a signed manufacturer's agreement to the satisfaction of the Licensor and a copy is provided to Licensor or Licensor's Representative (as directed)) to make arrangements for the subcontract, manufacture, finishing, packaging, and storing of Licensed Product(s), provided that the Licensee shall ensure that no such subcontractor shall take any action contrary to or inconsistent with the terms and conditions set out in this Agreement. The Licensee shall advise Licensor of all details of each subcontractor and shall diligently monitor each of its subcontractors that manufacture, in whole or in part, any Licensed Product(s) in order to determine that each and every Licensed Product(s) is manufactured in accordance with the requirements set out herein. Licensee will on demand by Licensor provide the pertinent commercial details and/or other documentation pertaining to the Licensed Product(s) it has with any sub-contractor. For the avoidance of doubt, a sub-contracted manufacturer, or any related party or affiliate of same, may under no circumstances also be a distributor, agent, retailer, or other type of reseller of the Licensed Product(s) and no sub-contracted party may have the right to sub-license or to further sub-contract any rights or obligations under this Agreement. The Licensee shall be liable for all acts and omissions of any sub-contractor appointed by it in connection with this Agreement.

## 11    PREMIUMS AND FOB SALES

Sensitivity: Confidential

11.1    The Licensee agrees that Licensed Product(s) will not be sold or given away as a Premium without the prior written consent of the Licensor, or otherwise supplied to any third party without the prior written consent of the Licensor if to the knowledge of the Licensee after reasonable inquiry such Licensed Product(s) are intended to be used as a Premium by such third party. Further, unless otherwise set forth herein, the Licensee agrees that no other item of merchandise shall be used as a Premium by the Licensee as part of any sales promotion plan intended to increase sales of Licensed Product(s) without the prior written consent of the Licensor. If the Licensee wishes to sell or supply Licensed Product(s) for use by any third party as a Premium as aforesaid, or if the Licensee wishes to obtain the right to distribute Premium items in connection with the promotion of Licensed Product(s), the Licensee shall notify the Licensor and shall disclose to the Licensor the nature of such proposed Premium arrangement, and in such event the Licensor agrees to consider such proposal in good faith taking into account all of the circumstances, subject to payment by the Licensee of the applicable Royalty in relation thereto. Notwithstanding the foregoing, Licensee is permitted to devote a reasonable number of Licensed Products ▮▮▮▮▮▮▮▮▮▮ or its own marketing purposes (e.g., influencer giveaways, fan media, etc.) without Licensor's written approval. In addition, Licensee shall gif ▮▮▮▮▮▮▮▮▮▮ he Licensed Products.

11.2    No products may be sold by Licensee F.O.B. unless a specific F.O.B. Royalty Rate has been explicitly established in the commercial conditions and set out in Part I, paragraph 14. For the sake of clarity, "**F.O.B.**" shall mean sales made by Licensee to a retailer or other customer (the "**F.O.B. Customer**") where the F.O.B. Customer takes possession of the Licensed Products at a location that is outside of the country where such F.O.B. Customer will ultimately sell the Licensed Products to consumers. An example of an F.O.B. sale is one in which Licensee sells Licensed Products to a UK retailer F.O.B. Hong Kong, with the retailer taking possession of the Licensed Products in Hong Kong and ultimately importing to and selling these Licensed Products in the UK. If Licensee (i) has made any F.O.B. sale without Licensor's explicit written consent on an agreed royalty rate to be paid for such F.O.B. sales; or (ii) participates in any other arrangements which result in such customer paying less for the Licensed Product(s) than Licensee's regular wholesale selling price to the trade, Licensee shall pay Royalties with respect to all such sales at ▮▮▮▮▮ higher Royalty Rate than the Royalty Rates specified in Part I. Further, the Royalties related to such sales shall be payable to Licensor immediately and shall not be credited or set off against any remaining Minimum Guarantee. All sales made on any F.O.B basis or to will be duly noted as such in all sales royalty reports.

## 12    INTELLECTUAL PROPERTY

12.1    The Licensee acknowledges that, as between Licensor and Licensee, the Licensor owns all IPR in the Property throughout the world. The Licensee acknowledges and agrees that the Licensee shall not obtain any right, title, or interest in the Property, and that all goodwill from the use of the Property shall accrue solely for the benefit of the Licensor. If the Licensee acquires any rights in the Property, by operation of law or otherwise, such rights shall be deemed and are hereby irrevocably assigned with full title guarantee to the Licensor without further action by any of the parties.

12.2    The Licensor shall have sole right, in its discretion, to maintain the existing registrations of the Property and prosecute any pending applications. The Licensee shall at Licensor's cost provide, at the request of the Licensor, all necessary assistance with such maintenance and prosecution.

12.3    The Licensee shall not dilute, tarnish, misuse, or bring into disrepute the Property, nor do or omit to do or permit there to be done any act which may harm the value of the Property or the reputation of the Licensor.

12.4    No representations or warranties are given by the Licensor, express or implied, in respect of ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ The Licensor hereby disclaims all representations and warranties

LD/VK/JP/2020/507774                                      15

regarding

12.5   The Licensee hereby undertakes that during the Term it shall not do or authorize to be done any act which would or might jeopardize or invalidate any registration or enforceability of the Property, nor do any act which might assist or give rise to an application to remove the Property from any register or which might prejudice the right of or title of the Licensor. Licensee shall not grant or attempt to grant a security interest in, or otherwise encumber, the Property or record any such security interest or encumbrance against any application or registration regarding the Property in the United States Patent and Trademark Office or elsewhere.

12.6   Licensor can, at its own cost, record the license granted to it in Section 2.1 in the relevant trademark registries in the countries in which it markets and distributes Licensed Products.

12.7   The Licensee undertakes not to register, attempt to register, or use the Prohibited Names as its company name, business name, trading name, internet domain name, or for any other use whatsoever in any jurisdiction throughout the world unless specifically permitted in terms of this Agreement or approved in writing in advance by the Licensor. In the event the Licensee registers, attempts to register, obtains any ownership in, or otherwise utilizes any Prohibited Name in violation of this paragraph, the Licensee agrees to assign and hereby assigns to Licensor all rights, title, and interest therein.

12.8   

Sensitivity: Confidential

██████████████████████████████████████████████████████

12.9    Licensee further agrees and undertakes to provide such assistance to Licensor and/or their professional agents (as the case may be) as is reasonably requested in order to protect the Property and the IPR therein, at Licensor's cost in respect of any external reasonable expenses, including:

    12.9.1    to assist Licensor and their professional agents with such registration of the Property as those parties may decide to apply for; and

    12.9.2    to execute and deliver to the Licensor such other and further instruments and documents as the Licensor may from time to time reasonably request for the purpose of establishing, evidencing and enforcing or defending the complete, exclusive, perpetual and worldwide ownership by the Licensor of all rights, titles and interests of every kind and nature whatsoever.

12.10   The Licensee shall affix to each and every Licensed Product(s) and/or Related Materials (as required), a product label and/or swing tag containing the appropriate logos, copyright and trademark notices, website references, and the Licensee's address, in a form and design to be specified by the Licensor. The Licensee shall also comply with any anti-counterfeiting measures the Licensor is using, for example the purchase (from Licensor's designated supplier) and use of official holograms or other authenticity labels on all Licensed Product(s), if requested to do so. In addition, at the discretion of Licensor's partner, Netflix, Licensee will be required to include the Netflix approved mark on packaging and/or on the Licensed Product, as further directed by Licensor.

## 13   INFRINGEMENT

13.1    The Licensee shall notify the Licensor immediately in writing in the event of the Licensee becoming aware of:

    13.1.1    any infringement (including possible infringement) or imitations by others of the Property;

    13.1.2    any activity by a third party which amounts to or could amount to passing off in respect of the Property;

    13.1.3    any opposition by any third party to any registration or application for registration of the Property; or

    13.1.4    any allegation by a third party that the Property is invalid or infringes any rights of a third party.

13.2    The Licensor shall ████████████████████████████████████ ny action shall be taken on account of such infringement, opposition, allegation, or imitations. The Licensee shall ████████████████████████████████████████████████████████ The Licensee shall cooperate with the Licensor in relation to any action or proposed action for infringement or passing off activity in relation to the Property as the Licensor may deem fit, including without limitation conducting all actions, proceedings, and any negotiations for settlement in respect of any such infringement or passing off activity.

13.3    The Licensor ███████████████ bring or defend any proceedings in relation to the Property ████████████████. The preceding sentence shall not prohibit or restrict the Licensee's right to take action in respect of its own name or logo(s). In the event that Licensor is notified of any allegation by a third party that any Licensed Product infringes any rights of a third party in any jurisdiction in the Territory, Licensee shall, upon notice from Licensor, immediately cease sale of such Licensed Product in such jurisdiction.

Sensitivity: Confidential

## 14     INDEMNITY

14.1     Licensor and Licensor's Representative assume no liability to Licensee or any third parties with respect to ███████████████████████████████████████ The Licensee hereby indemnifies and agrees to keep indemnified the Licensor and the Licensor's Representative and their associated companies, and any shareholders, officers, directors, employees, representatives, and agents of the Licensor, the Licensor's Representative, and their associated companies, from

14.2     To the extent permitted by law, Licensor will defend, indemnify, and hold Licensee harmless from

14.3

## 15     INSURANCE

15.1     Licensee shall acquire and maintain ███████████████████ throughout the Term and any applicable Renewal Term, and ███████████████ following the termination or expiration of this Agreement,

   (a)     Comprehensive General Liability Insurance ████████████████████████████

   (b)     Workers' Compensation (statutory) and Employer liability with limits ████████████

15.2

In the event Licensee's insurance is cancelled and replacement insurance as required by this Agreement is not obtained prior to the effective date of such cancellation, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Upon request, Licensee shall furnish a copy of the insurance certificate to Licensor or Licensor's Representative.

15.3   Prior to the effective date of this Agreement, Licensee shall cause certificates issued by Licensee's insurance company evidencing the insurance required above to be provided to Licensor and Licensor's Representative. Such certificates shall set forth, minimally, the amount of insurance, the additional insured endorsement, the policy number, the date of expiration, and an endorsement that Licensor and Licensor's Representative shall receive thirty (30) days written notice prior to termination, of the coverage. Certificates shall be furnished to Licensor and Licensor's Representative upon renewal of insurance. In the event Licensee has not provided its certificate of insurance as required herein,

## 16   SALE OF PRODUCTS TO THE LICENSOR

The Licensee shall supply to the Licensor, from time to time and following a request by the Licensor, such reasonable quantities of the Licensed Product(s) as are requested by the Licensor, upon terms

## 17   TERMINATION

17.1   The Licensor shall have the right, but not the obligation, to terminate this Agreement immediately and forthwith by notice in writing to the Licensee (unless otherwise specified below) in the event that:

17.1.1   Intentionally omitted;

17.1.2   the Licensee fails to pay by the due date any amount due or owing by it under this Agreemen▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and such non-payment continues uncured at the expiration o▮▮▮▮▮▮▮▮ ollowing receipt of written notice of such non-payment;

17.1.3   the Licensee is in material or ongoing breach of this Agreement and such breach has not, if capable of remedy, been remedied withi▮▮▮▮▮▮▮▮▮ of written notice requiring such remedy, which for the avoidance of doubt, shall include, without limitation: (i) any failure to comply with any instructions relating to the application of IPR to the Licensed Products or Related Materials;

17.1.4   the Licensee is in material or ongoing breach of this Agreement and such breach is not capable of remedy, which for the avoidance of doubt, shall include: (i) any failure to comply with the Code; (ii) any failure to comply with the product approval process set out herein before selling Licensed Products; and (iii) any breach of Part II, paragraph 10;

17.1.5   the Licensee is in breach of Part II, paragraph 15 of this Agreement;

Sensitivity: Confidential

17.1.6   the Licensee is in breach of this Agreement in selling items which (i) are not included within the Licensed Products as listed at Part I, paragraph 5 of this Agreement, (ii) utilize the Property and are not approved in accordance with this Agreement, or (iii) utilize the Property and are sold outside the permitted Distribution Channels and/or Territory, except as otherwise set forth in this Agreement with respect to the European Union and EEA;

17.1.7   the Licensee is insolvent, unable to pay its debts when due, or makes any assignment for the benefit of creditors or an agreement pursuant to any bankruptcy law, or files or has filed against it any petition under the bankruptcy or insolvency laws of any jurisdiction, county or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or to be adjudicated a bankrupt or an insolvent, in which case no notice shall be required. In such an event, neither the Licensee nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to sell, exploit, or otherwise deal with or in the Licensed Product(s);

17.1.8   the Licensee merges or consolidates with any other entity which was not a subsidiary or an affiliate of the Licensee prior to such merger or consolidation, or if the Licensee sells, assigns or otherwise disposes of any part of its business connected to the manufacture, sale, or marketing of the Licensed Product(s), or if the Licensee otherwise is the subject of an asset or share purchase agreement;

17.1.9   the Licensee does or omits to do something which could or does have a materially adverse effect on the reputation of the Property, the Licensor or any associated company, entity, or person, or could or does reduce the value of the Property; or

17.1.10   there has been a material adverse change to the business, assets, or financial condition of the Licensee or the ability of the Licensee to perform any of its obligations under this Agreement; or

17.1.11   the Licensee or any of its affiliates shall default in the performance of any of the agreements, conditions, covenants, or terms contained in any other agreement between Licensor or any of its affiliates, joint ventures, or licensees, on the one hand, and Licensee or any of its affiliates, on the other hand, and such default shall have continued for the applicable cure period (if any) specified therein after written notice of such default from Licensor or any of its affiliates, joint ventures, or licensees, as applicable.

17.2   The Licensee shall have the right, but not the obligation, to terminate this Agreement by providing at least ▮▮▮▮▮▮▮▮ written notice to Licensor in the event that Licensor breaches any of its representations or warranties as set forth in Section 20.1 below.

17.3   Termination of this Agreement for any reason shall be without prejudice to the rights and obligations of either party existing at termination, including without limitation the right to take action in respect of the circumstances giving rise to such termination.

## 18   CONSEQUENCES OF TERMINATION

18.1   Upon the expiration or termination of this Agreement for any reason, the Licensee shall:

18.1.1   immediately relinquish all rights to manufacture, distribute, promote, advertise, and sell or in any way deal with Licensed Product(s) or Related Materials, except as is specifically permitted by Part II, paragraph 19, and shall provide a written declaration of such relinquishment and cessation of all manufacturing, distribution, promotion, advertisement, and sale of the Licensed Product(s) and Related Materials by Licensee, its subcontractors, distributors, and agents;

Sensitivity: Confidential

18.1.2  promptly deliver up to the Licensor all Related Materials which do not contain LEGO IP Rights and in any event within ▮▮▮▮▮ f request by the Licensor

18.1.3  ensure that all materials used by or on behalf of the Licensee in connection with the manufacture, distribution, and sale of Licensed Product(s), including without limitation artwork, product labels, hang-tags, holograms, or other similar product authentication materials which do not contain LEGO IP Rights, shall either be destroyed or delivered up to the Licensor, at the Licensor's option (but at the Licensee's cost), and the Licensee shall furnish the Licensor with sworn affidavits of destruction if the Licensor so directs

18.1.4  upon request provide the Licensor a written confirmation that such sub-contractor has ceased the manufacture of all Licensed Product(s) (except solely to complete the manufacturing of Licensed Product(s) that are in the process of manufacture at the date of the termination or expiration as expressly permitted in Part II, paragraph 19.1);

18.1.5  upon request provide the Licensor with a written confirmation that all of its distributors have ceased to distribute all Licensed Product(s) (except solely to distribute any Sell-Off Inventory during the Sell-Off Period to the list of customers in the unit volume and sales volume as approved by Licensor in accordance with Part II, paragraph 19.4); and

18.1.5  with respect to an early termination of this Agreement only, immediately pay ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18.2  Not later than ▮▮▮▮▮▮ after the expiration of this Agreement, receipt of notice of termination or, where no such notice is required, the happening of the event which terminates this Agreement, the Licensee shall furnish the Licensor a statement showing the number and description of each and every Licensed Product(s) then in stock or in process of manufacture.

18.3  The Licensee shall have the right during the Sell-Off Period to dispose of any Licensed Product(s) in stock or in process of manufacture at the date of termination in accordance with the provisions of Part II, paragraph 19 below provided that:

18.3.1  the Licensee discharges fully its obligations to the Licensor as set out in paragraphs 18.1 and 18.2; and

18.3.2  the termination of this Agreement has not resulted from the Licensor's exercise of the right to terminate under Part II, paragraph 17; and

18.3.3  the quantity of Licensed Product(s) in inventory at the time of such termination is not in excess of a reasonable quantity taking into account the Licensee's past sales of Licensed Product(s).

18.4  Upon termination of the Agreement or, if applicable, after the expiration of the Sell-Off Period, the Licensee shall:

18.4.1  at the Licensor's option either: (i) destroy all remaining stock or inventory of Licensed Product(s) and Related Materials and furnish the Licensor with an additional sworn affidavit of such destruction if the Licensor so directs (at the Licensee's sole cost); and

18.4.2  provide the Licensor with a comprehensive final Certified Statement, setting out a summary of all statements submitted by the Licensee pursuant to Part II, paragraph 8.4.

Sensitivity: Confidential

**19    SELL-OFF PERIOD**

19.1   Subject to Part II, paragraph 18, upon expiration of this Agreement, the Licensee shall have the right provided for in Part II, paragraph 18.3 to complete the manufacture of Licensed Product(s) which are in the process of manufacture at the date of termination or expiration and to sell such Licensed Product(s) and any other Licensed Product(s) in stock at the date of termination or expiration of this Agreement (the "**Sell-Off Inventory**"), during the Sell-Off Period. The Licensee will comply with the relevant provisions of Part II, paragraph 6.5 above. ███████████

19.2   The Licensor may immediately upon notice, revoke or restrict (at its sole discretion) any rights in respect of Sell-Off Inventory, if the total volume of Licensed Products in the marketplace and/or in Licensee's possession during the Sell-Off Period is, in the Licensor's reasonable opinion, deemed to be at levels not in accordance with this Part II, paragraph 19

19.3   If during the Sell-Off Period any of the events specified under Part II, paragraph 17.1 occur, the Licensor shall be entitled to end the Sell-Off Period forthwith by notice in writing.

19.4   The Licensee acknowledges that during the Sell-Off Period the Sell-Off Inventory may be sold only in the normal course of business and at regular selling prices and in compliance with all terms of this Agreement (unless otherwise agreed by the Licensor in writing).

19.5   The Licensee shall pay to the Licensor the Royalties on Sell-Off Inventory sold during the Sell-Off Period within █████████ following (x) ███████████ o the extent the Sell-Off Period exceeds of the Sell-Off Period and, in each case ███████████

**20    REPRESENTATIONS AND WARRANTIES OF LICENSEE; LIMITATION OF LIABILITY**

20.1   Licensee and Licensor each represent and warrant that: (a) it is duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization or chartering; (b) (i) it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted hereunder and to perform its obligations hereunder, and (ii) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of Licensee; (c) when executed and delivered by such party, this Agreement will constitute the legal, valid, and binding obligation of Licensee, enforceable against Licensee in accordance with its terms; and (d) it is of good standing.

20.2   The Licensee hereby covenants, represents, warrants and undertakes that:

20.2.1   it is creditworthy;

20.2.2   it has experience of the manufacture and distribution of the relevant Licensed Products in the relevant Territory;

20.2.3   it has not been subject to any previous legal or regulatory action regarding compliance with labor and ethical standards;

20.2.4   it is not in breach of any obligation (whether contractual or arising from any Applicable Laws) as a result of anything done or omitted to be done which may affect the ability of the Licensee to fulfil its obligations under this Agreement;

20.2.5   it will at all times exercise all rights and licences granted in this Agreement in accordance with all Applicable Laws, except to the extent inconsistent with U.S. laws;

20.2.6   it shall, and shall ensure that its employees, directors and officers, as well as those of its agents and sub-contractors, which are engaged by it to perform work and/or services in

Sensitivity: Confidential

connection with this Agreement shall, at all times uphold the good name and reputation of the Licensor, and shall not conduct themselves in a manner that is intended to be or which it is reasonably foreseeable shall be damaging, defamatory or prejudicial to the reputation of the Licensor;

20.2.7   it will not use the Property unless and until it has received the written approval of Licensor in accordance with this Agreement;

20.2.8   it will ensure that no Licensed Products or Related Materials shall contain anything which is obscene, libellous, blasphemous or defamatory, or which, having conducted all reasonable searches, infringes the copyright, design right or other right of any third party;

20.2.9   it will obtain all necessary clearances, consents, waivers and permissions in relation to the use of any third party intellectual property rights or other rights in connection with Licensed Products and/or Related Materials;

20.2.10   it will not do or permit there to be done any act or omission which will or is likely to denigrate the value of or render invalid the Property;

20.2.11   it will comply fully in every respect with the terms of any brand guidelines issued by the Licensor from time to time; and

20.2.12   it will, at its own expense, obtain all approvals, consents, certificates, authorities and clearances (including customs clearances) of any relevant authorities which may be necessary in connection with the exercise or the rights or performance of the obligations under this Agreement;

20.3   In no event shall the Licensor be liable to the Licensee for ████████████████

████████████████████████████████████████████████

████████████████████ Nothing in this Agreement shall limit the liability of any party for personal injury or death caused by negligence.

## 21   NOTICES AND APPROVALS

21.1.   All notices and statements to be given and approvals to be sought hereunder shall be given or made in respect of the Licensor and the Licensee to the addresses set out in Part I, paragraph 1 or such other address as each party hereto may notify the other party hereto from time to time. A copy of all notices, statements and sought approvals which are submitted to the Licensor shall be forwarded to the Licensor's Representative, at the address set out under Part I, paragraph 2, at the same time as the submission to the Licensor.

To Licensor:

IMG Worldwide, LLC
1370 Avenue of the Americas
20th Floor
New York, New York 10019
Attention: Jonathan Seiden

With a copy to:

IMG GmbH
Linkstr 2
Quarter Potsdamer Platz, Level 8
10785 Berlin
Germany
Attention: Sven Thierhoff

LD/VK/JP/2020/507774                    23

To Licensee:

      LEGO System A/S
      Aastvej 1
      DK-7190 Billund
      Denmark
      Attention: ███████████

21.2    Any notice shall be hand delivered, faxed, or sent by prepaid first class post, and shall be deemed to have been received: (i) if hand delivered – at the time of delivery; (ii) if sent by fax, at the time of confirmed transmission; or (iii) if sent by prepaid first class post – two (2) business days after posting if to an address within the country of posting and six (6) business days if to an address outside such country.

21.3    Approvals may be notified by email which shall be deemed to have been received at the time of confirmed transmission.

## 22    ASSIGNMENT

22.1    This Agreement and the rights granted hereunder are personal to Licensee and may not and shall not be assignable by Licensee or by operation of law. Any attempt by Licensee to assign, mortgage, or hypothecate this Agreement or any of Licensee's rights hereunder shall constitute a material breach of this Agreement and any assignment, mortgage, or hypothecation of this Agreement by Licensee shall be null and void and shall have no effect.

22.2    Nothing in this Agreement shall preclude the Licensor from assigning, subcontracting, or otherwise transferring this Agreement or any of its rights and/or obligations hereunder provided that any transferee of the Licensor shall have license of such rights as required to enable the transferee to grant the rights to the Licensee in the terms of this Agreement.

## 23    GENERAL

23.1    In the event that any paragraph of this Agreement shall be deemed to be invalid or unenforceable, this shall not affect the legal enforceability of the Agreement as a whole, and the parties agree to replace such invalid paragraph with a mutually agreed enforceable replacement paragraph, as close as possible in interpretation to the invalid paragraph.

23.2    If this Agreement is signed and dated on different dates, the later date should be deemed to be the date of this Agreement. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.3    Except as otherwise stated herein nothing in this Agreement is intended on a proper construction to confer any benefit on any third party (whether such benefit would have arisen under the Contracts (Rights of Third Parties) Act 1999 or otherwise) and no term will be enforceable by any third party.

23.4    Failure of any party at any time to demand strict performance by the other of any of the undertakings, terms, or conditions set out this Agreement shall not be construed as a continuing waiver or relinquishment thereof and each party may at any time demand strict and complete performance by the other of the said undertakings, terms, and conditions. No written waiver shall excuse the performance of any act other than those specifically referred to therein. The

Sensitivity: Confidential

Licensor makes no warranties or representations to the Licensee except those specifically expressed herein.

23.5   This Agreement does not constitute and shall not be construed as constituting an agency, partnership, or joint venture relationship between the Licensee and the Licensor. The Licensee shall have no right to obligate or bind the Licensor in any manner whatsoever, and nothing herein contained shall give or is intended to give any rights of any kind to any third persons.

23.6   This Agreement and any attached annexures, exhibits, schedules, etc. constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. Licensor and Licensee each acknowledge that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, concerning the subject matter hereof to induce Licensor or Licensee to execute or authorize the execution of this Agreement, and Licensor and Licensee each acknowledge that they have not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein.   No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing and signed by both parties.

23.7   Both parties shall keep confidential at all times during the Term and for a period of five (5) years following the expiry thereof, the terms of this Agreement and any confidential and non-public information about the other party or their affiliates (including, without limitation: (i) all technical and scientific information; (ii) all business know-how; and (iii) financial information of the other party) which is acquired from any source during the Term, save for disclosures (x) that must be made in accordance with law or other applicable regulations or (y) to such party's directors, officers, employees, consultants, agents, investors, and advisors (collectively, "**Party's Representatives**") who need to know such confidential and non-public information and who are informed of the confidential nature of such information. Each party will cause its Party's Representatives to observe the terms of this Agreement, and will be responsible for any breach of this Agreement by any of its Party's Representatives.

23.8   No announcement, circular or other publicity in connection with the subject matter or contents of this Agreement shall be made by either party without the prior written approval of the other (such approval not to be unreasonably withheld or delayed).

23.9   The Licensed Products are to be designed, manufactured, advertised, promoted, distributed, sold and otherwise exploited by Licensee, its subcontractors, and its distributors (as applicable) pursuant to the terms of this Agreement in strict compliance with all applicable federal, state, and local laws and regulations, and all applicable industry standards and regulations. On a periodic basis, Licensee may be required to provide documentation of such compliance.

23.10  The provisions of Part II, paragraphs 1, 8, 9, 12.1, 12.4, 12.7, 12.8, 13.2, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24 and 25 of this Agreement shall survive any termination or expiration of this Agreement.

## 24  ANTI-BRIBERY COMPLIANCE

24.1   Licensee shall: (i) comply with all Applicable Laws relating to anti-bribery and anti-corruption including but not limited to the Bribery Act 2010 and the Foreign Corrupt Practices Act 1977 (as amended) ("**Relevant Requirements**"); (ii) not directly or indirectly engage in any activity, practice or conduct which would constitute an offence under sections 1, 2, or 6 of the Bribery Act 2010 if such activity, practice, or conduct had been carried out in the UK or would otherwise be in contravention of the Relevant Requirements; (iii) have instituted, shall maintain in place and shall monitor throughout the term of this Agreement its own policies and procedures, including adequate procedures under the Bribery Act 2010 and the Foreign Corrupt Practices

Sensitivity: Confidential

Act 1977, to ensure, and which are reasonably expected to continue to ensure, compliance with the Relevant Requirements and Part II, paragraph 24.1(ii), and will enforce them where appropriate; and (iv) promptly report to Licensor any request or demand for any undue financial or other advantage of any kind received directly or indirectly by Licensee in connection with the performance of this Agreement.

24.2      Licensee shall ensure that any person associated with Licensee who is performing services in connection with this Agreement does so only on the basis of a written contract which imposes on and secures from such person terms equivalent to those imposed on Licensee in this Part II, paragraph 24 ("**Relevant Terms**"). Licensee shall be responsible for the observance and performance by such persons of the Relevant Terms, and shall be directly liable to Licensor for any breach by such persons of any of the Relevant Terms.

24.3      Breach of this Part II, paragraph 24 by Licensee shall be deemed a material breach under Part II, paragraph 17.1.3.

24.4      For the purpose of this Part II, paragraph 24, the meaning of adequate procedures and foreign public official and whether a person is associated with another person shall be determined in accordance with section 7(2) of the Bribery Act 2010 (and any guidance issued under section 9 of that Act), sections 6(5) and 6(6) of that Act and section 8 of that Act respectively, and the equivalent provisions under the Foreign Corrupt Practices Act 1977. For the purpose of this Part II, paragraph 24, a person associated with Licensee includes but is not limited to any agent, delegate, or subcontractor of Licensee.

## 25      GOVERNING LAW; EQUITABLE RELIEF

25.1      This Agreement shall be governed by, construed and interpreted in accordance with the laws of the ▮▮▮▮▮▮▮▮ without regard to the principles of conflict of laws. Venue of any dispute or action relating to, or arising out of, this Agreement shall lie exclusively in ▮▮▮▮▮▮▮▮ and the Parties irrevocably submit to the jurisdiction of such courts. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

25.2 

## ANNEX A

### THE PROPERTY



ARTIST'S NAME / LIKENESS. Licensee shall have the right to use, reproduce, exhibit and publish the name, likeness, voice of each Artist (including, but not limited to, any catchphrases, slogans, verbal expressions or terms associated with each Artist), performance, photo and Licensor supplied biographical material in and in connection with the Queer Eye series and solely for the purpose of advertising, publicity, marketing and/or promoting the Licensed Products as well as the Queer Eye brand, but specifically excluding the categories of tobacco, firearms, feminine hygiene, politics and lotteries. Artist shall be defined individually as Jonathan Van Ness, Antoni Porowski, Karamo Brown, Tan France and Bobby Berk.

Sensitivity: Confidential

DocuSign Envelope ID: 5E50C538-C1C3-436A-A5A9-A8565A2937A3

## ANNEX B

### CODE OF LABOR PRACTICE FOR THE PRODUCTION OF GOODS LICENSED BY THE LICENSOR

PREAMBLE

As a condition of the license agreement, each licensee awarded the right to use the Licensor's name, trademark or other intellectual property in the manufacture and/or supply of Licensed Product(s) must provide written confirmation that the workers involved in the chain of production receive a living wage and enjoy decent working conditions that conform to minimum international labor standards and to the relevant local legal and industry standards.

Each licensee must further agree to ensure that these conditions and standards are observed by each supplier and subcontractor in the manufacture and distribution of Licensed Product(s) or their components. Prior to placing orders with suppliers or engaging suppliers and subcontractors, licensees should assess whether these companies can meet the provisions of this Code.

The Licensee acknowledges that failure by it, or by its contractors, subcontractors, and/or suppliers, to comply with the requirements of this Code may lead to immediate termination of its license agreement with the Licensor.

OBLIGATIONS

The Licensor requires that its licensees, suppliers, and subcontractors agree to comply with the following obligations:

**Forced Labor** - There shall be no use of forced labor whether in the form of forced prison or bonded labor or otherwise.

**Discrimination** - No person shall be subject to any discrimination in employment, including hiring, and every employee shall be treated with respect and dignity and afforded equality of opportunity and treatment regardless of gender, race, color, sexual orientation, age, disability, religion, political opinion, trade union membership, nationality, social origin, or other distinguishing characteristic. Employees shall not be subjected to behavior, including gestures, language and physical contact, that is sexually coercive, threatening, abusive, or exploitative.

**Child Labor** - There shall be no use of the labor of any person less than fifteen years of age (or fourteen where the law of the country of manufacture allows) or of any person younger than the age for completing compulsory education in the country of manufacture where such age is higher than fifteen.

**Wages** - Wages and benefits for a standard working week shall meet at least applicable local legal or industry minimum standards. Deductions from wages shall not be made for disciplinary purposes and the composition of wages and benefits composition are detailed clearly and regularly for workers.

**Hours of Work** - Hours of work shall comply with legally mandated work hours. Overtime shall only be used when each employee is fully compensated according to local law and employees shall be entitled to at least one day off in every seven day period.

**Environment, Health and Safety** - A safe and hygienic working environment shall be provided, bearing in mind knowledge of the industry and of any specific hazards. Adequate steps shall be taken to prevent accidents and injury to health arising out of, associated with, or occurring in the course of work. Reasonable steps will be taken to minimize any negative impacts of manufacturing and other practices on the environment.

LD/VK/JP/2020/507774

Sensitivity: Confidential

**Disciplinary Practices** - Personnel should never be submitted to corporal punishment, mental or physical coercion, or verbal abuse. Disciplinary procedures shall comply with applicable local laws and employment practices.

**Management Systems** - The Licensee shall establish and maintain appropriate procedures to evaluate and select suppliers based on their ability to meet the requirements of this Code. The Licensee shall maintain appropriate records of suppliers' commitments to social accountability.

The Licensee shall ensure that all contractors, suppliers, or other third parties engaged by it in relation to licensed goods and services undertake in writing to be bound by this Code and the Licensee shall maintain reasonable evidence of compliance with the Code.

The Licensee shall provide reasonable information and access to interested parties seeking to verify conformity to the requirements of this Code and shall maintain appropriate records to demonstrate conformity to the requirements of this Code.

Sensitivity: Confidential

## ANNEX C

*Intentionally omitted.*

Sensitivity: Confidential

DocuSign Envelope ID: 5E50C538-C1C3-4354-AFA9-A8E65A2037A3

# ANNEX D

*Intentionally omitted.*

Sensitivity: Confidential

DocuSign Envelope ID: 5E50C538-C1C3-4354-AFA9-A8E65A2037A3