| | |
|---|---|
| JAMES CONCANNON, | Civil Action No. 3:21-CV-1678 (OAW) |
| Plaintiff, | |
| v. | |
| LEGO Systems, Inc. and LEGO System A/S, | |
| Defendants. | December 18, 2024 |

## <u>*REDACTED* DEFENDANTS LEGO SYSTEMS, INC. AND LEGO SYSTEM A/S' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

## Table of Contents

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................3

LEGAL STANDARD ...............................................................................................................8

ARGUMENT .............................................................................................................................8

I.     THE LEGO GROUP IS ENTITLED TO SUMMARY JUDGMENT ON
CONCANNON'S COPYRIGHT INFRINGEMENT CLAIMS (COUNTS I-III). ............8

    A.    The LEGO Group Obtained a Valid License to Use Porowski's Likeness. ............9

    B.    The Subject Torso Element of the Porowski Figurine Constitutes Transformative
Fair Use. ...............................................................................................................13

        1.    The Purpose and Character of the Subject Torso Element is Entirely
Different from the Porowski Jacket. .........................................................14

        2.    The Nature of the Copyrighted Work is Afforded Little Weight Because of
the Transformative Nature of the Porowski Figurine. ...............................18

        3.    The LEGO Group Evoked Only as Much of the Porowski Jacket as
Necessary to Effectuate its Transformative Purpose of Capturing
Porowski's Likeness to Create the Porowski Figurine. .............................19

        4.    There is No Effect of the Use on the Market or Value of the Copyrighted
Work Because the Subject Torso Element is not a Substitute for the
Porowski Jacket and they Exist in Entirely Different Markets. .................22

    C.    Concannon's Indirect Infringement Claims Fail as a Matter of Law. ...................24

II.    THE LEGO GROUP IS ENTITLED TO SUMMARY JUDGMENT ON
CONCANNON'S TRADE DRESS CLAIM (COUNT IV). .............................................25

    A.    Concannon Cannot Establish Valid Protectible Trade Dress. ..............................27

    B.    Concannon Has Not Produced Evidence of Likely Consumer Confusion. ...........34

III.    THE LEGO GROUP IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V.....38

CONCLUSION.........................................................................................................................39

# Table of Authorities

**Page(s)**

## Cases

*20th Century Wear, Inc. v. Sanmark-Stardust Inc.*,
747 F.2d 81 (2d Cir. 1984)......................................................................................34, 35

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022), *cert. denied*, 144 S. Ct. 77 (2023).......................10, 13

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)......................................................................................................8

*AM Gen. LLC v. Activision Blizzard, Inc.*,
450 F. Supp. 3d 467 (S.D.N.Y. 2020).......................................................................37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................................8

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)...............................................................................................15, 18

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014).........................................................................................23

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)..................................................................................23, 24

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)................................................................................. *passim*

*Black & Decker Corp. v. Dunsford*,
944 F. Supp. 220 (S.D.N.Y. 1996) ......................................................................31, 33

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006)..................................................................................18, 19

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
554 F. Supp. 3d 606 (S.D.N.Y. 2020), *aff'd*, 839 F. App'x 545
(Fed. Cir. 2021).....................................................................................................33, 34

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001)........................................................................................21

*C.M.B. Prods., Inc. v. SRB Brooklyn, LLC*,
No. 19-cv-2009, 2022 WL 2704506 (E.D.N.Y. July 12, 2022)..............................29

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ............................................................................................ *passim*

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 19-
  CV-01422, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022) .................................35, 38

*Cardinal Motors, Inc. v. H&H Sports Prot. USA, Inc.*,
  No. 1:20-CV-07899, 2021 WL 1758881 (S.D.N.Y. May 4, 2021) ...................26, 29

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ............................................................................20, 22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 323, 325 (1986) .................................................................................8

*Cicena Ltd. v. Columbia Telecomms. Grp.*,
  900 F.2d 1546 (Fed. Cir. 1990) ............................................................................32

*Com. Foods, Inc. v. PLC Com. Corp.*,
  504 F. Supp. 190 (S.D.N.Y. 1980) .......................................................................32

*Corporate Design of Am., P.C. v. KCC Architects, PLLC*,
  No. 11-cv-4717, 2014 WL 12829199 (E.D.N.Y. Feb. 4, 2014) .............................25

*D'Amico v. City of N.Y.*,
  132 F.3d 145 (2d Cir. 1998) ....................................................................................8

*DeClemente v. Columbia Pictures Indus., Inc.*,
  860 F. Supp. 30 (E.D.N.Y. 1994) .........................................................................37

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
  No. 12-cv-4112, 2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ................................34

*Doctor's Assocs., Inc. v. QIP Holder LLC*,
  No. 3:06-CV-1710, 2010 WL 669870 (D. Conn. Feb. 19, 2010) ..........................40

*Easy Spirit, LLC v. Skechers U.S.A., Inc.*,
  515 F. Supp. 3d 47 (S.D.N.Y. 2021) .........................................................28, 29, 33

*EBIN New York, Inc. v. SIC Enter., Inc.*,
  No. 19-cv-1017, 2023 WL 6141275 (E.D.N.Y. Sept. 20, 2023) ...........8, 29, 30, 32

*Elements/Jill Schwartz, Inc. v. Gloriosa Co.*,
  No. 01-cv-00904, 2002 WL 1492197 (S.D.N.Y. July 15, 2002) ...........................31

*Est. of Smith v. Graham*,
  799 F. App'x 36 (2d Cir. 2020) .............................................................................19

*Faulkner v. Nat'l Geographic Enters. Inc.*,
  409 F.3d 26 (2d Cir. 2005)........................................................................25

*Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)..................................................................................9

*Garden Catering-Hamilton Ave, LLC v. Wally's Chicken Coop, LLC*,
  30 F. Supp. 3d 117 (D. Conn. 2014).......................................................40

*Giggle, Inc. v. netFocal, Inc.*,
  856 F. Supp. 2d 625 (S.D.N.Y. 2012).................................................32, 34

*Graduation Sols., LLC v. Acadima, LLC*,
  No. 3:17-CV-1342 (VLB), 2020 WL 1466204 (D. Conn. Mar. 26, 2020)............................28

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998).......................................................................9

*Graham v. Prince*,
  265 F. Supp. 3d 366 (S.D.N.Y. 2017).....................................................20

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)................................................................................23

*Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*,
  No. 11-cv-01794, 2011 WL 6600267 (S.D.N.Y. Dec. 22, 2011), *aff'd*, 507 F.
  App'x 74 (2d Cir. 2013)...........................................................................34

*Int'l Leisure Prod., Inc. v. FUNBOY LLC*,
  747 F. App'x 23 (2d Cir. 2018) ................................................................28

*Jorgensen v. Epic/Sony Recs.*,
  351 F.3d 46 (2d Cir. 2003)........................................................................9

*L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*,
  79 F.3d 258 (2d Cir. 1996)...................................................................26, 29

*LMNOPI v. XYZ Films, LLC*,
  449 F. Supp. 3d 86 (E.D.N.Y. Mar. 30, 2020)...................................19, 24

*Lopez v. Gap, Inc.*,
  883 F. Supp. 2d 400 (S.D.N.Y. 2012)............................................ *passim*

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017).......................38

*Metro-Goldwin-Mayer Studios Inc. v Grokster, Ltd.*,
  545 U.S. 913 (2005)................................................................................25

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987)........................................................................39

*Morgans Grp. LLC v. John Doe Co.*,
    No. 10-cv-5225, 2012 WL 1098276 (S.D.N.Y. Mar. 31, 2012)..........................29

*Morris v. Lindau*,
    196 F.3d 102 (2d Cir. 1999)..........................................................................8

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)..........................................................36, 37, 40

*Presley's Est. v. Russen*,
    513 F. Supp. 1339 (D.N.J. 1981) ..................................................................12

*Psihoyos v. Pearson Educ., Inc.*,
    855 F. Supp. 2d 103 (S.D.N.Y. 2012)......................................................10, 11

*RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*,
    527 F. Supp. 3d 305 (E.D.N.Y. 2021) .....................................................28, 30

*Sherwood 48 Assocs. v. Sony Corp. of Am.*,
    76 F. App'x 389 (2d Cir. 2003) ....................................................................27

*SHL Imaging, Inc. v. Artisan House, Inc.*,
    117 F. Supp. 2d 301 (S.D.N.Y. 2000)............................................................13

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020)..................................................... *passim*

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)..........................................................................25

*Star Athletica, LLC v. Varsity Brands, Inc.*,
    580 U.S. 405 (2017)......................................................................................14

*Sunrise Home Juices, Inc. v. Coca–Cola Co.*,
    220 F. Supp. 558 (S.D.N.Y. 1963) (sales growing from $30,000 in 1952 to
    $600,000 in 1963 were insufficient to show secondary meaning)..........................31

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)............................................................................14

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
    338 F.3d 127 (2d Cir. 2003)..........................................................................21

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)........................................................................15

*Universal City Studios, Inc. v. Nintendo Co.*,
    578 F. Supp. 911 (S.D.N.Y. 1983), *aff'd*, 746 F.2d 112 (2d Cir. 1984) ................................29

*Wal-Mart Stores, Inc. v. Samara Bros.*,
    529 U.S. 205 (2000) ..........................................................................................27, 28

*Walt Disney Co. v. Goodtimes Home Video Corp.*,
    830 F. Supp. 762 (S.D.N.Y. 1993) ......................................................................29, 30

*White v. Samsung Elecs. Am.*,
    971 F.2d 1395 (9th Cir. 1992) .....................................................................................12

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) ........................................................................................29

**Statutes**

15 U.S.C. § 1125(a) ......................................................................................................1

17 U.S.C. § 101 ............................................................................................................1

17 U.S.C. § 107 ...................................................................................................7, 14, 15

17 U.S.C. § 412 ............................................................................................................7

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* .................1, 3, 7, 40

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................8

Joseph J. Beard, *Clones, Bones and Twilight Zones: Protecting the Digital
    Persona of the Quick, the Dead and the Imaginary*,
    49 J. Copyright Soc'y U.S.A. 441 (2001) ....................................................................12

Suzy Woltmann, *What is B-Roll Footage and How is it Used?*,
    https://www.backstage.com/magazine/article/what-is-b-roll-footage-75533/
    (last accessed Dec. 17, 2024) ....................................................................................12

Defendants LEGO Systems, Inc. ("LSI") and LEGO System A/S ("LSAS") (collectively the "LEGO Group"), respectfully submit this memorandum of law in support of their Motion for Summary Judgment on (1) Plaintiff James Concannon's ("Concannon") claims in the Third Amended Complaint (ECF No. 48) against the LEGO Group for copyright infringement, 17 U.S.C. § 101 (Count I), trade dress infringement and unfair competition, 15 U.S.C. § 1125(a) (Count IV), and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA") (Count V), (2) Concannon's indirect copyright claims against LSAS for contributory copyright infringement (Count II) and vicarious copyright infringement (Count III), and (3) on the LEGO Group's affirmative defenses of non-infringement (First and Third Affirmative Defenses), trademark and trade dress invalidity (Second Affirmative Defense), fair use (Fourth Affirmative Defense), and implied license (Fifth Affirmative Defense). ECF No. 70.

## INTRODUCTION

In October 2021, the LEGO Group launched the *Queer Eye – The Fab 5 Loft* construction set (the "Set") based on the popular Netflix show *Queer Eye*. True to the show, the Set replicates the Atlanta loft apartment from Seasons 1 and 2 and includes LEGO® Minifigure figurines representing the five *Queer Eye* hosts. The Set was among the LEGO Group's first LGBTQ+ sets.

In December 2021, Concannon brought this action against the LEGO Group claiming that one piece in the 974-piece Set—a torso element for the LEGO Minifigure figurine representing Antoni Porowski ("Porowski"), *Queer Eye*'s food and wine expert—infringes his alleged copyright and trade dress rights. At the center of the dispute is a hand painted leather jacket that Concannon decorated at Porowski's request (the "Porowski Jacket"). Porowski sent Concannon a leather jacket for Concannon to adorn, which Concannon did *gratis*, with no limitations on Porowski's use of jacket or the adornments thereon, and with the understanding that Porowski would wear the jacket on *Queer Eye* as part of his "James Dean" aesthetic. Consistent with that

understanding, Porowski not only wore the jacket on *Queer Eye* and in related promotional media, but also wore that jacket publicly for years and rented it to the general public.

Concannon's direct copyright infringement claim against the LEGO Group (Count I) fails for two separate and independent reasons. First, the LEGO Group had a valid license to use Porowski's likeness, including the Porowski Jacket that comprises part of his "James Dean" aesthetic. The undisputed facts show that (a) Concannon gave Porowski an implied non-exclusive license to use the Porowski Jacket without limitation, including as part of his likeness, when Concannon gifted the adornments on the Porowski Jacket "no strings attached", (b) Porowski, in turn, had the ability to license his likeness, including the Porowski Jacket, to *Queer Eye*'s representatives, who, in turn, licensed Porowski's likeness, including the Porowski Jacket, to the LEGO Group. Second, the LEGO Group's use of the Porowski Jacket is a transformative fair use—a complete defense to copyright infringement. There is no dispute that the Subject Torso Element is not a one-to-one replica of the Porowski Jacket. Instead, the element embodies a transformative purpose—namely, capturing Porowski's likeness and highlighting the brand collaboration between the LEGO Group and *Queer Eye*. Unsurprisingly, there is also no evidence in the record that the Subject Torso Element (a construction toy element) serves as a market substitute for the Porowski Jacket (an article of clothing), nor that Concannon's ability to license the Porowski Jacket (or any product) has been harmed as a result of the Set. ECF No. 66 at 26–27. Because there is no direct copyright infringement, Counts II and III also fail.

Concannon's trade dress infringement claim against the LEGO Group (Count IV) fares no better. After over one year of discovery, Concannon cannot establish that he owns valid trade dress in "(1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; [and] (3) hand-painted graffiti-style lettering" (ECF No. 66 at 29). Far from adducing

evidence sufficient to meet the heightened evidentiary requirements for secondary meaning, Concannon's asserted trade dress is vague, ubiquitous, limitless, and, at bottom, not protectable. At best, Concannon can show that some popular people (*i.e.,* certain celebrities) have worn certain of his products. This sporadic evidence is woefully insufficient to establish secondary meaning. That is, Concannon simply has not, and cannot, establish that consumers associate the asserted trade dress with a single source: Concannon. Moreover, the undisputed facts demonstrate that there is no likelihood of consumer confusion between the Subject Torso Element and Concannon's alleged trade dress—either the one-off jacket Concannon painted for Porowski or his product line as a whole. Because Concannon cannot establish a trade dress claim, his tag-along CUTPA claim (Count V) also fails.

## **FACTUAL BACKGROUND[1]**

### **The LEGO Group and its Design of the Set**

The LEGO Group is a world-famous toy company that manufacturers construction toys. SOF ¶ 1. In December 2019, LSAS reached out to Scout Productions, Inc. ("Scout"), *Queer Eye's* production company, about creating the Set. SOF ¶ 5. A partnership between the LEGO Group and Scout would enable the LEGO Group to design an LGBTQ+ product and leverage synergies between the *Queer Eye* franchise and the LEGO Group's Rebuild the World™ campaign, as the five *Queer Eye* artists "rebuild" people's lives. SOF ¶¶ 6-7.

Scout and LSAS entered into a deal memorandum on February 4, 2020, memorialized in a license agreement executed on September 24, 2020 (the "License Agreement"), wherein Scout licensed the *Queer Eye* intellectual property, including the name, image, and likeness of each of

---

[1] Citations to "SOF" refer to the LEGO Group's Local Rule 56(a)(1) Statement of Undisputed Material Facts filed contemporaneously with this memorandum of law.

the *Queer Eye* artists (Porowski, Karamo Brown, Bobby Berk, Jonathan Van Ness, and Tan France), to the LEGO Group to create a construction set. SOF ¶ 10. Pursuant to the License Agreement, LSAS designed the Set, including a LEGO Minifigure figurine for each *Queer Eye* artist. SOF ¶¶ 11-12. The LEGO Group's designers reviewed materials sent by Scout and watched every episode of *Queer Eye*, to understand each artist's unique look such that they could design Minifigure figurines that evoked each artist's likeness. SOF ¶ 15.

In developing the Porowski Minifigure figurine, the LEGO Group took inspiration from items Porowski wore on the show, including the Porowski Jacket—worn frequently on the show and in promotional media—to accurately capture Porowski's likeness. SOF ¶¶ 13, 16-17. The result was a figurine with two looks: a white t-shirt with a neck kerchief, and a leather jacket (at issue in this litigation, the "Subject Torso Element"). SOF ¶¶ 13, 19. In designing the Subject Torso Element, the LEGO Group not only simplified and rearranged certain facets of the leather jacket, but also created unique toyetic designs different from the designs on the Porowski Jacket. SOF ¶¶ 22-24. The LEGO Group intended for the Subject Torso Element to be recognizable as Porowski while also evoking a connection to the LEGO brand. SOF ¶¶ 13, 18. The LEGO Group therefore incorporated its own intellectual property on the Subject Torso Element, including a skull Minifigure figurine head and the LEGO Group's proprietary common law trademark REBUILD THE WORLD™. SOF ¶ 24. A blown-up image of the Subject Torso Element, which is less than one inch tall, is shown below: [2]

---

[2] In person, some of the designs on the Torso Element are only a fraction of a centimeter long. The LEGO Group submitted a physical copy of the Set to Judge Arterton's chambers in connection with its Motion to Dismiss (ECF No. 34.) The LEGO Group is happy to submit an additional physical copy of the Set if helpful to the Court.



Pursuant to the license agreement, Scout approved the LEGO Group's designs for the Set and each Minifigure figurine. SOF ¶ 19. The Set launched on October 1, 2021, and was sold until April 28, 2023. SOF ¶¶ 20, 26.

**Porowski Requested Concannon Paint a Leather Jacket for *Queer Eye***

In 2017, after Porowski had purchased some of Concannon's t-shirts, Porowski told Concannon he [Redacted] ." SOF ¶ 32. Porowski also told Concannon [Redacted]

[Redacted]

. SOF ¶ 33. Porowski told [Redacted]

[Redacted]

SOF ¶ 33. Porowski sent Concannon [Redacted]

[Redacted] . SOF ¶¶ 35-36. Porowski told Concannon

[Redacted]

. SOF ¶ 37. Porowski and Concannon [Redacted]

[Redacted] . SOF ¶ 38.

Concannon delivered the completed Porowski Jacket to Porowski on September 14, 2018. SOF ¶

40. At his deposition, Concannon confirmed that (a) the Porowski Jacket was a gift for his celebrity friend, Porowski, who Concannon knew would appear in public and on television wearing the jacket, (b) he created the adornments on the Porowski Jacket for free, with "no strings attached," and no limitations on how Porowski could use it. Porowski then wore the jacket at a public speaking event, on *Queer Eye*, and in promotional media for *Queer Eye*. SOF ¶¶ 40-46.

**Concannon Learns of the Set**

Two weeks before the Set launched, Concannon saw an image of the Subject Torso Element on social media. SOF ¶ 47. Concannon expressed his excitement to Porowski, referring to the Subject Torso Element ███████████████ Redacted ███████████████ ████████████" SOF ¶¶ 48-49. At that time, Concannon texted a friend and noted Redacted ████████████████████████████████████████████████████████ ████████████████. SOF ¶ 50, Brunau Decl. Ex. 18 at CONCANNON05170-71 ("B█████████████████ Redacted ██████████████████████ ████████████████████").

**Concannon Acquires a Copyright and Brings Suit**

A month later, on November 26, 2021, Concannon applied for a U.S. Copyright Registration for the "combination, positioning, and arrangement of original design elements and pictorial representations" on the Porowski Jacket. U.S. Copyright Reg. No. VA0002276952 (the "'952 Copyright") issued on November 29, 2021. SOF ¶¶ 57-58. Put differently, the '952 Copyright *only* covers what Concannon added to the leather jacket, and not any portion of the jacket itself. The '952 Copyright covers the nine adornments Concannon added to the Porowski Jacket (shown in line below) (SOF ¶ 59):

1. "BLESS THE YOUTH MANIFESTO" adornment on the upper left lapel;

2. Yin-yang adornment on the lower left lapel;

3. "RAW WAR" and Skull adornment on the left breast;

4. Crossed-out "MONSANTO" adornment on the left bicep;

5. "1967 IS DEAD" and peace sign adornment on the right upper lapel;

6. Eight safety-pin adornment on the right breast;



7. Two hands breaking chains with the text "AS MONUMENTS FALL TEAR DOWN THE WALLS AND SHAKE HATE'S CHAIN OFF SOCIETY'S BRAIN";

8. "PEACE" adornment depicted on the right elbow; and

9. "THYME IS ON MY SIDE" surrounded by the text "THYME" adornment on the back.

On December 17, 2021, Concannon brought suit. ECF No. 1. At bottom, Concannon claims that the LEGO Group infringed the '952 Copyright by creating a "blatant copy" of the Porowski Jacket and infringed his alleged trade dress by including a "pop culture pun"—the LEGO Group's proprietary phrase and common law trademark REBUILD THE WORLD™—in "Concannon's signature style and brand." ECF No. 48 ¶¶ 4, 51. He later asserted tag-along claims for infringement of unregistered trade dress and violation of CUTPA.

The LEGO Group asserted the following affirmative defenses: non-infringement of copyright; trademark and trade dress invalidity; non-infringement of trademark and trade dress; transformative fair use, 17 U.S.C. § 107; and implied, non-exclusive license.[3] ECF No. 70.

There is no genuine dispute as to any material facts, and Concannon's copyright, trade dress, and CUTPA claims fail as a matter of law.

_____

[3] The LEGO Group also asserted affirmative defenses of equitable estoppel and waiver, laches, failure to state a claim, and a limitation on copyright damages pursuant to 17 U.S.C. § 412, but does not seek summary judgment on any of the defenses. ECF No. 70.

## LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate where, after discovery, the undisputed facts show "there is an absence of sufficient proof as to one essential element of the claim." *EBIN New York, Inc. v. SIC Enter., Inc*., No. 19-cv-1017, 2023 WL 6141275, at *4 (E.D.N.Y. Sept. 20, 2023) (citation omitted). Once the defendant "point[s] out to the district court . . . that there is an absence of evidence to support [the plaintiff's] case," it has satisfied its burden, and the burden shifts to the plaintiff to identify "specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 323, 325 (1986)). The plaintiff must "do [ ] more than simply rely on the contrary allegation[s] in [its] complaint," and "go beyond the pleadings" to identify hard evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Celotex Corp.*, 477 U.S. at 324 (quotations omitted); *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment) (collecting cases).

## ARGUMENT

### I.     THE LEGO GROUP IS ENTITLED TO SUMMARY JUDGMENT ON CONCANNON'S COPYRIGHT INFRINGEMENT CLAIMS (COUNTS I-III).

To establish direct copyright infringement (Count I, against the LEGO Group), Concannon must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the

work that are original." *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 548 (1985)). "To satisfy the second element of an infringement claim—the unauthorized copying element—a plaintiff must show both that his work was actually copied' and that the portion copied amounts to an improper or unlawful appropriation." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003) (quotation marks omitted).

The LEGO Group is entitled to summary judgment on Concanon's copyright infringement claims (Counts I–III) because Concannon has failed to establish direct copyright infringement, thus also failing to establish indirect infringement. The undisputed material facts show the LEGO Group did not create an "improper or unlawful appropriation" of the Porowski Jacket because (a) the LEGO Group had a valid license to Porowski's likeness, and (b) the Subject Torso Element is a transformative fair use.

### A.     The LEGO Group Obtained a Valid License to Use Porowski's Likeness.

Concannon's claim for direct copyright infringement (Count I) fails because, by gifting the adornments on the jacket to Porowski without any limitations and with the expectation that Porowski would wear it on *Queer Eye* as part of his James Dean-like aesthetic, Concannon gave Porowski an implied, non-exclusive license to use the Porowski Jacket as part of his likeness. Porowski was free to license his name, image and likeness to *Queer Eye*'s representative, Scout, which sub-licensed Porowski's likeness to the LEGO Group.

"A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). Although the Second Circuit has "not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," courts utilize one of two tests.

*ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022), *cert. denied*, 144 S. Ct. 77 (2023). The first, "a narrow test, find[s] an implied license only where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." *Id.*; *see also Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020). The copyright owner's intent to have the recipient copy and distribute the copyrighted work as part of their likeness is inferred where the recipient is "likely to appear in public, on television, in commercials, or in other forms of media" with the artwork. *Solid Oak Sketches*, 449 F. Supp. 3d at 346 (quotation marks omitted). The second test is "a more permissive test by which consent may be inferred based on silence where the copyright holder knows of the use and encourages it." *ABKCO Music*, 50 F.4th at 320. "Ultimately, whichever test is applied, the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012).

Here, under either test, the undisputed facts show that Concannon conveyed to Porowski an implied, non-exclusive license. First, under the narrow test, the record is clear Porowski requested Concannon create adornments for the Porowski Jacket. SOF ¶¶ 32-35. Further, Porowski told Concannon he would wear the Porowski Jacket on the show. SOF ¶¶ 32-37. Concannon and Porowski discussed the timing of Porowski's filming schedule for *Queer Eye* and even discussed whether certain adornments would be palatable to Netflix. SOF ¶ 38; *Psihoyos*, 855 F. Supp. 2d at 124; *Solid Oak Sketches*, 449 F. Supp. 3d at 346.

Importantly, Porowski was "neither requested nor agreed to limit the display or depiction of the images" of the Porowski Jacket despite Concannon knowing of Porowski's fame, role on *Queer Eye*, and curated James-Dean aesthetic at the time the Porowski Jacket was requested and created. *Solid Oak Sketches*, 449 F. Supp. 3d at 346. Indeed, Concannon set *no limits* on Porowski's

use of adornments on the Porowski Jacket and instead gifted them to Porowski with the expectation that Porowski would not only wear it on *Queer Eye*, but also in public, in commercials, or in other forms of media. SOF ¶¶ 41-44, Brunau Decl., Ex. 14 (Concannon Dep. Excerpts). Further, Concannon took Porowski's celebrity status and aesthetic into account when designing the adornments for the Porowski Jacket, including by refraining from use of any expletives. SOF ¶¶ 38-39, Brunau Decl., Ex. 14 (Concannon Dep Tr.).

The undisputed facts here are analogous to the key facts in *Solid Oak Sketches*. There, the Court granted summary judgment, concluding NBA players had implied, non-exclusive licenses to their tattoos granted by the tattoo artists, such that the players could sublicense the tattoos to whomever they wished. This included the defendant companies who created and marketed the NBA2K video game featuring the players' likeness, which included reproductions of the tattoos.

> Here, the undisputed factual record clearly supports the reasonable inference that the tattooists necessarily granted the [NBA] [p]layers nonexclusive licenses to use the [t]attoos as part of their likenesses, . . . . (i) the [NBA] [p]layers each requested the creation of the [t]attoos, (ii) the tattooists created the [t]attoos and delivered them to the [NBA] [p]layers by inking the designs onto their skin, and (iii) the tattooists intended the [NBA] [p]layers to copy and distribute the [t]attoos as elements of their likenesses, each knowing that the [NBA] [p]layers were likely to appear in public, on television, in commercials, or in other forms of media. Thus, the [NBA] [p]layers, who were neither requested nor agreed to limit the display or depiction of the images tattooed onto their bodies, had implied licenses to use the [t]attoos as elements of their likenesses. Defendants' right to use the [t]attoos in depicting the [NBA] [p]layers derives from these implied licenses . . . .

*Solid Oak Sketches*, 449 F. Supp. 3d at 346 (quotation marks and citation omitted).

Further, there is no dispute that the Porowski Jacket is part of Porowski's celebrity likeness. The record shows that Porowski worked with his stylist to cultivate a certain look for *Queer Eye*— namely, a James Dean like aesthetic, which included leather jackets. Indeed, Porowski wears a black leather jacket in the show's opening sequence and has worn leather jackets in third-party

promotions for the show. SOF ¶¶ 16-17. Courts have considered clothing when determining the scope of celebrity's likenesses in the right to publicity context. *E.g.*, Joseph J. Beard, *Clones, Bones and Twilight Zones: Protecting the Digital Persona of the Quick, the Dead and the Imaginary*, 49 J. Copyright Soc'y U.S.A. 441, 545–47 (2001) (noting clothing is often considered by courts as an ancillary feature of an individual's likeness). Just as Vanna White's likeness included blond hair, a long gown, and large jewelry in front of a game-board (*White v. Samsung Elecs. Am.*, 971 F.2d 1395, 1399 (9th Cir. 1992)), or Elvis Presley's likeness included a "particular style jumpsuit and rings" (*Presley's Est. v. Russen*, 513 F. Supp. 1339, 1365 (D.N.J. 1981)), Porowski's aesthetic and likeness included black leather jackets, specifically the Porowski Jacket, because it featured so prominently in the show's b-roll footage[4] and resulting promotional material. As lead designer for the Set Matt Ashton testified, it was necessary for the LEGO Group to emulate Porowski's clothing and style so consumers would recognize the Minifigure figurine as Porowski. SOF ¶¶ 13-18; Brunau Decl., Ex. 3 (Ashton Dep. Tr.).

In short, under the narrower implied license test, the undisputed facts confirm (1) Porowski requested Concannon decorate the jacket, (2) Concannon created the designs on the jacket intending Porowski to wear the jacket on *Queer Eye*, and (3) Concannon provided the jacket to Porowski "no strings attached." *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) ("An implied license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose.").

Turning to the second, broader and more permissive implied license test, the undisputed facts show that Concannon "kn[ew] of the use and encourage[d] it." *ABKCO Music*, 50 F.4th at

---

[4] B-roll footage is footage that is "secondary to the main action being recorded," and can include stock foot or cutaway shots. *Suzy Woltmann*, What is B-Roll Footage and How is it Used?, https://www.backstage.com/magazine/article/what-is-b-roll-footage-75533/ (last accessed Dec. 17, 2024).

320. Concannon knew Porowski intended to wear the Porowski Jacket on *Queer Eye* and encouraged such use by ensuring he painted the jacket within the shooting window and that the adornments would be palatable to Netflix such that the Porowski Jacket *could* appear on the show.

The undisputed material facts show that Concannon conveyed to Porowski an implied, non-exclusive license for Porowski to use the Porowski Jacket as a part of his likeness, however he wanted, with "no strings attached." SOF ¶ 42. Scout then licensed Porowski's likeness to the LEGO Group via an express license and approved the design of the Set. SOF ¶ 10, 19. There is no evidence the LEGO Group "deliberate[ly], willful[ly], and . . . utter[ly] disregard [Concannon's] rights." ECF No. 48 ¶ 72. The LEGO Group acted pursuant to its *express license*. Thus, there is no direct infringement.

The Court should grant the LEGO Group's motion for summary judgment on Count I.

### B. The Subject Torso Element of the Porowski Figurine Constitutes Transformative Fair Use.

The Court should grant the LEGO Group summary judgment on Concannon's direct copyright infringement claim for the separate and independent reason that the Subject Torso Element is a transformative fair use of Concannon's adornments on in the Porowski Jacket.

"[T]he fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. In determining whether the use of a copyrighted work constitutes "fair use," courts consider:

1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2) the nature of the copyrighted work;
3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id*. "Though mandatory, these four factors are non-exclusive." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014). "Moreover, although defendants bear the burden

of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor.'" *Id.* (quotation marks and alterations omitted). "All [factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

Here, consideration of each of the fair use factors demonstrates that summary judgment for the LEGO Group is appropriate. At the outset, Concannon's copyright covers *only* the painted adornments and removable yin-yang pin. His copyright does *not* cover any portion of the leather jacket itself, nor could it, as the jacket is a functional piece of clothing. *E.g.*, *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405 (2017) (requiring separation of adornments from the clothing, which is a useful article). Though the LEGO Group modified some of the elements of the jacket itself to create the Subject Torso Element, any consideration of the similarities between the *jacket itself* and the Subject Torso Element is irrelevant to the fair use analysis relating to the '952 Copyright.

### 1. The Purpose and Character of the Subject Torso Element is Entirely Different from the Porowski Jacket.

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. "The central question it asks is whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character.'" *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 (2023) (quotation marks and alterations omitted). "Although such transformative use is not absolutely necessary for a

finding of fair use . . . the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. Notably, where the work was "not included for [its] expressive value, but rather to most accurately recreate [a] certain [individual's] likeness[,]" the use is "***entirely different***[.]" *Solid Oak Sketches*, 449 F. Supp. 3d at 347–48 (emphasis added). Moreover, the Second Circuit has "found fair use in works that are plainly 'commercial.'" *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993) (collecting cases).

The undisputed facts demonstrate that the LEGO Group's use of certain adornments on the Porowski Jacket was for the dual transformative purposes of: (1) recreating Porowski's likeness as he appeared on *Queer Eye*, and (2) establishing the brand collaboration between the LEGO Group and *Queer Eye*. SOF ¶¶ 13-18. It is undisputed that Porowski wore the Porowski Jacket multiple times on the show, most notably in b-roll footage that ran throughout several episodes and seasons, and in promotional material for the show, including third-party promotional material. SOF ¶¶ 17, 46. For the Minifigure figurines included in the Set to be recognizable as the hosts, it was important for the LEGO Group to evoke the hosts' likenesses as they appeared on the show.

This factual use is "entirely different" from the creative purpose of the Porowski Jacket. *Solid Oak Sketches*, 449 F. Supp. 3d at 347–48 (noting "[t]he uncontroverted evidence thus shows that the [t]attoos were included in NBA 2K for a purpose—general recognizability of game figures as depictions of the [p]layers—different than that for which they were originally created"). Concannon added "his original artwork" to the black leather jacket in a way that "incorporate[ed] elements personal to Mr. Porowski[,]" such as his "interest in food and cooking" as a means of self-expression. ECF No. 48 ¶¶ 32, 41. Further, Concannon claims that his designs were meant to "criticize mainstream pop culture through satirical phrases and puns handwritten in graffiti

lettering." *Id.* ¶ 31. In contrast, the LEGO Group included the Subject Torso Element in the Set not for its "expressive value," but rather "to most accurately depict" Porowski's likeness, specifically his James Dean aesthetic. *Bill Graham Archives*, 448 F.3d at 609.

Further, the LEGO Group did not substantially use the adornments on the Porowski Jacket. As in *Solid Oak Sketches*, the Subject Torso Element of the Porowski Figurine represents "an inconsequential portion of" the Set—it is one of 974 pieces. *Solid Oak Sketches*, 449 F. Supp. 3d at 348; *Bill Graham Archives*, 448 F.3d at 611 (noting that only 7 pages of a 480-page book included the copyrighted images was inconsequential); *infra* Section I.B.3. Moreover, while images of the Subject Torso Element have been blown up in this litigation, the actual element is less than one inch tall, and the designs thereon are a few centimeters. *Bill Graham Archives*, 448 F.3d at 611 (noting that the largest reproduction of an original work in a coffee table book wase "less than 1/20 the size of the original"). The LEGO Group also did not use every adornment on the Porowski Jacket; indeed, the LEGO Group used only enough to evoke the original jacket such that it was recognizable as part of Porowski's likeness. The LEGO Group also included its own intellectual property, namely, a skull Minifigure figurine head and the common law trademark REBUILD THE WORLD to highlight the collaboration between the LEGO Group and *Queer Eye* as a further transformative purpose. *Bill Graham Archives*, 448 at 609–11 (concluding both "enhanc[ing] the reader's understanding" and "serv[ing] as historical artifacts" were two transformative purposes).

Moreover, any use of the Subject Torso Element in the marketing of the Set is "merely incidental to the commercial value of the [Set]" and was to truthfully advertise the Set. *Solid Oak Sketches*, 449 F. Supp. 3d at 348 (quotation marks and ellipsis omitted); *Bill Graham Archives*, 448 F.3d 605, 611–12 (finding copyrighted works not exploited where the images included in the

book were "[b]y design . . . incidental to the commercial biographical value of the book"). And, as set forth below, the Subject Torso Element does not copy the adornments embodied in the '952 Copyright. Rather, the LEGO Group removed several adornments in the '952 Copyright and included designs *not* featured in the '952 Copyright on the Subject Torso Element, making this case even stronger than *Solid Oak Sketches*.

Finally, there is no evidence consumers purchased the Set for the Subject Torso Element. At the motion to dismiss stage, the Court noted that "[w]hether Defendant intended to use the LEGO Jacket specifically to attract customers, what profits it has earned based on the inclusion of the LEGO Jacket in the set that it would not otherwise have made, and whether there are customers who bought the set specifically because it had a product resembling or copying the Concannon Jacket, [we]re questions that cannot be resolved only on an analysis of the [Third Amended Complaint]" and it therefore declined to rule on the LEGO Group's fair use defense. ECF No. 66 at 23. After over a year of discovery, Concannon has failed to provide evidence that the Subject Torso Element drove sales of the Set. In fact, discovery demonstrated the LEGO Group had no knowledge of Concannon when it was designing and marketing the Set, and thus did not seek to use the Subject Torso Element to "attract customers." SOF ¶ 21. Accordingly, based on the undisputed factual record, Concannon's involvement in the Porowski Jacket was not a factor in the design or marketing of the Set. The undisputed evidence instead demonstrates the Subject Torso Element was designed to most accurately portray Porowski's likeness and highlight the collaboration between the LEGO Group and *Queer Eye*. Therefore, any "commercial nature of the use is not dispositive." *Andy Warhol*, 598 U.S. at 531.

Thus, the first fair use factor weighs in favor of the LEGO Group because the Subject Torso Element of the Porowski Figurine was "not included for [its] expressive value, but rather to most

accurately recreate [a] certain [individual's] likeness[,]" rendering the LEGO Group's use "***entirely different***[.]" *Solid Oak Sketches*, 449 F. Supp. 3d at 347–48 (emphasis added).

## 2. The Nature of the Copyrighted Work is Afforded Little Weight Because of the Transformative Nature of the Porowski Figurine.

The second fair use factor, the nature of the copyrighted work, "draws on . . . the value of the materials used." *Campbell*, 510 U.S. at 586 (quotation marks omitted). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Id*. In evaluating the second factor, the Court must consider: (1) whether the copyrighted work is "expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational; and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006).

Here, the Porowski Jacket was published years before Concannon applied to register the '952 Copyright, limiting the weight this factor should carry. ECF No. 48-1; *see also Bill Graham Archives*, 448 F.3d at 612-13 ("[E]ven though [the plaintiff's] images are creative works, which are a core concern of copyright protection, the second factor has limited weight in our analysis because the purpose of [the defendant's] use was to emphasize the images' historical rather than creative value."). But, more importantly, the Court "need not spend much time on the second factor. This factor 'has rarely played a significant role in the determination of a fair use dispute,' and when a work is transformative, the factor may nonetheless support fair use." *Est. of Smith v. Graham*, 799 F. App'x 36, 38 (2d Cir. 2020); *see also Bill Graham Archives*, 448 F.3d at 612; *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006) ("To paraphrase *Bill Graham Archives*, the second fair-use factor has limited weight in our analysis because Koons used Blanch's work in a

transformative manner to comment on her image's social and aesthetic meaning rather than to exploit its creative virtues.") As described *supra*, the LEGO Group's use was transformative for two reasons: the LEGO Group recreated Porowki's likeness on *Queer Eye* and to highlight the collaboration between the LEGO Group and *Queer Eye*. The LEGO Group thus did not "exploit [the] creative virtues" of the Porowski Jacket. *Blanch*, 467 F.3d at 257; Bill *Graham Archives*, 448 F.3d at 612–13; *LMNOPI v. XYZ Films, LLC*, 449 F. Supp. 3d 86, 94 n.6 (E.D.N.Y. Mar. 30, 2020).

In short, the second fair use factor weighs in favor of the LEGO Group because the LEGO Group's use was factual and not to "exploit" the adornments on the Porowski Jacket.

### 3. The LEGO Group Evoked Only as Much of the Porowski Jacket as Necessary to Effectuate its Transformative Purpose of Capturing Porowski's Likeness to Create the Porowski Figurine.

"The third fair use factor asks the court to examine 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole.'" *Bill Graham Archives*, 448 F.3d at 613 (quoting 17 U.S.C. § 107(3)). "The court must examine the quantitative and qualitative aspects of the portion of the copyrighted material taken." *Id.* (citing *Campbell*, 510 U.S. at 586). In so doing, the court "consider[s] not only the quantity of the materials taken but also their quality and importance to the original work." *Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013). "[T]he law does not require that the secondary artist may take no more than is necessary," as "[t]he secondary use must be permitted to conjure up at least enough of the original to fulfill its transformative purpose." *Id.* (quotation marks and alterations omitted). "[C]opying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham Archives*, 448 F.3d at 613; *see also Solid Oak Sketches*, 449 F. Supp. 3d at 349 ("While the [t]attoos were copied in their entirety, Defendants did so in order to effectuate the transformative purpose of creating a realistic game experience."); *see also Graham*

*v. Prince*, 265 F. Supp. 3d 366, 383 (S.D.N.Y. 2017) ("[D]efendant used plaintiff's images in their entirety, but displayed them in the *minimal* image size and quality necessary to effectuate defendant's transformative purpose." (quotation marks omitted)).

Here, a visual comparison demonstrates that the LEGO Group did not copy the adornments registered in the '952 Copyright "in their entirety," and any similarity was necessary to effectuate the transformative purposes of creating a realistic Minifigure figurine version of Porowski and to connect the LEGO Group and *Queer Eye*. As Ashton testified, the LEGO Group transformed the adornments on the Porowski Jacket and "reinterpret[ed] everything so it's got a more . . . toyetic, cartoony style that matches the LEGO DNA." Ashton Dep. Tr. 65:22-66:14; *see also id.* 74:23-75:4. Moreover, the Subject Torso Element only features elements in the public domain, stripped of Concannon's aesthetics, and the LEGO Group's intellectual property, such as the Minifigure figurine head and the common law REBUILD THE WORLD trademark.

*First*, it is undisputed that the front of the "jacket" on the Subject Torso Element includes two designs not embodied in the '952 Copyright: (1) an artistic rendering of a LEGO Minifigure figurine head (the LEGO Group's intellectual property), and (2) a globe. The undisputed evidence in the record shows this was to link the LEGO brand to *Queer Eye* as part of the collaboration between the two brands.

*Second*, it is undisputed that the LEGO Group did not include some of the adornments embodied in the '952 Copyright on the Subject Torso Element. Specifically, the word "Monsanto" and detailing of the sleeves are in no way represented on the Subject Torso Element. Alternatively, the designers added "the Earth", a peace sign, and a ghost emblem on the front. SOF ¶ 24.

*Third*, the yin-yang symbol, peace sign, and safety pins are in the public domain and unprotectable.[5] Indeed, Concannon admitted at his deposition that the yin-yang symbol and safety pins were in the public domain, "fair game" and their use would not infringe the '952 Copyright. SOF ¶ 60; Brunau Decl., Ex. 14 (Concannon Dep. Tr.). In any event, the LEGO Group did not copy Concannon's artistic interpretations of the yin-yang symbol or safety pins. The '952 Copyright includes a removable yin-yang pin (within the black yin symbol there is a white smile face; within the white yang symbol there is a black frown face) on the left lapel of the Porowski Jacket and eight safety-pins below the right lapel. *See* ECF No. 48 ¶ 48. In contrast, the Subject Torso Element contains a ghost rather than a yin-yang symbol and four safety pins of a different style than Concannon's. SOF ¶ 24. Further, the peace sign on the Subject Torso Element merely replicates what is in the public domain. The LEGO Group's peace sign uses different colors than on the Porowski Jacket (gray and white; not black and white), is in a different location than on the Porowski Jacket, and, significantly, does not include the text "1967 IS DEAD" above the peace sign, the shaded white border around the peace sign, or the text "FAILED" in the upper sections of the peace sign present in the '952 Copyright.

*Fourth*, the text on the back of the "jacket" on the Subject Torso Element is proprietary to the LEGO Group. Unlike the back of the Porowski Jacket, which features the white text "THYME IS ON MY SIDE" surrounded by a black and white painted design utilizing the word "THYME," the Subject Torso Element has light gray text with a solid dark grey border.

---

[5] U.S. Copyright Office, Works Not Protected by Copyright # 33, at 4 (LEGOGROUP0006684) (noting that both the yin-yang symbol and peace symbol are in the public domain). *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 268–69 (2d Cir. 2001) ("Some material is unprotectible because it is in the public domain, which means that it 'is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work'" (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992)); *see also Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 132, 135 (2d Cir. 2003) (indicating a court must factor out elements in the public domain, "[f]or copying is not unlawful if what was copied from the allegedly infringed work was not protected, [because] . . . the copied material had itself been taken from the public domain.").

*Finally*, the designs on the Subject Torso Element (which is less than one inch tall) are significantly smaller than the designs on the Porowski Jacket and are hardly discernable, making the two works even more visually dissimilar. *Solid Oak Sketches*, 449 F. Supp. 3d at 349; *Bill Graham Archives*, 448 F. Supp. 3d at 613.

In sum, the undisputed factual record, including a visual comparison of the Subject Torso Element and Porowski Jacket, shows that the LEGO Group at most "conjure[d] up at least enough of the original to fulfill its transformative purpose[s]" of accurately depicting Porowski's likeness in the Set and linking the *Queer Eye* and the LEGO Group. *Cariou*, 714 F.3d at 710. Accordingly, this factor weighs in favor of transformative use.

      **4.**      **There is No Effect of the Use on the Market or Value of the Copyrighted Work Because the Subject Torso Element is not a Substitute for the Porowski Jacket and they Exist in Entirely Different Markets.**

"The fourth fair use factor is 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). It requires consideration of "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Id.* (quotation marks and ellipsis omitted). Indeed, the fourth fair use factor is "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) (noting "the fourth fair use factor is of great importance in making a fair use assessment"). Moreover, there is a "close linkage between the first and fourth factors, in that the more the copying is done to achieve a purpose that differs from the purpose of the original, the

less likely it is that the copy will serve as a satisfactory substitute for the original. *Id.* (citing *Campbell*, 510 U.S. at 591).

"[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) (quoting *Campbell*, 510 U.S. at 591). "[U]nder Factor Four, any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." *Id.* (citing *Bill Graham Archives*, 448 F.3d at 614). Therefore, where the use is transformative, any evidence of lost licensing revenues is irrelevant. *Id.* at 99–100.

There is nothing in the record to demonstrate that the Subject Torso Element serves as a substitute for the Porowski Jacket – nor could there be as the former is a construction toy and the latter is a men's leather jacket. Indeed, Concannon admitted that the Subject Torso Element is not a direct substitute for his wearable articles of clothing. Similarly, to the extent the LEGO Group copied any adornments embodied in the '952 Copyright, it was to capture Porowski's likeness, which is markedly different from the creative purpose of the original. *Campbell*, 510 U.S. at 591.

Moreover, Concannon has failed in discovery to provide any evidence that the Subject Torso Element affected the value of the '952 Copyright or his ability to license his products. First, Concannon admitted that he would have signed a release for ITV America to use the Porowski Jacket (which would render his pending claims moot), and the only damages he claims are those he speculates that he could have obtained if he received a royalty bearing license from the LEGO Group; there is thus no evidence that the value of the '952 Copyright was affected, as there was no value at the outset. Second, there is no evidence to support a conclusion that Concannon would or could enter the global toy market, such that there would be overlap in the markets for the two

works. *Cf., e.g.*, *LMNOPI*, 449 F. Supp. 3d at 94 (dismissing the plaintiff's complaint where the defendant's use of the plaintiff's work was transformative and the secondary use would not usurp the market because of drastically different target audiences); *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 350 (the hypothetical market was the tattoos on the NBA players in video games, not the tattoos by the artist generally); *Authors Guild v. Google*, 804 F.3d at 224 (noting "the possibility, or even the probability or certainty of some loss of sales does not suffice to make the copy an effectively competing substitute . . . . [as] [t]here must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" (quoting 17 U.S.C. § 107(4)). There is no evidence in the record that the Subject Torso Element usurps Concannon's market to license the '952 Copyright. It further follows that there is no evidence to support that Concannon's ability to license *other* products is affected.

The undisputed material facts demonstrate that the LEGO Group's purposes for creating the Subject Torso Element constitute transformative fair uses. The Court should grant the LEGO Group's motion for summary judgment as to Concannon's direct infringement claim (Count I).

### C.     Concannon's Indirect Infringement Claims Fail as a Matter of Law.

The LEGO Group is entitled to summary judgment on Concannon's indirect infringement claims as his direct infringement claim fails. To establish contributory copyright infringement (Count II, against LSAS), Concannon must prove that LSAS "intentionally induc[ed] or encourag[ed]" LSI's direct infringement. *Metro-Goldwin-Mayer Studios Inc. v Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (citing *Gershwin Publ'g Corp. v. Columba Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). To establish vicarious copyright infringement (Count III, against LSAS), Concannon must show that LSAS "profit[ed] from direct infringement while declining to exercise a right to stop or limit it." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (citation omitted). It is axiomatic that there must be direct infringement for there to be either

contributory or vicarious liability. *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) (citing *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998)). Thus, the Court should grant the LEGO Group summary judgment on Counts II and III, as there can be no contributory or vicarious liability as to LSAS if there is no direct infringement against LSI. *E.g.*, *Corporate Design of Am., P.C. v. KCC Architects, PLLC*, No. 11-cv-4717, 2014 WL 12829199, at *2–3 (E.D.N.Y. Feb. 4, 2014) (granting summary judgement to defendants as to direct and indirect infringement claims where defendants established they were entitled to use architectural plans pursuant to a license).

## II.     THE LEGO GROUP IS ENTITLED TO SUMMARY JUDGMENT ON CONCANNON'S TRADE DRESS CLAIM (COUNT IV).

Concannon alleges the LEGO Group's sale of the Set containing the Subject Torso Element, and promotional media depicting the Subject Torso Element, is willful infringement of Concannon's unregistered trade dress (Count IV). Concannon's asserted trade dress[6] consists of designs featuring "(1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; [and] (3) hand-painted graffiti-style lettering" as applied to articles of clothing and accessories. ECF No. 66. at 29. To be clear, Concannon's purported trade dress only includes only the hand painted designs and does not extend to the functional items (*i.e.*, t-shirts, jackets, pins) to which the designs are applied.

---

[6] Trade dress "is 'essentially [the] total image and overall appearance' of a product." *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*, 79 F.3d 258, 262 (2d Cir. 1996) (quotation marks and alteration marks omitted). "It is a broad concept that encompasses a product's look—its overall design, and all the elements that make up its total appearance—which makes the product identifiable to consumers." *Cardinal Motors, Inc. v. H&H Sports Prot. USA, Inc.*, No. 1:20-CV-07899, 2021 WL 1758881, at *2 (S.D.N.Y. May 4, 2021) (citation omitted). A product's trade dress may include product "'features such as size, shape, color or color combinations, texture, or graphics.'" *Id.* (citation omitted).

To prevail on his trade dress infringement claim, Concannon must adduce evidence that: (1) his asserted trade dress has acquired secondary meaning[7]; (2) there is a likelihood of confusion between the Concannon's asserted trade dress and the Subject Torso Element; and (3) the asserted trade dress is non-functional. "To plead a claim of trade dress infringement involving the appearance of a product, [the rightsholder] must allege that (1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion between the plaintiff's good and the defendant's." *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (citation omitted). "A plaintiff must also offer 'a precise expression of the character and scope of the claimed trade dress.'" *Id.* (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997). While some types of trade dress may be inherently distinctive, trade dress based on product design requires proof of secondary meaning, as the Court correctly stated previously. ECF No. 66 at 28 (citing *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 157 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 19-CV-01422, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022)); *see also Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 215 (2000) ("To the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning.")[8]

The LEGO Group is entitled to summary judgment on Concannon's trade dress claim (Count IV) for two separate and independent reasons. First, Concannon does not own a valid,

---

[7] "Secondary meaning is synonymous with acquired distinctiveness and occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Cardinal Motors*, 2021 WL 1758881, at *3 n.3 (alteration in original) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000)) (internal quotation marks omitted).

[8] Because Concannon asserts trade dress in product designs, the asserted trade dress cannot be inherently distinctive. In any event, the asserted trade dress is not inherently distinctive because it is vague and inconsistent (discussed *infra*) such that "its intrinsic nature" does not "serve[] to identify a particular source." *Wal-Mart Stores*, 529 U.S. at 210.

protectable trade dress. After more than a year of discovery, the record is devoid of evidence sufficient to show that Concannon's asserted trade dress—the bounds of which remain unclear—acquired secondary meaning as of the date the Set launched. As such, Concannon cannot meet his burden of proving that he has valid protectible trade dress and Count IV fails as a matter of law. Second, even if Concannon could prove valid protectible trade dress (he cannot), the LEGO Group is entitled to summary judgment on Count IV because Concannon lacks evidence of a likelihood of consumer confusion.

### A. Concannon Cannot Establish Valid Protectible Trade Dress.

The LEGO Group is entitled to dismissal of Count IV at the summary judgment stage because Concannon cannot prove his asserted trade dress acquired secondary meaning. That is, Concannon cannot demonstrate that consumers associate the ubiquitous asserted trade dress with *any* specific source, let alone that consumers associate the trade dress with *Concannon*. Unable to meet this threshold requirement, Concannon lacks valid protectible trade dress, and Count IV fails.

"The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article *because of its source*." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 61 (S.D.N.Y. 2021) (emphasis added); *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 316 (E.D.N.Y. 2021) ("A mark has secondary meaning if 'in the minds of public, the primary significance of a product feature or term is to *identify the source of the product rather than the product itself*.'") (emphasis added). To survive summary judgment, Concannon must present evidence that his purported unregistered trade dress acquired secondary meaning on or before October 1, 2021, the date the Set launched. *Wal-Mart Stores*, 529 U.S. at 216 (2000) (holding "in an action for infringement of *unregistered* trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of [acquired] secondary meaning"); *Int'l Leisure Prod., Inc. v.*

*FUNBOY LLC*, 747 F. App'x 23, 26 n.2 (2d Cir. 2018) (citing *Walmart*); *see also Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 425 (S.D.N.Y. 2012) (stating a plaintiff must show unregistered trade dress "acquired secondary meaning by the time the allegedly infringing mark came onto the market."). To carry his burden, Concannon must produce evidence sufficient to show that prior to October 1, 2021, consumers had come to identify or associate the asserted trade dress with Concannon as its source. *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.*, 79 F.3d 258, 263 (2d Cir. 1996). Dismissal of a claim for trade dress infringement at the summary judgment stage is appropriate where, as here, there is no evidence the asserted trade dress had acquired secondary meaning. *E.g.*, *EBIN New York*, 2023 WL 6141275 at *8-9; *C.M.B. Prods., Inc. v. SRB Brooklyn, LLC*, No. 19-cv-2009, 2022 WL 2704506, at *7 (E.D.N.Y. July 12, 2022); *Morgans Grp. LLC v. John Doe Co.*, No. 10-cv-5225, 2012 WL 1098276, at *9 (S.D.N.Y. Mar. 31, 2012); *Easy Spirit*, 515 F. Supp. 3d at 68.

As an initial matter, far from establishing secondary meaning, the scope of Concannon's asserted trade dress is, at best, unclear as "(1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; [and] (3) hand-painted graffiti-style lettering" (ECF No. 66 at 29) is exceedingly vague and effectively boundless. The asserted trade dress therefore purports to cover an unprotectable "idea, [] concept, or a generalized type of appearance." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) (citation omitted). Telling of the unconstrained nature of the asserted trade dress is the fact that Concannon's designs vary significantly from one another.[9] Concannon does not, and cannot, properly define his trade dress,

---

[9] Concannon's claim differs from most trade dress claims in that he asserts trade dress in a product line (*i.e.*, a number of different designs), rather than in a single product or specific product packaging, thereby heightening his burden. Because he claims trade dress protection in an entire line of products, Concannon "must establish that [his designs] have a consistent overall look." *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993); *see also Cardinal*, 2021 WL 1758881, at *4. Concannon cannot establish that he has valid and protectable trade dress in a product line because the works that purport to embody Concannon's asserted trade dress vary significantly. Indeed, Concannon admitted that the main (if not only) consistency between certain products

let alone establish that the asserted trade dress has acquired secondary meaning. If consumers cannot even identify the trade dress, they necessarily cannot associate it with Concannon.

The Second Circuit has articulated six (6) factors relevant to determining secondary meaning: (1) consumer surveys linking the asserted trade dress to a source, (2) length and exclusivity of use, (3) sales success, (4) advertising expenditures, (5) unsolicited media coverage of the product, and (6) attempts to plagiarize. *RVC Floor*, 2024 WL 2847139, at *10 (recommending summary judgment for defendant on plaintiff's trade dress infringement claim due to lack of evidence of secondary meaning).

Here, consideration of the secondary meaning factors compels a conclusion that Concannon's asserted trade dress has not achieved secondary meaning and is therefore not protectable, warranting summary judgment for the LEGO Group.

(1) *Consumer surveys.* Consumer surveys are "the most direct and persuasive evidence of secondary meaning." *EBIN New York*, 2023 WL 6141275 at *8 (citing *Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 227 n.9 (S.D.N.Y. 1996)); *accord Lopez*, 883 F. Supp. 2d at 426. Despite the Court's clear warning at the motion to dismiss stage that Concannon would need an expert to prove his trade dress claim, Concannon has not identified an expert or produced any consumer survey linking Concannon's trade dress to Concannon, as the source, in the minds of consumers. ECF No. 66 at 32. Accordingly, this factor weighs in favor of the LEGO Group.

(2) *Exclusivity.* It is undisputed that Concannon's use of the purported asserted trade dress is not exclusive. Indeed, he admits, as he must, that others use graffiti writing. SOF ¶ 53 ("[T]here

---

embodying the asserted trade dress is his handwriting. SOF ¶ 52. The degree of variation between Concannon's products is fatal to his claim. *E.g.*, *Disney Co.*, 830 F. Supp. at 766.

Moreover, Concannon's definition of the asserted trade dress is facially vague, subjective, and conceivably extends to an unlimited number of products. Indeed, Concannon admitted that any additional elements he seeks to protect beyond his handwriting are subjective "visual aesthetic" elements that he could not define. If Concannon himself cannot define these elements, surely a consumer would not recognize them.

are a million graffiti writers in the world that are spray painting everywhere. I don't think that is something I inherently own, you know."). Indeed, the internet is replete with examples of clothing featuring spray painted graffiti lettering and puns or pop culture references, each of which conceivably fit within the scope of the asserted trade dress.[10] Further, Concannon has not produced any evidence of consistent of use—either visually or temporally. That is, Concannon admits that his art does not follow a consistent formula, and that over the last decade, the only thing that has been consistent is his use of graffiti style handwriting. SOF ¶¶ 51-56. This factor favors the LEGO Group. *Elements/Jill Schwartz, Inc. v. Gloriosa Co.*, No. 01-cv-00904, 2002 WL 1492197, at *6 (S.D.N.Y. July 15, 2002); *Black & Decker*, 944 F. Supp. at 228.

(3) *Sales success.* This factor favors the LEGO Group because Concannon's modest sales (on average ▮▮▮▮▮Redacted▮▮▮▮▮[11] do not meet "the substantial level of sales volume required for a showing of secondary meaning." SOF ¶¶ 29-31. *E.g.*, *Lopez*, 883 F. Supp. 2d at 428 ($10,000 annual sales "do not suffice"); *Black & Decker Corp.*, 944 F. Supp. 220 at 227 (sales of $80,000 over 5 year period, or $16,000 per year, was "minimal commercial activity" insufficient to support a finding of secondary meaning); *Sunrise Home Juices, Inc. v. Coca–Cola Co*., 220 F. Supp. 558, 559–61 (S.D.N.Y. 1963) (sales growing from $30,000 in 1952 to $600,000 in 1963 were insufficient to show secondary meaning). Similarly, Concannon has failed to identify or produce evidence that unit sales, or market share, increased during the ten-year period he claims to have used the asserted trade dress. *EBIN New York*, 2023 WL 6141275 at *9 (sales factor

---

[10] *See, e.g.*, T-Shirts from the brand Poizon: https://www.poizon.com/product/graffiti-letters-hip-hop-casual-t-shirt; https://www.poizon.com/product/graffiti-hand-painted-niche-letter-large-printed-short-sleeved-t-shirt.

[11] Despite claiming that his purported trade dress is more than a decade old, Concannon only produced sales records for 2019 to 2023. Those sales records show total sales of ▮▮▮▮▮Redacted▮▮▮▮▮. Typical yearly sales were ▮▮▮▮▮Redacted▮▮▮▮▮ SOF ¶ 29. Even ▮▮▮Redacted▮▮▮ falls woefully short of the threshold commercial activity needed to support a finding of secondary meaning.

weighed "only slightly" in favor of plaintiff where plaintiff produced evidence of upward trajectory in volume of sales, but lacked evidence of market share); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 631–32 (S.D.N.Y. 2012) ("The closest Plaintiff comes to doing so is providing its sales totals for various years, but these bare figures do not to the amount of money spent on advertising or marketing, or to the strength of Plaintiff's presence and renown in the marketplace of children's goods as a whole."). In any event, sales and advertising figures "are relevant only to the extent they create or reflect an identification in the mind of the consuming public of the trade dress with the manufacturer or distributor." *Com. Foods, Inc. v. PLC Com. Corp.*, 504 F. Supp. 190, 194 (S.D.N.Y. 1980) (explaining the fact that the candies were popular with the public does not necessarily mean the public associates them with a particular source). Concannon cannot show that consumers purchase his products because he is the source as opposed to any number of other reasons. *See Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 1551 (Fed. Cir. 1990) ("[S]ales success is not necessarily indicative of secondary meaning but can be attributed to many other factors—the most likely being that, in the public's eye, the ROXANNE is an aesthetically pleasing, desirable-looking telephone.").

(4) *Advertising expenditure*. The advertising factor favors the LEGO Group because Concannon did not spend *any* money on advertising (SOF ¶ 61; Brunau Decl., Ex. 14) and there is no evidence Concannon's marketing activities reached "a relevant segment of the population" such that consumers associated the purported trade dress with Concannon. *Lopez*, 883 F. Supp. 2d at 426 (concluding advertising factor favored defendant where plaintiff, a small business, adduced *no evidence* at summary judgment of advertising expenditures and no evidence that its marketing activities reached a relevant segment of the population such that consumers associated the asserted trade dress with plaintiff); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d

606, 617 (S.D.N.Y. 2020), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021) (finding factor weighed against plaintiff where plaintiff offered no evidence showing how much money was spent on advertising activities); *Black & Decker Corp.*, 944 F. Supp. at 227 (S.D.N.Y. 1996) (finding no reasonable jury could determine advertising expenditures contributed to secondary meaning where defendants spent $3,000 on advertising after becoming aware of plaintiff's product, and none before then). In any event, "showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the [mark] with [the] [p]laintiff." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 62 (S.D.N.Y. 2021). Here, , no reasonable juror could find the advertising factor supports a finding of secondary meaning.

(5) *Unsolicited media coverage of the product*. This factor favors the LEGO Group because, after more than a year of discovery, Concannon has not come forward with the required evidence, namely evidence of *unsolicited* media coverage of products featuring his trade dress, *and* evidence that such media coverage created the "required association in the minds of consumers" between his products, on the one hand, and Concannon as the source of those products, on the other hand. *Lopez*, 883 F. Supp. 2d. at 427. In discovery, Concannon identified a handful of articles and photographs of celebrities wearing his products that he claims support this factor.[12]

---

[12] In response to Interrogatory 7 ("Identify all facts and circumstances . . . that support Your assertion that the Asserted Trade Dress . . . has acquired secondary meaning"), Concannon relies on the assertion that celebrities wear and are photographed in his clothing, which he presents in several forms: (1) celebrities have worn products featuring the asserted trade dress; (2) celebrities have been photographed in products featuring the asserted trade dress; (3) celebrities have posted photographs on social media wearing products featuring the asserted trade dress; (4) media articles, about celebrities, include photos of celebrities wearing products featuring the asserted trade dress; (5) products featuring the asserted trade dress have been sold in trade channels associated with celebrities.

With respect to categories (1), (2), and (5), the fact that a celebrity was photographed wearing a product featuring the asserted trade dress, or that it was sold in trade channels associated with celebrities, is insufficient to support a finding of acquired secondary meaning. *E.g.*, *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, No. 11-cv-01794, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011), *aff'd*, 507 F. App'x 74 (2d Cir. 2013) (assertion that a product "line has been purchased by celebrities" is insufficient to establish secondary meaning) Indeed, "Proof of a product's popularity should not be equated with proof of secondary meaning." *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 90 n.9 (2d Cir. 1984). *See also supra* pp. 31–32 (discussing sales).

At best, Concannon can point to the following media coverage: (a) three blog posts on La Maison Gaga about celebrity Lady Gaga that include photos of her wearing clothing made by Concannon, and (b) one article about t-shirts worn by Porowski on *Queer Eye* that includes a photo of him wearing a t-shirt made by Concannon. These examples are sporadic at best. *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12-cv-4112, 2014 WL 814532, at *12 (S.D.N.Y. Mar. 3, 2014) (finding "[i]solated incidents" of unsolicited media coverage "insufficient to show secondary meaning"). In any event, Concannon has not demonstrated that the coverage was unsolicited, and it is his burden to do so. *Bobcar Media*, 554 F. Supp. 3d at 618.

Even if Concannon could show this media coverage was unsolicited[13] (he has not), there is no evidence that this media coverage led consumers to associate the asserted trade dress *with Concannon*. *Cf. Lopez*, 883 F. Supp. 2d at 426–27 (noting that although the plaintiff's evidence demonstrated that local figures had worn clothing with his mark, "[i]t is not, however, clear that the media coverage, such as it is, on each of these occasions was unsolicited."); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012) ("[S]imply because a reporter knows Plaintiff as 'Giggle' does not mean that the reporter's audience, or the consuming public, does as well."). This factor does not weigh in favor of secondary meaning.

(6) *Attempts to plagiarize*. In response to the LEGO Group's Interrogatories, Concannon identified a handful of documents as purported attempts to plagiarize his asserted trade dress. However, "the key question is whether the copying was done deliberately, so as to benefit from [the plaintiff's] name and good will." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d

---

With respect to categories (3) and (4), as discussed in Section II.A.5, Concannon has failed to produce evidence that the media coverage was unsolicited *and* that such coverage led consumers to associate the asserted trade dress with Concannon as its source.

[13] Concannon testified that *he solicited* coverage from his friends and celebrities. SOF ¶ 61; Brunau Decl. Ex. 14.

83, 157 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 19-cv-1422, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022) (quotation marks omitted). Even if the identified documents were evidence of unauthorized copies (they are not), there is no evidence that the supposed plagiarism demonstrates that the "copiers" intended to benefit from *Concannon's name and goodwill*, nor that the "consuming public associates" the asserted trade dress with Concannon as the source. Indeed, the documents depict t-shirts worn by, and described as being worn by, celebrities Lady Gaga and Porowski. *E.g.*, CONCANNON02837 (listing for "Lady Gaga 'PURPLE RAIN IN MY BRAIN' t-shirt"); CONCANNON02911 (listing for "Changing Times Changing Minds" on Amazon.com; worn by Porowski on *Queer Eye*). Notably, these listings contain no reference to Concannon. At best, these documents establish that certain t-shirt designs (or, more likely, the person wearing the t-shirt) may be popular. But popularity of a product (or, more apt here, popularity of a person wearing a product) does not equate to secondary meaning. *20th Century Wear, Inc.*, 747 F.2d at 90, n.9 ("Proof of a product's popularity should not be equated with proof of secondary meaning."). Nor does the existence of replicas of clothing worn by celebrities indicate any attempt to trade off of *Concannon's* name and goodwill.

The LEGO Group is entitled to summary judgment on Count IV because all six secondary meaning factors weight in its favor. After more than a year of discovery, there is no evidence from which a jury could find that a consumer would identify Concannon as the source of the asserted trade dress, or that consumers purchased products featuring the asserted trade dress *because they were made by Concannon*.

### B. Concannon Has Not Produced Evidence of Likely Consumer Confusion.

The LEGO Group is entitled to summary judgment on Count IV for the separate and independent reason that Concannon cannot establish a triable issue of fact under the eight-factor *Polaroid* analysis for likelihood of confusion. After over a year of discovery, the record is entirely

devoid of evidence supporting the conclusory allegations of trade dress infringement in the Third Amended Complaint.

Likelihood of consumer confusion is the lynchpin of any claim for trademark infringement. The ultimate question for the Court is whether consumers are likely to believe that the goods offered by the parties come from the same source. Concannon must show there is "a probability of confusion, not a mere possibility." ECF No. 66 at 36 (citing *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).

In evaluating likelihood of confusion, the Second Circuit looks to eight (8) *Polaroid* factors: (1) the strength of the asserted trade dress, (2) the degree of similarity of the parties' trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which the defendant sells its products), (5) evidence of actual confusion, (6) the defendant's good faith in adopting its own mark, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer group. ECF No. 66 at 36 (citing *Nat. Organics v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005)); *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

Here, the undisputed facts show that the *Polaroid* factors favor the LEGO Group:

(1) Factor 1 | *The asserted trade dress is weak and not protectable.*[14] As discussed *supra*, after more than a year of discovery, Concannon has not adduced evidence that consumers associate the asserted trade dress *with Concannon* as its source. Accordingly, the asserted trade dress lacks secondary meaning and is not entitled to protection under black letter trademark law. Even if the

---

[14] The first *Polaroid* factor (strength of the trade dress) considers the same factors as whether the trade dress has secondary meaning. ECF No. 66 at 38 (citing *River Light V, L.P. v. Olem Shoe Corp.*, No. 20-cv-7088, 2022 WL 4484575, at *6 (S.D.N.Y. Sep. 27, 2022)).

Court assumed, *arguendo*, the asserted trade dress was properly defined, valid, and protectable (it is not), Concannon's asserted trade dress is weak for the reasons discussed above.

(2) Factor 2 | *The dissimilarity of the parties' marks and purpose*. As discussed *supra*, visual comparison of the Subject Torso Element to the designs on the Porowski Jacket show numerous differences. Moreover, the Subject Torso Element serves a different purpose than the asserted trade dress. The Court (Arterton, J.) properly noted that where discovery shows that "marks are used for different purposes and are presented to the public differently," this factor favors the defendant. ECF No. 66 at 39 (citing *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 47 (E.D.N.Y. 1994)); *see also AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 481 (S.D.N.Y. 2020) (applying *DeClemente* to find the second *Polaroid* factor weighed in defendant's favor where plaintiff manufacturer of the Humvee vehicle had the purpose of "using [the Humvee] mark to sell vehicles to militaries" and defendant designed video games). Here, the Subject Torso Element was designed to accurately portray Porowski's likeness on *Queer Eye* in a construction toy set based on the *Queer Eye* show. This purpose stands in contrast to Concannon's use of the asserted trade dress on clothing and accessories marketed and sold to adults. Because the undisputed facts show the Subject Torso Element serves a different purpose, this factor favors the LEGO Group.

(3) Factors 3 and 4 | *The goods do not compete*. Concannon has not alleged or produced any evidence that he is in the global toy market, intends to enter the global toy market, or that the parties' share a mutual customer base. ECF No. 66 at 40. As the Court found at the motion to dismiss stage, this factor favors the LEGO Group because the parties' products do not "compete with each other", do not "serve the same purpose [or] fall within the same general class", and "are [not] used together." *Id.* (citing *Lang v. Ret. Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991)).

(5) Factor 5 | *There is no evidence of actual confusion.* The record is devoid of any evidence of actual confusion (*i.e.*, that consumers are *actually confused* as to the origin of the Set)[15], or believed the Set to be sponsored by or affiliated with Concannon (ECF No. 66 at 40)). While actual confusion is not required to prevail under the Lanham Act, "[t]here can be no more positive or substantial proof of the likelihood of confusion." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 671 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017). Indeed, "[a]s the Second Circuit has observed, 'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion.'" *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 170 (S.D.N.Y. 2022). This critical factor favors the LEGO Group.

(6) Factor 6 | *There is no evidence the LEGO Group acted in bad faith.* The bad faith factor "assesses whether the junior user intentionally copied *and intended to benefit off the goodwill of the senior user's entire trade dress.*" ECF No. 66 at 41 (citing *Capri Sun GmbH.*, 595 F. Supp. 3d at 19)). Here, there is no evidence the LEGO Group acted in bad faith in designing the set or intended to benefit off Concannon's goodwill. First, there is no evidence that the LEGO Group knew who Concannon was while designing the Set, let alone that Concannon would, at that time, claim an unregistered trade dress in and to "short provocative phrases" in "hand-painted graffiti style." *Cf. Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) ("[A]ctual or constructive knowledge *may* signal bad faith."). Indeed, Ashton testified that the LEGO Group was not aware of Concannon when it designed the Set and the Subject Torso Element. SOF ¶ 21. Second, there is no evidence the LEGO Group acted in bad faith by including

---

[15] This is unsurprising seeing as the iconic LEGO Minifigure figurine is itself a well-known trademark owned by the LEGO Group.

the Subject Torso Element on the box for the Set, and in marketing collateral. As Ashton testified, the LEGO Group included the Subject Torso Element on the Set's box to accurately depict for consumers the variety of elements in the Set. SOF ¶ 63; Brunau Decl., Ex. 3 (Ashton Dep. Tr.). Similarly, the LEGO Group used the Subject Torso Element in an animated video posted on the company's social media just prior to the Set's launch to recreate the *Queer Eye* opening sequence, wherein Porowski wore a leather jacket. SOF ¶ 64; Brunau Dec., Ex. 3 (Ashton Dep. Tr.) (the LEGO Group wanted the video "to be as recognizable to the opening sequence of the real show as possible"). There simply is no evidence the LEGO Group knew about Concannon's asserted trade dress rights, nor that it included the Subject Torso Element in the Set or associated marketing to capitalize on Concannon's purported trade dress.

(7) Factors 7 and 8 | *Adult consumers know the Set is not a replacement for Concannon products.* As discussed *supra*, the parties operate in different markets. The intended purchasers of the Set are adult fans of *Queer Eye*, who can clearly discern that the Set is not a replacement for an article of adult clothing bearing the asserted trade dress.

In short, the LEGO Group is entitled to summary judgment on Count IV for the additional reason that Concannon has not produced evidence to support the bald, conclusory allegations in the Third Amended Complaint[16], and cannot present a triable issue of fact under the *Polaroid* test.

## III.    THE LEGO GROUP IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V.

The LEGO Group is also entitled to summary judgment on Concannon's CUTPA claim because it derivatively "relies upon allegations tied to a Lanham Act claim," and Concannon's

---

[16] At the motion to dismiss stage, the Court found that three of the *Polaroid* factors (factors 1, 2 and 6) weighed in Concannon's favor "*at this stage*" based on *allegations* that the asserted trade dress "serves as a source identifier" that consumers have "come to associate" with Concannon (factor 1; ECF 66 at 36, 38), the LEGO Group "painstakingly copied" the Porowski Jacket to "benefit from the association" with the asserted trade dress (factor 2; *id.* at 39), and the LEGO Group "conspired" to "directly cop[y]" the Porowski Jacket without taking steps to "credit or compensate" Concannon (factor 6; *id.* at 41), but noted that discovery was necessary. After more than a year of discovery, Concannon has not come forward with *any* evidence to support these allegations.

"failure to establish a Lanham Act violation is fatal to [his] CUTPA claim." *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 3:06-CV-1710, 2010 WL 669870, at *25 (D. Conn. Feb. 19, 2010); *Garden Catering-Hamilton Ave, LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 140 n.20 (D. Conn. 2014).

## <u>CONCLUSION</u>

For the reasons set forth above, the LEGO Group respectfully requests that the Court grant its Motion and enter summary judgment in the LEGO Group's favor on all counts in the Third Amended Complaint (Counts I through V).[17]

Respectfully submitted,

By:    <u>/s/ *Andraya P. Brunau*</u>
        Elizabeth A. Alquist (ct15643)
        Andraya Pulaski Brunau (ct29715)
        Emily M. Ferriter Russo (ct31354)
        Caitlin M. Barrett (ct31379)
        Day Pitney LLP
        Goodwin Square
        225 Asylum Street
        Hartford, CT 06103-1212
        Telephone: (860) 275-0137
        Facsimile:  (860) 881-2456
        *eaalquist@daypitney.com*
        *abrunau@daypitney.com*
        *eferriterrusso@daypitney.com*
        *cbarrett@daypitney.com*

        *Attorneys for Defendants LEGO Systems, Inc. and LEGO System A/S*

---

[17] If the Court denies the LEGO Group's Motion for Summary Judgment, in whole or in part, the LEGO Group respectfully requests that the Court immediately schedule a conference to set a trial date and pre-trial schedule.

## <u>CERTIFICATION</u>

I hereby certify that on December 18, 2024, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ *<u>Andraya P. Brunau</u>*