James Concannon,

   Plaintiff,

      v.

LEGO Systems, Inc. and LEGO System A/S,

   Defendants.

Civil Action No. 3:21-cv-01678-OAW

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# Table of Contents

INTRODUCTION ..................................................................................................................... 1

LEGAL STANDARD ............................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.  THERE ARE GENUINE DISPUTES OF MATERIAL FACT ON CONCANNON'S COPYRIGHT INFRINGEMENT
CLAIMS (COUNTS I-III). ....................................................................................................... 2

    A.  *LEGO Has Failed to Establish an Implied License to Exploit the Concannon Jacket.* ...................... 3

    i.  *There is an Issue of Fact As to Whether the Parties Had A Meeting of Minds Regarding the Use of
the Concannon Jacket.* ......................................................................................................... 4

    ii.  *There is a Dispute of Material Fact as to Whether Defendants Believed They Possessed a License
to the Concannon Jacket.* ..................................................................................................... 8

    iii.  *Defendants Fail to Address the Revocation of Any Alleged Implied License.* ............................... 8

    iv.  *Defendants' Continued Reliance on Solid Oak Sketches is Misplaced.* ....................................... 9

    B.  *LEGO Has Failed to Establish that its Use of the Concannon Jacket is Transformative and Subject
to Fair Use.* ..................................................................................................................... 12

    v.  *There is a Genuine Issue of Material Fact as to Whether Defendants Added Any Transformative
Elements in its Recreation of the Concannon Jacket.* ................................................................. 13

    vi.  *There is a Genuine Issue of Material Fact as to the Nature of the Copyrighted Work in
Comparison to the Infringing Product.* .................................................................................. 14

    vii.  *There is a Genuine Issue of Material Fact as to the Amount and Substantiality of the Use of the
Concannon Jacket in Relation to the Infringing Product.* ........................................................... 20

    viii.  *There is a Genuine Issue of Material Fact as to the Effect of the Set Upon the Potential Market for
the Concannon Jacket.* ....................................................................................................... 24

II.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INDIRECT
INFRINGEMENT CLAIMS ....................................................................................................... 25

III.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL
TRADE DRESS CLAIM (COUNT IV) ........................................................................................ 26

    C.  *There is a Genuine Issue of Material Fact as to Secondary Meaning.* ......................................... 26

    D.  *There is a Genuine Issue of Material Fact as to Likelihood of Confusion* ..................................... 33

IV.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CUPTA
CLAIM (COUNT V) ............................................................................................................... 38

CONCLUSION ....................................................................................................................... 40

# TABLE OF AUTHORITIES

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309, (2d Cir. 2022)……..............................................................................4

*Agence France Presse v. Morel*,
769 F. Supp. 2d 295, (S.D.N.Y. 2011) ……..............................................................4

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913, (2d Cir. 1994)……...........................................................14, 20, 24

*Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26, (C.A.2 (N.Y.), 2021)…....................................................….14,15

*Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*,
2024 WL 4555822, (S.D.N.Y. Oct. 23, 2024) …......................................28, 36, 37, 38

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537, (S.D.N.Y. 2013)…..................................................….5

*Authors Guild, Inc. v. Google Inc.*,
954 F.Supp.2d 282, (S.D.N.Y. 2013) …...................................................….18

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87, (2d Cir. 2014)……...............................................................18

*Baker v. Weber*,
2021 WL 4480998, (S.D.N.Y. Sept. 30, 2021)……....................................................2

*Best Cellars, Inc. v. Wine Made Simple, Inc.*,
320 F. Supp. 2d 60, (S.D.N.Y. 2003)….3...............................................................8

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) …...............................................................…19

*Black & Decker Corp. v. Dunsford*,
944 F. Supp. 220, (S.D.N.Y. 1996)…...............................................….29, 31

*Blanch v. Koons*,
467 F.3d 244, (2d Cir. 2006)……...............................................................15

*Brod v. Omya, Inc.*,
653 F.3d 156, (2d Cir. 2011)…...............................................................…1

*Campbell v. Acuff–Rose Music, Inc.*,
510 U.S. 569, 590, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)……........................13, 14, 18, 20, 23

*Campbell v. Koons*,
1993 WL 97381, (S.D.N.Y. Apr. 1, 1993) ….......................................………..14

*Capri Sun GmbH v. Am. Beverage Corp.*,
2022 WL 976270 (S.D.N.Y. Mar. 31, 2022)….........................................….26

*Cariou v. Prince*,
714 F.3d 694, (2d Cir. 2013)……..........................................................13, 24

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*,
150 F.3d 132, (2d Cir. 1998).…....................................................................20

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 6
96 F.3d 206, (2d Cir. 2012)……..................................................................28

*Cicena Ltd. v. Columbia Telecomms. Grp.*,
900 F.2d 1546, (Fed. Cir. 1990)……...........................................................32

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
933 F.2d 162, (2d Cir. 1991)……............................................................1, 28

*Com. Foods, Inc. v. PLC Com. Corp.*,
504 F. Supp. 190, (S.D.N.Y. 1980)……...................................................31, 32

*Design Options, Inc. v. BellePointe, Inc.*,
940 F. Supp. 86, (S.D.N.Y. 1996)……......................................................2,4

*Elements/Jill Schwartz, Inc. v. Gloriosa Co.*,
2002 WL 1492197 (S.D.N.Y. July 15, 2002)……......................................29

*F.D.I.C. v. Giammettei*,
34 F.3d 51, (2d Cir. 1994)……….................................................….13

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
499 U.S. 340, (1991)……..............................................................................1

*Ferdman v. CBS Interactive Inc.*,
342 F.Supp.3d 515, (S.D.N.Y., 2018) ….........................................………15

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
80 F. Supp. 3d 535, (S.D.N.Y. 2015)……...................................................4,5

iv

*Giggle, Inc. v. netFocal, Inc.*,
856 F. Supp. 2d 625, (S.D.N.Y. 2012) …..................................................................32

*Graham v. Prince*,
265 F. Supp. 3d 366, (S.D.N.Y. 2017)…...........................................................12, 13

*Gross v. Bare Escentuals Beauty, Inc.*,
2008 WL 2332307, (S.D.N.Y. June 4, 2008)…......................................................28

*GTFM, Inc. v. Solid Clothing, Inc.*,
215 F. Supp. 2d 273, (S.D.N.Y. 2002)………...........................................30, 31, 32

*Hachette Book Group, Inc. v. Internet Archive*,
664 F.Supp.3d 370, (S.D.N.Y., 2023)………...................................................14, 16

*Harlequin Enterprises Ltd. v. Gulf & Western Corp.*,
503 F.Supp. 647 (S.D.N.Y.1980)………..............................................................27

*Harlequin Enterprises Ltd. v. Gulf & Western Corp.*,
644 F.2d 946 (2d Cir.1981)………......................................................................27

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)………...........................18

*Heptagon Creations, Ltd. v. Core Grp. Mktg.*,
2011 WL 6600267, (S.D.N.Y. Dec. 22, 2011)…....................................................30

*Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*,
507 F. App'x 74 (2d Cir. 2013)…........................................................................30

*ID7D Co., Ltd. v. Sears Holding Corp.*,
2012 WL 1247329, (D. Conn. Apr. 13, 2012)…....................................................34

*In re Dana Corp.*,
574 F.3d 129, (2d Cir. 2009)…..............................................................................1

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.*,
596 F. Supp. 2d 497, (D. Conn. 2009)…..........................................................39, 40

*Jose Luis Pelaez, Inc. v. McGraw-Hill Global Education Holdings LLC*,
399 F. Supp. 3d 120, (S.D.N.Y., 2019) …........................................................4, 6, 12

*Knitwaves, Inc. v. Lollytogs Ltd.*,
71 F.3d 996, (2d Cir. 1995)………….................................................................21

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
117 F. Supp. 2d 360, (S.D.N.Y. 2000)…….....................................................28

*LEGO A/S v. Best-Lock Constr. Toys, Inc.*,
404 F. Supp. 3d 583, (D. Conn. 2019)…….............................................21, 22

*Life Indus. Corp. v. Star Brite Distrib., Inc.*,
31 F.3d 42, (2d Cir. 1994)….................................................................35

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
799 F.2d 867, (2d Cir. 1986)…..............................................................34

*Luv N' Care, Ltd. v. Walgreen Co.*,
695 F. Supp. 2d 125, (S.D.N.Y. 2010)…….................................................29

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,
345 F. Supp. 3d 482, (S.D.N.Y. 2018)…...................................................21

*Murphy v. Provident Mutual Life Insurance Co.*,
923 F.2d 923, (2d Cir. 1991)….............................................................39

*N. Jersey Media Group Inc. v. Pirro*,
74 F. Supp. 3d 605, (S.D.N.Y. 2015) ……………………………………......14, 15, 24

*Naked Cowboy v. CBS*,
844 F. Supp. 2d 510, (S.D.N.Y. 2012)…….................................................34

*Nat. Organics, Inc. v. Nutraceutical Corp.*,
426 F.3d 576, (2d Cir. 2005)…..............................................................34

*New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*,
312 F. Supp. 2d 195, (D. Conn. 2004)……..........................................33, 36, 39

*O'Neil v. Ratajkowski*,
563 F.Supp.3d 112, (S.D.N.Y., 2021)…..............................................……..15

*Ortiz v. Guitian Music Bros.*,
2009 WL 2252107, (S.D.N.Y. July 28, 2009)…...........................................9

*Penguin Books USA v. New Christian Church of Full Endeavor, Ltd.*,
2000 WL 1028634, (S.D.N.Y. July 25, 2000).............................................33

*Presley's Est. v. Russen*,
513 F. Supp. 1339 (D.N.J. 1981)…..........................................................10

*R.F.M.A.S., Inc. v. Mimi So,*
619 F. Supp. 2d 39, (S.D.N.Y. 2009)…...............................................................27, 28

*Ramirez v. Health Net of the Northeast, Inc.,*
285 Conn. 1, 19, 938 A.2d 576 (Conn.2008)…........................................................40

*Schutte Bagclosures Inc. v. Kwik Lok Corp.,*
48 F. Supp. 3d 675, (S.D.N.Y. 2014)…...............................................................34, 38

*Sheldon v. Metro–Goldwyn Pictures Corp.,*
81 F.2d 49, (2d Cir. 1936)…….......................................................................22

*Sherwood 48 Assocs. v. Sony Corp. of Am.,*
76 Fed. Appx. 389, (2d Cir. 2003)……..................................................................26

*SHL Imaging, Inc. v. Artisan House, Inc.,*
117 F. Supp. 2d 301, (S.D.N.Y. 2000) ……............................................................6

*Solid Oak Sketches, LLC v. 2K Games, Inc.,*
449 F. Supp. 3d 333, (S.D.N.Y. 2020)…..............................................3, 9, 10, 11, 21

*Steven Madden, Ltd. v. Yves Saint Laurent,*
2019 WL 2023766, (S.D.N.Y. May 8, 2019)…..........................................................30

*Sunrise Home Juices, Inc. v. Coca–Cola Co.,*
220 F. Supp. 558, (S.D.N.Y. 1963) ….................................................................31

*Tasini v. New York Times, Co.,*
206 F.3d 161, (2d Cir. 2000)……......................................................................4

*U-Neek, Inc. v. Wal-Mart Stores, Inc.,*
147 F. Supp. 2d 158, (S.D.N.Y. 2001) ….........................................................32, 36

*Wal-Mart Stores, Inc. v. Samara Bros.,* 5
29 U.S. 205, (2000)……...............................................................................27

*Walt Disney Co. v. Goodtimes Home Video Corp.,*
830 F. Supp. 762, (S.D.N.Y. 1993)……...............................................................27

*White v. Samsung Elecs. Am.,*
971 F.2d 1395 (9th Cir. 1992)…......................................................................10

*Wright v. Warner Books, Inc.,*
953 F.2d 731, (2d Cir. 1991)……......................................................................13

*Yurman Design, Inc. v. PAJ, Inc.,*
262 F.3d 101, 117 (2d Cir. 2001)……........................................................................27

*Zulick v. Patrons Mutual Ins. Co.,*
287 Conn. 367, 949 A.2d 1084 (Conn. 2008)….........................................................39

# INTRODUCTION

This case presents a troubling question: can a global corporation knowingly take an artist's work, make a few tweaks, and profit millions—leaving the artist empty-handed? James Concannon's Concannon Jacket is not just fabric and paint; it's an original expression. Defendants copied its distinctive elements and used them to market and sell a product—without asking, paying, or acknowledging the artist.

Copyright law protects artists from this kind of misappropriation. An artist's work cannot be reproduced, adapted, or commercially exploited without permission. Defendants' emails show they knew about the Concannon Jacket, based the toy jacket on it, and proceeded without a license. They claim an "implied sublicense," but no such license applies. Concannon had no way of knowing his jacket would be used in a Lego set, nor was he informed or given the chance to consent. Accepting Lego's implied license argument would set a dangerous precedent, allowing work to be exploited without an artist's knowledge or permission. Their fair use defense is equally weak—it was not transformative or necessary, but a direct appropriation of Concannon's creative work without compensation.

This case also involves trade dress—the protection of a distinctive visual identity that consumers associate with a specific creator. The District Court has already determined that the Concannon Jacket is a distinctive trade dress, serving as Concannon's signature. Defendants' reproduction not only misappropriates his work but also misleads consumers into believing there's an official collaboration.

This Court should reject Defendants' distortion of copyright and trade dress law. Genuine disputes of material fact remain, and summary judgment would be inappropriate. The rights of creators must be upheld to protect both the legal system and artistic innovation.

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). "When the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc*., 653 F.3d 156, 164 (2d Cir. 2011).

**ARGUMENT**

**I.     There Are Genuine Disputes of Material Fact on Concannon's Copyright Infringement Claims (Counts I-III).**

To prevail on a claim of copyright infringement, a plaintiff must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991). Here, there is no dispute that Concannon owns and has registered the copyrights to the Concannon Jacket. *See Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 89 (S.D.N.Y. 1996) (holding that under the Copyright Act, a certificate of registration constitutes prima facie evidence of the valid ownership of a copyright); *Baker v. Weber*, No. 19 CIV. 1093 (JPC), 2021 WL 4480998, at *5 (S.D.N.Y. Sept. 30, 2021) (holding that submitting a registration for works is prima facie evidence of a copyright).

Concannon has also established actual copying of the Concannon Jacket. The similarities

between the LEGO Jacket and the Concannon Jacket are self-evident. Filed contemporaneously herewith is Plaintiff's Local Rule 56(A)(2) Statement Of Facts In Opposition To Summary Judgment ("Pl. SOF"), Additional Fact ("AF") AF ¶¶ 14-16. Specifically, Defendants have copied the unique design and placement of the protectable elements of the Concannon Jacket, including: (1) the yin-yang symbol with a smiling expression drawn inside of it on the left collar; (2) the peace sign on the right collar; (3) the skull on the left breast; (4) the safety pin detailing on the right breast; (5) the circular chain link pattern below the right breast; and (6) the graffiti-style lettering of a play on words on the back of the jacket ("Thyme Is On My Side" in the Concannon Jacket, and "Rebuild the World" in the Infringing Product), including the dripping paint on the letters T, O, D, and E. *Id.* These similarities are neither incidental nor coincidental—they are direct appropriations of Concannon's original creative expression.

Rather than disputing these facts, Defendants attempt to justify their misappropriation by arguing that they were entitled to appropriate the Concannon Jacket without Plaintiff's permission or knowledge. Yet, to date, Defendants have failed to meaningfully substantiate any of their affirmative defenses, including their claims of an implied license or fair use. The Court has already expressed skepticism about Defendants' reliance on *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020). *See* ECF No. 66 ("MTD Order"), at 16-17, 20-23, 25. Despite this, Defendants recycle the same flawed arguments in their Motion, offering no new evidence to support their position.

**A.    LEGO Has Failed to Establish an Implied License to Exploit the Concannon Jacket.**

Defendants assert that the mere fact that Concannon gifted Porowski the Concannon Jacket and allowed Porowski to wear his work on *Queer Eye* somehow grants *Queer Eye* the unfettered right to license the Concannon Jacket to Defendants, permitting them to duplicate and distribute it

so that they can generate millions in revenue off the back of Concannon's intellectual property. However, "where the dispute turns on whether there is a license at all, the burden is on the alleged infringer to prove the existence of the license." *See* MTD Order at 13 (quoting *Tasini v. New York Times, Co.*, 206 F.3d 161, 171 (2d Cir. 2000)); *see also Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011) (holding that the defendant bears the burden of coming forward with evidence of a license).

There is a genuine issue of material fact as to whether Defendants have met their burden to demonstrate that the Parties had the requisite "meeting of the minds" necessary to establish the affirmative defense of an implied nonexclusive license to use Concannon's design.

## ix. There is an Issue of Fact As to Whether the Parties Had A Meeting of Minds Regarding the Use of the Concannon Jacket.

As this Court noted:

"[t]he Second Circuit's most recent case on implied licenses, *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022), recognized two potential tests to determine whether an implied license existed: 'a narrow test, finding an implied license only where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it,'' and 'a more permissive test by which consent may be inferred based on silence where the copyright holder knows of the use and encourages it.'"

MTD Order at 10. Importantly, under either test, the Second Circuit held that an implied license requires "a meeting of the minds between the parties to permit the particular usage at issue." *Id.* Indeed, "an implied license to use a copyrighted work 'cannot arise out of the unilateral expectations of one party.'" *Jose Luis Pelaez, Inc. v. McGraw-Hill Global Education Holdings LLC*, 399 F. Supp. 3d 120, 142 (S.D.N.Y., 2019) (*citing Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996)) (internal citations omitted). Generally, a defendant asserting the existence of an implied license must show that the plaintiff "created a work at [another's] request and handed it over, ***intending that [the other] copy and distribute it***." *Flo & Eddie, Inc. v.*

4

*Sirius XM Radio Inc*., 80 F. Supp. 3d 535, 539 (S.D.N.Y. 2015) (internal citations omitted) (emphasis added). The circumstances in which an implied license may be found are exceedingly narrow and require evidence of "a meeting of the minds between the licensor and licensee such that it is fair to infer that the licensor intended to grant a nonexclusive license." *Associated Press v. Meltwater U.S. Holdings, Inc*., 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013).

Here, there is a genuine issue of material fact as to whether Defendants have satisfied the requirements under either test. Defendants simply do not demonstrate the requisite meeting of the minds.

Defendants' implied license argument hinges on the flawed notion that because Porowski wore the Concannon Jacket on *Queer Eye*, the show somehow acquired the right to sublicense the jacket's design for reproduction. However, Concannon never granted *Queer Eye* any license—express or implied—to replicate his work in third-party collaborations. Pl. SOF, AF ¶¶ 11–23. Mr. Porowski, a fan of Concannon, wore several Concannon Products on *Queer Eye*. Pl. SOF, AF ¶ 2. From 2017 to 2021, Concannon provided Porowski with several custom works. Pl. SOF, AF ¶ 3. In each instance where a Concannon Product appeared on *Queer Eye*, ITV America would notify Concannon, obtain his permission, and have him execute a narrow release granting ITV America (on behalf of Netflix) the limited right to feature the work on the show and in its promotion. Pl. SOF, AF ¶ 9. In addition, Porowski would credit Concannon on social media and in interviews. Pl. SOF, AF ¶ 4. This history of interactions established a consistent practice: *Queer Eye* would obtain permission from Concannon when featuring his works, but no broader rights—especially sublicensing—were ever granted. Thus, through their previous business interactions, Concannon expected that *Queer Eye* would contact him when Porowski wore a Concannon Product on the show. Pl. SOF, AF ¶ 10. In turn, Concannon would agree to allow *Queer Eye* to display the

Concannon Product both on the show and in connection with advertising for the show. Pl. SOF, AF ¶¶ 11-12. *Queer Eye* never asked, and Concannon never agreed, to replicate his work in connection with third-party collaborations. Pl. SOF, AF ¶ 13.

Further, Concannon was completely unaware of *Queer Eye*'s collaboration with Defendants and thus could not have agreed to license the jacket for reproduction. Pl. SOF, AF ¶ 27. Concannon explicitly did not intend to grant any license for the Concannon Products beyond its limited use on *Queer Eye,* and never granted a license for the use of the Concannon Jacket. Pl. SOF, AF ¶¶ 11–12. The inquiry into implied licenses focuses on the licensor's objective intent at the time of creation and delivery, and the Parties' conduct clearly demonstrates no such intent existed. *See Jose Luis Pelaez, Inc*., 399 F. Supp. 3d at 142; *SHL Imaging, Inc. v. Artisan House, Inc*., 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) (holding that "[a]n implied [non-exclusive] license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose").

The timeline of events further refutes Defendants' argument. The Set was not even conceptualized until December 2019 (Pl. SOF, ¶ 5), while the Concannon Jacket was gifted to Porowski in September 2018 (Pl. SOF, ¶ 40). It is illogical to claim that Concannon could have intended the jacket to be used in the Set when the Set did not even exist at the time. *Jose Luis Pelaez, Inc.*, 399 F. Supp. 3d at 144 (holding that that the "failure to provide evidence of … knowledge of … use distinguishes" any argument regarding an implied license).

Even if Defendants could establish an implied license between Concannon, Porowski, and *Queer Eye*, they have failed to present any evidence that *Queer Eye* or Scout Productions had the authority to sublicense those rights to Defendants. For Defendants' argument to prevail, the Court would need to conclude that Concannon granted Scout Productions an unfettered license to the

Concannon Jacket, permitting its use in future third-party collaborations, and that Scout Productions had the authority to sublicense those rights to Defendants. However, this assertion is unsupported by any law or evidence in the record. As the Court stated, even if Concannon did "see the appearance of the [Concannon Jacket] on *Queer Eye* and subsequently chose not to take further action, that alone is not enough to infer that he *intended* for it to be copied and distributed, or that he and Porowski had any common understanding of how the jacket would be used." MTD Order, at 15-16. To date, Defendants have failed to show any intention from Plaintiff for the Concannon Jacket to be used for the Set. It is undisputed that Porowski owned the Concannon Jacket. Defendants' focus on the ownership of the Concannon Jacket is a red herring. Put simply, Defendants do not—because they cannot—cite to any authority that supports the contention that owning an article of clothing grants one the right to license any underlying intellectual property in the design of the clothing. Moreover, Defendants cannot establish that Concannon had any reason to believe, based on his prior dealings with Porowski and *Queer Eye*, that Defendants would use the Concannon Jacket to create a new product. Pl. SOF, AF ¶¶ 8-13. Rather, the record is clear that Concannon had no knowledge that Defendants would appropriate the Concannon Jacket until he viewed the product in Defendants' advertising. Pl. SOF, AF ¶¶ 27-29.

Finding that an implied license exists based on these facts sets a concerning precedent that would have far-reaching implications for artists and jeopardize their livelihoods. Finding an implied license here would mean that selling or gifting a copyrighted design to a third party grants them carte blanche to commercially license the work without the designer's consent. This outcome undermines the foundational principles of copyright law[1] and would cause substantial harm to

---

[1] Imagine a fashion designer who creates an exclusive, one-of-a-kind dress and lends it to a celebrity for an event. If the Court were to find that lending the dress implied a license for the celebrity to sell replicas of the design to a mass-market retailer, this would allow the celebrity—

designers and copyright holders.

###### x. There is a Dispute of Material Fact as to Whether Defendants Believed They Possessed a License to the Concannon Jacket.

The record shows that there is a factual issue as to whether Defendants believed they had a valid license to use the Concannon Jacket. Internal communications reveal that Defendants expressed admiration for the Concannon Jacket, stating ███████████████████████████ ███████████████ Pl. SOF, AF ¶ 17. Despite this enthusiasm, Defendants acknowledged ██████ ███████████████████████████████████ indicating they knew they needed a proper license. Pl. SOF, AF ¶¶ 18-20. Rather than obtain a license however, Defendants were determined to circumvent a license and discussed ███████████████████████████████ ███████████ Pl. SOF, AF ¶¶ 21-22. Defendants should have obtained a license to use the Concannon Jacket but, ███████████████████████████████████████ ███████ by creating the Infringing Product without one. *Id.* Most tellingly, both IMG and Scout have admitted that they ███████████████████████████████████████ ███████████████████████ Pl. SOF, AF ¶¶ 23. This further supports the conclusion that Defendants' argument is nothing more than an after-the-fact attempt to justify their unauthorized use of Concannon's work, without compensating or crediting him for the creation of the Concannon Jacket. Defendants should not be permitted to get away with their blatant misappropriation.

###### xi. Defendants Fail to Address the Revocation of Any Alleged Implied License.

---

without the designer's consent—to profit from the designer's intellectual property. The designer would have no say in how the design is used or who profits from it, even though they invested time, effort, and creativity into the piece. Such a precedent could result in designers losing control over their work, as others could use or profit from their designs without permission, simply by receiving or borrowing them for a limited time.

Even if Defendants could establish the existence of an implied license—they cannot— any such license was revoked when Concannon filed this lawsuit. MTD Order, at 17-18 (citing *Ortiz v. Guitian Music Bros.*, No. 07 CIV. 3897, 2009 WL 2252107, at *4 (S.D.N.Y. July 28, 2009)). In *Ortiz*, the Court held that "Plaintiff revoked any license that may have existed between him and Defendants" by filing a lawsuit, reaffirming that implied licenses are revocable by their nature. *Id.* The Court specifically rejected the affirmative defense of implied license because the defendants continued to distribute and sell the product after the lawsuit was filed. *Id.* Similarly, Defendants here continued to sell the Set through April 28, 2023, during the pendency of this litigation. Pl. SOF, ¶ 27. The record is clear that Concannon has not been compensated for the use of his design, and by initiating this action, Concannon effectively revoked any implied license that may have existed before the lawsuit. Defendants ninth inning claim of an implied license to use the Concannon Jacket is unavailing.

### xii. Defendants' Continued Reliance on *Solid Oak Sketches* is Misplaced.

In its Motion, Defendants once again rely heavily on *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020). However, *Solid Oak Sketches* is fundamentally distinguishable from the instant case. In that case, the plaintiff, which held the copyright to five tattoo designs inked on NBA players, alleged that the defendants infringed upon its copyrights when the video games depicted the NBA players with their visible tattoos. *Id.*

First, *Solid Oak Sketches* involved tattoos—an unremovable and intrinsic part of a person's likeness. *Id.* The tattoos were permanent features on the players' bodies, and their display as part of the players' likeness was an expected and natural consequence of the players' participation in televised games. *Id.* In stark contrast, the Concannon Jacket is a removable piece of clothing, distinct from Mr. Porowski's likeness. Pl. SOF, AF ¶ 24. Defendants themselves recognize the distinction between a permanent tattoo, which is part of someone's likeness, and an item of

clothing, which is not. In fact, by providing alternative outfits for the Antoni figurine in the Set, Defendants acknowledge the natural separation between clothing and a person's likeness. Pl. SOF, AF ¶ 34 (showing Antoni in a plain white t-shirt).

To highlight nonexistent parallels between *Solid Oak Sketches* and the instant case, Defendants improperly cite cases involving the misappropriation of a celebrity's name, image, and likeness. For example, *White v. Samsung Elecs. Am.*, 971 F.2d 1395 (9th Cir. 1992), and *Presley's Est. v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981), address whether certain visual representations— such as a robot evocative of Vanna White or an impersonator dressed in Elvis Presley's iconic jumpsuit—violate publicity or trademark rights. *See White v. Samsung Elecs. Am.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (considering whether the use of a robot, dressed in a wig, gown, and jewelry meant to evoke Vanna White infringed upon her publicity rights); *Presley's Est. v. Russen*, 513 F. Supp. 1339, 1365 (D.N.J. 1981) (considering trademark rights to Mr. Presley dressed in "one of his characteristic jumpsuits and ***holding a microphone in a singing pose***") (emphasis added). These cases merely establish that general types of clothing can be associated with a celebrity when used in contexts that exploit their likeness for commercial gain. However, they do not support the notion that specific clothing itself can be impliedly licensed as part of a celebrity's likeness. The design of clothing is a separate and distinct creative work protected by copyright law, and its inclusion in a celebrity's image does not automatically transfer any intellectual property rights or licensing authority to the celebrity. To conflate the association of clothing with likeness rights ignores the legal distinction between the ownership of a physical item and the intellectual property rights in its design. Such a claim disregards the distinct intellectual property rights of clothing designers, whose creativity and labor brought the work to life.

Here, while Porowski has the right to wear the Concannon Jacket, Concannon retained all

intellectual property rights to the design. Pl. SOF, AF ¶ 8. Porowski acknowledges that by crediting Concannon as the designer behind the piece. Pl. SOF, AF ¶ 26. While Concannon expected that Porowski would be seen wearing the Concannon Jacket, he never expected that Defendants would exploit his designs for their own profit in the Set. Pl. SOF, AF ¶¶ 27-28. Defendants' argument leads to the absurd conclusion that merely owning a protected piece of clothing gives the owner the unfettered right to replicate and distribute the work. If Defendants' argument is credited, any celebrity gifted with a designer clothing item would have the unrestricted right to recreate and distribute copies of the clothing item, since it would be considered part of their likeness. This result is in direct contravention of the purpose of the Copyright Act.

Second, in *Solid Oak Sketches*, the plaintiff was aware that the NBA Players would appear on television in standard basketball uniforms which could reveal the tattoos. *Id.* Here, the record shows that Concannon was unaware that the Concannon Jacket would appear in the Set until after its release. Pl. SOF, AF ¶¶ 27-29. Indeed, such knowledge would be impossible since the idea of the Set was conceived long after Mr. Concannon created and gave the Concannon Jacket to Mr. Porowski. *Id.* Porowski never indicated to Mr. Concannon that the Concannon Jacket would be used in conjunction with the Set. Pl. SOF, AF ¶ 29

Third, the court found that there was an implied license in *Solid Oak Sketches* in part because the NBA players had never "requested nor agreed to limit the display or depiction of the images tattooed onto their bodies." *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 346. Here, Concannon and ITV had an extensive licensing history which specifically limited the display of Concannon Products. Pl. SOF, AF ¶¶ 9-10. Every time a Concannon Product was featured on *Queer Eye*, ITV America would notify Concannon, obtain his consent, and have him execute a narrow release granting ITV America (on behalf of Netflix) the limited right to feature Concannon

Products on the show and in connection with the show's advertising. *Id.* In other words, Concannon and ITV agreed on the limited depiction of certain Concannon Products, and ITV had no right to grant Defendants the right to replicate the Concannon Jacket. *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 143 (S.D.N.Y. 2019) (holding that written agreements are compelling evidence of a party's expectations with respect to licensing and finding that the defendant's argument for an implied license was inconsistent with its limited scope for licensing in the past).

Defendants' claim of an implied license fails both factually and legally. The evidence demonstrates no meeting of the minds, no intent by Concannon to grant such an all-encompassing license, and no basis for Defendants' reliance on prior dealings or precedent. At a minimum material issues of fact remain with respect to the license issue, and the Motion must be denied..

## B. LEGO Has Failed to Establish that its Use of the Concannon Jacket is Transformative and Subject to Fair Use.

Defendants' invocation of fair use as a defense seeks to cloak their unauthorized appropriation of Concannon's intellectual property in the guise of transformative creativity. Fair use is a narrow exception, and not, as Defendants suggest, a free pass to exploit copyrighted works for commercial gain. The Copyright Act identifies four statutory factors to evaluate fair use, none of which supports Defendants' position here. *Graham v. Prince*, 265 F. Supp. 3d 366, 376–77 (S.D.N.Y. 2017) (quoting 17 U.S.C. § 107) (holding that courts are required to consider four non-exclusive factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted

work").

The factual record demonstrates that Defendants' replication of the Concannon Jacket in the Set raises genuine questions about whether their use was transformative, non-commercial, or justified under the principles of fair use. Indeed, fair use is an affirmative defense to copyright infringement, and thus the party asserting fair use bears the burden of proof. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Moreover, the determination of fair use is a "mixed question of fact and law," which necessitates "an open-ended and context-sensitive inquiry," *Cariou v. Prince*, 714 F.3d 694, 704–05 (2d Cir. 2013). In fact, the Second Circuit has stated that "the fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area." *Graham v. Prince*, 265 F. Supp. 3d 366, 377 (S.D.N.Y. 2017) (citing *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991). Because fair use is an affirmative defense, on which the defendant bears the burden at trial, when a plaintiff challenges it on summary judgment, he "may satisfy [his] Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994).

Here, the factual disputes—particularly regarding the purpose, nature, and impact of Defendants' actions—must be resolved by the trier of fact and cannot be decided as a matter of law at this stage. The Defendants' Motion should be denied.

### *xiii.* There is a Genuine Issue of Material Fact as to Whether Defendants Added Any Transformative Elements in its Recreation of the Concannon Jacket.

The first factor, which addresses the way the copied work is used, is the "heart of the fair use inquiry." *Campbell*, 510 U.S. at 579. As the Supreme Court instructed in *Campbell*, the central purpose of the inquiry is to determine whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character,

altering the first with new expression, meaning, or message. *Id.* "A use is transformative if it does something more than repackage or republish the original copyrighted work." *N. Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 614 (S.D.N.Y. 2015) (internal citations omitted). The allegedly offending use of the original work is "transformative if it 'alter[s] the first [work] with new expression, meaning, or message" and is the "very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Campbell*, 510 U.S. at 579. "The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).

Defendants contend that their use of the jacket design was not for its expressive value but instead to most accurately depict Porowski's likeness. Defendants' explanation misses the mark. It says nothing about how Defendants' use provided "criticism, commentary, or information." *Hachette Book Group, Inc. v. Internet Archive*, 664 F.Supp.3d 370, 380 (S.D.N.Y., 2023). As this Court noted, "[c]hoosing a new medium and changing a few elements also do not constitute transformation; 'taking 'the heart of' a copyrighted work, even if the taking is quantitatively insubstantial, militates against fair use." *MTD Order* at 20-21 (citing *Campbell v. Koons*, No. 91 CIV. 6055 (RO), 1993 WL 97381, at *3 (S.D.N.Y. Apr. 1, 1993) (holding that modifying a few elements from the original product, a picture, was not enough to render the infringing product, a sculpture, transformative when the "central subject matter" was the same). The assertion that replication of specific elements of the Concannon Jacket—created as an expression of Porowski's individuality and interests—is transformative fails to acknowledge the artistic and expressive choices inherent in the design of the Concannon Jacket. *Andy Warhol Foundation for Visual Arts,*

*Inc. v. Goldsmith*, 11 F.4th 26, 42 (C.A.2 (N.Y.), 2021) (holding that "there can be no meaningful dispute that the overarching purpose and function of the two works at issue here is identical, not merely in the broad sense that they are created as works of visual art, but also in the narrow but essential sense that they are portraits of the same person").

The record demonstrates that Concannon's artwork is a unique creative work, incorporating satirical and expressive elements that are integral to the jacket's identity. Porowski asked Plaintiff to design a custom piece with elements distinctive to Concannon's signature style. Pl. SOF, AF ¶ 5. Whether Defendants' use altered or merely replicated that expression remains a genuine factual dispute. *O'Neil v. Ratajkowski*, 563 F.Supp.3d 112, 129 (S.D.N.Y., 2021) (holding that there was a triable issue of material fact whether adding a new caption and certain emojis to a photograph was transformative).

Further, there is ample evidence that Defendants' purpose was not to accurately portray Mr. Porowski, but to exploit the Concannon Jacket's value. *North Jersey Media Group Inc. v. Pirro*, 74 F.Supp.3d 605, 617 (S.D.N.Y., 2015) (holding that there was an issue as to whether defendant created anything new at all, much less anything transformative); *Blanch v. Koons*, 467 F.3d 244, 252 (2d Cir. 2006) (holding that Courts have often "declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work") (citing cases). LEGO itself stated that Mr. Porowski "***has a really iconic leather jacket that we redid in LEGO version***." Pl. SOF, AF ¶ 31. The record shows that Defendants strived to copy the Concannon Jacket, but, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, chose to eschew the required license. Pl. SOF, AF ¶¶ 16-23; *Ferdman v. CBS Interactive Inc.*, 342 F.Supp.3d 515, 531 (S.D.N.Y., 2018) (holding that courts can consider bad faith of a defendant in considering fair use). Indeed, Defendants themselves state ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████ Pl. SOF, AF ¶ 20. "[A] transformative work is one that serves a new and different function from the original work and is not a substitute for it." *Hachette Book Group, Inc. v. Internet Archive*, 664 F.Supp.3d 370, 383 (S.D.N.Y., 2023). Here, Defendants intended for the Infringing Product to be a substitute for the Concannon Jacket—not a transformation. Defendants acknowledged that they could "accurately depict" Porowski without the Concannon Jacket, yet they deliberately chose to use the Concannon Jacket due to its distinctive look and effect. Pl. SOF, AF ¶ 25.

Finally, Defendants' assertion that their use served a dual purpose—recreating Porowski's likeness and highlighting their brand collaboration with *Queer Eye*—further highlights the existence of a material, factual dispute. The contention that the use was transformative because it was intended to most accurately portray Porowski's likeness conflicts with evidence suggesting that the expressive elements of the Concannon Jacket were deliberately reproduced as part of Defendants' marketing strategy. Pl. SOF, AF ¶ 30. Merely using the design to promote the brand collaboration does not transform the original work; it exploits its expressive value to enhance Defendants' commercial objectives. This dual purpose—and whether it truly adds something new or simply capitalizes on the original's creative elements—is precisely the type of factual determination that must be resolved by the trier of fact.

Defendants also argue that the Infringing Product represents an inconsequential portion of the Set. *See* Motion at 16. This Court previously rejected Defendants' argument that the LEGO Jacket is an "inconsequential portion" of the Set. *MTD Order* at 21-22. Indeed, the evidence shows that Defendants placed great importance on copying the Concannon Jacket. Pl. SOF, AF ¶ 31. The designers of the Set specifically stated that they wanted to recreate the Concannon Jacket. *Id.* Defendants ████████████████████████████ chose to usurp Concannon's intellectual property

rights ██████████████ . Pl. SOF, AF ¶¶ 18-23. Defendants gloss over the fact that the Minifigures in the Set had multiple outfit choices, yet the Infringing Product was specifically featured. Pl. SOF, AF ¶¶ 25, 32-36. In brief, Defendants could have produced the Set without the Infringing Product and chose not to.

Defendants' argument that Plaintiff has not shown that consumers purchased the Set specifically because of the infringing design misstates the scope of fair use analysis and copyright infringement. Tellingly, Defendant fails to cite any case law in support of this contention. That is because none exists. Copyright law does not require the plaintiff to demonstrate that the infringing element was the sole or even primary reason for consumer purchases. Instead, the relevant inquiry is whether Defendants used Plaintiff's copyrighted work without authorization and whether that use served a commercial purpose. Here, the evidence shows that the expressive elements of the Concannon Jacket were deliberately included to evoke Porowski's likeness and enhance the marketability of the Set. Pl. SOF, AF ¶ 31. Whether individual consumers purchased the Set specifically because of the infringing design is irrelevant to whether Defendants improperly benefitted from the unauthorized use of Plaintiff's work. Additionally, Defendants' own acknowledgment of the importance of accurately representing Porowski's likeness—including the distinctive elements of the Concannon Jacket—undermines their claim. *Id*. By their admission, the design was integral to the product's commercial appeal and the successful marketing of the set. *Id*. Regardless of whether the specific adornments on the jacket directly drove sales, their use undeniably contributed to the overall value of the product and Defendants' broader marketing objectives.

The mere fact that the Infringing Product was created as part of the Set does not make the purpose transformative, absent a meaning that supersedes Defendants' blatant and intentional

infringement. As shown in the record, Defendants copied the Concannon Jacket for the sole purpose of recreating it. Pl. SOF ¶ 13; Pl. SOF, AF ¶¶ 14, 15, 31. And Defendants' Motion provides no evidence of a different purpose. The goal of copyright is to "promote science and the arts." *Authors Guild, Inc. v. Google Inc.*, 954 F.Supp.2d 282, 290–91 (S.D.N.Y. 2013) (quoting *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164). Defendants' Motion is devoid of any reasoning as to how it promotes art to allow large corporations to misappropriate works created by small artists, without credit or compensation. This is not fair use. This is theft packaged as "transformative" after-the-fact.

### xiv.    There is a Genuine Issue of Material Fact as to the Nature of the Copyrighted Work in Comparison to the Infringing Product.

Despite Defendants' assertions otherwise, this Court must consider "whether [the] use [of the Infringing Product] is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The question of whether the work is commercial "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). The purpose of this factor is to consider whether the copyrighted work is "of the creative or instructive type that the copyright laws value and seek to foster." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).



Here, the record demonstrates that Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Pl. SOF, AF ¶¶ 18-23.  Internal communications reveal that Defendants discussed ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Instead

of obtaining authorization from Concannon, they intentionally ███████████ ██████ creating a derivative work that still closely mirrored the expressive elements of the Concannon Jacket, thereby constituting copyright infringement. SOF, AF ¶¶ 14-16. This calculated decision underscores Defendants' intent to appropriate the value of Concannon's work without proper licensing or compensation.

Curiously, Defendants continue to reference cases that involve educational and informative works, attempting to justify their actions by claiming that their use of the Concannon Jacket was "factual." *See Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605 (2d Cir. 2006) (concerning the use of posters in a biographical book about a famous music group). However, this defense is unfounded, as their use of the design was not educational or "factual" in nature. The Set is a toy centered around aesthetics and is meant to capitalize on the popularity of *Queer Eye*. Pl. SOF, ¶¶ 5-7. Defendants are indisputably a commercial business motivated by profits. *Id*. Defendants use the popularity of cultural pieces like *Queer Eye* and the Concannon Jacket to sell their products. *Id*. Defendants recreated the Concannon Jacket with the intention of appealing to *Queer Eye* fans who would recognize Concannon's distinctive work so that they would sell more LEGO sets. This factor weighs heavily against Defendants' assertion of fair use.

In sum, the commercialization of the Concannon Jacket was not a mere incidental use but a deliberate attempt to profit from a design that closely resembled the original. This blatant misappropriation, intentionally done without authorization, is clear evidence of Defendants' pursuit of commercial gain at the expense of the creator's rights. Their use of the jacket, far from being transformative or educational, was driven solely by the desire to capitalize on its established appeal. At a minimum, a material issue of fact remains as to Defendants' alleged fair use and the Motion should be denied.

*xv.* **There is a Genuine Issue of Material Fact as to the Amount and Substantiality of the Use of the Concannon Jacket in Relation to the Infringing Product.**

In considering the substantiality of the infringement, the Court must focus upon whether "[t]he extent of . . . copying" is consistent with or more than necessary to further "the purpose and character of the use." *Campbell,* 510 U.S. at 586–87, 114 S.Ct. 1164. "In general, the more of a copyrighted work that is taken, the less likely the use is to be fair." *Swatch*, 756 F.3d at 89 (internal citations omitted). "[B]y focusing on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 144 (2d Cir. 1998) (quoting *Texaco*, 60 F.3d at 926). In *Campbell*, for example, the Supreme Court determined that a "parody must be able to 'conjure up' at least enough of [the] original [work] to make the object of its critical wit recognizable" and then determined whether the amount used of the original work was "no more than necessary" to satisfy the purpose of parody. *Id.* (quoting *Campbell,* 510 U.S. at 588–89). By contrast, in *Castle Rock Entm't, Inc.,* the Second Circuit held that the defendant's excessive use of the copyrighted material was for entertainment purposes, rather than commentary, and would not serve a critical or otherwise transformative purpose. *Id.*

Defendants argue that their use was transformative and that they were justified in copying any elements of the Concannon Jacket that they desired. However, the fact that Defendants desired to create Porowski's likeness does not make their use of the Concannon Jacket transformative. Indeed, this purpose fails to add any transformative meaning. Further, Defendants could have portrayed Porowski's likeness without copying the Concannon Jacket. Quite obviously, Mr. Porowski wears other clothing and accessories beyond the Concannon Jacket. Porowski dresses in various additional clothing on *Queer Eye* and is recognizable in other sartorial choices. Pl. SOF,

AF ¶ 25. Porowski's appearance and likeness is separate from the Concannon Jacket which Defendants admit by including other accessories in the Set that depict Porowski's clothing style. Pl. SOF, AF ¶ 35. In recreating Porowski's likeness, Defendants did not need to borrow from the Concannon Jacket. Yet, they deliberately chose to use the entirety of the design of the Concannon Jacket in the Infringing Product.

Further, Defendants made no attempt to obscure the borrowed elements of the Concannon Jacket. *Solid Oak Sketches, LLC v. 2K Games, Inc*., 449 F. Supp. 3d at 345 (holding that the use of the tattoos was insubstantial when the "undisputed factual record shows that average gameplay is unlikely to include the players with the Tattoos and that, even when such players are included, the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures in groups of player figures"). Further, the *Solid Oak Sketches* court found significant that "the Tattoos are not featured on any of the game's marketing material". *Id*. Here, the Infringing Product was highlighted in the Set and in advertising campaigns related to the Set. Pl. SOF, AF ¶ 30. Further, there were only six LEGO mini-figurines in the Set, with the rest of the Set consisting of architectural pieces. Pl. SOF, AF ¶¶ 32-33.

Defendants attempt to draw distinctions between the Concannon Jacket and the Infringing Product that do not exist. Specifically, they attempt to compare each element of the Concannon Jacket separately. Motion at 20-21. Plaintiff's copyrights extend to the overall aesthetic of the work and cover the placement and overall composition of the Concannon Jacket. *See* Pl. SOF, ¶¶ 59, 60; Pl. SOF, AF ¶ 14. LEGO A/S v. Best-Lock Constr. Toys, Inc., 404 F. Supp. 3d 583, 609 (D. Conn. 2019)(citing *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995)(holding that when looking at copyright infringement "[the] inquiry necessarily focuses on whether the alleged infringer has misappropriated 'the original way in which the author has selected, coordinated, and

arranged the elements of his or her work'"). Further, the absence of certain elements of the Concannon Jacket in the Infringing Product does nothing to dispute Concannon's allegations of substantial similarity between other protectable elements of the '952 Copyright. *LEGO A/S*, 404 F. Supp. 3d at 608 (citing *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 500 (S.D.N.Y. 2018))(holding that "[m]inor differences in surface adornments do not detract from the overwhelming number of similarities that, beyond a reasonable dispute, 'would not be expected to arise if the works had been independently created'").

First, Defendants unconvincingly argue that the LEGO Minifigure head and globe as pictured on the Infringing Product are not on the Concannon Jacket. Motion at 20. However, these designs are derivative of the skull and circular chain link pattern found on the Concannon Jacket. Pl. SOF, AF ¶¶ 14-16. And, the placement and overall aesthetic of the design copies directly from the Concannon Jacket. *Id.*

Second, Defendants argue that the Infringing Product did not include the word "Monsanto" and any of the detailing on the sleeves. Motion at 20. Additionally, Defendants argue that they added certain elements. *Id.* These insubstantial changes do not negate the substantial similarities between the copyrighted design and the Infringing Product. LEGO A/S, 404 F. Supp. 3d 583, 615 (D. Conn. 2019)(citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (holding that "it has long been the law that no infringer may "excuse the wrong by showing how much of his work he did not pirate"). The inclusion of different symbols does not sufficiently distinguish the overall design, as the core expressive elements of the original work—such as the layout, color scheme, and general aesthetic—remain largely intact. The minor alterations do not eliminate the fact that the Infringing Product closely resembles the protected features of the '952 Copyright, making it a derivative work rather than an independent creation.

Third, Defendants argue that the yin-yang symbol and safety pins are part of the public domain. Motion at 21. However, the overall composition, placement, and unique features such as the placement of and an expression inside the yang symbol, are all protected elements copied from the Concannon Jacket. Pl. SOF, AF ¶¶ 14-16. Moreover, Defendants cannot deny that they copied Concannon's unique take on the yin-yang symbol which included a smiling expression. *Id.*

Third, the placement of the peace sign on the right collar is virtually identical between the works. *Id.*

Fourth, Defendants attempted to copy the placement and hand-painted graffiti style of the Concannon Jacket on the Infringing Product. To the extent Defendants altered the original text on the back of the jacket, they did so in a way that still evokes Concannon's signature style and brand, so that the Infringing Product would look like the Concannon Jacket and benefit from the association with Concannon. *Id.* Indeed, Defendants altered the text in the same way that a genuine Concannon Product would, by customizing the phrase to evoke the "customer's" interests. Here, because Defendants create blocks that are used to build things, the phrase "REBUILD THE WORLD" on the LEGO version of the jacket, is exactly the type of pop culture pun that would be included on a genuine Concannon Product bearing the Trade Dress. *Id.*

Fifth, Defendants argue that the reduced size obscures certain design elements found on the Infringing Product. Motion at 20. Images of the Infringing Product demonstrate the falsity of this contention. The Infringing Product is featured in the Set.

It is evident that the substantial similarity between the original copyrighted design and the Infringing Product cannot be overlooked. The core expressive elements of the design are clearly reproduced, and the minor differences offered by Defendants do not negate the overall infringement. At a minimum, there is a genuine issue of material fact as to the claim of substantial

similarity, and Defendants' Motion should be denied.

> ### *xvi.* There is a Genuine Issue of Material Fact as to the Effect of the Set Upon the Potential Market for the Concannon Jacket.

Under this factor, the Court should "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164. The fourth factor must also "take account . . . of harm to the market for derivative works," defined as those markets "that creators of original works would in general develop or license others to develop," *Id.* at 592. In considering this factor, the Court should be "mindful that [t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original, even though the fair use, being transformative, might well harm, or even destroy, the market for the original." *Cariou*, 714 F.3d at 709 (internal quotes omitted). Further, "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *N. Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605, 622 (S.D.N.Y. 2015) (quoting *Am. Geophysical Union,* 60 F.3d at 929).

Defendants wrongly argue that the Concannon Jacket and the Infringing Product have separate markets because one is a construction toy. Motion at 23. Defendants' application of the fourth factor is tortured and overly literal. Concannon is not required to show that he intends to use the design of the Concannon Jacket to enter the toy market. Concannon is a multidisciplinary artist who creates art in forms outside of clothing. Pl. SOF, AF ¶ 37. Concannon has shown that Defendants have harmed the distinctiveness and market for any derivative works that Concannon could make. Concannon relies on the exclusivity and distinctiveness of his designs to sell

Concannon Products. Pl. SOF, AF ¶¶ 48-51. Accepting Defendants' contention would set a dangerous precedent: that any company can borrow copyrighted works without paying licensing fees if they simply do so in a different market than the original. Here again, this factor weighs against the finding of fair use. While Defendants claim that the Infringing Product serves a different purpose—capturing Porowski's likeness for a construction toy—this does not change the fact that the market for licensing fashion designs, particularly in toy and pop culture collectibles, can be interconnected.

Further, Concannon has suffered a loss of royalties from Defendants for the Concannon Jacket; harm to the exclusivity and consumer view of his products; and future harm to his brand due to the risk that other companies will follow Defendants' lead and use his products in different markets without paying licensing fees. Defendants' contention that there is no evidence of market harm is unsubstantiated, as the potential for licensing revenue, particularly in merchandise and branding opportunities, is directly impacted by the unauthorized use of Concannon's designs.

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INDIRECT INFRINGEMENT CLAIMS

Concannon has shown that there is a triable issue of fact regarding whether direct infringement occurred, therefore it follows that there is also a corresponding issue of fact as to whether there is contributory and vicarious liability. Defendants' argument presupposes that the absence of direct infringement eliminates any possibility of indirect liability. However, because there is a genuine dispute over whether direct infringement took place, the Court cannot grant summary judgment on the contributory and vicarious infringement claims at this stage. As both claims hinge on the potential for direct infringement, the unresolved factual issues regarding the alleged infringement are sufficient to allow these claims to proceed.

## III.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL TRADE DRESS CLAIM (COUNT IV)

Summary judgment is also inappropriate on Concannon's trade dress claim. "When, as here, the trade dress infringement claim is based on the product's design, the plaintiff must show "(1) non-functionality[2], (2) secondary meaning, and (3) a likelihood of confusion." MTD Order at 28 (quoting *Capri Sun GmbH v. Am. Beverage Corp.*, No. 19CIV1422PAEDCF, 2022 WL 976270, at *66 (S.D.N.Y. Mar. 31, 2022)). "A plaintiff must also offer a precise expression of the character and scope of the claimed trade dress," and describe the elements of "design with specificity to be afforded trade dress protection." *Id.* (quoting *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 Fed. Appx. 389, 391 (2d Cir. 2003)). Defendants argue that summary judgment in this case is warranted because Plaintiff cannot (i) demonstrate his Trade Dress has acquired secondary meaning or (ii) present evidence of a likelihood of consumer confusion. Motion at 26. These arguments fail for the following reasons.

### C.    There is a Genuine Issue of Material Fact as to Secondary Meaning

*First*, Concannon has sufficiently defined his Trade Dress. Concannon's Trade Dress, as applied to apparel and accessories, includes three distinct elements that appear in both his ready-made and his custom pieces: "(1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; and (3) hand-painted graffiti-style lettering." Pl. SOF, AF ¶ 1; MTD Order at 29.  The Court already rejected Defendants' argument that the works that embody Concannon's Trade Dress vary significantly, finding that the Concannon Products demonstrate "a consistent 'overall look' and fall within the parameters [Concannon] has defined." MTD Order at

---

[2] Defendants concede that Concannon's Trade Dress is non-functional.

32.

Discovery in this case has only further confirmed the Court's finding. Since 2013, Concannon's work has always attributed itself to a punk rock ethos. Pl. SOF, AF ¶ 39. More importantly, a visual inspection of the Concannon Products (including those referenced in the Third Amended Complaint and by the Court in the MTD Order) demonstrates his consistent use of the Trade Dress across his works. Pl. SOF, AF ¶ 40. Accordingly, the scope of Concannon's Trade Dress is sufficiently definite. *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 503 F.Supp. 647 (S.D.N.Y.1980), *aff'd* 644 F.2d 946 (2d Cir.1981) (finding a protectable trade dress when a volume of books had consistent glossy white covers of similar size and displaying the Harlequin trademark at the top of the cover).[3]

Here, a jury could find that the Trade Dress has acquired secondary meaning in the marketplace. Secondary meaning attaches when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000); *see also R.F.M.A.S., Inc. v. Mimi So*,

---

[3] Defendants' reliance on *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993) is misplaced. As the Court already noted, "the court in *Walt Disney* made its determination that the differences in packaging outweighed any consistent elements of the proposed trade dress after 'observing the demeanor of the witnesses on direct and cross-examination, and weighing the evidence, particularly after viewing' the packages during the bench trial." MTD Order at 31-32 (quoting *Walt Disney Co.*, 830 F. Supp. at 768). No such circumstances exist at the summary judgment stage. *Yurman Design, Inc. v. PAJ, Inc.* is equally unpersuasive – the plaintiff in that case failed to even offer a description of design elements to support a trade dress claim. 262 F.3d 101, 117 (2d Cir. 2001). Moreover, contrary to Defendants' contention (Motion at 28, n. 9), Concannon never suggested that he could not define his Trade Dress beyond his handwriting, but instead confirmed that "the unique combination of provocative tongue in cheek phrases relating to pop culture, the hand-painted graffiti style lettering" was "a way to hopefully accurately describe in a word sense the visual attributes to [his] creations." Pl. SOF, AF ¶ 1, Pl. Ex. 5 (Pl. Dep.) 168:15-169:3; Pl. SOF, ¶¶ 51-56.

619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ("Trade dress has secondary meaning when the primary significance of the [trade dress] in the minds of the consuming public is not the product but the producer, such that the trade dress tends to be associated not just with the goods or services but with a single, though possibly anonymous, source.")  The Second Circuit has articulated six non-exclusive factors for courts to consider when weighing secondary meaning: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." MTD Order at 33 (citing *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012)). However, "none of these elements is determinative and not every one of them must be proved to make a showing of secondary meaning." *Id.* (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 366 (S.D.N.Y. 2000)).

"[D]etermining secondary meaning is a fact-intensive inquiry that is generally avoided at the summary judgment phase." *Gross v. Bare Escentuals Beauty, Inc.,* No. 03 Civ. 3089, 2008 WL 2332307, at *5 (S.D.N.Y. June 4, 2008); *see also Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 169 (2d Cir.1991) ("The careful weighing of evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment."); *Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, No. 22 CIV. 7719 (LLS), 2024 WL 4555822, at *4 (S.D.N.Y. Oct. 23, 2024) ("Secondary meaning analysis is similarly fact-intensive, and the Second Circuit has warned against deciding it on summary judgment, as it is apt to require a trial."). Thus, as shown below, although an analysis of the six factors weighs in favor of Concannon, the Court should defer weighing this evidence until trial.

***Length and exclusivity.***  Defendants argue that Concannon's use of the Trade Dress is not

exclusive because others use graffiti writing and Concannon has not produced evidence of consistent use. Motion at 29-30. Defendants misquote Concannon, who never stated that elements of his trade dress were not consistently applied or that his trade dress was solely limited to graffiti style handwriting. Indeed, Concannon confirmed that the opposite was true. Pl. SOF, ¶¶ 51-56; *see also supra* pages 13-14, n. 5.[4] Thus, whether other artists use only one element of Concannon's work—graffiti writing—is irrelevant.[5] Further, Concannon's defined elements are also distinctive because he has been making the Concannon Products for "over the past decade"[6] and "because no other artist or designer has released a line of clothing containing his *unique combination of specific elements*", which weighs in favor of the exclusivity of the Concannon brand. Pl. SOF, AF ¶ 41; MTD Order at 31, 34; *see also Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 131–32 (S.D.N.Y. 2010) (denying summary judgment motion where plaintiff provided evidence that when it introduced its hard and soft spout cups, no other cups in the marketplace had the same look and appearance).

*Unsolicited media coverage*. This Court previously found that "photographs of celebrities 'wearing and promoting' Concannon Products, often 'specifically identifying [Concannon] as the source of those [p]roducts, on social media and in interviews'" constitutes "unsolicited media

---

[4] Thus, Defendants' reliance on *Elements/Jill Schwartz, Inc. v. Gloriosa Co.*, is misplaced. No. 01 CIV. 904 (DLC), 2002 WL 1492197 (S.D.N.Y. July 15, 2002). There, the level of generality with which Plaintiff's trade dress was described, combined with the variability in arrangement and configuration of the trade dress elements and the inclusion in many cases of striking design elements in addition to the specified trade dress elements, weighed against Plaintiff. *Id.* at *6. No such facts are present in this case.

[5] Contrary to Defendants' contention, there is no evidence in the record of any other clothing that uses all of the elements of Concannon's Trade Dress. The example provided by Defendants of t-shirts from the brand Poizon only uses graffiti writing. Motion at 30, n. 10.

[6] Defendants' cite to *Black & Decker Corp. v. Dunsford,* 944 F. Supp. 220, 226 (S.D.N.Y. 1996) is thus unavailing, as the plaintiff in that case only established 3 or 5 years of use of the "Snakelight" trade name.

attention." MTD Order at 34; Pl. SOF., AF ¶ 43. The Court specifically noted the Instagram post of Porowski wearing a Concannon T-shirt that received 66,563 likes and which "credited" Concannon by tagging his Instagram handle while also promoting *Queer Eye*. MTD Order at 34, n. 9; ECF No. 48 (3d Am. Compl.) at ¶ 29. Concannon and the Trade Dress have been covered in numerous interviews, articles, social media posts, and other media outlets. Pl. SOF, AF ¶ 42. Contrary to Defendants' contention, this media coverage was in fact unsolicited and Concannon never testified otherwise. Pl. SOF, ¶ 62. Moreover, various celebrities and public figures have posted pictures of themselves wearing Concannon Products on Instagram and *tagged Concannon as the source of the products.* Pl. SOF, AF ¶ 43. Thus, contrary to Defendants' contention (Motion at 33), there is substantial evidence that media coverage led consumers to associate the Trade Dress with Concannon. *See GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (holding that widespread public exposure through its affiliation with prominent celebrities constituted evidence of secondary meaning); *see also Steven Madden, Ltd. v. Yves Saint Laurent*, No. 18-CV-7592 (VEC), 2019 WL 2023766, at *7 (S.D.N.Y. May 8, 2019) (finding secondary meaning when products had been prominently worn by celebrities and were the subject of unsolicited blogs.).[7]

   ***Attempts to plagiarize.*** Defendants contend that there is no evidence in the record of unauthorized copies or that copiers intended to benefit from Concannon's name and goodwill.

-----

[7] Defendants' reliance on *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, No. 11-cv-01794, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011), aff'd, 507 F. App'x 74 (2d Cir. 2013), is misplaced. The Court already rejected the applicability of this case. MTD Order at 35 ("The plaintiff there also lacked details or support on factors like sales, exclusivity, unsolicited media attention, or attempted counterfeiting; Concannon's allegations, on the other hand, allege facts addressing each of those factors. Further, the absence of consumer surveys or advertising expenditure claims is more notable for a company producing a furniture line than for a single artist who trades on exclusivity and the "underground" perception of his work.")

Motion at 34. Yet, Concannon has produced sufficient evidence to refute this contention. Concannon testified that the Concannon Products' association with *Queer Eye* spurred the popularity of those products and the copying of his Trade Dress. Pl. SOF, AF ¶ 44. Many counterfeit versions of Concannon Products have been marketed for sale or sold without his permission. Pl. SOF, AF ¶ 45. Defendants suggest that the evidence in the record is limited to celebrities simply wearing Concannon Products. Motion at 34. This is false. Many examples of plagiarism do not include references to celebrities, and at least one example explicitly references Concannon as the creator. Pl. SOF, AF ¶ 46. In any event, explicit reference to Concannon is not necessary. The efforts of others copying Concannon's Trade Dress in and of itself "is strong evidence that these rivals recognized that the [Trade Dress] had acquired secondary meaning in the marketplace." *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002).

**Sales success.** Concannon has experienced a high volume of sales, especially considering the artistic nature of his work. From January 1, 2019 to August 11, 2023, Concannon's revenue from sales of his clothing and accessories was $107,218.17. Pl. SOF, AF ¶ 47. Moreover, custom Concannon Products are "highly sought after," "very valuable," and sell for "hundreds or thousands of dollars," all of which the Court noted would be evidence in support of this factor. Pl. SOF, AF ¶¶ 48-49; MTD Order at 34-35. The cases Defendants cite are not persuasive. The trademark owners in those cases had fewer than $20,000 in annual sales and/or those sales related to a product that, unlike visual art, is highly reproducible. *Lopez*, 883 F. Supp. 2d at 420 ($10,000 annual sales of printed t-shirts); *Black & Decker Corp.*, 944 F. Supp. 220 at 227 (sales of $16,000 per year of flexible lighting apparatus); *Sunrise Home Juices, Inc. v. Coca–Cola Co.*, 220 F. Supp. 558, 559–61 (S.D.N.Y. 1963) (sales of orange juice product beverage). Further, unlike Concannon, the plaintiff in *Com. Foods, Inc. v. PLC Com. Corp.* failed to offer any other evidence besides sales

figures in support of secondary meaning. 504 F. Supp. 190, 194 (S.D.N.Y. 1980); *see also Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 631–32 (S.D.N.Y. 2012) (referencing "bare figures" of sales insufficient to show secondary meaning); *Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 1551 (Fed. Cir. 1990) (only noting that "sales success is not *necessarily* indicative of secondary meaning").

   ***Advertising expenditures and consumer studies.*** These two factors do not favor either party, and at most are neutral. Even if Plaintiff does not spend money on advertising his products, it is significant that Concannon's work has "gained notoriety." MTD Order at 34; Pl. SOF, AF ¶¶ 43-44, 48. The Court did not indicate, during the motion to dismiss, that Concannon would need an expert to prove his trade dress claim. To the contrary, the Court specifically noted that "the absence of consumer surveys or advertising expenditure claims is more notable for a ***company*** producing a furniture line than for a ***single artist*** who trades on exclusivity and the 'underground' perception of his work." MTD Order at 35 (emphasis added).

   ***In sum***, the Court should deny Defendants' Motion because Concannon has evidence of "sales, exclusivity, unsolicited media attention, [and] attempted counterfeiting" that demonstrates a triable issue of material fact. *See* MTD Order, at 35. As the Court noted:

> Plaintiff rightly compares this case instead to *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002). There, the court found after a bench trial that due to the sales volume, plaintiff's consistent use of the design element as a "designation of source," and the efforts of other companies to copy the mark, plaintiff's proof was sufficient to find that the mark acquired secondary meaning; the fact that it "failed to present consumer survey evidence" was not dispositive because "every element need not be proved."

MTD Order at 35 (quoting *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002)); *see also U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 172 (S.D.N.Y. 2001)

(finding plaintiff's submission of evidence of advertisements, sales quantity, exclusivity, and purported infringement of design by the defendants sufficient to preclude summary judgment).

The six-factor test is "meant to get at [] whether the public is moved to buy the product because of its source" and the fact that "'customers reach out' for [Plaintiff's] custom orders 'with the expectation that any products they buy from Concannon will feature the Trade Dress,'" and that his trade dress 'serves as a source identifier' that consumers have 'come to associate' with his products" is evidence of secondary meaning. MTD Order at 35-36. Indeed, consumers regularly contact Concannon to request custom works based on his signature aesthetic. Pl. SOF, AF ¶ 50. Concannon also has created custom pieces bearing the Concannon Trade Dress for several celebrities and public figures. Pl. SOF, AF ¶ 51.

The majority of the above factors weigh in favor of Concannon. Yet, even if "[o]n balance [the Court finds that Concannon has] not present[ed] particularly strong evidence of secondary meaning in [his] trade dress, because there are factual disputes with respect to some of the factors discussed, and a finding of secondary meaning can only be made by a careful consideration of all six factors, with no single factor being determinative, the question cannot be decided as a matter of law, but is properly to be decided by a jury." *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 209 (D. Conn. 2004); *see also Penguin Books USA v. New Christian Church of Full Endeavor, Ltd.*, 96 Civ. 4126 (RWS), 2000 WL 1028634, at *21 (S.D.N.Y. July 25, 2000) (denying summary judgment where the evidence was [submitted] is not sufficient in and of itself to establish secondary meaning, [but] does establish an issue of material fact").

## D.     There is a Genuine Issue of Material Fact as to Likelihood of Confusion

To determine whether there is a likelihood of confusion between the Concannon Trade Dress and the Infringing Product, "the Court must examine whether 'an appreciable number of

ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source

of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or

otherwise approved of the defendant's use of the mark.'" MTD Order at 36 (quoting *Naked*

*Cowboy v. CBS,* 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012)). The Second Circuit relies on the eight

*Polaroid* factors to evaluate the likelihood of confusion:

> (1) strength of the plaintiff's trade dress; (2) similarity of the trade
> dresses; (3) proximity of the products in the marketplace; (4)
> likelihood that the plaintiff will bridge the gap between the products
> (enter a market related to that in which the defendant sells its
> product); (5) evidence of actual confusion; (6) the defendant's bad
> faith; (7) quality of the defendant's product; and (8) sophistication
> of the relevant consumer group.

*Id.* (citing *Nat. Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005)). The

*Polaroid* factors are not an exhaustive list and must not be applied mechanically; rather, a court

should focus on the ultimate question of whether consumers are likely to be confused. *ID7D Co.,*

*Ltd. v. Sears Holding Corp.*, 311CV1054 VLB, 2012 WL 1247329, at *10 (D. Conn. Apr. 13, 2012).

Moreover, "cases may certainly arise where a factor is irrelevant to the facts at hand."

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 700 (S.D.N.Y. 2014). In some

cases, like this one, the *Polaroid* factors must be applied "with an eye to how they bear on the

likelihood that [Defendants'] use of [Concannon's Trade Dress] will confuse consumers into

thinking that [Concannon] is somehow associated with [Defendants] or has consented to their use

of the [Trade Dress]." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d

Cir. 1986). The "general rule" is that "determining likelihood of confusion is usually reserved for

a jury, as it requires a fact intensive examination of the probable reactions of prospective

purchasers of the parties' goods." MTD Order at 37 (citing cases). Summary judgment is

inappropriate where, as here, there is a genuine issue of material fact under several of the *Polaroid*

factors.[8]

*Strength of the trade dress*. A mark is considered strong if it is distinctive, arbitrary, and fanciful. *Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d 42, 46 (2d Cir. 1994). Even if elements of a trade dress are plain and descriptive, "their manner of combination" can make the mark unique. *Id.* The Trade Dress is fanciful, and its unique combination of elements further evidences the strength of the Trade Dress. Defendants concede that this *Polaroid* factor considers the same factors as whether the trade dress has secondary meaning. As there is evidence in the record for a jury to find that the Trade Dress has secondary meaning (*see supra* II.A), this factor weighs in favor of Concannon. At the very least, it presents an issue of fact for the jury to determine.

*Similarity of the trade dress.* As discussed above (*supra* I.B.III), the Infringing Product is substantially similar to Concannon's Trade Dress. Pl. SOF, AF ¶ 14. Indeed, the Infringing Product borrows the Trade Dress's hand-painted graffiti style lettering and attempts to evoke Concannon's signature tongue in-cheek pop culture reference by using the phrase "REBUILD THE WORLD" as a circular reference to LEGOs. *Id*. As the Court previously observed:

> A visual comparison of the two products reveals similarity in the placement and general design; the safety pins, the peace sign, and the yang symbol are all placed in similar places on both jackets, and the remaining elements that LEGO modified often still bear visual resemblance to the original, such as the visual blur around the words on the back of the jacket, the use of a short all-caps phrase on the back of the jacket, and a LEGO skull placed on the LEGO Jacket in the spot where a human skull shape is placed on the Concannon Jacket.

MTD Order at 39. Moreover, the purpose of the use of the Trade Dress was to "create a perception

---

[8] Indeed, contrary to Defendants' argument (Motion at 38, n. 16), as demonstrated below, Concannon has offered evidence in support of his allegations that the Court already found weighed in his favor (factors 1, 2, and 6). MTD Order at 38-39, 40.

of affiliation." MTD Order at 39. Defendants' argument that the Infringing Product was designed to "accurately portray Porowski's likeness on *Queer Eye*" is unavailing. Motion at 36. Defendants could have easily used any number of outfits that Porowski wore on *Queer Eye*, and they acknowledge Porowski has worn other articles of clothing besides the Concannon Jacket on the show. Pl. SOF, AF ¶ 25. Indeed, Defendants admitted that they ███████████████████ ███████████████████ and viewed it as "iconic." Pl. SOF, AF ¶¶ 17, 31; Pl. SOF ¶ 13. Defendants loved the Concannon Jacket and that is why the Infringing Product, as the Court observed, has a similar placement of various design elements and general design as the Concannon Jacket. Thus, the Concannon Jacket and the Infringing Product "are superficially similar enough that this factor must count against Defendant." *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 226 (D. Conn. 2004) (finding summary judgment inappropriate where the defendant's revolver was intended to be a "replica" of the plaintiff's product); *see also U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 173 (S.D.N.Y. 2001) (disputed issues of fact related to degree of similarity between plaintiff's trade dress and the overall appearance of defendants' design precluded summary judgment).

**Bad faith.** There is ample evidence that Defendants acted in bad faith. Whether Defendants knew specifically of Concannon when it designed the Infringing Product is not dispositive. Defendants were certainly aware of the Concannon Jacket and were intent on copying the overall feel of the Concannon Jacket by emulating Concannon's signature Trade Dress. Pl. SOF, AF ¶¶ 14-15. Defendants even admitted that they wanted to recreate the "iconic leather jacket" in LEGO version. Pl. SOF, AF ¶ 31. *See Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, No. 22 CIV. 7719 (LLS), 2024 WL 4555822, at *7 (S.D.N.Y. Oct. 23, 2024) (evidence that defendant's head buyer was a fan of plaintiff's product and wanted to capitalize on its name recognition and create

similar packaging precluded summary judgment).

**Actual confusion.** Defendants' infringing conduct has led to actual confusion amongst consumers. When the Set was released, people contacted Concannon believing that he was affiliated with the LEGO Group. Pl. SOF, AF ¶ 53. Several consumers also identified the Infringing Product as a flagrant copy of the Concannon Jacket. Pl. SOF, AF ¶ 54. Porowski has even publicly associated the Infringing Product with Concannon and the Concannon Jacket, glorifying Concannon's art and specifically identifying one of the distinctive elements of the Trade Dress, that it is "handpainted": "Porowski said on a particular James Concannon piece [the Concannon Jacket]: 'This jacket. The brilliant James Concannon handpainted this moto jacket – it's been on Queer Eye, it's been to Congress, *and it's even on a Lego*. I am forever in awe of James's art and you can also find some of his painted tees in my closet." Pl. SOF, AF ¶26, Ex. 17 at LEGOGROUP0005541 (emphasis added). These instances of public confusion are sufficient evidence of actual confusion and create a genuine issue of material fact to be decided by a jury. *See Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, No. 22 CIV. 7719 (LLS), 2024 WL 4555822, at *7 (S.D.N.Y. Oct. 23, 2024) (comments on social media confusing the two products constituted evidence of actual confusion).

**Proximity of the products and bridging the gap.** Contrary to Defendants' contention, a mutual consumer base exists for the Concannon Products and the Infringing Product. Concannon is a prominently known artist that frequently provided clothing for Porowski and *Queer Eye*. Both *Queer Eye* and Porowski commissioned Concannon's work to appear on *Queer Eye* pursuant to a release. Pl. SOF, AF ¶ 55. Defendants marketed the Infringing Products to ███████████

████████████████████████████████████████████████

████████████████████████ Pl. SOF, AF ¶ 56. Thus, consumers are likely

to falsely associate Concannon with the design of the Infringing Product.

   *Quality of Defendants' goods and sophistication of the consumers.* Neither side has presented evidence on the quality of Defendants' goods or the sophistication of the parties' consumers. Accordingly, summary judgment is inappropriate based on these factors. *See Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F. Supp. 2d 60, 75 (S.D.N.Y. 2003) (finding that because there was so little evidence on these factors presented by either party, these factors did not favor either party precluded summary judgment); *see also Apollo Healthcare Corp. v. Sol de Janeiro USA Inc.*, No. 22 CIV. 7719 (LLS), 2024 WL 4555822, at *8 (S.D.N.Y. Oct. 23, 2024) ("[W]hen there is a strong likelihood of confusion created by other factors, even a high level of care exercised by an ordinary purchaser in a certain setting will not be sufficient to tip the scales in the other direction.").

   *In sum*, analysis of the *Polaroid* factors weighs in favor of Concannon. At the very least, Plaintiff has raised a genuine issue of fact as to likelihood of confusion that precludes summary judgment. Moreover, even "[w]hen the likelihood of confusion is in doubt, the question will be resolved in favor of the senior user." *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F.Supp.3d 675, 700 (S.D.N.Y. 2014) (collecting cases). Accordingly, Defendant's Motion on Concannon's trade dress claim should be denied.

## IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CUPTA CLAIM (COUNT V)

   Defendants contend that Concannon's Connecticut Unfair Trade Practices Act (CUTPA) claim fails because his Lanham Act claim fails. Defendants are wrong.  Concannon has established a triable cause of action under CUTPA based on  the following factors:

   (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been

> established by statutes, the common law, or otherwise-in other
> words, it is within at least the penumbra of some common law,
> statutory, or other established concept of fairness; (2) whether it is
> immoral, unethical, oppressive, or unscrupulous; (3) whether it
> causes substantial injury to consumers, competitors or other
> businesspersons.

*Zulick v. Patrons Mutual Ins. Co.*, 287 Conn. 367, 378 n. 11, 949 A.2d 1084 (Conn. 2008) (internal

citations and quotations omitted). All three criteria do not need to be satisfied to support a finding

of unfairness since a "practice may be unfair because of the degree to which it meets one of the

criteria or because to a lesser extent it meets all three." *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*,

596 F. Supp. 2d 497, 506–07 (D. Conn. 2009).

Thus, a violation of CUTPA may be established by showing either an actual deceptive

practice or a practice amounting to a violation of public policy. *Id.* Although a Lanham Act

violation is a per se violation of CUTPA, "a party need not successfully assert a statutory claim to

maintain a CUTPA claim." *Indiaweekly.com, LLC.,* 596 F. Supp. 2d at 506 (citing *Murphy v.*

*Provident Mutual Life Insurance Co.*, 923 F.2d 923, 929 (2d Cir. 1991)) (considering CUTPA claim

after dismissing trademark claim based on the same conduct).[9] Here, Defendants fail to establish

that summary judgment is appropriate on Concannon's trade dress claims, and so separate

consideration of Count V is unnecessary. *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*,

312 F. Supp. 2d 195, 202, n. 3 (D. Conn. 2004). Moreover, Concannon has successfully asserted

an independent claim under CUPTA by demonstrating that the Defendants conspired to

misappropriate the Concannon Jacket without providing him with compensation or credit. *See*

---

[9] Therefore, if the Court were to grant summary judgment on Concannon's CUTPA claim,
Concannon would be wrongly precluded from providing any evidence independent of his Lanham
Act claim.

*supra.;* Indiaweekly.com, LLC, 596 F. Supp. 2d at 507 (citing *Ramirez v. Health Net of the Northeast, Inc.,* 285 Conn. 1, 19, 938 A.2d 576 (Conn.2008)(holding that CUPTA "provides a private cause of action to any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a prohibited method, act, or practice").

Defendants' Motion for summary judgment on the CUTPA claim should be denied.

## CONCLUSION

For the foregoing reasons, Concannon respectfully requests that the Court deny Defendants' Motion in its entirety.

Dated: January 31, 2025                 Respectfully submitted,

*/s/ Christina Mastrucci Lehn*
Vivek Jayaram (*pro hac vice*)
Christina Mastrucci Lehn (*pro hac vice*)
Gabrielle Wilson (*pro hac vice*)
Palak Patel (*pro hac vice*)
JAYARAM PLLC
54 W. 21st Street, Suite 801
New York, NY 10010
Telephone: (312) 212-8676
E-mail: vivek@jayaramlaw.com
E-mail: christina@jayaramlaw.com
E-mail: gabrielle@jayaramlaw.com
E-mail: palak@jayaramlaw.com

*Attorneys for Plaintiff James Concannon*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2025, a true and correct copy of the foregoing document was served via the CM/ECF system on all counsel and parties of record.

*/s/ Christina Mastrucci Lehn*
Christina Mastrucci Lehn