**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JAMES CONCANNON,<br>*Plaintiff*,<br><br>v.<br><br>LEGO SYSTEMS, INC., et al.,<br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 3:22-CV-1527 (OAW) |

**<u>RULING DENYING IN PART MOTION FOR SUMMARY JUDGMENT</u>**

**THIS ACTION** is before the court upon the motion for summary judgment and its accompanying memorandum (together, "Motion") filed by LEGO Systems, Inc., and LEGO System A/S ("Defendants" or "LEGO"). *See* ECF Nos. 114 and 150.[1] The court has reviewed the Motion; Plaintiff's opposition, ECF No. 156; Defendants' reply, ECF No. 151; the parties' statements of facts, ECF Nos. 155 and 157;[2] and all exhibits and is thoroughly apprised in the premises. For the reasons set forth herein, the Motion is **<u>GRANTED</u> in part and is <u>DENIED</u> in part.**

[1] The court cites to the updated public filings submitted in response to a ruling rejecting certain request to seal, *see* ECF No. 149, but has reviewed the unredacted versions of all relevant documents.

[2] Defendants contend that all of the additional facts asserted in Plaintiff's Local Rule 56(a)(2) statement of facts are immaterial and fail to raise any genuine factual dispute. The court finds that both Plaintiff and Defendants have adduced a number of facts which are immaterial, and have claimed certain facts which the cited evidence does not support. The court disregards any immaterial facts herein, and where necessary, cites directly to the record evidence instead of the parties' representations thereof. *See Freeman v. Sansom*, No. 3:22-CV-331 (VAB), 2024 WL 665921, at *6 (D. Conn. Feb. 16, 2024), *appeal dismissed,* No. 24-668-CV, 2025 WL 763427 (2d Cir. Mar. 11, 2025) ("When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact."); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## I. BACKGROUND

Plaintiff is a self-employed artist who created a number of items of clothing for Antoni Porowski, one of the stars of the popular Netflix program *Queer Eye*. ECF No. 137 ¶ 2 and response. Mr. Porowski wore several of these items of clothing on the show. *Id.* For each of the T-shirts that Plaintiff produced and Mr. Porowski wore on the show, the show secured releases to display them. *Id.* ¶ 9 and response.

In 2018, Mr. Porowski commissioned Plaintiff to adorn a leather jacket for him. *Id.* ¶ 5 and response; ECF No. 157 ¶¶ 35–36, 40 and responses.[3] Mr. Porowski specifically told Plaintiff when he would be filming the show, and it appears that Plaintiff produced the jacket with an eye toward making it available for Mr. Porowski to wear on the show. *Id.* ¶¶ 37–38 and responses. He specifically conferred with Mr. Porowski about certain elements that Netflix might find unpalatable, though Plaintiff denies that the jacket was made specifically for the purpose of being worn on the show. *Id.* ¶ 38 and response. He testified it was a gift. ECF No. 137 ¶ 6 and response.

The jacket itself (the "Porowski Jacket") is a black, leather, biker-style jacket. ECF No. 157 ¶ 36 and response. To it, Plaintiff added the following elements, for which he later obtained a copyright for their use, combination, and arrangement: <u>on the right lapel</u>,[4] (1) the phrase "BLESS THE YOUTH MANIFESTO"[5] and (2) a yin-yang pin;[6] <u>on the left lapel</u>, (3) "1967 IS DEAD" and a peace sign; <u>on the right sleeve</u>, (4) the word

---

[3] Citations to this filing do not refer to Plaintiff's additional material facts, for which he started numbering his paragraphs at one again.

[4] The court uses directional terms in relation to a wearer, not a viewer.

[5] All adornments are in white, and all appear hand-painted in a graffiti style unless otherwise stated. *See* ECF No. 48 at 2.

[6] The court notes that the yin-yang is altered so that each teardrop shape of the familiar symbol has a smiling face where the dot normally would be. *See* ECF No. 48 at 2.

"MONSANTO" crossed out; on the left sleeve, (5) the word "PEACE";[7] on the right breast, (6) "RAW WAR" and a skull;[8] on the left breast, (7) eight safety pins painted on and (8) a picture of a chain in a circle with two hands breaking the chain and the words "AS MONUMENTS FALL TEAR DOWN THE WALLS AND SHAKE HATE'S CHAIN OFF SOCIETY'S BRAIN"; on the back, (9) the words "THYME IS ON MY SIDE" surrounded by the word "THYME" repeated on such small font as to give the impression of a textured or gray background. *Id.* ¶ 59 and response.

Porowski wore the jacket on the show, but this time, the show did not get a release from Plaintiff to depict it. ECF No. 137 ¶ 11 and response. Plaintiff did not press any rights as to the display of the jacket on the show. *Id.*

In December 2019, LEGO approached the show's production company, Scout Productions, Inc. ("Scout"), with the idea to create a *Queer Eye* construction set. ECF No. 157 ¶ 5 and response. In 2020, LEGO was granted a license to *Queer Eye* intellectual property, including the likenesses of the stars of the show. *Id.* ¶ 10 and response. LEGO designed the *Queer Eye* set (the "Set") between January and June 2020. *Id.* ¶ 12 and response. During that time there was ongoing conversation between LEGO and the show's licensing company ("IMG") about the design, and particularly about requisite permissions. *See generally* ECF No. 152-2. Plaintiff was not involved in the design of the Set and never granted LEGO any license in relation to the Set. ECF No. 137 ¶ 28 and response.

The final Set included LEGO Minifigures (the iconic LEGO humanoid figurines) of all five *Queer Eye* stars. ECF No. 157 ¶ 11 and response. The Porowski Minifigure came

---

[7] This word appears to be stenciled on. *See* ECF No. 48 at 2.
[8] These also appear to be stenciled; they are not in the graffiti-style font. *See* ECF No. 48 at 2.

with two torso elements: a white T-shirt with a red bandanna, and a black leather jacket with white, punk, graffiti-style elements (the "Minifigure Jacket"). ECF No. 137 ¶¶ 14, 34–35 and responses.

The Minifigure Jacket gives rise to this action.

The Minifigure Jacket is painted to look like a black leather jacket with the following elements painted on in white: on the right lapel, (1) a white swooping teardrop shape with a smiley face;[9] on the left lapel, (2) a peace sign; on the right breast, (3) a LEGO skull; on the left breast, (4) four safety pins and (5) white blobs encircled by a broken white line;[10] on the back, "REBUILD THE WORLD" in graffiti-style font over a gray background. ECF No. 157 ¶¶ 22–24 and responses; *see also* ECF No. 48 at 2.

Plaintiff brought suit for the unlicensed copying of his work in the Set. Defendants now move for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment appropriately may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine factual disputes exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. "'[I]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party,' summary judgment

[9] Defendants refer to this as a ghost.
[10] Defendants refer to this as a globe.

must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002)) (alteration in original).

But a party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Where there is no evidence upon which a jury properly could return a verdict for the nonmovant, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010) ("[The] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alterations in original).

## III. DISCUSSION

Plaintiff brings three copyright claims against Defendants (Counts One through Three), one trade dress infringement claim (Count Four) and one claim under the Connecticut Unfair Trade Practice Act (Count Five), all related to the use of the Minifigure Jacket in the Set.

### A. Copyright Infringement

Plaintiff asserts a direct copyright infringement claim against all defendants, and contributory and indirect copyright infringement claims against LEGO Systems A/S specifically. In general, to prevail upon any of these claims, Plaintiff must show "(1)

ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co*., 499 U.S. 340, 361 (1991). It is undisputed that Plaintiff did own a valid copyright for the Porowski Jacket. Defendants argue, though, that (1) they had a valid license to use Mr. Porowski's likeness, and (2) that the Minifigure Jacket is "fair use" within the meaning of the Copyright Act.

***i. Implied License***

Defendants argue that Plaintiff gave Mr. Porowski an implied, non-exclusive license to use the Porowski Jacket as part of his likeness, and Mr. Porowski licensed the use of his likeness to LEGO.

It is generally acknowledged in this circuit that there are two different tests in use to determine the existence of an implied license, but neither has been endorsed by the Court of Appeals for the Second Circuit. "Some courts use a narrow test, finding an implied license only where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)) (alterations in original). "Others have applied a more permissive test by which consent 'may be inferred based on silence where the copyright holder knows of the use and encourages it.'" *Id.* (quoting *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006)). Defendants assert they succeed under either test.

As a preliminary matter, it is not clear that *Field* states an entirely new test in the first place. Given that the District of Nevada is within the Ninth Circuit and therefore ought to have applied the *Effects Assocs.* test in the first instance, that ruling having been published by the Court of Appeals for the Ninth Circuit some sixteen years prior, it is

plausible that *Field* simply intended to apply the *Effects Assocs.* test to a novel situation, namely, the Internet. In *Fields*, the plaintiff published content to the world wide web that Google was able to find and represent *because the plaintiff coded the content to permit such action*. The court posits that the circumstances presented in *Fields* are insufficiently analogous to those here, where the parties are not nameless IP addresses and the content at issue is not being mined by a search engine, and therefore application of the broader test is not warranted in this case.

But the court need not make a firm determination on this point because, as the Honorable United States District Judge Janet B. Arterton noted in Her Honor's ruling on Defendants' motion to dismiss, both tests require a meeting of the minds, and there has been no such showing here. At the time of the ruling, Judge Arterton concluded that there were insufficient facts stated in the operative complaint from which the court could find agreement between Plaintiff and Mr. Porowski as to the permissible use of the Porowski Jacket. ECF No. 66 at 3. Therefore, the question now is whether Defendants have adduced evidence adequate to establish this element as a matter of law.

The court concludes it has not. Defendants have made the same argument that they did in their motion to dismiss, relying upon the same authority, citing the same facts. This issue is in the same posture that it was at the dismissal phase, but now the legal standard is more demanding. The court cannot grant summary judgment to Defendants when their position was too weak even for dismissal.

Defendants rely exclusively, as they did in their motion to dismiss, upon *Solid Oak Sketches, LLC v. 2K Games, Inc.,* 449 F. Supp. 3d 333 (S.D.N.Y. 2020), as authority for their position that Plaintiff's gift of the jacket to a celebrity included an unlimited implied

license in the work. Setting aside that *Solid Oak* has no precedential value, the court finds that Defendants have not even tried to address the ways that Judge Arterton found that case to be distinguishable to the one at bar. Not only did the plaintiffs in *Solid Oak* (tattoo artists who had tattooed several NBA players, which tattoos were recreated in a video game) expressly admit that they intended their work to be incorporated into their subjects' likenesses, but a tattoo, indelibly and permanently affixed to a person's body, is appreciably different from clothing. ECF No. 66 at 17. Defendants make no argument as to these distinctions.

Defendants have adduced some additional evidence at this summary judgment phase, specifically, conversations that Plaintiff had with Mr. Porowski in the development of the art piece and Plaintiff's deposition testimony, but that evidence only shows what already was accepted as fact at the dismissal phase: that Mr. Concannon gifted the Porowski Jacket to Mr. Porowski (free of charge) and understood that Mr. Porowski would wear the Porowski Jacket in public, and even specifically on *Queer Eye.* It also always has been undisputed that Plaintiff knew Mr. Porowski wore the Porowski Jacket on *Queer Eye* and did not object to its depiction on the show. But, as Judge Arterton pointed out, this is insufficient to show the requisite meeting of the minds. *Id.* at 14–16. The court still cannot infer from these facts that Plaintiff intended for the Porowski Jacket to be copied and distributed more widely. And notably, there is nothing in the record from which one may discern what *Mr. Porowski* understood his rights to be with respect to the Porowski Jacket, and as it is the meeting between Mr. Porowski's and Mr. Concannon's minds that is the essential element of Defendants' argument, this omission alone prevents the court from accepting it. But the court also notes that in the new conversations and deposition

testimony Defendants cite, Mr. Porowski and Plaintiff clearly discuss the creation of the jacket in relation to the show, which tends to indicate that, if anything, Plaintiff granted Mr. Porowski a *limited* license to wear the jacket on the show and in public appearances, not an unlimited license to copy and redistribute it more widely. Thus, Defendants either have only repackaged a failing argument, or perhaps have presented evidence that contradicts that argument.

Finally, Defendants do not even reference Judge Arterton's observation that if an implied license was granted, Plaintiff's subsequent actions (most significantly, filing this lawsuit) clearly revoked it. *Id.* at 17–18.

For all these reasons, the court again rejects Defendants' argument that Plaintiff granted Mr. Porowski an implied, unlimited license to the Porowski Jacket.

***ii. Fair Use***

The Copyright Act allows for specific, "fair" uses of copyrighted works "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research . . . ." 17 U.S.C. § 107. There are four non-exclusive factors courts must consider when determining whether a particular use of a copyrighted work is "fair" within the meaning of the Act: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.* "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 560 (1985). Thus, fair use may be the basis upon which summary judgment

is granted upon a copyright claim, but "a district court should be cautious in granting Rule 56 motions in this area . . . ." *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d Cir. 1991).

Defendants contend the statutory factors support the conclusion that the Minifigure Jacket was fair use, and consequently, could not constitute copyright infringement. They argue that the Minifigure Jacket was intended to accurately depict Mr. Porowski's likeness; the Minifigure Jacket is transformative; that not every element of the Porowski Jacket was reproduced on the Minifigure Jacket; and that the Minifigure Jacket had no economic effect on the market for Plaintiff's work. The court takes each point seriatim.

a) *Purpose and Character of the Use*

The first factor the court must consider contains "two sub-factors: (i) the extent to which the secondary use is transformative and (ii) whether the secondary use is commercial in nature." *Richardson v. Townsquare Media, Inc.*, 174 F.4th 299, 306 (2d Cir. 2026) (quoting *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 179 (2d Cir. 2024)) (internal quotation marks omitted).

1. Commerciality

The court takes the latter sub-factor first. "The commercial nature of a secondary use generally weighs against a finding of fair use . . . ." *Hachette,* 115 F.4th at 184. Of course, fair use still may be found in commercial uses, but the Second Circuit has "been more solicitous of the fair use defense in works, which though intended to be profitable, aspired to serve broader public purposes." *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993). Said otherwise, the question is "whether the user stands to profit from exploitation of the copyrighted material without paying the

customary price." *Wilder v. Hoiland*, No. 24-1436, 2025 WL 783642, at *2 (2d Cir. Mar. 12, 2025) (quoting *Harper,* 471 U.S. at 562) (internal quotation marks omitted). Defendants represent that the secondary purposes of their use of the Porowski Jacket were (1) to accurately depict Mr. Porowski, and (2) to promote the brand collaboration between LEGO and *Queer Eye*. They, themselves, do not propose any broader public purpose for its Minifigure Jacket, but rather point explicitly to their commercial goals as the reason for their use of the Porowski Jacket. This case therefore does not present a situation where, for example, a publisher of an educational book still hopes to make a profit on the sale of that book. Thus, the court finds that the second sub-factor clearly weighs against Defendants, particularly since, as will be discussed infra, the secondary use is not transformative. *See Hachette*, 115 F.4th at 184 (stating that commercial secondary uses are less like to be fair use where only somewhat transformative).

2. Transformative Nature

In considering the transformative nature of a new work, courts look to "whether the new work merely supplants the original, 'or instead adds something new, with a further purpose or different character, altering the [original] with new expression, meaning, or message.'" *Id.* at 179 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)) (alteration in original). There are two considerations relevant to this analysis. First, whether the allegedly infringing item merely supersedes the original, or actually "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . ." *Romanova v. Amilus Inc.*, 138 F.4th 104, 110 (2d Cir. 2025) (quoting *Campbell,* 510 U.S. at 579) (internal quotation marks omitted); *see also Richardson*, 174 F.4th at 306 ("A secondary use will not be transformative where

it merely offers a substitute for the original work."). And second, whether there is sufficient justification for copying the original. *Id.* at 111.

Defendants contend that the accurate representation of Mr. Porowski's likeness is an entirely different and factual,[11] and therefore transformative, use. The court is not persuaded.

Defendants fail to show how a "factual" use, that is, a reproduction of a copyrighted work intended simply to accurately portray that work, is at all transformative. To the contrary, this appears to be a purely substitutive purpose, and therefore by definition not transformative. Such a use does not add anything new to the subject material, nor does it imbue the subject material with some further message or meaning. To the contrary, this "factual" use necessarily strives *not* to alter Plaintiff's original work with new expression, meaning, or message. The point is specifically to reproduce it. Defendants again rely upon *Solid Oak* for the proposition that the recognizability of a figure is an "entirely different" purpose from that of a subject copyrighted work. But again, this case does not have any precedential value and is distinguishable in several key ways. Further, the Second Circuit has issued several relevant rulings since *Solid Oak* that obviously could not be addressed therein. For these reasons, the court cannot rely upon that case.

Defendants do also cite to *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), for support, but the court finds that this ruling rather contradicts their position. In *Bill Graham,* a publisher produced a coffee-table book delineating the

[11] It is not clear to the court that the factual nature of either the original work or the copy is relevant to this factor. Review of applicable authority reveals that whether an *original* work is more factual or expressive is relevant to the *second* fair-use factor. *See, e.g., Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 612 (2d Cir. 2006); *Richardson*, 174 F.4th at 308; *Hachette,* 115 F.4th at 187. Even *Solid Oak*, Defendant's primary authority, engages in the inquiry in this way. 449 F.Supp.3d at 348. Thus, the reference to any "factual" reproduction may be misplaced. The court addresses it nevertheless.

history of the Grateful Dead. Within that book were several reproductions of seven images that originally had graced Grateful Dead posters and tickets. The Second Circuit found that this use was transformative, relying in large part upon the fact that the copying work was biographical in nature, and as such fit squarely within those "fair" exceptions specifically noted in the Copyright Act (criticism, comment, news reporting, teaching, scholarship, and research), and that the use of the seven images was intended to illustrate the text, thereby performing the "transformative purpose of enhancing the biographical information." *Bill Graham*, 448 F.3d at 610.

Here, unlike a biographical book, the Set itself does not have any of the secondary purposes listed in the Act, all of which tend to promote public discourse, so unlike the seven images in *Bill Graham,* the accurate depiction of Mr. Porowski does not contribute to any transformative purpose. In fact, the need to accurately depict Mr. Porowski appears to have been in service to Defendants' other declared purpose of promoting the brand collaboration between them and the show. That is to say, the recognizability of Mr. Porowski was important to LEGO's commercial needs, and not to any broader public benefit, notwithstanding any theme of LEGO's commercial campaign.

Even if the court were to accept that the recognizability of Mr. Porowski was a transformative purpose, it is not clear in the first instance that the Porowski Jacket is a part of Mr. Porowski's "likeness." Defendants provide no authority on that point. They again rely upon *Solid Oak* exclusively to support their position, without addressing the distinction Judge Arterton explicitly pointed out, i.e., that a tattoo, which becomes a part of a person's body, is very different from clothing, which is removable. Moreover, even assuming that wardrobe could comprise an individual's likeness, Mr. Porowski wore a lot

of different articles of clothing on *Queer Eye*, and after review of the videos submitted in support of the Motion, the court is unconvinced that the Porowski Jacket was a so significant part of his on-screen wardrobe that it is part of his likeness as a matter of fact or law. Mr. Porowski wears the Porowski Jacket throughout *one* episode in season four, and then in flashes of a second or less in three other episodes that same season, and in some promotional material. He wears the same jacket before its adornment as much if not more often. In fact, throughout those same videos, the court noted that he wears at least three leather jackets (four, if one counts the Porowski Jacket before and after Plaintiff's adornment as separate jackets). Thus, the Porowski Jacket is far from the long, glittering gown associated with Vanna White, or the spangled jumpsuit sported by Elvis Presley impersonators. The court finds there to be a significant question of fact as to whether the Porowski Jacket was so encompassed within Mr. Porowski's likeness as to be a "factual" secondary use.

A significant question of fact also remains as to the degree to which the Minifigure Jacket copied the Porowski Jacket. In somewhat contradictory fashion, Defendants argue that their copying of the Porowski Jacket was "factual" and simply an accurate recreation of Mr. Porowski. But they also argue that their recreation was not all that similar to the Porowski Jacket. To be sure, the jacket does not mimic the Porowski Jacket exactly. It could not, given the vast difference in the size of the two items. But within the confines of the Minifigure's dimensions, the court finds that a reasonable jury could find the Minifigure Jacket to *very* closely imitate the Porowski Jacket.

Back. The Porowski Jacket says "THYME IS ON MY SIDE" against a backdrop of the word "thyme" repeated over and over in tiny script, which gives the effect of a textured,

gray backdrop. LEGO initially wanted to retain this phrase, but through discussions with its own legal department and Scout, they decided to change the words to "REBUILD THE WORLD," a LEGO slogan, on the Minifigure Jacket. ECF No. 153-1. The court notes that in the depiction of the originally-proposed version of the Minifigure Jacket, the script of "THYME IS ON MY SIDE" clearly attempted to reproduce Plaintiff's writing exactly, even including the precise *drips of paint* that run from the letters on the Porowski Jacket. ECF No. 121-4 at 40.[12] When the verbiage changed, the font did not, and the original drips remained through production and sale of the Set. Further, while LEGO attests that the font is "chunkier" and "more cartoony" on the Minifigure Jacket (consistent with what they call the "LEGO DNA"), ECF No. 127 at 79 and 81, the court finds it debatable whether the pictures in the record show any great difference on that point.

Minifigure adornments. A reasonable factfinder could (and likely would easily) conclude that the adornments on the Minifigure Jacket and their placement thereupon strongly resemble those on the Porowski Jacket. The skull on the right breast of the Porowski Jacket simply has been made into a Minifigure skull on the Minifigure Jacket. The right lapel has what in the briefs is referred to as a ghost, but the court notes it is exactly the lower half of the yin-yang symbol Plaintiff put on the Porowski Jacket: a swooping white teardrop shape with a smiley face. The face is spread out a little more over the teardrop shape, but, this appears to be a functional design alteration and not an expressive decision. Furthermore, as with the other mimicked adornments, its placement

[12] The court has permitted the attachment in which this picture was included to remain under seal because the document as a whole discusses proprietary information. But this specific content does not include any proprietary information; it contains the very sort of proposed design the court previously found was not entitled to protection from public scrutiny. Therefore, the court leaves the larger attachment under seal, but describes this one point, as it is highly relevant to the discussion.

is in the exact location of its source image. The left lapels on both the Porowski Jacket and the Minifigure Jacket display the peace sign. The left breast of the Minifigure Jacket has fewer painted-on safety pins than the Porowski Jacket (again, an apparent concession to size), but they are in the exact same place – a somewhat unique feature as compared to other leather jackets, generally. And on the left lower breast of the Minifigure Jacket is a globe (apparently; the landmasses displayed thereon do not match any currently on Earth) with a broken outer boundary. The blobs of landmass replace the text that is presented on that part of the Porowski Jacket, and do not bear any strong resemblance. The broken boundary of the globe, though, does have the rough appearance of the chain that is drawn in a circle on the part of the Porowski Jacket, but, "Many secondary works add something new. That alone does not render such uses fair." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 529, 143 S. Ct. 1258, 1275, 215 L. Ed. 2d 473 (2023). Taken as a whole, the two items show very strong resemblance to each other. And again, as with the other adornments on the two jackets, its similar placement of this similar object is unmistakable.

<u>Omissions.</u> Defendants point out that much of the text from the Porowski Jacket is absent from the Minifigure Jacket: the word "MONSANTO" crossed out, the word "PEACE," the "RAW WAR" text, "BLESS THE YOUTH MANIFESTO," "1967 IS DEAD," and "AS MONUMENTS FALL TEAR DOWN THE WALLS AND SHAKE HATE'S CHAIN OFF SOCIETY'S BRAIN" do not appear on the Minifigure Jacket. But Plaintiff has produced evidence indicating that the omissions were not only for the practical reason of size, but also for the commercial reason of not wanting to depict anything too political. Thus, these alterations not only fail to add any new meaning to the copyrighted work, but

deliberately *erase* the meaning the original work had for commercial purpose. Thus, the court finds Defendant's arguments regarding the weight of the first factor to be wanting.

Beyond that, Defendants completely ignore a crucial component of the transformative inquiry: justification. There must be some distinct purpose for the secondary use of the specific copyrighted material. "[T]hat new purpose must supply a sufficient 'justification for copying, such as providing a 'critique or commentary on the original' or supplying 'information to the public about the copied work' that is not otherwise available." *Richardson*, 174 F.4th at 306–07 (quoting *Romanova*, 138 F.4th at 115).

Here, there is no reason why Defendants needed to use *this jacket* as inspiration for the Set. The Minifigure Jacket presents no commentary on the original Porowski Jacket, nor does it respond to the expressions contained therein. And certainly there is no information about the original work. Much to the contrary, Plaintiff and the original expressions of the Porowski Jacket are entirely erased from the Minifigure Jacket. The court therefore finds any justification for using the Porowski Jacket to be wholly lacking.

The court finds *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), to be instructive. In *Warhol*, Vanity Fair magazine licensed a photograph of the musical artist Prince for renowned pop artist Andy Warhol to use as a reference in his production of an artistic rendering of the same subject, which was to be published in the magazine. The photographer, Lynn Goldsmith, permitted the use of her work for that single purpose, that one time only. Warhol made over a dozen pieces derived from Goldsmith's photograph, from which Vanity Fair selected one for print ("Purple Prince," as the selected photograph became known). One of those creations not then selected was an orange silkscreen rendition of Goldsmith's photograph, which essentially cropped

the photograph to focus more closely on Prince's face, increased the lighting contrast, and bathed it in an ambient orange color. "Orange Prince," as it was called, was published in connection with another article about Prince, to which Goldsmith objected, claiming that the use infringed upon her copyright. The Supreme Court of the United States issued a narrow ruling that the first fair-use factor favored Goldsmith's position, as Orange Prince was not transformative of her original photograph.

Here, LEGO's proffered justification of accurately depicting Mr. Porowski "can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* at 581 (quoting *Campbell,* 510 U.S. at 581) (internal quotation marks omitted). But the Minifigure Jacket "has no critical bearing on" the Porowski Jacket, and thus the "claim to fairness in borrowing from" the Porowski jacket "diminishes accordingly (if it does not vanish)." *Id.* at 547 (quoting *Campbell,* 510 U.S. at 580) (internal quotation marks omitted). In sum, simply taking another artist's work and applying the "LEGO DNA" to it does not qualify as justification. *Id.* at 543 (rejecting "the idea 'that any secondary work that adds a new aesthetic . . . to its source material is necessarily transformative.'") (quoting *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 38 (2d Cir. 2021)).

Accordingly, the court finds that the factor clearly weighs in Plaintiff's favor.

*b) Nature of the Copyrighted Work*

In assessing the next fair-use factor, "courts consider (i) whether the work is expressive or creative, with 'greater leeway being allowed to a claim of fair use where the work is factual or informational'; and (ii) 'whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.'"

*Hachette*, 115 F.4th at 187 (quoting *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006)). Clearly, the Porowski Jacket is creative and not factual, which narrows the scope of fair use. *See Bill Graham,* 448 F.3d at 612 ("[C]reative expression for public dissemination falls within the core of the copyright's protective purposes.") (quoting *Campbell,* 510 U.S. at 586) (internal quotation marks omitted) (alteration in original). The Porowski Jacket also was a published work, however, which broadens the scope of fair use, though to what degree is not clearly stated in caselaw.

Here, the court finds that degree to be small. The distinction of publication is relevant because "[p]ublication of an author's expression before he has authorized its dissemination seriously infringes the author's right to decide when and whether it will be made public, a factor not present in fair use of published works." *Harper*, 471 U.S. at 551. But the fact of a work's publication does not forfeit the author's right to any derivative works, which the Act explicitly retains to him. 17 U.S.C. § 106(2) ("[T]he owner of copyright . . . has the exclusive rights . . . to prepare derivative works based upon the copyrighted work . . . ."). And though Defendants argue that this factor is of limited usefulness, that is more the case where a particular use is transformative, and as discussed supra, the court finds the Minifigure Jacket was not transformative, but derivative. At the end of the day, the Minifigure Jacket is intended to be, and is, a reproduction of the unique, commissioned Porowski Jacket. The fact that it is meant to be worn by a Minifigure only shows that it is a derivative of the Porowski Jacket, which, per the Act, Plaintiff had sole right to produce. Therefore, the court concludes that this factor also weighs in Plaintiff's favor.

*c) Amount and Substantiality of the Portion Used*

In considering this factor, courts "examine the volume and substantiality of the work used with reference to the copyrighted work, not to the allegedly infringing work." *Wright*, 953 F.2d at 738. "Generally, a finding of fair use is more likely when 'small amounts, or less important passages [of the work] are copied than when the copying is extensive, or encompasses the most important parts of the original.'" *Hachette,* 115 F.4th at 187 (quoting *Authors Guild v. Google, Inc*., 804 F.3d 202, 221 (2d Cir. 2015)). "[T]he enquiry will harken back to the first of the statutory factors" because courts "recognize that the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87.

Defendants contend that they did not copy the copyrighted adornments in their entirety, and anything they did copy was only what was necessary to effectuate a realistic rendering of Mr. Porowski. The court already has addressed (1) that the Minifigure Jacket and the Porowski Jacket appear incredibly similar, allowing for the practicalities of reducing Plaintiff's art to a one-inch figurine, and any omissions from Plaintiff's design have the effect of removing expression, and (2) that it is not clear that the Porowski Jacket was necessary to rendering Mr. Porowski accurately. Thus, to the extent this factor "harkens back" to the first, it does not support Defendants' position. LEGO took everything that it could fit onto the Minifigure Jacket, only changing what was necessitated by the figurine's size and its own commercial needs.

Moreover, though, Defendants gloss over the fact that the Minifigure Jacket *in its entirety* is based upon the Porowski Jacket *in its entirety*. As already discussed, the overall look of the Minifigure Jacket strongly recalls the Porowski Jacket, which was,

Defendants admit, the entire point. Defendants' whole object in creating the Minifigure Jacket was to reproduce the Porowski Jacket, and to that end they copied the major elements of the Porowski Jacket. Defendants certainly altered the content, but they kept Plaintiff's aesthetic, the general elements of the adornments, and the placement of the same. Indeed, they needed to do that to ensure the Minifigure Jacket was recognizable as the Porowski Jacket worn on the show. Thus, what they did take was "essentially the heart" of the copyrighted work, and positioned it in a "key role in the infringing work." *Harper*, 471 U.S. at 565 and 566.

Thus, the court finds that this factor also favors Plaintiff.

*d) <u>Effect on the Market</u>*

Finally, the court must consider the balance "between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981). "The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use." *Id.* "It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original.'" *Campbell*, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A] [4], p. 13–102.61). This includes the market for derivatives of the original. *Id.*

Defendants again argue that their use of the Porowski Jacket is transformative, which argument already has been rejected. The Minifigure Jacket clearly is derivative –

it is intended to be the Porowski Jacket in different form. Other than that, Defendants argue that there is no evidence that Plaintiff could or would enter the global toy market, that Plaintiff would have signed a release anyway, and that there has been no effect upon his ability to license his products.

None of these arguments is convincing. The creator of a copyrighted work has sole control over derivative works, *including whether or not to make a particular derivative work in the first instance*. Moreover, it is not Plaintiff's burden to show that he might have created a derivative toy of the Porowski Jacket. It is Defendant's burden to show that their infringing product would not adversely impact *the potential market for derivatives*. This is particularly important where, as here, this copyrighted work is one of a kind, thus rendering it unsurprising that there is no record evidence that it has not otherwise been licensed. This fact also magnifies the importance of derivative works, as that is more likely to be how this artist would recreate this work. It cannot be that LEGO is free to use any artist's original works as long as those artists are not likely to enter the toy market and do not mass-produce their products. Artists' original works "are entitled to copyright protection, even against famous" infringers. *Warhol*, 598 U.S. at 550.

And the fact remains that Plaintiff did not sign a release for the Porowski Jacket, so what rights he might have granted are immaterial. What he might have been willing to accept in exchange for approval to use his work (had he been asked) is not the question this factor seeks to answer. The court therefore finds that this factor also favors Plaintiff.

In conclusion, the court finds that none of the fair-use factors favor Defendants, and that argument therefore is rejected. As Defendants rely upon the same arguments

with respect to Counts One, Two, and Three, the Motion must be denied as to all three of those claims.

### B. Trade Dress

"To plead a claim for trade dress infringement based on product design, a plaintiff must plead that (1) its product design is distinctive, (2) there is a likelihood of confusion between its product design and that of the defendant, and (3) its product design is not functional." *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 121 (2d Cir. 2025). As the Second Circuit recently has clarified, however, "Before a court may evaluate the three elements of a trade dress infringement claim . . . a plaintiff must clearly articulate what it seeks to protect." *Id.* at 122. Thus, while the distinctiveness of a trade dress and its proper articulation are not completely unrelated, they are discrete components of the analysis.

#### *i. Articulation*

Judge Arterton already accepted that Plaintiff's proffered trade dress, *i.e.* "(1) short, provocative phrases; (2) satirical commentary on punk rock and mainstream pop culture; [and] (3) hand-painted graffiti-style lettering," was properly articulated. ECF No. 66 at 30 (stating that "the definition is sufficiently specific . . . ."). Further, Her Honor concluded that review of those works exemplary of the trade dress that were depicted in the complaint did convey a consistent "overall look," such that the entire line of products fits within the articulated elements of the alleged trade dress. *Id.* at 32. Defendants' argument that Plaintiff's asserted trade dress is too vague to qualify for protection, as evidenced from the variation between his different works, simply repeats the arguments

they already presented at the dismissal phase, which already were rejected. Absent any new argument or evidence, those conclusions shall not be disturbed.

***ii. <u>Secondary Meaning</u>***

Defendants next argue that this proffered trade dress is not distinctive because it has taken on no secondary meaning. "Generally, a plaintiff may plead distinctiveness by alleging that its trade dress has either inherent or acquired distinctiveness," but "a trade dress plaintiff specifically alleging infringement of its product design must always plead -- and eventually prove -- acquired distinctiveness," which is to say, secondary meaning. *Cardinal Motors*, 128 F.4th at 121–22; *see also Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000) ("We hold that, in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning."). "The careful weighing of evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 169 (2d Cir. 1991).

"A claimed trade dress has secondary meaning when 'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" *APP Grp. (Canada) Inc. v. Rudsak USA Inc.*, No. 22-1965, 2024 WL 89120, at *3 (2d Cir. Jan. 9, 2024) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012)) (alteration in original). When analyzing this element of a trade dress infringement claim, courts consider several factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize

the mark, and (6) length and exclusivity of the mark's use." *APP Grp.*, 2024 WL 89120, at *3 (quoting *Louboutin*, 686 F.3d at 226) (internal quotation marks omitted). "The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir.1990). However, a "plaintiff is not required to establish that *all* consumers relate the product to its producer; it need only show that a substantial segment of the relevant consumer group makes this connection." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991) (emphasis in original).

Thus, a predicate question neither party discusses is what the "relevant consumer group" is in this case. The court recognizes that Plaintiff is a small artist whose work is described as "punk" and "underground." Thus, the relevant consumer group must be that subset of consumers who would purchase apparel that expresses such themes. *Priv. Eyes Sunglass Corp. v. Priv. Eye Vision Ctr. of New Milford, P.C.*, No. CIV. B-89-45 (TFGD), 1992 WL 464228, at *5 (D. Conn. Aug. 13, 1992), aff'd sub nom. *Priv. Eyes Sunglas v. Priv. Eye Vision*, 992 F.2d 321 (2d Cir. 1993) ("The relevant consumer group in this case is the ultimate purchaser of plaintiff's products . . . .").

The court finds this conclusion particularly relevant in consideration of the factors listed supra because it is unclear that certain of those factors are particularly probative of secondary meaning within this specific consumer group, especially in this case where, as Judge Arterton previously found, Plaintiff is a sole proprietor and small artist, and not a large, multinational company. ECF No. 66 at 35. Plaintiff does not spend money on advertising and he has produced no consumer reports indicating that the relevant consumer group associates his trade dress with him, and so the court must conclude that

these two factors favor Defendants. But the court also finds that they do not carry significant weight, given Plaintiff's business model and the non-mainstream content of his work.

As to unsolicited media coverage of the product, it is undisputed that there have been several articles written about Plaintiff and his work, and many celebrities who have worn his work have credited him in social media postings, some of which have garnered significant reaction from those celebrities' followers. Defendants dispute whether this coverage was "unsolicited," and they argue that it does not show "the required association in the minds of consumers" between himself and his products. Plaintiff has asserted that the media coverage was unsolicited, though, and Defendants cite no precedential authority which requires this specific factor to show any such association. Indeed, the point of the *multi*-factor test is to determine whether the association exists. The court therefore rejects Defendants' arguments, and finds that Plaintiff has adduced sufficient evidence as to this factor so as to raise a genuine question of fact.

Defendants next argue that Plaintiff has enjoyed so little sales success that this factor, too, must weigh in its favor, but the court again disagrees. The authorities which Defendants cite, again, have no precedential value and/or deal with enormous companies that sell enormous quantities of a single product for sale in brick-and-mortar stores across the country. These, of course, are wholly inapposite to determining the sales success of a small artist a significant part of whose business is unique art pieces and small batches of hand-made works. Plaintiff has produced evidence sufficient to create a triable question as to his success as an artist.

As to attempts to plagiarize the mark, Defendants fail to account for their own alleged intentional copying of Plaintiff's proffered trade dress. *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1224 (2d Cir. 1987) (considering the defendant's own intentional copying of the plaintiff's work in assessing this factor). In addition to this, though, Plaintiff also identified several apparent copies of work exhibiting his proffered trade dress for sale on the Internet. The court finds that this is sufficient to raise a triable issue of fact as to this factor.

As to the final factor (length and exclusivity), Plaintiff has provided evidence that he has been employing his proffered trade dress for over a decade, and that in that time no other similar product line has been released by any retailer. Defendants assert that "the internet is replete" with examples of clothing that features graffiti-style writing. But they do not adequately support this assertion, pointing only to two t-shirts from a single retailer in a footnote.[13] Moreover, though, the trade dress comprises more than this single element. The court therefore finds that Plaintiff has raised sufficient evidence to show a triable issue of fact as to this factor.

Accordingly, the court finds that Plaintiff has shown sufficient issues of fact to reserve to the jury the question of secondary meaning.

***iii. <u>Confusion</u>***

In determining whether Plaintiff has shown a likelihood of confusion by Defendants' use of his trade dress, the court must consider the following nonexclusive factors: (1) the strength of the trade dress, (2) the degree of similarity between the products, (3) the

[13] The court accepts on faith that there ever were two such t-shirts, as the links provided (neither of which is a permalink) only lead to an "authentication page" for POIZON, which appears to be some sort of second-hand marketplace.

proximity of the products, (4) the likelihood that Plaintiff will "bridge the gap" into Defendants' market, (5) evidence of actual confusion, (6) Defendants' bad faith, (7) the quality of Defendants' product, and, finally, (8) the sophistication of the relevant consumer group. *Centaur*, 830 F.2d at 1225 (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961); *see also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir. 1992) (stating that "these factors are appropriately considered when examining the likelihood of confusion between two competing products.").

*Strength of Trade Dress/Degree of Similarity/Quality of Defendants' Product.* The first factor treads much the same ground as already has been covered in the secondary meaning analysis. *Bristol-Myers*, 973 F.2d at 1044 ("The strength of a particular mark or dress is measured by its distinctiveness or the degree to which it indicates the source or origin of the product."). And the degree of similarity between the two products already has been discussed in connection with the transformative nature of the Minifigure Jacket. *Id.* ("[I]n a trade dress infringement case the question is not how many points of similarity exist between the two packages but rather whether the two trade dresses 'create the same general overall impression.'") (quoting *RJR Foods v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979)). The court therefore incorporates its prior findings and concludes that Plaintiff has raised genuine issues of fact as to these two factors. And neither party presents any argument as to the quality of the Set or the Minifigure Jacket, so the court will not consider that factor in this analysis.

*Proximity.* As to the proximity of the products, it is clear that Plaintiff's products and LEGO products are not directly competitive. In such cases, "the degree of proximity

between the two products is relevant here primarily insofar as it bears on the likelihood that customers may be confused as to the [s]ource of the products, rather than as to the products themselves . . . . ." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d Cir. 1979). Here, consideration of the products' "form, composition, texture or quality, the service or function for which they are intended, the manner in which they are advertised, displayed or sold, the place where they are sold, [and] the class of customers for whom they are designed and to whom they are sold" indicates little proximity. *Id.* at 1135 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies s. 84, at 577 (3d ed. 1969)). The products Plaintiff produces using his trade dress are items of apparel to be worn by adults. Defendants' products are plastic toys. The court must conclude that this factor weighs in Defendants' favor.

*Bridging the Gap.* As to Plaintiff's probability of "bridging the gap," the argument presented by Defendants in connection with the copyright claims is more applicable here: there is nothing in the record indicating that Plaintiff has any intention ever to enter the global toy market. This factor, too, therefore favors Defendants.

*Actual Confusion.* As to actual confusion, Plaintiff provided deposition testimony that he did receive congratulations after the release of the Set. It does not appear, though, that any of the individuals extending these congratulations believed that Plaintiff had produced the Set. Rather, it appears they believed he had collaborated in its design. Significant as that misplaced belief of collaboration might be to an artist, the court finds that these congratulations do not show any actual confusion. Indeed, it is difficult to imagine that anyone could pick up the Set (which clearly was branded by LEGO) and think that Plaintiff himself produced it. Thus, this factor, too, favors Defendants.

*Bad Faith.* "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol-Myers*, 973 F.2d at 1044; *see also Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586 (2d Cir. 1993) ("Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion."). In the trade dress context, the question this factor aims to answer is whether "the copier references the prior dress in establishing [its] design with the apparent aim of securing the customers of the other based on confusion . . . ." *Paddington*, 996 F.2d at 587. Defendants concede that they deliberately copied the Porowski Jacket to create the Minifigure Jacket, but there is nothing in the record to show that they did so intending to coopt Plaintiff's consumer base. Thus, the court is not convinced that the current record explicitly shows the specific sort of bad faith relevant to this factor. The court finds that this factor weighs in Plaintiff's favor, but only weakly.

*Sophistication of Consumers.* Here, again, the court must determine the relevant consumer group. Given the generally mature content of his products, the court finds that Plaintiff's work attracts adults. Purchasers of his wares might procure merchandise through his website, or they might commission him to produce pieces specifically for them. Further, "[t]he greater the value of an article the more careful the typical consumer can be expected to be," *McGregor-Doniger*, 599 F.2d at 1137, and Plaintiff's products are not inexpensive. His pieces sell for hundreds or even thousands of dollars. The court therefore finds that Plaintiff's customers are of at least average, but perhaps greater-than-average, sophistication as a consumer group. Such a purchaser, "buying under the normally prevalent conditions of the market and giving the attention such purchasers

usually give in buying that class of goods," is unlikely to be confused as to the origin of the Set and the Minifigure Jacket. *Id.* (quoting Callman, s. 84, at 577); *see also Bristol-Myers*, 973 F.2d at 1046 ("Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product."). In *McGregor-Doniger,* the Second Circuit found that "[c]ustomers shopping for an inexpensive golf jacket are not likely to become confused by the similarity of the marks and mistakenly purchase a fashionable and expensive woman's coat." 599 F.2d at 1134–35. The greater difference between the products at issue here (a toy and adult apparel, as opposed to two clothing lines), must also mean that the unlikelihood of confusion is even greater here. Thus, the court finds that this factor favors Defendants, though the court again acknowledges the possibility that the astute consumer of Plaintiff's products (or even those who admire but cannot afford them) might see its clear depiction *within* Defendants' work and mistakenly believe that it represents Plaintiff's endorsement or collaboration, thereby causing the consumer to purchase Defendants' product, the *Set*.

Overall, four of the *Polaroid* factors favor Defendants, while three favor Plaintiff, though one only weakly. Given all the evidence in the record, the court must conclude that Plaintiff has failed to raise a genuine question of fact as to whether consumers were confused by Defendants' use of his trade dress. "The purchasing public must be credited with at least a modicum of intelligence," *Id.* at 1138 (quoting *Carnation Co. v. California Growers Wineries*, 97 F.2d 80, 81 (Cust. & Pat.App.1938)), and even granting that a reasonable factfinder could find (1) that the Minifigure Jacket is a fairly close copy of the Porowski Jacket, and (2) that Plaintiff's trade dress is distinctive enough to identify him

as the source of his work, the court finds, as a matter of law, that there is insufficient evidence from which any reasonable factfinder could conclude that there was any real danger *that* a consumer purchasing the LEGO-branded Set might believe that Plaintiff had *produced* the Minifigure Jacket.

Accordingly, the court must grant the Motion as to Count Four.

### C. CUTPA

Defendants argue that because the Plaintiff's CUTPA claim is derivative of his Lanham Act claim, granting summary judgment in their favor on the latter necessitates the same on the former. Plaintiff argues, though, that he has alleged a viable CUTPA claim independent of his trade dress claim by accusing Defendants of "conspiring to misappropriate the Porowski Jacket without providing him compensation or credit." ECF No. 156 at 39. Defendants reply that the intracorporate conspiracy doctrine bars any such claim.

The court is unconvinced that the intracorporate conduct doctrine applies here. The doctrine provides that "wholly intracorporate conduct does not satisfy the plurality requirement necessary to establish an actionable conspiracy claim." *Harp v. King*, 266 Conn. 747, 776 (2003) (quoting *Trau–Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn.2002)) (internal quotation marks omitted). The doctrine derives from the basic agency principle that a corporation can only act through its employees, and those actions taken by one or several employees in the course of their employment are attributed to the corporation itself. *Id.* Such conduct, even amongst multiple employees of the same entity, cannot be a conspiracy because all their actions are attributed to the employer, and the employer cannot conspire with itself. *Day v. Gen. Elec. Credit Corp.*,

15 Conn. App. 677, 684 (1988) ("Employees of a corporation acting in the scope of their employment cannot conspire with one another or with the corporation that employs them; each acts for the corporation and the corporation cannot conspire with itself.").

Here, though, we are not dealing with individual employees of a single employer, but a wholly-owned subsidiary of a parent company. Connecticut law recognizes that "the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary . . . ." *SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 232 (1991) (quoting H. Henn & J. Alexander, Laws of Corporations (3d Ed.1983) § 148, p. 355) (internal quotation marks omitted). And under the usual principles of agency (of which the intracorporate conspiracy doctrine is a specific application), "[a] parent corporation may be liable . . . for the acts of its subsidiary depending on the amount of control the parent corporation exercises over the actions of the subsidiary." *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802-MPS, 2026 WL 1802825, at *8 (D. Conn. June 23, 2026) (quoting *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4810801, at *12 (E.D. Pa. Oct. 25, 2017)) (internal quotation marks omitted). Defendants have provided nothing to show that such control exists here, and so it not clear that the intracorporate conspiracy doctrine ought to apply. Defendants therefore have failed to carry their argument with respect to Count Five, and the Motion must be denied as to that claim.

## IV. CONCLUSION

Accordingly, it is hereupon **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, ECF No. 44, hereby is **GRANTED in part** and is **DENIED in part**.
   i. The Motion is denied as to Counts One, Two, Three, and Five.
   ii. The Motion is granted as to Count Four.
2. On or before **October 30, 2026,** the parties shall file a status report either (1) indicating that they have resumed settlement discussions, or (2) proposing a schedule to govern trial in this matter.

**IT IS SO ORDERED** at Hartford, Connecticut, this 27th day of September, 2026.

*/s/*
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE